# EXHIBIT 1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# ▓AIA® Document A133™ – 2009

**Standard Form of Agreement Between Owner and Construction Manager as Constructor** *where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price*

**AGREEMENT** made as of the 28th day of May in the year 2021
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status and address)*

Cody Lane Development Corporation
P.O. Box 734
Teton Village, WY  83025-0734

and the Construction Manager:
*(Name, legal status and address)*

Layton Construction Company, LLC
9090 South Sandy Parkway
Sandy, Utah 84070

for the following Project:
*(Name and address or location)*

Hoback Club
Jackson, WY

The Architect:
*(Name, legal status and address)*

IBI Group, a California Partnership
10 Exchange Place, Suite #112
Salt Lake City, UT 84111

The Owner's Development Manager for the Project:
*(Name, address and other information)*

DDRM Jackson, LLC and Martin J. Breen, only as a member of DDRM Jackson, LLC and
not in any individual or personal capacity, shall serve as the Owner's Development
Manager for the Project
800 Tuacahn Dr.
Ivins, UT 84738

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

DSL init.

D ᵻ Ƨ

**AIA Document A133™ – 2009 (formerly A121™ CMc – 2003).** Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                        (862472773)

1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

The Construction Manager's Designated Representative:
*(Name, address and other information)*

Bil Munck, Vice President
Matthew Noyce, Senior Project Manager
Layton Construction Company, LLC
9090 South Sandy Parkway
Sandy, Utah 84070

The Architect's Designated Representative:
*(Name, address and other information)*

Peter Pillman, AIA (WY License # C-3199)
Steve Jones, AIA
IBI Group
10 Exchange Place, Suite 112
Salt Lake City, UT 84111
T:  (801) 532-4233

The Owner and Construction Manager agree as follows.

**AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344480123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:**                                                                                    (862472773)

2

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    CONSTRUCTION MANAGER'S RESPONSIBILITIES

3    OWNER'S RESPONSIBILITIES

4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

5    COMPENSATION FOR CONSTRUCTION PHASE SERVICES

6    COST OF THE WORK FOR CONSTRUCTION PHASE

7    PAYMENTS FOR CONSTRUCTION PHASE SERVICES

8    INSURANCE AND BONDS

9    DISPUTE RESOLUTION

10   TERMINATION OR SUSPENSION

11   MISCELLANEOUS PROVISIONS

12   SCOPE OF THE AGREEMENT

EXHIBIT A  GUARANTEED MAXIMUM PRICE AMENDMENT

## ARTICLE 1    GENERAL PROVISIONS

### § 1.1 The Contract Documents

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, and all exhibits and schedules to any of the foregoing, other documents listed in this Agreement, and Modifications issued after execution of this Agreement, and exhibits to be attached by the Guaranteed Maximum Price Amendment, all of which form the Contract and are as fully a part of the Contract as if attached to this Agreement or repeated herein.  Upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal, the Contract Documents will also include the documents described in Section 2.2.3 and identified in the Guaranteed Maximum Price Amendment and revisions prepared by the Architect and furnished by the Owner as described in Section 2.2.8. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral, and specifically supersedes the parties April 1, 2020 Limited Authorization to Commence Pre-Construction Services (the "April 2020 Letter Agreement"). Work performed, payments applied for, and payments made and received under the April 2020 Letter Agreement are incorporated into and shall be accounted for under this Agreement and the Contract Documents. If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement, this Agreement shall govern.

### § 1.2 Relationship of the Parties

The Construction Manager covenants with the Owner to cooperate with the Architect and exercise the Construction Manager's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. Notwithstanding the foregoing, the Construction Manager does not agree to any fiduciary obligations to the Owner. The Owner agrees to furnish or approve, in a timely manner, information required by the Construction Manager and to make payments to the Construction Manager in accordance with the requirements of the Contract Documents.

### § 1.3 General Conditions

For the Preconstruction Phase, AIA Document A201™–2017, General Conditions of the Contract for Construction, shall apply only as specifically provided in this Agreement. For the Construction Phase, the general conditions of the

**AIA Document A133™ – 2009** (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                 (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

contract shall be as set forth in A201–2017, which document is incorporated herein by reference. The term "Contractor" as used in A201–2017 shall mean the Construction Manager.

§ 1.4 BIM Files.  The Architect has supplied the Construction Manager with Building Information Modeling (BIM) electronic files for the Project (the "BIM Files") for the convenience of the Construction Manager and at its request to carry out its Work on the Project. In its receipt of and use of the BIM Files, the Construction Manager understands and agrees that (1) the BIM Files are not part of the Contract Documents and will never be part of the Contract Documents; (2) the BIM Files are not to scale such that no dimensions may be scaled and the Construction Manager may only use the BIM Files as a template for the preparation of interference and shop drawings; (3) the Architect, Owner, and Development Manager do not warrant and are not responsible for the accuracy of information in the BIM Files and are not liable in any way for anyone's use of the BIM Files or any damages of any kind arising from errors or omissions in the BIM Files or use of the BIM Files – the Construction Manager agrees the use of the BIM Files is at its sole risk and that it will indemnify and defend the Architect, Owner, and Development Manager from any claims resulting from use of the BIM Files; and (4) the Construction Manager's receipt and use of the BIM Files does not relieve the Construction Manager from any of its contractual obligations - the Construction Manager recognizes its responsibility to fully ascertain all site conditions and measurements.

## ARTICLE 2    CONSTRUCTION MANAGER'S RESPONSIBILITIES

The Construction Manager's Preconstruction Phase responsibilities are set forth in Sections 2.1 and 2.2. The Construction Manager's Construction Phase responsibilities are set forth in Section 2.3. The Owner and Construction Manager may agree, in consultation with the Architect, for the Construction Phase to commence prior to completion of the Preconstruction Phase, in which case, both phases will proceed concurrently. The Construction Manager shall identify a representative authorized to act on behalf of the Construction Manager with respect to the Project.

### § 2.1 Preconstruction Phase

§ 2.1.1 The Construction Manager shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other.  The preconstruction scope of services exhibit from the April 2020 Letter Agreement is attached hereto as Exhibit B.

### § 2.1.2 Consultation

The Construction Manager shall schedule and conduct meetings with the Architect and Owner to discuss such matters as procedures, progress, coordination, and scheduling of the Work. The Construction Manager shall advise the Owner and the Architect on proposed site use and improvements, selection of materials, and building systems and equipment. The Construction Manager shall also provide recommendations consistent with the Project requirements to the Owner and Architect on constructability; availability of materials and labor; time requirements for procurement, installation and construction; and factors related to construction cost including, but not limited to, costs of alternative designs or materials, preliminary budgets, life-cycle data, and possible cost reductions.

§ 2.1.3 When Project requirements in Section 3.1.1 have been sufficiently identified, the Construction Manager shall prepare and periodically update a Project schedule for the Architect's review and the Owner's acceptance. The Construction Manager shall obtain the Architect's approval for the portion of the Project schedule relating to the performance of the Architect's services. The Project schedule shall coordinate and integrate the Construction Manager's services, the Architect's services, other Owner consultants' services, and the Owner's responsibilities and identify items that could affect the Project's timely completion. The updated Project schedule shall include the following: submission of the Guaranteed Maximum Price proposal; components of the Work; times of commencement and completion required of each Subcontractor; ordering and delivery of products, including those that must be ordered well in advance of construction; and the occupancy requirements of the Owner.

§ 2.1.4 The Work also shall include the obligation on the part of the Construction Manager to make an affirmative, good faith effort during the course of construction to identify and propose for review by the Owner and Architect and decision by the Owner value engineering and other deductive changes to the Work with the aim of lessening the overall cost of the Project without any or significant diminution in the overall value of the Project.  Any value engineering or voluntary alternates that are accepted by the Owner will be listed in an Exhibit and the Architect will update the Contract Documents to reflect the accepted value engineering or voluntary alternates.  In the event the Architect cannot modify the Contract Documents then the value engineering or voluntary alternates will be rejected and a corresponding adjustment will be made to the GMP.

DSL  nit.

D∟S

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                              (882472773)

4

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

### § 2.1.5 Phased Construction
The Construction Manager shall provide recommendations with regard to accelerated or fast-track scheduling, procurement, or phased construction. The Construction Manager shall take into consideration cost reductions, cost information, constructability, provisions for temporary facilities and procurement and construction scheduling issues.

*(Paragraphs deleted)*
### § 2.1.6
*(Paragraphs deleted)*
**Preliminary Cost Estimates**
§ 2.1.6.1 Based on the preliminary design and other design criteria prepared by the Architect, the Construction Manager shall prepare preliminary estimates of the Cost of the Work or the cost of program requirements using area, volume or similar conceptual estimating techniques for the Architect's review and Owner's approval. If the Architect or Construction Manager suggests alternative materials and systems, the Construction Manager shall provide cost evaluations of those alternative materials and systems.

§ 2.1.6.2 As the Architect progresses with the preparation of the Schematic Design, Design Development and Construction Documents, the Construction Manager shall prepare and update, at appropriate intervals agreed to by the Owner, Construction Manager and Architect, estimates of the Cost of the Work of increasing detail and refinement and allowing for the further development of the design until such time as the Owner and Construction Manager agree on a Guaranteed Maximum Price for the Work. Such estimates shall be provided for the Architect's review and the Owner's approval. The Construction Manager shall inform the Owner and Architect when estimates of the Cost of the Work exceed the latest approved Project budget and make recommendations for corrective action.

### § 2.1.7 Subcontractors and Suppliers
The Construction Manager shall develop bidders' interest in the Project. For all portions of the Work (including those Construction Manager proposes to self-perform) whose contract value is expected to exceed **$50,000.00**, Construction Manager shall conduct competitive bidding among at least three bidders using a process approved by Owner. In the event Construction Manager is unable to receive three bids for a portion of the Work, Construction Manager may seek Owner's approval to proceed with the bids received and Owner's approval shall not unreasonably be withheld.

§ 2.1.8 The Construction Manager shall prepare, for the Architect's review and the Owner's acceptance, a procurement schedule for items that must be ordered well in advance of construction. The Construction Manager shall expedite and coordinate the ordering and delivery of materials that must be ordered well in advance of construction. If the Owner agrees to procure any items prior to the establishment of the Guaranteed Maximum Price, the Owner shall procure the items on terms and conditions acceptable to the Construction Manager. Upon the establishment of the Guaranteed Maximum Price, the Owner shall assign all contracts for these items to the Construction Manager and the Construction Manager shall thereafter accept responsibility for them.

### § 2.1.9 Extent of Responsibility
The Construction Manager shall exercise reasonable care in preparing schedules and estimates. The Construction Manager, however, does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Construction Manager shall promptly report to the Architect and Owner any nonconformity discovered by or made known to the Construction Manager as a request for information in such form as the Architect may require.

### § 2.1.10 Notices and Compliance with Laws
The Construction Manager shall comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to its performance under this Contract, and with equal employment opportunity programs, and other programs as may be required by governmental and quasi governmental authorities for inclusion in the Contract Documents.

### § 2.2 Guaranteed Maximum Price Proposal and Contract Time
§ 2.2.1 At a time to be mutually agreed upon by the Owner and the Construction Manager and in consultation with the Architect, the Construction Manager shall prepare a Guaranteed Maximum Price proposal for the Owner's review and

DSL  nit.

De S

**AIA Document A133™** – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                     (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

acceptance. The Guaranteed Maximum Price in the proposal shall be the sum of the Construction Manager's estimate of the Cost of the Work, including contingencies described in Section 2.2.4, and the Construction Manager's Fee.

§ **2.2.2** To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Construction Manager shall provide in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

§ **2.2.3** The Construction Manager shall include with the Guaranteed Maximum Price proposal a written statement of its basis, which shall include the following:

.1    A list of the Drawings and Specifications, including all Addenda thereto, and the Conditions of the Contract;

.2    A list of the clarifications and assumptions made by the Construction Manager in the preparation of the Guaranteed Maximum Price proposal, including assumptions under Section 2.2.2, to supplement the information provided by the Owner and contained in the Drawings and Specifications;

.3    A statement of the proposed Guaranteed Maximum Price, including a statement of the estimated Cost of the Work organized by trade categories or systems, allowances, contingency, and the Construction Manager's Fee;

.4    The anticipated date of Substantial Completion upon which the proposed Guaranteed Maximum Price is based; and

.5    A date by which the Owner must accept the Guaranteed Maximum Price.

§ **2.2.4** In preparing the Construction Manager's Guaranteed Maximum Price proposal, the Construction Manager shall include its contingency for the Construction Manager's exclusive use to carry out the full original intent of the Contract Documents to cover those costs considered reimbursable as the Cost of the Work but not included in a Change Order, including (i) costs caused by gaps between Subcontractors' scopes of work, (ii) costs caused by nonperformance by Subcontractors, and (iii) costs resulting from material price escalations resulting from unanticipated events.

§ **2.2.4.1** Construction Manager's Contingency shall not be used for design changes, Architect design errors, or Owner changes. Construction Manager shall keep Owner reasonably informed of Construction Manager's use and intended use of the Construction Manager's Contingency, including but not limited to submitting with Applications for Payment information requested by Owner to demonstrate how requested contingency use qualifies under this Section.

§ **2.2.4.2** No funds may be transferred from or spent from the contingency account without the prior written consent of Owner, which shall not be unreasonably withheld. To request an expenditure or transfer from the contingency account, Construction Manager shall submit a zero cost proposed Change Order, transferring amounts from the contingency account to the affected line item on the Schedule of Values. All approved proposed Change Order modifying the Construction Manager's Schedule of Values shall be incorporated into the Contract by signed Change Order. Upon completion, Construction Manger's contingency account savings shall be subject to the Shared Savings provisions as set forth in Section 5.2.1. The Construction Manager's Contingency is subject to the Guaranteed Maximum Price.

§ **2.2.5** The Construction Manager shall meet with the Owner and Architect to review the Guaranteed Maximum Price proposal. In the event that the Owner and Architect discover any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Construction Manager, who shall make appropriate adjustments to the Guaranteed Maximum Price proposal, its basis, or both.

§ **2.2.6** If the Owner notifies the Construction Manager that the Owner has accepted the Guaranteed Maximum Price proposal in writing before the date specified in the Guaranteed Maximum Price proposal, the Guaranteed Maximum Price proposal shall be deemed effective without further acceptance from the Construction Manager. Following acceptance of a Guaranteed Maximum Price, the Owner and Construction Manager shall execute the Guaranteed Maximum Price Amendment amending this Agreement, a copy of which the Owner shall provide to the Architect. The Guaranteed Maximum Price Amendment shall set forth the agreed upon Guaranteed Maximum Price with the information and assumptions upon which it is based.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                (862472773)

6

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ **2.2.7** The Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work prior to the commencement of the Construction Phase, unless the Owner provides prior written authorization for such costs.

§ **2.2.8** The Owner shall authorize the Architect to provide the revisions to the Drawings and Specifications to incorporate the agreed upon assumptions and clarifications contained in the Guaranteed Maximum Price Amendment. The Owner shall promptly furnish those revised Drawings and Specifications to the Construction Manager as they are revised. The Construction Manager shall notify the Owner and Architect of any inconsistencies between the Guaranteed Maximum Price Amendment and the revised Drawings and Specifications.

§ **2.2.9** The Construction Manager shall include in the Guaranteed Maximum Price all sales, consumer, use and similar taxes for the Work provided by the Construction Manager that are legally enacted, whether or not yet effective, at the time the Guaranteed Maximum Price Amendment is executed.

§ **2.2.10** At any point in time during the Preconstruction or Construction Phase, the Owner and Construction Manager may mutually agree to convert the GMP into a lump sum amount by Change Order to the Agreement.

§ **2.3 Construction Phase**
§ **2.3.1 General**
§ **2.3.1.1** For purposes of Section 8.1.2 of the modified A201–2017, the date of commencement of the Work shall mean the date of commencement of the Construction Phase.

§ **2.3.1.2** The Construction Phase of any portion of the Work shall commence when a permit for that portion of the Work has been obtained and, either upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal or the Owner's issuance of a Notice to Proceed, whichever occurs earlier.

§ **2.3.2 Administration**
§ **2.3.2.1** Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under written subcontracts or by other appropriate agreements with the Construction Manager. The Owner may designate specific persons from whom, or entities from which, the Construction Manager shall obtain bids. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work including pursuant to the competitive bidding requirement of section 2.1.6 above and shall deliver such bids to the Owner. The Owner shall then determine, with the advice of the Construction Manager and the Architect, which bids will be accepted. The Construction Manager shall not be required to contract with anyone to whom the Construction Manager has reasonable objection.

§ **2.3.2.2** If the Guaranteed Maximum Price has been established and when a specific bidder (1) is recommended to the Owner by the Construction Manager, (2) is qualified to perform that portion of the Work, and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Construction Manager may require that a Change Order be issued to adjust the Contract Time and the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Construction Manager and the amount and time requirement of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ **2.3.2.3** Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If the Subcontract is awarded on a cost plus fee basis, the Construction Manager shall provide in the Subcontract for the Owner to receive the same audit rights with regard to the Subcontractor as the Owner receives with regard to the Construction Manager in Section 6.11 below.

§ **2.3.2.3.1** As used in this Section and other provisions of the Contract, the terms "subcontract agreement", "subcontract" and similar terms shall mean and include subcontracts per se, consultant agreements and similar contracts for labor, services, for the Project to which a Subcontractor or Sub-subcontractor is a party.

§ **2.3.2.4** If the Construction Manager recommends a specific bidder that may be considered a "related party" according to Section 6.10, then the Construction Manager shall promptly notify the Owner in writing of such relationship and notify the Owner of the specific nature of the contemplated transaction, according to Section 6.10.2.

**AIA Document A133™** – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                            (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ **2.3.2.5** The Construction Manager shall schedule and conduct meetings to discuss such matters as procedures, progress, coordination, scheduling, and status of the Work. The Construction Manager shall prepare and promptly distribute minutes to the Owner and Architect.

§ **2.3.2.6** Upon the execution of the Guaranteed Maximum Price Amendment, the Construction Manager shall prepare and submit to the Owner and Architect a construction schedule for the Work and submittal schedule in accordance with Section 3.10 of the modified A201–2017.

§ **2.3.2.7** The Construction Manager shall record the progress of the Project. On a monthly basis, or otherwise as agreed to by the Owner, the Construction Manager shall submit written progress reports to the Owner and Architect, showing percentages of completion and other information required by the Owner. The Construction Manager shall also keep, and make available to the Owner and Architect, a daily log containing a record for each day of weather, portions of the Work in progress, number of workers on site, identification of equipment on site, problems that might affect progress of the work, accidents, injuries, and other information required by the Owner.

§ **2.3.2.8** The Construction Manager shall develop a system of cost control for the Work, including regular monitoring of actual costs for activities in progress and estimates for uncompleted tasks and proposed changes. The Construction Manager shall identify variances between actual and estimated costs and report the variances to the Owner and Architect and shall provide this information in its monthly reports to the Owner and Architect, in accordance with Section 2.3.2.7 above.

§ **2.4 Professional Services**
Section 3.12.10 of the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

§ **2.5 Hazardous Materials**
Section 10.3 of the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

**ARTICLE 3   OWNER'S RESPONSIBILITIES**
§ **3.1 Information and Services Required of the Owner**
§ **3.1.1** The Owner shall provide information with reasonable promptness, regarding requirements for and limitations on the Project, including a written program prepared by the Architect which shall set forth the Owner's objectives, constraints, and criteria, including schedule, space requirements and relationships, flexibility and expandability, special equipment, systems, sustainability and site requirements.

§ **3.1.2** Prior to the execution of the Guaranteed Maximum Price Amendment, the Construction Manager may request in writing that the Owner provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract. Thereafter, the Construction Manager may only request such evidence if (1) the Owner fails to make payments to the Construction Manager as the Contract Documents require, (2) a change in the Work materially changes the Contract Sum, or (3) the Construction Manager identifies in writing a reasonable concern regarding the Owner's ability to make payment when due. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Construction Manager and Architect. The Construction Manager agrees that the Funds Control Agreement attached hereto as Exhibit D satisfies the reasonable evidence of financial arrangements required of the Owner by this section and Article 2.2 of the General Conditions. The Construction Manager agrees that any evidence of financial arrangements furnished by the Owner shall be considered and handled as "Confidential Information" as otherwise provided for in this Contract. To the extent the Construction Manager needs to share any evidence of financial arrangements furnished by the Owner to any Subcontractors or third parties, the Construction Manager shall ensure those parties equally agree in writing to consider and handle the evidence as "Confidential Information."

§ **3.1.3** The Owner shall establish and periodically update the Owner's budget for the Project, including (1) the budget for the Cost of the Work as defined in Section 6.1.1, (2) the Owner's other costs, and (3) reasonable contingencies related to all of these costs. If the Owner significantly increases or decreases the Owner's budget for the Cost of the Work, the Owner shall notify the Construction Manager and Architect. The Owner and the Architect, in consultation with the Construction Manager, shall thereafter agree to a corresponding change in the Project's scope and quality.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ **3.1.4 Structural and Environmental Tests, Surveys and Reports.** During the Preconstruction Phase, the Owner shall furnish the following information or services with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Construction Manager's performance of the Work with reasonable promptness after receiving the Construction Manager's written request for such information or services. The Construction Manager shall be entitled to rely on the accuracy of information and services furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ **3.1.4.1** The Owner shall furnish tests, inspections and reports required by law and as otherwise agreed to by the parties, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

§ **3.1.4.2** The Owner shall furnish surveys describing known physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark. The Construction Manager shall be entitled to reasonably rely on the accuracy of the information provided to it by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ **3.1.4.3** The Owner, when such services are requested, shall furnish services of geotechnical engineers, which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, seismic evaluation, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with written reports and appropriate recommendations.

§ **3.1.4.4** During the Construction Phase, the Owner shall furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Construction Manager's performance of the Work with reasonable promptness after receiving the Construction Manager's written request for such information or services.

§ **3.2 Owner's Development Manager**
DDRM Jackson, LLC and Martin J. Breen, only as a member of DDRM Jackson, LLC and not in any individual or personal capacity, shall serve as the Owner's Development Manager(s) for the Project. Such individual shall have the authority to make decisions on behalf of, represent and bind the Owner with respect to the Work, the Project and the Contract except as may be determined by the Owner in writing to the Construction Manager. The Development Manager may delegate all or a portion of his or her authority under this section to other persons or parties, upon written notice to and approval by the Construction Manager, which approval shall not be unreasonably withheld. The authority of such other persons or parties shall not exceed or extend beyond that specified in the written delegation, and such authority may be modified or withdrawn by written notice. The Owner may change the person serving as the Development Manager by written notice to and approval of the Construction Manager, which approval shall not unreasonably be withheld. Should a delegation of Development Manager's authority or a change in the person serving as the Development Manager cause an actual increase in Construction Manager's scope of work or Contract Sum, the Construction Manager may present a claim pursuant to the other provisions of this Agreement. No employee or consultant of the Owner or other person or party shall have authority to make decisions on behalf of, represent or bind the Owner, except as set out in or otherwise delegated pursuant to this section.

§ **3.2.1 Legal Requirements.** To the extent the Owner requires legal, insurance, and accounting services, the Owner shall furnish all such legal, insurance and accounting services, including auditing services, that may be reasonably necessary to meet the Owner's needs and interests.

§ **3.3 Architect**
The Owner shall retain an Architect to provide services, duties and responsibilities as described in AIA Document B101 Standard Form of Agreement Between Owner and Architect. The Owner shall provide the Construction Manager a copy of the executed agreement between the Owner and the Architect, and any further modifications to the agreement.

**AIA Document A133™ – 2009** (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C87-E5EF-478F-8D2F-48FAC0C4D4EE

## ARTICLE 4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES
§ 4.1 Compensation

§ 4.1.1 For the Construction Manager's Preconstruction Phase services, the Owner shall compensate the Construction Manager as follows:

§ 4.1.2 For the Construction Manager's Preconstruction Phase services described in Sections 2.1 and 2.2:
*(Insert amount of, or basis for, compensation and include a list of reimbursable cost items, as applicable.)*

$400,000.00.  (To be clear, per Section 1.1 above, this $400,000.00 Preconstruction Phase services compensation is inclusive of the $300,000.00 authorized by the April 2020 Letter Agreement.)

§ 4.1.3 If the Preconstruction Phase services covered by this Agreement have not been completed by May 31, 2021 plus an additional three month overlap into construction , and to the extent not caused by fault of the Construction Manager, the Construction Manager's compensation for Preconstruction Phase services shall be equitably adjusted.

§ 4.1.4 Compensation based on Direct Personnel Expense includes the direct salaries of the Construction Manager's personnel providing Preconstruction Phase services on the Project and the Construction Manager's costs for the mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

§ 4.2 Payments

§ 4.2.1 Unless otherwise agreed, payments for services shall be made monthly in proportion to services performed.

§ 4.2.2 Payments are due and payable upon presentation of the Construction Manager's invoice and approval by the Owner pursuant to the Payment Application provisions of the Contract. Amounts unpaid (30) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Construction Manager.
*(Insert rate of monthly or annual interest agreed upon.)*

Wyoming statutory interest of seven percent (7%) per annum

## ARTICLE 5    COMPENSATION FOR CONSTRUCTION PHASE SERVICES
§ 5.1 For the Construction Manager's performance of the Work as described in Section 2.3, the Owner shall pay the Construction Manager the Contract Sum in current funds. The Contract Sum is the Cost of the Work as defined in Section 6.1.1 plus the Construction Manager's Fee.

§ 5.1.1
*(Paragraphs deleted)*
The Construction Manager's Fee is four point seven five percent (4.75%), which includes overhead and profit to be paid to the Contractor on the Project.

§ 5.1.2 [Intentionally deleted.]

§ 5.1.3 [Intentionally deleted.]

§ 5.1.4 Rental rates for Construction Manager-owned equipment shall not exceed  one hundred  percent (  100  %) of the standard rate paid at the place of the Project.

§ 5.1.5 Unit prices, if any:
*(Identify and state the unit price; state the quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price per Unit ($0.00) |
|---|---|---|
|  |  |  |

§ 5.1.6 Liquidated damages:

§ 5.1.6.1 Liquidated Damages

*DSL* nlt.

**AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344480123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.**
**User Notes:**                                                                                                                           (862472773)

10

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

If the Construction Manager does not achieve Substantial Completion by the date required by the Contract, as that date may be amended as provided in the Contract Documents, Construction Manager will reimburse Owner three thousand five hundred Dollars ($3,500.00) per day as liquidated damages to compensate the Owner for all delay related damages, except to the extent additional delay related damages are covered by applicable insurance.

### § 5.1.6.2 Payment of Liquidated Damages Not A Penalty
The Owner and Construction Manager agree that liquidated damages are compensation for delay damages and not intended as a penalty or forfeiture, and that the amounts of such liquidated damages to be paid are reasonable in comparison to the approximate scope of actual loss of use that the parties anticipated as of the time of execution of this Agreement.

### § 5.1.6.3 Withholding of Liquidated Damages
Owner may withhold liquidated damages from any progress or final payment.

### § 5.2 Guaranteed Maximum Price
**§ 5.2.1** The Construction Manager guarantees that the Contract Sum shall not exceed the Guaranteed Maximum Price set forth in the Guaranteed Maximum Price Amendment, as it is amended from time to time. To the extent the Cost of the Work exceeds the Guaranteed Maximum Price, the Construction Manager shall bear such costs in excess of the Guaranteed Maximum Price without reimbursement or additional compensation from the Owner.
*(Insert specific provisions if the Construction Manager is to participate in any savings.)*

In the event that the Cost of the Work plus the Construction Manager's Fee and Contingency shall be less than the Guaranteed Maximum Price for such Phase, then the difference ("Shared Savings"), after application of the provisions of Section 5.6.1, shall be shared seventy five percent (75%) to Owner and twenty five percent (25%) to Construction Manager, provided however, that before any split the first $Three Hundred Thousand Dollars ($300,000.00) of Shared Savings shall first be distributed to Construction Manager's site management team as an incentive bonus ("Site Team Incentive Bonus"). The Owner shall retain final approval of the distribution of the incentive bonus among the site team members, which shall not be unreasonably withheld. The Construction Manager's portion of the Shared Savings and the Site Team Incentive Bonus shall be paid only if the Project is delivered in full compliance with the Contract Documents, including meeting the original date for Substantial Completion reflected in the Construction Schedule attached as an exhibit to the Contract, and without adjustment; otherwise Construction Manager shall forfeit its portion of the Shared Savings and the Site Team Incentive Bonus to Owner.

**§ 5.2.2** The Guaranteed Maximum Price is subject to additions and deductions by Change Order as provided in the Contract Documents and the Date of Substantial Completion shall be subject to adjustment as provided in the Contract Documents.

### § 5.3 Changes in the Work
**§ 5.3.1** The Owner may, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions. The Owner shall issue such changes in writing. The Architect may make minor changes in the Work as provided in Section 7.4 of the modified AIA Document A201–2017, General Conditions of the Contract for Construction. The Construction Manager shall be entitled to an equitable adjustment in the Contract Time as a result of changes in the Work to the extent of any actual impact to the schedule's critical path.

**§ 5.3.2** Adjustments to the Guaranteed Maximum Price on account of changes in the Work subsequent to the execution of the Guaranteed Maximum Price Amendment may be determined by any of the methods listed in Section 7.3.3 of the modified AIA Document A201–2017, General Conditions of the Contract for Construction.

**§ 5.3.3** In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of the modified AIA Document A201–2017 and the term "costs" as used in Section 7.3.7 of the modified AIA Document A201–2017 shall have the meanings assigned to them in the modified AIA Document A201–2017 and shall not be modified by Sections 5.1 and 5.2, Sections 6.1 through 6.7, and Section 6.8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ **5.3.4** In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of the modified AIA Document A201–2017 shall mean the Cost of the Work as defined in Sections 6.1 to 6.7 of this Agreement and the term "fee" shall mean the Construction Manager's Fee as defined in Section 5.1 of this Agreement.

§ **5.3.5** If no specific provision is made in Section 5.1.2 for adjustment of the Construction Manager's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Section 5.1.2 will cause substantial inequity to the Owner or Construction Manager, the Construction Manager's Fee shall be equitably adjusted on the same basis that was used to establish the Fee for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.

## ARTICLE 6    COST OF THE WORK FOR CONSTRUCTION PHASE
### § 6.1 Costs to Be Reimbursed
§ **6.1.1** The term Cost of the Work shall mean costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in Sections 6.1 through 6.7.

§ **6.1.2** Where any cost is subject to the Owner's prior approval, the Construction Manager shall obtain this approval prior to incurring the cost. The parties shall endeavor to identify any such costs prior to executing Guaranteed Maximum Price Amendment.

### § 6.2 Labor Costs )
§ **6.2.1** Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's prior written approval, at off-site workshops, which wages will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

§ **6.2.2** Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior written approval will be billed at rates included in the General Conditions of the GMP Amendment to the Contract. Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior written approval will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

§ **6.2.3** Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work, which wages will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

§ **6.2.4** Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 6.2.1 through 6.2.3. The costs identified in this Section 6.2.4 will be billed at rates included in the General Conditions that are a part of the GMP Amendment to the Contract, except for Health Insurance and Subcontractor Default Insurance will be billed at the Charge Out Rates in Exhibit G ("Charge Out Rates").

§ **6.2.5** Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Construction Manager or paid to any Subcontractor or vendor, with the Owner's prior written approval.

§ **6.2.6 Owner's Audit of Wages and Burden.** Contractor's wages and costs in this Section 6.2, except for Charge Out Rates, are subject to Owner's audit on at least an annual basis and at the time of Final Payment. Any overbillings will be adjusted by Change Order in a credit back to the Owner upon the conclusion of each audit. To be clear, savings resulting from audits shall not be subject to Shared Savings described in section 5.2.1 of this Agreement.

### § 6.3 Subcontract Costs
Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.

*DSL* nit.

**AIA Document A133™** – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                        (862472773)

12

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**§ 6.4 Costs of Materials and Equipment Incorporated in the Completed Construction**
**§ 6.4.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ 6.4.2** Costs of materials described in the preceding Section 6.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ 6.5 Costs of Other Materials and Equipment, Temporary Facilities and Related Items**
**§ 6.5.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Construction Manager shall mean fair market value.

**§ 6.5.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Construction Manager-owned item may not exceed the purchase price of any comparable item. Rates of Construction Manager-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ 6.5.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ 6.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site, cell phones for use by on-site personnel and by off-site personnel approved in advance by Owner, computer hardware and software licenses for on-site personnel and for limited off-site personnel approved in advance by owner, reasonable subsistence for on-site personnel consisting of temporary housing and utilities approved in advance by Owner, payments to offset employee income taxes on subsistence when applicable and required by the government, and reasonable petty cash expenses of the site office.

**§ 6.5.5** That portion of the reasonable expenses of the Construction Manager's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work and any reasonable recruiting fees incurred by Construction Manager in staffing the Project, approved in writing in advance by Owner.

**§ 6.5.6** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, subject to the Owner's prior approval.

**§ 6.5.7. Owner's Audit of Equipment Costs.** Contractor's equipment costs in Sections 6.4 and 6.5, except for any Charge Out Rates, are subject to Owner's audit on at least an annual basis and at the time of Final Payment. Any overbillings will be adjusted accordingly in a credit back to the Owner upon the conclusion of each audit. To be clear, savings resulting from audits shall not be subject to Shared Savings described in section 5.2.1 of this Agreement.

**§ 6.6 Miscellaneous Costs**
**§ 6.6.1** Premiums for that portion of (a) insurance (Health Insurance as a Charge Out Rate), (b) Subcontractor Default Insurance as a Charge Out Rate, and (c) bonds, required by the Contract Documents, that can be directly attributed to this Contract. Self-insurance for either full or partial amounts of the coverages required by the Contract Documents, with the Owner's prior approval..

**§ 6.6.2** Sales, use or similar taxes, and any new taxes and tariffs imposed by a governmental authority that are related to the Work and for which the Construction Manager is liable.

**§ 6.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay; but such fees and assessments shall be excluded from the Cost of the Work for purposes of determining the Contractor's Fee.

AIA Document A133™ – 2009 (formerly A121™ CMc - 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                      (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ 6.6.4 Fees of laboratories for tests and inspections required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.4.3 of the modified AIA Document A201–2017 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 6.7.3.

§ 6.6.5 Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of the modified AIA Document A201–2017 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

§ 6.6.6 Costs for electronic equipment and software, directly related to the Work with the Owner's prior written approval.

§ 6.6.7 Deposits lost for causes other than the Construction Manager's fault or failure to fulfill a specific responsibility in the Contract Documents.

§ 6.6.8 For any disputes commenced prior to Final Completion, legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager after the execution of this Agreement in the performance of the Work and with the Owner's prior approval, which shall not be unreasonably withheld.

§ 6.6.9 Subject to the Owner's prior written approval, expenses incurred in accordance with the Construction Manager's standard written personnel policy for relocation and temporary living allowances of the Construction Manager's personnel required for the Work.

§ 6.6.10 A mutually agreed upon Lump Sum amount in the Guaranteed Maximum Price for administration of any warranty claims.

§ 6.7 Other Costs and Emergencies
§ 6.7.1 Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

§ 6.7.2 Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of the modified AIA Document A201–2017.

§ 6.7.3 Costs of repairing or correcting damaged, defective, or nonconforming Work executed by the Construction Manager, Subcontractors, or suppliers, provided that such damaged, defective, or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Construction Manager or a Subcontractor or supplier and only to the extent that the cost of repair or correction is not recovered by the Construction Manager from insurance, sureties, Subcontractors, suppliers, or others.

§ 6.7.4 The costs described in Sections 6.1 through 6.7 shall be included in the Cost of the Work, notwithstanding any provision of the modified AIA Document A201–2017 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Section 6.8.

§ 6.8 Costs Not To Be Reimbursed
§ 6.8.1 The Cost of the Work shall not include the items listed below:
    .1    Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Section 6.2, or as may be provided in Article 11 and except for those positions included in the Construction Manager's General Conditions in the GMP Amendment approved by Owner ;
    .2    Expenses of the Construction Manager's principal office and offices other than the site office;

*DSU* nit.

*D & S*

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                              (882472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

.3   Overhead and general expenses, except as may be expressly included in Sections 6.1 to 6.7;

.4   The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work;

.5   Except as provided in Section 6.7.3 of this Agreement, costs due to the negligence or failure of the Construction Manager, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

.6   Any cost not specifically and expressly described in Sections 6.1 to 6.7;

.7   Costs, other than costs included in Change Orders approved in writing by the Owner, that would cause the Guaranteed Maximum Price to be exceeded;

.8   Costs expressly excluded from the Cost of the Work by the Contract Documents.

## § 6.9 Discounts, Rebates and Refunds

§ 6.9.1 Cash discounts obtained on payments made by the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they can be obtained.

§ 6.9.1 The Contractor shall inform the Owner and Architect in a timely manner of opportunities for cash discounts under Section 9.1 of $500 or more.

§ 6.9.2 Amounts that accrue to the Owner in accordance with the provisions of Section 6.9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## § 6.10 Related Party Transactions

§ 6.10.1 For purposes of Section 6.10, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Construction Manager; any entity in which any stockholder in, or management employee of, the Construction Manager owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Construction Manager. The term "related party" includes any member of the immediate family of any person identified above.

§ 6.10.2 If any of the costs to be reimbursed arise from a transaction between the Construction Manager and a related party, the Construction Manager shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Construction Manager shall procure the Work, equipment, goods or service from the related party, as a Subcontractor, according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3. If the Owner fails to authorize the transaction, the Construction Manager shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3.

## § 6.11 Accounting Records

§ 6.11.1 The Construction Manager shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Construction Manager's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Contract. The Construction Manager shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

§ 6.11.2 The term "Owner's auditors" as used in this Contract shall mean, at the Owner's discretion, "Owner's accountants," "Owner's internal audit department" or any other person or entity designated by Owner.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                          (882472773)

15

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ 6.11.3 If the Owner's audit once completed and mutually agreed determines that the Contractor has submitted applications for payment or has been paid over one hundred and one percent or more of the amount actually due under the Contract, the Contractor shall pay the Owner's costs for the audit and return all excess payments to Owner.

## ARTICLE 7    PAYMENTS FOR CONSTRUCTION PHASE SERVICES
### § 7.1 Progress Payments
§ 7.1.1 Based upon Applications for Payment submitted to the Architect by the Construction Manager and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents.

§ 7.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month.

§ 7.1.3 Provided that an Application for Payment is received by the Architect not later than the twenty-fifth day of a month, the Owner shall make payment of the certified amount to the Construction Manager not later than the twenty-fifth day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than (30) days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 7.1.4 With each Application for Payment, the Construction Manager shall submit timecards, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed progress payments already received by the Construction Manager, less that portion of those payments attributable to the Construction Manager's Fee, plus timecards for the period covered by the present Application for Payment.

§ 7.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Construction Manager and approved by Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect and Owner may require. This schedule, unless objected to by the Architect or Owner, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

§ 7.1.6 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed, or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Construction Manager on account of that portion of the Work for which the Construction Manager has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

§ 7.1.7 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:
 .1 Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of the modified AIA Document A201–2017;
 .2 Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;
 .3 Add the Construction Manager's Fee, less retainage per Section 7.1.7.8 below. The Construction Manager's Fee shall be computed upon the Cost of the Work at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, shall be an amount that bears the

**AIA Document A133™ – 2009** (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                    (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4    Subtract retainage per Section 7.1.7.8 below from that portion of the Work that the Construction Manager self-performs;

.5    Subtract the aggregate of previous payments made by the Owner;

.6    Subtract the shortfall, if any, indicated by the Construction Manager in the documentation required by Section 7.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

.7    Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of the modified AIA Document A201–2017.

.8    Retainage shall be ten percent (10%) withheld from every pay application and upon fifty percent (50%) Project completion the Owner shall, subject to Section 9.4.1 of the A201 General Conditions of the Contract for Construction, release in each subsequent monthly Application for Payment one-half of the retainage collected in the Application for Payment which shall be applied to Work completed in the first fifty percent (50%) of Project completion.

**§ 7.1.8** The Owner and Construction Manager shall agree upon (1) a mutually acceptable procedure for review and approval of payments to Subcontractors and (2) the percentage of retainage held on Subcontracts, and the Construction Manager shall execute subcontracts in accordance with those agreements.

**§ 7.1.9** Except with the Owner's prior written approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ 7.1.10** In taking action on the Construction Manager's Applications for Payment, the Owner and Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Owner or Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 7.1.4 or other supporting data; that the Owner or Architect has made exhaustive or continuous on-site inspections; or that the Owner or Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

**§ 7.2 Final Payment**
**§ 7.2.1** "Final Payment," which means and constitutes the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when

.1    the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provided in Section 12.2.2 of the modified AIA Document A201–2017, and to satisfy other requirements, if any, which extend beyond final payment;

.2    the Construction Manager has submitted a final accounting for the Cost of the Work and a final Application for Payment; and

.3    a final Certificate for Payment has been issued by the Architect and approved by the Owner, which shall not be unreasonably withheld; and

.4    the Construction Manager has fully complied with Section 9.10 of the General Conditions, and all other requirements of the Contract Documents for final payment.

The Owner's final payment to the Construction Manager shall be made no later than 30 days after the Owner's approval of the Architect's final Certificate for Payment. Owner's approval shall not unreasonably be withheld.

**§ 7.2.2** The Owner, or at the Owner's discretion, the Owner's auditors may review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner or the Owner's auditors report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Section 7.2.1 have been met, the Architect will, within seven days after receipt of the report, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the modified AIA Document

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                         (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

A201–2017. The time periods stated in this Section supersede those stated in Section 9.4.1 of the modified AIA Document A201–2017. The Architect is not responsible for verifying the accuracy of the Construction Manager's final accounting.

**§ 7.2.3** If the Owner or the Owner's auditors report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of the modified A201–2017. A request for mediation shall be made by the Construction Manager within 30 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 30-day period, unless mutually agreed to be extended in a writing signed by both parties, shall result in the substantiated amount reported by the Owner or the Owner's auditors becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

**§ 7.2.4** If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Section 6.1.1 and not excluded by Section 6.8 to correct defective or nonconforming Work, the Owner shall reimburse the Construction Manager such costs and the Construction Manager's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Construction Manager has participated in savings as provided in Section 5.2.1, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Construction Manager.

**§ 7.3 Late Payments**
Undisputed progress payments and final payment not made by the Owner on a timely basis, as described in 7.1 and 7.2, shall accrue interest at the Wyoming statutory rate of seven percent (7%) per annum with such interest accruing from the due date of payment until the date payment is made and is due and payable with the related late payment. Payments which are disputed but are later found to be improperly withheld shall also accrue interest at the rate identified, above, from the date the payment should have been received.

**ARTICLE 8    INSURANCE AND BONDS**
For all phases of the Project, the Construction Manager and the Owner shall purchase and maintain insurance, including but not limited to Subcontractor Default Insurance, and the Construction Manager shall provide payment and performance bonds at 100% of the value of the Guaranteed Maximum Price, as set forth in Exhibit D – Project Insurance and Bonding Requirements.

| Type of Insurance or Bond | Limit of Liability or Bond Amount ($0.00) |
|---|---|
| | |

**ARTICLE 9    DISPUTE RESOLUTION**
**§ 9.1** Any Claim between the Owner and Construction Manager shall be resolved in accordance with the provisions set forth in this Article 9 and Article 15 of the modified A201–2017. However, for Claims arising from or relating to the Construction Manager's Preconstruction Phase services, no decision by the Initial Decision Maker shall be required as a condition precedent to mediation or binding dispute resolution, and Section 9.3 of this Agreement shall not apply.

**§ 9.2** For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of the modified AIA Document A201–2017, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Construction Manager do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[  ]

[ X ]    Litigation in a court of competent jurisdiction in the state of Wyoming.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                      (862472773)

**18**

DSL  nit.

D ɛ ϛ

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

[   ]    Other: *(Specify)*

### § 9.3 Initial Decision Maker
The Owner's Development Manager will serve as the Initial Decision Maker pursuant to Section 15.2 of the modified AIA Document A201–2017 for Claims arising from or relating to the Construction Manager's Construction Phase services, unless the parties appoint below another individual, not a party to the Agreement, to serve as the Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

The Owner's Development Manager as identified in Section 3.2 above.

### § 9.4 FORUM
Unless otherwise agreed by the parties in writing, any trial, court suit or action arising out of or relating to this Agreement or the Construction Manger's Work on the Project shall be commenced and conducted in Teton County, WY.

### § 9.5 ATTORNEYS' FEES
The prevailing party in any dispute shall be awarded their attorneys' fees and costs and experts' fees and costs incurred pre-trial, during trial, and upon any appeal, petition for reconsideration and collection proceedings.

### § 9.6 CONTINUATION OF PERFORMANCE DURING DISPUTE
Pending final resolution of a claim, dispute or other matter in question governed by this Article 9, unless otherwise directed by the Owner, the Construction Manager shall continue to perform diligently its services required by this Agreement and the Owner shall continue to make its payments to the Construction Manager required by this Agreement.

### ARTICLE 10    TERMINATION OR SUSPENSION
### § 10.1 Termination Prior to Establishment of the Guaranteed Maximum Price
§ 10.1.1 Prior to the execution of the Guaranteed Maximum Price Amendment, the Owner may terminate this Agreement upon not less than seven days' written notice to the Construction Manager for the Owner's convenience and without cause, and the Construction Manager may terminate this Agreement, upon not less than seven days' written notice to the Owner, for the reasons set forth in Section 14.1.1 of the modified A201–2017.

§ 10.1.2 In the event of termination of this Agreement pursuant to Section 10.1.1, the Construction Manager shall be equitably compensated for Preconstruction Phase services performed prior to receipt of a notice of termination. In no event shall the Construction Manager's compensation under this Section exceed the compensation set forth in Section 4.1.

§ 10.1.3 If the Owner terminates the Contract pursuant to Section 10.1.1 after the commencement of the Construction Phase but prior to the execution of the Guaranteed Maximum Price Amendment, the Owner shall pay to the Construction Manager an amount calculated as follows, which amount shall be in addition to any compensation paid to the Construction Manager under Section 10.1.2:

    .1    Take the Cost of the Work incurred by the Construction Manager to the date of termination;
    .2    Add the Construction Manager's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and
    .3    Subtract the aggregate of previous payments made by the Owner for Construction Phase services.

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Section 10.1.3.1. Upon termination for any reason, Construction Manager shall, at the election of Owner, assign any and all subcontracts or purchase orders to Owner or Owner's

*DSL* nit.

*D & S*

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                           (862472773)

**19**

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

designee. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders. All Subcontracts, purchase orders and rental agreements entered into by the Construction Manager will contain provisions allowing for assignment to the Owner as described above.

If the Owner accepts assignment of subcontracts, purchase orders or rental agreements as described above, the Owner will reimburse or indemnify the Construction Manager for all costs arising under the subcontract, purchase order or rental agreement, if those costs would have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner chooses not to accept assignment of any subcontract, purchase order or rental agreement that would have constituted a Cost of the Work had this agreement not been terminated, the Construction Manager will terminate the subcontract, purchase order or rental agreement and the Owner will pay the Construction Manager the costs necessarily and reasonably incurred by the Construction Manager because of such termination.

### § 10.2 Termination Subsequent to Establishing Guaranteed Maximum Price
Following execution of the Guaranteed Maximum Price Amendment and subject to the provisions of Section 10.2.1 and 10.2.2 below, the Contract may be terminated as provided in Article 14 of the modified AIA Document A201–2017.

### § 10.2.1 If the Owner terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager pursuant to Sections 14.2 and 14.4 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received for Work performed pursuant to Sections 10.1.2 and 10.1.3 of this Agreement.

### § 10.2.2 If the Construction Manager terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager under Section 14.1.3 of the modified A201–2017 shall not exceed the amount the Construction Manager would otherwise have received under Sections 10.1.2 and 10.1.3 above, subject to Section 14.1.3 of the modified AIA Document A201-2017..

### § 10.3 Suspension
The Work may be suspended by the Owner as provided in Article 14 of the modified AIA Document A201–2017. In such case, the Guaranteed Maximum Price and Contract Time shall be adjusted to the extent of actual impacts as provided in Section 14.3.2 of the modified AIA Document A201–2017, except that the term "profit" shall be understood to mean the Construction Manager's Fee as described in Sections 5.1 and 5.3.5 of this Agreement.

### ARTICLE 11    MISCELLANEOUS PROVISIONS
§ 11.1 Terms in this Agreement shall have the same meaning as those in the modified A201–2017.

### § 11.2 Ownership and Use of Documents
Section 1.5 of the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

### § 11.3 Governing Law
Section 13.1 of the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

### § 11.4 Assignment
The Owner and Construction Manager, respectively, bind themselves, their agents, successors, assigns and legal representatives to this Agreement. The Construction Manager shall not assign its rights or delegate its duties under this Agreement, in whole or in part, without the written consent of the Owner. Construction Manager agrees that Owner may, with the consent of the Construction Manager which shall not unreasonably be withheld, assign all or part of its rights and delegate all of its duties under this Agreement to any person or entity (the "Assignee") as determined by the Owner and Assignee's agreement. The Construction Manager and Owner shall execute all consents reasonably required to facilitate any assignment. The Construction Manager acknowledges it is aware that the Owner plans to assign portions of its rights and duties, including those related to Construction Manager's warranties against defects in the Work and Construction Manager's correction of work upon notice obligations, to individual unit owners and/or the

DSL nit.

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                    (882472773)

20

D⋅S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

homeowner's association at or following Substantial Completion of the Project. Construction Manager agrees that it will not object to such assignments if made.

§ 11.5 Other provisions:

§ 11.5.1 Owner and Construction Manager agree that the Contract Documents for the Project are not complete as of the date of this Contract and the Owner and Construction Manager may mutually agree that Work may be performed in portions (e.g., grading sitework, interior improvements, etc.) as the Contract Documents are completed so that the Project can be constructed as expeditiously as possible. When the Architect provides the Construction Manager with the Contract Documents for a portion of the Work, Construction Manager shall obtain bids on a competitive basis to the extent reasonably possible for such Work from Subcontractors, Sub-Subcontractors, Fabricators and Suppliers and/or provide detailed cost estimates as required. Construction Manager shall then submit a detailed proposal to Owner setting forth the Price excluding General Conditions Costs and Construction Manager's Fee to perform that portion of the Work. Upon Agreement by Owner and Construction Manager as to the Price of such portion of the work, the Owner shall authorize the Construction Manager to proceed forward with that portion of the work at the agreed upon Price.

§ 11.5.2 The Construction Manager represents and warrants to the Owner, in addition to the other representations and warranties contained in the Contract Documents and as an inducement to the Owner to execute this Agreement, which representations and warranties shall survive the execution of this Agreement and the Final Completion of the Work, as follows:

.1 that the Construction Manager is financially solvent, able to pay its debts as they mature and possessed of sufficient working capital to perform and complete the Work as described in the Contract Documents and to otherwise perform its obligations under the Contract Documents;

2 that the Construction Manager is able to furnish the labor, services, materials, equipment, facilities, supervision, Project management and other services necessary and required to perform and complete the Work as described in this Agreement and to otherwise perform its obligations under the Contract Documents, and has sufficient experience and competence to do so;

.3 that the Construction Manager is authorized to do business in the state where the Project is located and is properly licensed and registered by all necessary governmental and quasi-public authorities having jurisdiction over the Contractor, the Work and the Project; and

.4 that the Construction Manager's execution of this Agreement and its performance of the Contract is within its duly authorized powers.

§ 11.5.3 Review by Owner. Review or approval by Owner or its agents (including but not limited to Architect or other design professionals or inspectors) of Construction Manager's Work or services, including but not limited to its means, methods, techniques, sequences, subcontractors, materials or recommendations (or any other products or services under this Agreement) ("Construction Manager Services") shall not relieve Construction Manager of its liability for any damages resulting from or arising out of defects or deficiencies in the Work or Construction Manager Services, except where Owner expressly directs such defective or deficient Work or Construction Manager Services and Construction Manager files a written objection at the time the Work is directed by Owner.

§ 11.5.4 Construction Manager Responsibility. Activities or duties of the Architect in the Architect's administration of the Contract or tests, reviews, observations, inspections or approvals required or performed by Owner, Architect or other persons or entities other than the Construction Manager, shall not relieve Construction Manager of its liability for any damages resulting from or arising out of defect or deficiencies in the Work, unless Owner expressly directs such defective or deficient Work and Construction Manager files a written objection at the time the Work is directed by Owner.

ARTICLE 12    SCOPE OF THE AGREEMENT
§ 12.1 This Agreement represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Construction Manager. Any inconsistency

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                            (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

between this Agreement and any attachments shall be resolved in favor of this Agreement, which means that, in the case of limitations and disclosures, no such limitations or disclaimers shall be allowed.

**§ 12.2** The following documents comprise the Agreement:

.1    AIA Document A133–2009, Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

.2    The modified AIA Document A201–2017, General Conditions of the Contract for Construction

.3    AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed, or the following:


.4
*(Paragraphs deleted)*
Other documents:
*(List other documents, if any, forming part of the Agreement.)*

.1  Exhibit A –Guaranteed Maximum Price Amendment
.2  Exhibit B - Preconstruction Scope of Services Exhibit from April 2020 Letter Agreement
.3  Exhibit C - Lien and Claim Release and Waiver Forms
.4  Exhibit D – Project Insurance and Bonding Requirements
.5  Exhibit D-1 – Subcontractor Default Insurance Policy
.6  Exhibit E – Funds Control Agreement
.7  Exhibit F – Responsibility Matrix
.8  Exhibit G – Construction Manager Charge Out Rates


This Agreement is entered into as of the day and year first written above.


**OWNER** *(Signature)*

Cody Lane Development Corporation
David C. Saunders, President
*(Printed name and title)*

David S. Layton

**CONSTRUCTION MANAGER** *(Signature)*

David S. Layton, President
Layton Construction Company, LLC
*(Printed name and title)*

AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for me use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail ight@aia.org.
Notes:                                                                                    (862472773)

**22**

DSL  Init.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# Additions and Deletions Report for
## AIA® Document A133™ – 2009

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 13:57:01 ET on 05/28/2021.

PAGE 1

AGREEMENT made as of the 28th day of May in the year 2021

...

Cody Lane Development Corporation
P.O. Box 734
Teton Village, WY  83025-0734

...

Layton Construction Company, LLC
9090 South Sandy Parkway
Sandy, Utah 84070

...

Hoback Club
Jackson, WY

...

(Name, legal status and address)

IBI Group, a California Partnership
10 Exchange Place, Suite #112
Salt Lake City, UT 84111

...

The Owner's ~~Designated Representative:~~Development Manager for the Project:

...

DDRM Jackson, LLC and Martin J. Breen, only as a member of DDRM Jackson, LLC and not in any individual or personal capacity, shall serve as the Owner's Development Manager for the Project
800 Tuacahn Dr.
Ivins, UT 84738

DSL

D e S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not ed without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on /2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report ght violations, e-mail copyright@aia.org.
Notes:                                                                                                      (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

PAGE 2

Bil Munck, Vice President
Matthew Noyce, Senior Project Manager
Layton Construction Company, LLC
9090 South Sandy Parkway
Sandy, Utah 84070

...

Peter Pillman, AIA (WY License # C-3199)
Steve Jones, AIA
IBI Group
10 Exchange Place, Suite 112
Salt Lake City, UT 84111
T: (801) 532-4233
PAGE 3

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, and all exhibits and schedules to any of the foregoing, other documents listed in this Agreement, and Modifications issued after execution of this Agreement, and exhibits to be attached by the Guaranteed Maximum Price Amendment, all of which form the Contract and are as fully a part of the Contract as if attached to this Agreement or repeated herein.  Upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal, the Contract Documents will also include the documents described in Section 2.2.3 and identified in the Guaranteed Maximum Price Amendment and revisions prepared by the Architect and furnished by the Owner as described in Section 2.2.8. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. oral, and specifically supersedes the parties April 1, 2020 Limited Authorization to Commence Pre-Construction Services (the "April 2020 Letter Agreement"). Work performed, payments applied for, and payments made and received under the April 2020 Letter Agreement are incorporated into and shall be accounted for under this Agreement and the Contract Documents. If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement, this Agreement shall govern.

...

The Construction Manager accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Construction Manager's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. Notwithstanding the foregoing, the Construction Manager does not agree to any fiduciary obligations to the Owner. The Owner agrees to furnish or approve, in a timely manner, information required by the Construction Manager and to make payments to the Construction Manager in accordance with the requirements of the Contract Documents.

...

For the Preconstruction Phase, AIA Document A201™ 2007, A201™ 2017, General Conditions of the Contract for Construction, shall apply only as specifically provided in this Agreement. For the Construction Phase, the general conditions of the contract shall be as set forth in A201 2007, A201 2017, which document is incorporated herein by reference. The term "Contractor" as used in A201 2007 shall mean the Construction Manager. A201 2017 shall mean the Construction Manager.

§ 1.4 BIM Files. The Architect has supplied the Construction Manager with Building Information Modeling (BIM) electronic files for the Project (the "BIM Files") for the convenience of the Construction Manager and at its request to carry out its Work on the Project.  In its receipt of and use of the BIM Files, the Construction Manager understands and

DSL

D & S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
er Notes:                                                                                                    (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

agrees that (1) the BIM Files are not part of the Contract Documents and will never be part of the Contract Documents; (2) the BIM Files are not to scale such that no dimensions may be scaled and the Construction Manager may only use the BIM Files as a template for the preparation of interference and shop drawings; (3) the Architect, Owner, and Development Manager do not warrant and are not responsible for the accuracy of information in the BIM Files and are not liable in any way for anyone's use of the BIM Files or any damages of any kind arising from errors or omissions in the BIM Files or use of the BIM Files – the Construction Manager agrees the use of the BIM Files is at its sole risk and that it will indemnify and defend the Architect, Owner, and Development Manager from any claims resulting from use of the BIM Files; and (4) the Construction Manager's receipt and use of the BIM Files does not relieve the Construction Manager from any of its contractual obligations - the Construction Manager recognizes its responsibility to fully ascertain all site conditions and measurements.

**PAGE 4**

§ **2.1.1** The Construction Manager shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other. The preconstruction scope of services exhibit from the April 2020 Letter Agreement is attached hereto as Exhibit B.

...

§ **2.1.4** ~~Phased Construction~~
~~The Construction Manager shall provide recommendations with regard to accelerated or fast-track scheduling, procurement, or phased construction. The Construction Manager shall take into consideration cost reductions, cost information, constructability, provisions for temporary facilities and procurement and construction scheduling issues.~~ The Work also shall include the obligation on the part of the Construction Manager to make an affirmative, good faith effort during the course of construction to identify and propose for review by the Owner and Architect and decision by the Owner value engineering and other deductive changes to the Work with the aim of lessening the overall cost of the Project without any or significant diminution in the overall value of the Project. Any value engineering or voluntary alternates that are accepted by the Owner will be listed in an Exhibit and the Architect will update the Contract Documents to reflect the accepted value engineering or voluntary alternates. In the event the Architect cannot modify the Contract Documents then the value engineering or voluntary alternates will be rejected and a corresponding adjustment will be made to the GMP.

§ **2.1.5** ~~Preliminary Cost Estimates~~**Phased Construction**
The Construction Manager shall provide recommendations with regard to accelerated or fast-track scheduling, procurement, or phased construction. The Construction Manager shall take into consideration cost reductions, cost information, constructability, provisions for temporary facilities and procurement and construction scheduling issues.
§ ~~2.1.5.1 Based on the preliminary design and other design criteria prepared by the Architect, the Construction Manager shall prepare preliminary estimates of the Cost of the Work or the cost of program requirements using area, volume or similar conceptual estimating techniques for the Architect's review and Owner's approval. If the Architect or Construction Manager suggests alternative materials and systems, the Construction Manager shall provide cost evaluations of those alternative materials and systems.~~

§ ~~2.1.5.2 As the Architect progresses with the preparation of the Schematic Design, Design Development and Construction Documents, the Construction Manager shall prepare and update, at appropriate intervals agreed to by the Owner, Construction Manager and Architect, estimates of the Cost of the Work of increasing detail and refinement and allowing for the further development of the design until such time as the Owner and Construction Manager agree on a Guaranteed Maximum Price for the Work. Such estimates shall be provided for the Architect's review and the Owner's approval. The Construction Manager shall inform the Owner and Architect when estimates of the Cost of the Work exceed the latest approved Project budget and make recommendations for corrective action.~~

§ **2.1.6** ~~Subcontractors and Suppliers~~
~~The Construction Manager shall develop bidders' interest in the Project.~~
**Preliminary Cost Estimates**
§ **2.1.6.1** Based on the preliminary design and other design criteria prepared by the Architect, the Construction Manager shall prepare preliminary estimates of the Cost of the Work or the cost of program requirements using area, volume or similar conceptual estimating techniques for the Architect's review and Owner's approval. If the Architect or Construction Manager suggests alternative materials and systems, the Construction Manager shall provide cost evaluations of those alternative materials and systems.

DSL

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                      (862472773)

**3**

D e S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**§ 2.1.6.2** As the Architect progresses with the preparation of the Schematic Design, Design Development and Construction Documents, the Construction Manager shall prepare and update, at appropriate intervals agreed to by the Owner, Construction Manager and Architect, estimates of the Cost of the Work of increasing detail and refinement and allowing for the further development of the design until such time as the Owner and Construction Manager agree on a Guaranteed Maximum Price for the Work. Such estimates shall be provided for the Architect's review and the Owner's approval. The Construction Manager shall inform the Owner and Architect when estimates of the Cost of the Work exceed the latest approved Project budget and make recommendations for corrective action.

**§ 2.1.7** ~~The Construction Manager shall prepare, for the Architect's review and the Owner's acceptance, a procurement schedule for items that must be ordered well in advance of construction. The Construction Manager shall expedite and coordinate the ordering and delivery of materials that must be ordered well in advance of construction. If the Owner agrees to procure any items prior to the establishment of the Guaranteed Maximum Price, the Owner shall procure the items on terms and conditions acceptable to the Construction Manager. Upon the establishment of the Guaranteed Maximum Price, the Owner shall assign all contracts for those items to the Construction Manager and the Construction Manager shall thereafter accept responsibility for them. Subcontractors and Suppliers~~
The Construction Manager shall develop bidders' interest in the Project. For all portions of the Work (including those Construction Manager proposes to self-perform) whose contract value is expected to exceed $50,000.00, Construction Manager shall conduct competitive bidding among at least three bidders using a process approved by Owner. In the event Construction Manager is unable to receive three bids for a portion of the Work, Construction Manager may seek Owner's approval to proceed with the bids received and Owner's approval shall not unreasonably be withheld.

**§ 2.1.8** ~~Extent of Responsibility~~
~~The Construction Manager shall exercise reasonable care in preparing schedules and estimates. The Construction Manager, however, does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Construction Manager shall promptly report to the Architect and Owner any nonconformity discovered by or made known to the Construction Manager as a request for information in such form as the Architect may require.~~The Construction Manager shall prepare, for the Architect's review and the Owner's acceptance, a procurement schedule for items that must be ordered well in advance of construction. The Construction Manager shall expedite and coordinate the ordering and delivery of materials that must be ordered well in advance of construction. If the Owner agrees to procure any items prior to the establishment of the Guaranteed Maximum Price, the Owner shall procure the items on terms and conditions acceptable to the Construction Manager. Upon the establishment of the Guaranteed Maximum Price, the Owner shall assign all contracts for these items to the Construction Manager and the Construction Manager shall thereafter accept responsibility for them.

**§ 2.1.9** ~~Notices and Compliance with Laws~~Extent of Responsibility
The Construction Manager shall exercise reasonable care in preparing schedules and estimates. The Construction Manager, however, does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Construction Manager shall promptly report to the Architect and Owner any nonconformity discovered by or made known to the Construction Manager as a request for information in such form as the Architect may require.

**§ 2.1.10 Notices and Compliance with Laws**
PAGE 6

**§ 2.2.4** In preparing the Construction Manager's Guaranteed Maximum Price proposal, the Construction Manager shall include its contingency for the Construction Manager's exclusive use to carry out the full original intent of the Contract Documents to cover those costs considered reimbursable as the Cost of the Work but not included in a Change ~~Order.~~ Order, including (i) costs caused by gaps between Subcontractors' scopes of work, (ii) costs caused by nonperformance by Subcontractors, and (iii) costs resulting from material price escalations resulting from unanticipated events.

DSL

D ε S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not . : used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on !/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report pyright violations, e-mail copyright@aia.org.
ser Notes:                                                                                                    (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

§ 2.2.4.1 Construction Manager's Contingency shall not be used for design changes, Architect design errors, or Owner changes.  Construction Manager shall keep Owner reasonably informed of Construction Manager's use and intended use of the Construction Manager's Contingency, including but not limited to submitting with Applications for Payment information requested by Owner to demonstrate how requested contingency use qualifies under this Section.

§ 2.2.4.2 No funds may be transferred from or spent from the contingency account without the prior written consent of Owner, which shall not be unreasonably withheld. To request an expenditure or transfer from the contingency account, Construction Manager shall submit a zero cost proposed Change Order, transferring amounts from the contingency account to the affected line item on the Schedule of Values.  All approved proposed Change Orders modifying the Construction Manager's Schedule of Values shall be incorporated into the Contract by signed Change Order.  Upon completion, Construction Manger's contingency account savings shall be subject to the Shared Savings provisions as set forth in Section 5.2.1.  The Construction Manager's Contingency is subject to the Guaranteed Maximum Price.
PAGE 7

§ 2.2.10 At any point in time during the Preconstruction or Construction Phase, the Owner and Construction Manager may mutually agree to convert the GMP into a lump sum amount by Change Order to the Agreement.

...

§ 2.3.1.1 For purposes of Section 8.1.2 of A201–2007, the modified A201–2017, the date of commencement of the Work shall mean the date of commencement of the Construction Phase.

§ 2.3.1.2 The Construction Phase of any portion of the Work shall commence when a permit for that portion of the Work has been obtained and, either upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal or the Owner's issuance of a Notice to Proceed, whichever occurs earlier.

...

§ 2.3.2.1 Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under written subcontracts or by other appropriate agreements with the Construction Manager. The Owner may designate specific persons from whom, or entities from which, the Construction Manager shall obtain bids. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work including pursuant to the competitive bidding requirement of section 2.1.6 above and shall deliver such bids to the Architect. Owner. The Owner shall then determine, with the advice of the Construction Manager and the Architect, which bids will be accepted. The Construction Manager shall not be required to contract with anyone to whom the Construction Manager has reasonable objection.

...

§ 2.3.2.3.1 As used in this Section and other provisions of the Contract, the terms "subcontract agreement", "subcontract" and similar terms shall mean and include subcontracts per se, consultant agreements and similar contracts for labor, services, for the Project to which a Subcontractor or Sub-subcontractor is a party.

PAGE 8

§ 2.3.2.6 Upon the execution of the Guaranteed Maximum Price Amendment, the Construction Manager shall prepare and submit to the Owner and Architect a construction schedule for the Work and submittal schedule in accordance with Section 3.10 of A201–2007. the modified A201–2017.

...

Section 3.12.10 of A201–2007 the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

_DSL_

...

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not ı used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on J/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report ιpyright violations, e-mail copyright@aia.org.
ₘser Notes:    (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Section 10.3 of ~~A201  2007~~ the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

...

**§ 3.1.1** The Owner shall provide information with reasonable promptness, regarding requirements for and limitations on the Project, including a written program <u>prepared by the Architect</u> which shall set forth the Owner's objectives, constraints, and criteria, including schedule, space requirements and relationships, flexibility and expandability, special equipment, systems, sustainability and site requirements.

**§ 3.1.2** Prior to the execution of the Guaranteed Maximum Price Amendment, the Construction Manager may request in writing that the Owner provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract. Thereafter, the Construction Manager may only request such evidence if (1) the Owner fails to make payments to the Construction Manager as the Contract Documents require, (2) a change in the Work materially changes the Contract Sum, or (3) the Construction Manager identifies in writing a reasonable concern regarding the Owner's ability to make payment when due. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Construction Manager and Architect. <u>The Construction Manager agrees that the Funds Control Agreement attached hereto as Exhibit D satisfies the reasonable evidence of financial arrangements required of the Owner by this section and Article 2.2 of the General Conditions. The Construction Manager agrees that any evidence of financial arrangements furnished by the Owner shall be considered and handled as "Confidential Information" as otherwise provided for in this Contract. To the extent the Construction Manager needs to share any evidence of financial arrangements furnished by the Owner to any Subcontractors or third parties, the Construction Manager shall ensure those parties equally agree in writing to consider and handle the evidence as "Confidential Information."</u>
**PAGE 9**

**§ 3.1.4.2** The Owner shall furnish surveys describing <u>known</u> physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark. <u>The Construction Manager shall be entitled to reasonably rely on the accuracy of the information provided to it by the Owner but shall exercise proper precautions relating to the safe performance of the Work.</u>

...

**§ 3.2** ~~Owner's  Designated  Representative~~<u>Owner's  Development Manager</u>
~~The Owner shall identify a representative authorized to act on behalf of~~<u>DDRM Jackson, LLC and Martin J. Breen, only as a member of DDRM Jackson, LLC and not in any individual or personal capacity, shall serve as the Owner's Development Manager(s) for the Project. Such individual shall have the authority to make decisions on behalf of, represent and bind</u> the Owner with respect to the ~~Project. The Owner's representative shall render decisions promptly and furnish information expeditiously, so as to avoid unreasonable delay in the services or Work of the Construction Manager. Except as otherwise provided in Section 4.2.1 of A201  2007, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.~~<u>Work, the Project and the Contract except as may be determined by the Owner in writing to the Construction Manager. The Development Manager may delegate all or a portion of his or her authority under this section to other persons or parties, upon written notice to and approval by the Construction Manager, which approval shall not be unreasonably withheld. The authority of such other persons or parties shall not exceed or extend beyond that specified in the written delegation, and such authority may be modified or withdrawn by written notice. The Owner may change the person serving as the Development Manager by written notice to and approval of the Construction Manager, which approval shall not unreasonably be withheld. Should a delegation of Development Manager's authority or a change in the person serving as the Development Manager cause an actual increase in Construction Manager's scope of work or Contract Sum, the Construction Manager may present a claim pursuant to the other provisions of this Agreement. No employee or</u>

*DSL*

*D* ∈ *S*

**Additions and Deletions Report for AIA Document A133™ – 2009** (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 5/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**Notes:**

6

(862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

consultant of the Owner or other person or party shall have authority to make decisions on behalf of, represent or bind the Owner, except as set out in or otherwise delegated pursuant to this section.

**§ 3.2.1 Legal Requirements.** ~~The Owner shall furnish all~~ To the extent the Owner requires legal, insurance, and accounting services, the Owner shall furnish all such legal, insurance and accounting services, including auditing services, that may be reasonably necessary ~~at any time for the Project~~ to meet the Owner's needs and interests.

...

The Owner shall retain an Architect to provide services, duties and responsibilities as described in AIA Document ~~B133™ 2014,~~ B101 Standard Form of Agreement Between Owner and ~~Architect, Construction Manager as Constructor Edition.~~ Architect. The Owner shall provide the Construction Manager a copy of the executed agreement between the Owner and the Architect, and any further modifications to the agreement.
**PAGE 10**

$400,000.00. (To be clear, per Section 1.1 above, this $400,000.00 Preconstruction Phase services compensation is inclusive of the $300,000.00 authorized by the April 2020 Letter Agreement.)

**§ 4.1.3** If the Preconstruction Phase services covered by this Agreement have not been completed ~~within ( ) months of the date of this Agreement, through no~~ by May 31, 2021 plus an additional three month overlap into construction , and to the extent not caused by fault of the Construction Manager, the Construction Manager's compensation for Preconstruction Phase services shall be equitably adjusted.

...

**§ 4.2.2** Payments are due and payable upon presentation of the Construction Manager's ~~invoice. Amounts unpaid ( )~~ invoice and approval by the Owner pursuant to the Payment Application provisions of the Contract. Amounts unpaid (30) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Construction Manager.

...

~~%~~ Wyoming statutory interest of seven percent (7%) per annum

...

**§ 5.1.1** ~~The Construction Manager's Fee:~~
~~(State a lump sum, percentage of Cost of the Work or other provision for determining the Construction Manager's Fee.)~~

The Construction Manager's Fee is four point seven five percent (4.75%), which includes overhead and profit to be paid to the Contractor on the Project.

**§ 5.1.2** ~~The method of adjustment of the Construction Manager's Fee for changes in the Work:~~

[Intentionally deleted.]

**§ 5.1.3** ~~Limitations, if any, on a Subcontractor's overhead and profit for increases in the cost of its portion of the Work:~~

[Intentionally deleted.]

**§ 5.1.4** Rental rates for Construction Manager-owned equipment shall not exceed one hundred percent ( 100 %) of the standard rate paid at the place of the Project.

...

**§ 5.1.6 Liquidated damages:**

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 2/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

### § 5.1.6.1 Liquidated Damages

If the Construction Manager does not achieve Substantial Completion by the date required by the Contract, as that date may be amended as provided in the Contract Documents, Construction Manager will reimburse Owner three thousand five hundred Dollars ($3,500.00) per day as liquidated damages to compensate the Owner for all delay related damages, except to the extent additional delay related damages are covered by applicable insurance.

### § 5.1.6.2 Payment of Liquidated Damages Not A Penalty

The Owner and Construction Manager agree that liquidated damages are compensation for delay damages and not intended as a penalty or forfeiture, and that the amounts of such liquidated damages to be paid are reasonable in comparison to the approximate scope of actual loss of use that the parties anticipated as of the time of execution of this Agreement.

### § 5.1.6.3 Withholding of Liquidated Damages

Owner may withhold liquidated damages from any progress or final payment.

**PAGE 11**

In the event that the Cost of the Work plus the Construction Manager's Fee and Contingency shall be less than the Guaranteed Maximum Price for such Phase, then the difference ("Shared Savings"), after application of the provisions of Section 5.6.1, shall be shared seventy five percent (75%) to Owner and twenty five percent (25%) to Construction Manager, provided however, that before any split the first $Three Hundred Thousand Dollars ($300,000.00) of Shared Savings shall first be distributed to Construction Manager's site management team as an incentive bonus ("Site Team Incentive Bonus"). The Owner shall retain final approval of the distribution of the incentive bonus among the site team members, which shall not be unreasonably withheld. The Construction Manager's portion of the Shared Savings and the Site Team Incentive Bonus shall be paid only if the Project is delivered in full compliance with the Contract Documents, including meeting the original date for Substantial Completion reflected in the Construction Schedule attached as an exhibit to the Contract, and without adjustment; otherwise Construction Manager shall forfeit its portion of the Shared Savings and the Site Team Incentive Bonus to Owner.

...

§ 5.3.1 The Owner may, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions. The Owner shall issue such changes in writing. The Architect may make minor changes in the Work as provided in Section 7.4 of the modified AIA Document A201-2007, A201–2017, General Conditions of the Contract for Construction. The Construction Manager shall be entitled to an equitable adjustment in the Contract Time as a result of changes in the Work.the Work to the extent of any actual impact to the schedule's critical path.

§ 5.3.2 Adjustments to the Guaranteed Maximum Price on account of changes in the Work subsequent to the execution of the Guaranteed Maximum Price Amendment may be determined by any of the methods listed in Section 7.3.3 of the modified AIA Document A201-2007, A201–2017, General Conditions of the Contract for Construction.

§ 5.3.3 In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of the modified AIA Document A201-2007 A201–2017 and the term "costs" as used in Section 7.3.7 of the modified AIA Document A201-2007-A201–2017 shall have the meanings assigned to them in the modified AIA Document A201-2007 A201–2017 and shall not be modified by Sections 5.1 and 5.2, Sections 6.1 through 6.7, and Section 6.8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

§ 5.3.4 In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of the modified AIA Document A201-2007 A201–2017 shall mean the Cost of the Work as defined in Sections 6.1 to 6.7 of this Agreement and the term "fee" shall mean the Construction Manager's Fee as defined in Section 5.1 of this Agreement.

**PAGE 12**

DSL

D e S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**§ 6.2 Labor Costs )**

**§ 6.2.1** Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's prior ~~approval, at off-site workshops.~~written approval, at off-site workshops, which wages will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

**§ 6.2.2** Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior ~~approval.~~
~~(If it is intended that the wages or salaries of certain personnel stationed at the Construction Manager's principal or other offices shall be included in the Cost of the Work, identify in Section 11.5, the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)~~written approval will be billed at rates included in the General Conditions of the GMP Amendment to the Contract. Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior written approval will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

**§ 6.2.3** Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the ~~Work.~~Work, which wages will be billed at rates included in the General Conditions in the GMP Amendment to the Contract.

**§ 6.2.4** Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 6.2.1 through 6.2.3. The costs identified in this Section 6.2.4 will be billed at rates included in the General Conditions that are a part of the GMP Amendment to the Contract, except for Health Insurance and Subcontractor Default Insurance will be billed at the Charge Out Rates in Exhibit G ("Charge Out Rates").

**§ 6.2.5** Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Construction Manager or paid to any Subcontractor or vendor, with the Owner's prior written approval.

**§ 6.2.6 Owner's Audit of Wages and Burden.** Contractor's wages and costs in this Section 6.2, except for Charge Out Rates, are subject to Owner's audit on at least an annual basis and at the time of Final Payment. Any overbillings will be adjusted by Change Order in a credit back to the Owner upon the conclusion of each audit. To be clear, savings resulting from audits shall not be subject to Shared Savings described in section 5.2.1 of this Agreement.
PAGE 13

**§ 6.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the ~~site~~site, cell phones for use by on-site personnel and by off-site personnel approved in advance by Owner, computer hardware and software licenses for on-site personnel and for limited off-site personnel approved in advance by owner, reasonable subsistence for on-site personnel consisting of temporary housing and utilities approved in advance by Owner, payments to offset employee income taxes on subsistence when applicable and required by the government, and reasonable petty cash expenses of the site office.

**§ 6.5.5** That portion of the reasonable expenses of the Construction Manager's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the ~~Work.~~Work and any reasonable recruiting fees incurred by Construction Manager in staffing the Project, approved in writing in advance by Owner.

...

**§ 6.5.7. Owner's Audit of Equipment Costs.** Contractor's equipment costs in Sections 6.4 and 6.5, except for any Charge Out Rates, are subject to Owner's audit on at least an annual basis and at the time of Final Payment. Any overbillings will be adjusted accordingly in a credit back to the Owner upon the conclusion of each audit. To be clear, savings resulting from audits shall not be subject to Shared Savings described in section 5.2.1 of this Agreement.

**§ 6.6.1** Premiums for that portion of ~~insurance and bonds required by the Contract Documents~~ (a) insurance (Health Insurance as a Charge Out Rate), (b) Subcontractor Default Insurance as a Charge Out Rate, and (c) bonds, required by

DSL

D & S

**Additions and Deletions Report for AIA Document A133™ – 2009** (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not e used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 2/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
ser Notes:                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

the Contract Documents, that can be directly attributed to this Contract. Self-insurance for either full or partial amounts of the coverages required by the Contract Documents, with the Owner's prior ~~approval.~~approval..

**§ 6.6.2** Sales, use or similar taxes, and any new taxes and tariffs imposed by a governmental authority that are related to the Work and for which the Construction Manager is liable.

**§ 6.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to ~~pay;~~pay; but such fees and assessments shall be excluded from the Cost of the Work for purposes of determining the Contractor's Fee.

**§ 6.6.4** Fees of laboratories for tests and inspections required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section ~~13.5.3 of AIA Document A201–2007~~13.4.3 of the modified AIA Document A201–2017 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 6.7.3.

**§ 6.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of the modified AIA Document ~~A201–2007~~A201–2017 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**§ 6.6.6** Costs for electronic equipment and software, directly related to the Work with the Owner's prior written approval.

**§ 6.6.7** Deposits lost for causes other than the Construction Manager's ~~negligence~~fault or failure to fulfill a specific responsibility in the Contract Documents.

**§ 6.6.8** ~~Legal,~~ For any disputes commenced prior to Final Completion, legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager after the execution of this Agreement in the performance of the Work and with the Owner's prior approval, which shall not be unreasonably withheld.

**§ 6.6.9** Subject to the Owner's prior written approval, expenses incurred in accordance with the Construction Manager's standard written personnel policy for relocation and temporary living allowances of the Construction Manager's personnel required for the Work.

**§ 6.6.10** A mutually agreed upon Lump Sum amount in the Guaranteed Maximum Price for administration of any warranty claims.
PAGE 14

**§ 6.7.2** Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of the modified AIA Document ~~A201–2007.~~A201–2017.

**§ 6.7.3** Costs of repairing or correcting ~~damaged~~damaged, defective, or nonconforming Work executed by the Construction Manager, Subcontractors or suppliers, provided that such ~~damaged~~damaged, defective, or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Construction Manager or a Subcontractor or supplier and only to the extent that the cost of repair or correction is not recovered by the Construction Manager from insurance, sureties, Subcontractors, suppliers, or others.

**§ 6.7.4** The costs described in Sections 6.1 through 6.7 shall be included in the Cost of the Work, notwithstanding any provision of the modified AIA Document ~~A201–2007~~A201–2017 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Section 6.8.

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on ?/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report :opyright violations, e-mail copyright@aia.org.
ser Notes:                                                                      (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

...

.1    Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Section 6.2, or as may be provided in Article 11;11 and except for those positions included in the Construction Manager's General Conditions in the GMP Amendment approved by Owner ;

**PAGE 15**

.7    Costs, other than costs included in Change Orders approved in writing by the Owner, that would cause the Guaranteed Maximum Price to be exceeded; and

.8    Costs for services incurred during the Preconstruction Phase.expressly excluded from the Cost of the Work by the Contract Documents.

...

**§ 6.9.1** The Contractor shall inform the Owner and Architect in a timely manner of opportunities for cash discounts under Section 9.1 of $500 or more.

...

The Construction Manager shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Construction Manager's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Contract. The Construction Manager shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.§ 6.11.1 The Construction Manager shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Construction Manager's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Contract. The Construction Manager shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

**§ 6.11.2** The term "Owner's auditors" as used in this Contract shall mean, at the Owner's discretion, "Owner's accountants," "Owner's internal audit department" or any other person or entity designated by Owner.

**§ 6.11.3** If the Owner's audit once completed and mutually agreed determines that the Contractor has submitted applications for payment or has been paid over one hundred and one percent or more of the amount actually due under the Contract, the Contractor shall pay the Owner's costs for the audit and return all excess payments to Owner.

**PAGE 16**

**§ 7.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

month.

**§ 7.1.3** Provided that an Application for Payment is received by the Architect not later than the twenty-fifth day of a month, the Owner shall make payment of the certified amount to the Construction Manager not later than the twenty-fifth day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than (—)(30) days after the Architect receives the Application for Payment.

DSL

D & S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on ·/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
·er Notes:                                                                                                                 (862472773)

**11**

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

...

§ 7.1.4 With each Application for Payment, the Construction Manager shall submit ~~payrolls,~~ timecards, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed progress payments already received by the Construction Manager, less that portion of those payments attributable to the Construction Manager's Fee, plus ~~payrolls~~ timecards for the period covered by the present Application for Payment.

§ 7.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Construction Manager and approved by Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect and Owner may require. This schedule, unless objected to by the ~~Architect,~~ Architect or Owner, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

...

.1    Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of the modified AIA Document ~~A201–2007;~~ A201–2017;

...

.3    Add the Construction Manager's Fee, less retainage ~~of    percent (    %).~~ per Section 7.1.7.8 below. The Construction Manager's Fee shall be computed upon the Cost of the Work at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4    Subtract retainage ~~of    percent (    %)~~ per Section 7.1.7.8 below from that portion of the Work that the Construction Manager self-performs;

PAGE 17

.7    Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of ~~AIA Document A201–2007.~~ the modified AIA Document A201–2017.

.8    Retainage shall be ten percent (10%) withheld from every pay application and upon fifty percent (50%) Project completion the Owner shall, subject to Section 9.4.1 of the A201 General Conditions of the Contract for Construction, release in each subsequent monthly Application for Payment one-half of the retainage collected in the Application for Payment which shall be applied to Work completed in the first fifty percent (50%) of Project completion.

...

§ 7.1.9 Except with the Owner's prior written approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

§ 7.1.10 In taking action on the Construction Manager's Applications for Payment, the Owner and Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Owner or Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 7.1.4 or other supporting data; that the Owner or Architect has made exhaustive or continuous on-site inspections; or that the Owner or Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on

DSL

D e S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 32/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                          (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

...

§ 7.2.1 ~~Final payment, constituting~~ "Final Payment," which means and constitutes the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when

    .1    the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provided in Section 12.2.2 of the modified AIA Document ~~A201–2007,~~ A201–2017, and to satisfy other requirements, if any, which extend beyond final payment;

...

    .3    a final Certificate for Payment has been issued ~~by the Architect.~~ by the Architect and approved by the Owner, which shall not be unreasonably withheld; and

    .4    the Construction Manager has fully complied with Section 9.10 of the General Conditions, and all other requirements of the Contract Documents for final payment.

The Owner's final payment to the Construction Manager shall be made no later than 30 days after the ~~issuance~~ Owner's approval of the Architect's final Certificate for ~~Payment, or as follows:~~

Payment. Owner's approval shall not unreasonably be withheld.

§ 7.2.2 The ~~Owner's auditors will~~ Owner, or at the Owner's discretion, the Owner's auditors may review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner or the Owner's auditors report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Section 7.2.1 have been met, the Architect will, within seven days after receipt of the ~~written report of the Owner's auditors,~~ report, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the modified AIA Document ~~A201–2007.~~ A201–2017. The time periods stated in this Section supersede those stated in Section 9.4.1 of the ~~AIA Document A201–2007.~~ modified AIA Document A201–2017. The Architect is not responsible for verifying the accuracy of the Construction Manager's final accounting.

§ 7.2.3 If the Owner or the Owner's auditors report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of ~~A201–2007.~~ the modified A201–2017. A request for mediation shall be made by the Construction Manager within 30 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 30-day ~~period~~ period, unless mutually agreed to be extended in a writing signed by both parties, shall result in the substantiated amount reported by the Owner or the Owner's auditors becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.
PAGE 18

§ 7.3 Late Payments
Undisputed progress payments and final payment not made by the Owner on a timely basis, as described in 7.1 and 7.2, shall accrue interest at the Wyoming statutory rate of seven percent (7%) per annum with such interest accruing from the due date of payment until the date payment is made and is due and payable with the related late payment. Payments which are disputed but are later found to be improperly withheld shall also accrue interest at the rate identified, above, from the date the payment should have been received.

For all phases of the Project, the Construction Manager and the Owner shall purchase and maintain insurance, including but not limited to Subcontractor Default Insurance, and the Construction Manager shall provide ~~bonds as set~~

DSL

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 12/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:    (862472773)

13

D e S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

~~forth in Article 11 of AIA Document A201–2007.~~payment and performance bonds at 100% of the value of the Guaranteed Maximum Price, as set forth in Exhibit D – Project Insurance and Bonding Requirements. ~~(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)~~

...

...

**§ 9.1** Any Claim between the Owner and Construction Manager shall be resolved in accordance with the provisions set forth in this Article 9 and Article 15 of ~~A201–2007.~~the modified A201–2017. However, for Claims arising from or relating to the Construction Manager's Preconstruction Phase services, no decision by the Initial Decision Maker shall be required as a condition precedent to mediation or binding dispute resolution, and Section 9.3 of this Agreement shall not apply.

**§ 9.2** For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of the modified AIA Document ~~A201–2007,~~A201–2017, the method of binding dispute resolution shall be as follows:

...

      [ ]    ~~Arbitration pursuant to Section 15.4 of AIA Document A201–2007~~

      [ X ]    Litigation in a court of competent jurisdiction in the state of Wyoming.

**PAGE 19**

The ~~Architect~~ Owner's Development Manager will serve as the Initial Decision Maker pursuant to Section 15.2 of the modified AIA Document ~~A201–2007~~A201–2017 for Claims arising from or relating to the Construction Manager's Construction Phase services, unless the parties appoint below another individual, not a party to the Agreement, to serve as the Initial Decision Maker.

...

The Owner's Development Manager as identified in Section 3.2 above.

**§ 9.4 FORUM** Unless otherwise agreed by the parties in writing, any trial, court suit or action arising out of or relating to this Agreement or the Construction Manger's Work on the Project shall be commenced and conducted in Teton County, WY.

**§ 9.5 ATTORNEYS' FEES**
The prevailing party in any dispute shall be awarded their attorneys' fees and costs and experts' fees and costs incurred pre-trial, during trial, and upon any appeal, petition for reconsideration and collection proceedings.

**§ 9.6 CONTINUATION OF PERFORMANCE DURING DISPUTE**
Pending final resolution of a claim, dispute or other matter in question governed by this Article 9, unless otherwise directed by the Owner, the Construction Manager shall continue to perform diligently its services required by this Agreement and the Owner shall continue to make its payments to the Construction Manager required by this Agreement.

...

**§ 10.1.1** Prior to the execution of the Guaranteed Maximum Price Amendment, the Owner may terminate this Agreement upon not less than seven days' written notice to the Construction Manager for the Owner's convenience and without cause, and the Construction Manager may terminate this Agreement, upon not less than seven days' written notice to the Owner, for the reasons set forth in Section 14.1.1 of ~~A201–2007.~~the modified A201–2017.

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                    (862472773)

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

...

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Section 10.1.3.1. Upon termination for any reason, Construction Manager shall, at the election of Owner, assign any and all subcontracts or purchase orders to Owner or Owner's designee. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders. All Subcontracts, purchase orders and rental agreements entered into by the Construction Manager will contain provisions allowing for assignment to the Owner as described above.

If the Owner accepts assignment of subcontracts, purchase orders or rental agreements as described above, the Owner will reimburse or indemnify the Construction Manager for all costs arising under the subcontract, purchase order or rental agreement, if those costs would have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner chooses not to accept assignment of any subcontract, purchase order or rental agreement that would have constituted a Cost of the Work had this agreement not been terminated, the Construction Manager will terminate the subcontract, purchase order or rental agreement and the Owner will pay the Construction Manager the costs necessarily and reasonably incurred by the Construction Manager because of such termination.
**PAGE 20**

Following execution of the Guaranteed Maximum Price Amendment and subject to the provisions of Section 10.2.1 and 10.2.2 below, the Contract may be terminated as provided in Article 14 of the modified AIA Document A201–2007.A201–2017.

**§ 10.2.1** If the Owner terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager pursuant to Sections 14.2 and 14.4 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received for Work performed pursuant to Sections 10.1.2 and 10.1.3 of this Agreement.

**§ 10.2.2** If the Construction Manager terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager under Section 14.1.3 of A201–2007 the modified A201–2017 shall not exceed the amount the Construction Manager would otherwise have received under Sections 10.1.2 and 10.1.3 above, except that the Construction Manager's Fee shall be calculated as if the Work had been fully completed by the Construction Manager, utilizing as necessary a reasonable estimate of the Cost of the Work for Work not actually completed.subject to Section 14.1.3 of the modified AIA Document A201-2017..

...

The Work may be suspended by the Owner as provided in Article 14 of the modified AIA Document A201–2007. A201–2017. In such case, the Guaranteed Maximum Price and Contract Time shall be increased adjusted to the extent of actual impacts as provided in Section 14.3.2 of the modified AIA Document A201–2007, A201–2017, except that the term "profit" shall be understood to mean the Construction Manager's Fee as described in Sections 5.1 and 5.3.5 of this Agreement.

...

**§ 11.1** Terms in this Agreement shall have the same meaning as those in A201–2007.the modified A201–2017.

...

Section 1.5 of A201–2007 the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

DSL

...

D ᵋ S

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on /05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                (862472773)

**15**

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Section 13.1 of ~~A201~~ ~~2007~~ the modified A201–2017 shall apply to both the Preconstruction and Construction Phases.

...

The Owner and Construction Manager, respectively, bind themselves, their agents, successors, assigns and legal representatives to this Agreement. ~~Neither the Owner nor the Construction Manager shall assign this Agreement~~ The Construction Manager shall not assign its rights or delegate its duties under this Agreement, in whole or in part, without the written consent of the ~~other, except that the Owner may assign this Agreement to a lender providing financing for the Project if the lender agrees to assume the Owner's rights and obligations under this Agreement. Except as provided in Section 13.2.2 of A201  2007, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.~~Owner. Construction Manager agrees that Owner may, with the consent of the Construction Manager which shall not unreasonably be withheld, assign all or part of its rights and delegate all of its duties under this Agreement to any person or entity (the "Assignee") as determined by the Owner and Assignee's agreement. The Construction Manager and Owner shall execute all consents reasonably required to facilitate any assignment. The Construction Manager acknowledges it is aware that the Owner plans to assign portions of its rights and duties, including those related to Construction Manager's warranties against defects in the Work and Construction Manager's correction of work upon notice obligations, to individual unit owners and/or the homeowner's association at or following Substantial Completion of the Project.  Construction Manager agrees that it will not object to such assignments if made.
**PAGE 21**

**§ 11.5.1** Owner and Construction Manager agree that the Contract Documents for the Project are not complete as of the date of this Contract and the Owner and Construction Manager may mutually agree that Work may be performed in portions (e.g., grading sitework, interior improvements, etc.) as the Contract Documents are completed so that the Project can be constructed as expeditiously as possible. When the Architect provides the Construction Manager with the Contract Documents for a portion of the Work, Construction Manager shall obtain bids on a competitive basis to the extent reasonably possible for such Work from Subcontractors, Sub-Subcontractors, Fabricators and Suppliers and/or provide detailed cost estimates as required.  Construction Manager shall then submit a detailed proposal to Owner setting forth the Price excluding General Conditions Costs and Construction Manager's Fee to perform that portion of the work. Upon Agreement by Owner and Construction Manager as to the Price of such portion of the work, the Owner shall authorize the Construction Manager to proceed forward with that portion of the work at the agreed upon Price.

**§ 11.5.2** The Construction Manager represents and warrants to the Owner, in addition to the other representations and warranties contained in the Contract Documents and as an inducement to the Owner to execute this Agreement, which representations and warranties shall survive the execution of this Agreement and the Final Completion of the Work, as follows:

 .1   that the Construction Manager is financially solvent, able to pay its debts as they mature and possessed of sufficient working capital to perform and complete the Work as described in the Contract Documents and to otherwise perform its obligations under the Contract Documents;

 2   that the Construction Manager is able to furnish the labor, services, materials, equipment, facilities, supervision, Project management and other services necessary and required to perform and complete the Work as described in this Agreement and to otherwise perform its obligations under the Contract Documents, and has sufficient experience and competence to do so;

 3   that the Construction Manager is authorized to do business in the state where the Project is located and is properly licensed and registered by all necessary governmental and quasi-public authorities having jurisdiction over the Contractor, the Work and the Project; and

 4   that the Construction Manager's execution of this Agreement and its performance of the Contract is within its duly authorized powers.

**§ 11.5.3 Review by Owner.**  Review or approval by Owner or its agents (including but not limited to Architect or other design professionals or inspectors) of Construction Manager's Work or services, including but not limited to its

**Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003).** Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report ~~c~~yright violations, e-mail copyright@aia.org.
~~e~~r Notes:                                                                                              (682472773)

16

DSL

D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

means, methods, techniques, sequences, subcontractors, materials or recommendations (or any other products or services under this Agreement) ("Construction Manager Services") shall not relieve Construction Manager of its liability for any damages resulting from or arising out of defects or deficiencies in the Work or Construction Manager Services, except where Owner expressly directs such defective or deficient Work or Construction Manager Services and Construction Manager files a written objection at the time the Work is directed by Owner.

**§ 11.5.4 Construction Manager Responsibility.** Activities or duties of the Architect in the Architect's administration of the Contract or tests, reviews, observations, inspections or approvals required or performed by Owner, Architect or other persons or entities other than the Construction Manager, shall not relieve Construction Manager of its liability for any damages resulting from or arising out of defect or deficiencies in the Work, unless Owner expressly directs such defective or deficient Work and Construction Manager files a written objection at the time the Work is directed by Owner.

...

**§ 12.1** This Agreement represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Construction Manager. Any inconsistency between this Agreement and any attachments shall be resolved in favor of this Agreement, which means that, in the case of limitations and disclosures, no such limitations or disclaimers shall be allowed.
PAGE 22

  .2    The modified AIA Document ~~A201–2007,~~ A201–2017, General Conditions of the Contract for Construction

...

  .4    ~~AIA Document E202™–2008, Building Information Modeling Protocol Exhibit, if completed, or the following:~~

  ~~.5~~    Other documents:

...

      .1  Exhibit A –Guaranteed Maximum Price Amendment
      .2  Exhibit B - Preconstruction Scope of Services Exhibit from April 2020 Letter Agreement
      .3  Exhibit C - Lien and Claim Release and Waiver Forms
      .4  Exhibit D – Project Insurance and Bonding Requirements
      .5  Exhibit D-1 – Subcontractor Default Insurance Policy
      .6  Exhibit E – Funds Control Agreement
      .7  Exhibit F – Responsibility Matrix
      .8  Exhibit G – Construction Manager Charge Out Rates

...

Cody Lane Development Corporation                     David S. Layton, President
David C. Saunders, President                          Layton Construction Company, LLC

*DSL*

Additions and Deletions Report for AIA Document A133™ – 2009 (formerly A121™ CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report oyright violations, e-mail copyright@aia.org.
er Notes:                                                                                                          (862472773)

*D₂S*

17

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## *Certification of Document's Authenticity*
### *AIA® Document D401™ – 2003*

I, , hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 13:57:01 ET on 05/28/2021 under Order No. 7344460123 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A133™ – 2009, Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price, as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

_____
*(Signed)*

_____
*(Title)*

_____
*(Dated)*

*DSL*

*D ᴇ S*

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This document was produced by AIA software at 13:57:01 ET on 05/28/2021 under Order No.7344460123 which expires on 02/05/2022, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                         (862472773)

1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## EXHIBIT B

## PRECONSTRUCTION SCOPE OF SERVICES

Layton will provide preconstruction services to the Owner and Owner's Representatives for the Teton Village luxury condominium project as described in the scope of work below.

1) **Meetings:** Attend weekly team meetings held in the Salt Lake City area (or via phone/skype for out of town meetings).

2) **Project Site Visits:** Make approximately six (6) Site visits.

3) **Program Review:** Complete review of owner's program and make recommendations

4) **Budget:** Produce take-offs and estimates in CSI Division format for 3 complete estimates at mutually-agreed upon design stages as per the Development Schedule. Provide monthly project estimate updates with itemized trend log.

5) **Schedules**: Monitor Owner's Design progress as per the Development Schedule. Develop CPM Construction schedule to include all construction activities and completion date.

6) **Long Lead:** Identify Long Lead items and coordinate planning for early procurement/bid.

7) **Value Engineering** – Identify, track, and quantify cost reduction ideas, recommend material or systems alternates that would increase value and/or reduce costs.

8) **Constructability**– Provide constructability reviews, evaluation and analysis of major systems (structural, MEP, FA/FP), and material selection suggestions.

9) **Document Review** – Review construction documents created by the design team for thoroughness, constructability, conflicts, errors, and omissions.

10) **Site Logistics**– Prepare a site staging plan that includes additional land(s) for construction staging and parking/shuttling of personnel. Coordinate with Owner for assistance in obtaining all necessary governmental and neighbor approvals.

11) **Bid Packages for 2021 Construction**
    a) Develop prequalified subcontractor list with Owner Representative's participation and approval.
    b) Solicit subcontractor participation sufficient to obtain 3 qualified and competitive bids per trade.
    c) Prepare a bid spread recap and proposed GMP cost breakdown and review with Owner Representative to obtain Owner approval.
    d) Develop qualifications, assumptions, and clarifications document, but only to the extent to clarify changes to the bid documents or gaps and omissions within the bid documents.
    e) Variance Reports - Identify budget impacts due to changes in project design and scope

DSL D ₌ S

72548.1 0070998-00001

DocuSign Envelope ID: 9BCA2C87-E5EF-478F-8D2F-48FAC0C4D4EE

14) Cooperate with Owner to negotiate and prepare the Prime Contract and all relevant exhibits.

15) **Authorized Subcontractor Work:** Shoring engineering by Schnabel Engineering is authorized to be completed for an amount not to exceed $30,000 within the GMP amount.

16) Reference Preconstruction Schedule "Concept 3.0" dated 02/05/20 prepared by Breen Group Inc. for DDRM Jackson LLC, development manager for Owner. The Development Schedule will be updated from time to time.

17) Authorized personnel or positions that may charge time and cost to the Project for services performed under this agreement are as follows:
   a. Project Executive – Bil Munck
   b. Construction Manager – Robert Minhondo and Matt Noyce
   c. Superintendent – Travis Mortensen and Paul Nelson
   d. Preconstruction Manager – Jacob Keith
   e. Estimators – As assigned by Jacob Keith
   f. Other personnel as approved by Owner's Representative

18) Costs from approved subcontractors within amounts authorized within this agreement.

19) Reimbursable expenses to include costs incurred by Contractor related to travel, lodging, meals, and other miscellaneous expenses such as specialty printing by outside vendors or other expenses approved by Owner's Representative.

DSL D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# EXHIBIT C

## CLAIM WAIVER AND RELEASE FORMS

| CONDITIONAL CLAIM WAIVER AND RELEASE | UNCONDITIONAL CLAIM WAIVER AND RELEASE |
|---|---|

The undersigned does hereby acknowledge that upon receipt by the undersigned of a check from _____ in the sum of $_____ and when the check has been properly endorsed and has been paid by the bank upon which it was drawn, this document will become effective to waive and release any and all claims, including, but not limited to, negligence, breach of contract, delay and impact claims, or otherwise, which the undersigned has or may have, whether known or unknown, on the below-referenced job ("Claims"). This waiver and release covers a payment for labor, services, equipment, materials furnished and/or Claims through_ _____(Date) only and does not cover (a) any retention or (b) any change order work approved in writing but not included in the progress or final pay request. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF WYOMING THAT THE ABOVE IS A TRUE AND CORRECT STATEMENT.

SIGNATURE:

_____
(Authorized Corporate Officer/Partner/Owner)

(Title)_____

Company Name: _____

Dated this____day of_____, 202

Project Name: _____

Project Address: _____

_____

---

The undersigned does hereby acknowledge that the undersigned has been paid and has received progress payments in the sum of $_____ for, labor, services, equipment or materials furnished to the below-referenced job and does hereby waive and release any and all claims, including, but not limited to, negligence, breach of contract, delay and impact claims, or otherwise, which the undersigned has or may have, whether known or unknown, on the below-referenced job ("Claims"). This wavier and release covers payment for labor, services, equipment, materials furnished and/or Claims through _____ (Date) only and does not cover (a) any retention or (b) any change order work approved in writing but not included in the progress or final pay request.

NOTICE: THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.

I CERTIFY UNDER PENALTY OF PERJURY UNDER LAWS OF THE STATE OF WYOMING THAT THE ABOVE IS A TRUE AND CORRECT STATEMENT.

SIGNATURE:

_____
(Authorized Corporate Officer/Partner/Owner)

(Title)_____

Company Name: _____

Dated this____day of_____, 202

Project Name: _____

Project Address: _____

DSL D &S

460.1 0070998-00001

30238.1 0070998-00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# EXHIBIT C

## WYOMING STATUTORY LIEN WAIVER FORM

Note to lien claimant: Signing this form has legal implications. If you have any questions regarding how to complete this form or whether it has been properly completed, you should consult an attorney.

### LIEN WAIVER

TO:_____          PROJECT: Hoback Club_____

FROM:_____

DATE:_____

PAYMENT: $_____

In consideration of the PAYMENT received to date, the undersigned does hereby waive, release, and relinquish any and all claim and/or right of lien against the project and the real property improvements thereto for labor and/or materials furnished for use in construction of the project; provided however, the undersigned reserves all claims and/or rights of lien as to monies withheld as retainage in the amount of $ _____, and any labor and/or materials hereafter furnished for which payment has not yet been made. The undersigned has not been paid the sum of $ _____ for work performed and/or materials provided under contract on this project and retains the right to file a lien against the property and pursue any and all actions to recover the full amount due, including any and all equitable claims. The undersigned acknowledges receipt of payment for work performed or materials provided and acknowledges that this waiver may be relied upon by the owner even if the undersigned accepts payment in uncertified funds and such payment is subsequently dishonored or revoked, in which case this lien waiver shall remain in full force and effect. The foregoing waiver shall not apply, however, if payment tendered by the owner is dishonored or revoked.

By:                                          _____

                                             Contractor/Subcontractor/Materialman/Employee

Title: _____

Date _____

STATE OF _____          )

_____          )

                                             )    ss.

COUNTY OF _____          )

_____

This instrument was acknowledged before me on this _____ day of _____, 20___, by (name of person) as lien claimant or (title, position or type of authority granted by lien claimant) of _____ _____ (lien claimant).

IN WITNESS THEREOF, I have hereunto set my hand and affixed my official seal on the day and year last above written.

_____

Notarial officer

My Commission Expires:

Seal:

DSL  D&S   2222255-600000026-00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# EXHIBIT D

## PROJECT INSURANCE AND BONDING REQUIREMENTS

I.    **Owner's Insurance**

   A.    **Owner Controlled Insurance Program**

Owner, as part of an Owner Controlled Insurance Program ("OCIP"), has obtained a primary commercial general liability insurance policy ("OCIP Policy"), also commonly referred to as a Wrap Up Policy, naming it, as well as other designated construction participants, including Contractor, and other eligible and enrolled trades (hereinafter collectively referred to as "Participants"), for certain insurable risks on this Project. The OCIP is administered through Paladin Risk Management ("Program Administrator").

The OCIP Policy is specific to the subject Project and extends coverage to Contractor and all of its eligible and enrolled subcontractors performing Work (as defined in the AIA A133-2009 Construction Contract and AIA A201-2017 General Conditions (the "Agreement"), or defined as services performed, if undefined) in connection with the Project on the property. Execution hereof by Contractor constitutes Contractor's agreement to enroll in such OCIP Policy and to abide and be bound by (a) all the terms, conditions, limitations, and exclusions of the OCIP Policy and (b) all the provisions and requirements of the OCIP Insurance Program Manual ("Insurance Manual") as it may be amended from time to time, the "Manual".

Without in any manner modifying the OCIP policy, enrollment in the OCIP occurs upon the issuance of a Certificate of Enrollment. Enrollment must take place prior to an occurrence for which coverage is sought under the OCIP. Eligible parties shall be enrolled in the OCIP through the Program Administrator ("Eligible Parties"). Certain parties may be ineligible for enrollment into the OCIP if their scope of Work is of the type which would be excluded under the OCIP ("Ineligible Parties"). These Ineligible Parties shall provide insurance as set forth herein and in the Agreement. In limited circumstances, parties may be excluded from the OCIP by Owner in its sole discretion ("Non-Enrolled Parties"). These Non-Enrolled Parties shall provide insurance as set forth herein and in the Agreement.

The OCIP Coverages shall cover Enrolled Parties only. Enrolled Parties are the Owner, Contractor and eligible subcontractors of all tiers that enroll in the OCIP, and such other trades, persons or entities as Owner may designate, in its sole discretion (each party insured under the OCIP is an '"Enrolled Party"). Enrolled Parties shall obtain and maintain and shall require each of their subcontractors of all tiers to obtain and maintain, the insurance coverages required of them herein in addition to the OCIP.

The OCIP Coverages do not cover the following "Excluded Parties" or coverages:
   a.  Hazardous materials, their remediation, removal and/or transport companies and their consultants;
   b.  Worker Compensation, Employers Liability and Unemployment – Contractor and Subcontractors to provide coverage or enroll in WY statutory program;
   c.  General Liability for Off-site Operations – Contractor and Subcontractors to provide;
   d.  Commercial Automobile Liability – Contractor and Subcontractors to provide;
   e.  Professional Liability;
   f.  Architects, surveyor, engineers, and soil testing engineers, and their consultants;
   g.  Vendors, suppliers, fabricators, material dealers, truckers, haulers, drivers and others who merely transport, pick up, deliver, or carry materials, personnel, parts or equipment, or any other items or persons to or from the Project site;

DSL   D c S

1

111007410 1 0070998- 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

h. Subcontractors and each of its or their respective subcontractors of all tiers that do not perform any actual labor on the Project site; and

i. Any parties or entities not specifically identified in this Exhibit, as well as any parties or entities excluded by Owner in its sole discretion, even if they are otherwise eligible.

The types of risks covered by this policy are defined and specified in the actual insurance policy. Contractor is charged with the responsibility of obtaining from the Broker-of-Record, IMA Corp., a copy of the OCIP Policy for review. It is Contractor's responsibility to obtain professional assurance and/or legal counsel regarding this insurance policy. Owner makes no representations regarding the scope, adequacy, nature, quality or limits of the OCIP and Contractor expressly acknowledges the lack of reliance upon any representations made by Owner or its representatives regarding the scope, adequacy, nature, quality or limits of the insurance provided by the OCIP Policy. Contractor shall hold Owner and its representatives, including, but not limited to free and harmless from any and all claims asserting or alleging that the scope, type and/or amount of coverage provided under the OCIP is inadequate or insufficient. The OCIP is intended to be the primary source of coverage for the risks covered thereunder and shall assume primary position to Contractor's insurance in the areas of risk covered by the OCIP.

1. Owner shall be responsible for payment of insurance premiums for the OCIP Policy. Contractor shall not be responsible in contributing toward the OCIP insurance premium. Contractor shall bid net of its general liability insurance costs for insurance coverage provided under the OCIP only. Contractor shall require all subcontractors and all their sub tier subcontractors who participate in the OCIP to bid net of their general liability insurance costs for insurance coverage provided under the OCIP.

2. The OCIP Policy available limits shared among Owner, Contractor, and eligible and enrolled subcontractors and all their sub tier contractors are as follows:

| Designated Project Name | H1 Teton Village, Jackson Hole, WY |
|---|---|
| Type of Project | Condominiums |
| Number of Units | 25 |
| Coverage Area | Includes 2,000 feet within the staging area including parcel G, 224 & 225 |
| First Named Insured | Cody Lane Development Corp |
| OCIP Administrator | Paladin Risk Management |
| OCIP Inspections | Quality Built |
| **Primary Insurance** | |
| Insurance Carrier | Hudson $2M/$2M/$2M |
| Policy Period | 05/26/2021 – 05/26/2024 |
| Policy Number | HCG1000453-01 |
| Limits | $2,000,000 Each Occurrence<br>$2,000,000 General Aggregate<br>$2,000,000 Products-Completed Operations Aggregate |
| Deductible | $25,000 per occurrence |
| **Excess Insurance** | |
| Limits | $115,000,000 Each Occurrence<br>$115,000,000 General Aggregate<br>$115,000,000 Products-Completed Operations Aggregate |

3. **Deductible:** The OCIP requires satisfaction of a per occurrence Deductible in the amount of $25,000. In the event of an occurrence during the course of construction (prior to

DSL

D ᴇ S

111092410 1 0070008- 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

completion and acceptance of Contractor or subcontractor's Work) or after the course of construction (during the policy's statute of repose), which requires Owner to satisfy all or any portion of the Deductible and which arises out of the scope of Work by or for Contractor, Contractor shall contribute up to the maximum amount of the Deductible due for events arising out of the negligent or other wrongful acts or omissions of the Contractor or its subcontractors, including those acts and omissions which constitute breaches of the Contract Documents.

This allocation of the Deductible is not an indemnity claim and shall remain uninsured by the OCIP. It is a contractual allocation of the mutual obligations of the insureds under the OCIP Policy. Upon written notice from Owner of the required Deductible contribution amount provided above and the basis therefore, Contractor shall provide said sum to Owner within thirty (30) days after receipt of such notice.

**B.      Builder's Risk Insurance**

Owner shall provide property insurance/Builders Risk coverage on an "all-risk" or equivalent policy form and shall include, without limitation, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, and to building systems from testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

1.      The Builder's Risk insurance requires a $25,000 deductible and the Owner shall be responsible to pay costs not covered because of such deductibles. However, the Owner reserves the right, at the Owner's sole discretion, to require repayment from the Contractor of the deductible amounts caused, in whole or in part, by any loss or damages – including water intrusion within the building - resulting from the acts, errors or omissions of the Contractor or its Subcontractors, and Contractor may pass through the cost of such deductibles to its Subcontractors, as appropriate. The deductible obligation of Contractor shall not be greater than that which is proportionate to the insured damages for which Construction Manager or its subcontractors are responsible compared to the total insured damages. At Owner's sole option and election, Owner may offset the cost of such deductibles against amounts owing by Owner to Contractor under the Agreement and/or the other Contract Documents.

2.      This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit anywhere in the USA and Canada to a limit of $5M per occurrence (which can be increased on a case by case basis). Airborne and over-water shipping transports are excluded.

3.      Partial occupancy or use in accordance with Section 9.9 of the AIA A201-2017 General Conditions shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

4.      If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such or adjacent insurance.

a.      If during the Project construction period the Owner insures properties, real or personal or both, at to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those

DSL   D & S

.....2410 | 0070998- 00001

3

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

insuring the Project during the construction period, the Owner waives all rights in accordance with the terms of Section 11.3 of the General Conditions for damages caused by fire or other causes of loss covered by this separate property insurance.

### C.    Pollution Insurance

The Owner is placing and paying for a project specific primary Pollution Liability wrap-up insurance policy that will include coverage for the General Contractor and every subcontractor who are enrolled. All Bids are to be "Net of Pollution Wrap-up Policy" meaning to exclude coverage and premiums, except for coverages that are excluded from this policy noted below.

| | |
|---|---|
| Coverage Limit: | $10M through Excess Limits per Occurrence & Aggregate |
| Coverage Period: | Construction Period plus a 10 year tail for completed operations through the WY Period of Repose |
| Deductible: | $25,000 per occurrence (paid by the party responsible for the claim) |
| | $50,000 per occurrence for mold claims (paid by the party responsible for the claim) |

DSL D⋅S

02410 1 0070998. 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## II. Contractor's Insurance and Bonds

A.    **Insurance.**  Contractor and its subcontractors and its sub tier contractors who are enrolled in the OCIP shall, prior to commencement of their Work and prior to entry onto the Project, provide evidence of all Required Insurance coverages as set forth in this Addendum in the form of a certificate from a carrier or carriers that has or have a current AM Best rating of A- or better:

1.    Commercial General Liability Insurance, written on a full occurrence policy form, provides coverage on a primary and non-contributory basis, and **covers work and operations away from and/or adjacent to the Project (off-site)**, with minimum limits of liability of not less than:

| | | |
|---|---|---|
| $ | 1,000,000 | Each Occurrence |
| $ | 1,000,000 | Personal and Advertising Injury |
| $ | 2,000,000 | General Aggregate |
| $ | 2,000,000 | Products/Completed Operations Aggregate |
| $ | 50,000 | Fire Damage Legal Liability |
| $ | 10,000 | Medical Expenses Per Person |

This insurance will (i) be written on an occurrence basis; (ii) name Owner as additional insured and not contain any cross suits exclusion; (iii) be primary with respect to any insurance or self-insurance programs maintained by Owner, except for the OCIP described herein; (iv) include terms and conditions substantially similar to Insurance Service Office Form CG 001 10 01; (v) include additional insured coverage for ongoing operations for the duration of the applicable statute of repose; (vi) not include any mold exclusion, and (vii) include third-party crime coverage for Contractor's employees.

2.    Excess/Umbrella Liability Coverage:

| | |
|---|---|
| $5,000,000 | Each Occurrence |
| $5,000,000 | Aggregate |

Owner to be named as an additional insured.

CGL Insurance Limit requirements of certain subcontractors may be less than the above if agreed to by the Owner and Contractor in writing with reference to the specific Subcontractor or trade.

3.    Commercial Auto Insurance, including liability for "any auto" or for all owned, non-owned, leased and hired automobiles, trucks, trailers, and semi-trailers, including but not limited to any machinery or apparatus attached thereto, with minimum limits of not less than:

| | |
|---|---|
| $1,000,000 | Combined Single Limit per each Accident for bodily injury and property damage |

DSL  D ← S

11110924101 0020998- 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

4.  Workers' Compensation Insurance compliant with State law and maintained at least 10 years after Substantial Completion, and Employer's Liability maintained at least one year after all on-site operations (including warranty or repair work) are completed, with minimum limits of not less than:

| | |
|---|---|
| $1,000,000 | Bodily Injury by Accident (per accident) |
| $1,000,000 | Bodily Injury by Disease (policy limit) |
| $1,000,000 | Bodily Injury by Disease (per employee) |

4.  Professional Liability Insurance

Contractor shall provide Professional Liability Insurance for errors and/or omissions for design or design/build professional services with minimum limits of:

| | |
|---|---|
| $5,000,000 | Per claim limit and |
| $5,000,000 | Annual aggregate limit |

All coverage shall be retroactive to the earlier of the date of Contractor's Preconstruction Services Limited Authorization Letter Agreement and shall be maintained for a period of ten (10) years after the date of final payment under the Agreement. Retroactive date of such policy must be on or before the date Contractor began offering professional services.

5.  Pollution Liability Insurance

The Contractor will carry a Pollution Liability policy which provides coverage above the Owner procured coverage identified above as follows:

| | |
|---|---|
| Coverage Limit: | $5M per Occurrence & Aggregate |
| Coverage Period: | Construction Period plus a 10 year tail for completed operations through the WY Period of Repose |

6.  Contractor agrees that Excluded Parties and parties no longer enrolled in or covered by the OCIP shall obtain and maintain, and shall require each of their subcontractors of all tiers to obtain and maintain Commercial General Liability Insurance coverage which shall be:

(i.)  Commercial General Liability Insurance, written on a full occurrence policy form, primary and non-contributory to the OCIP, and **covering work and operations on-premises at the Project site and off-premises**, with minimum limits of liability of not less than:

| | |
|---|---|
| $5,000,000 | Each Occurrence |
| $5,000,000 | General Aggregate |
| $5,000,000 | Products/Completed Operations Aggregate |

Such insurance shall contain all standard comprehensive or commercial General liability broad form terms and conditions including coverage for liability for bodily injury, property damage, personal injury, products, contractual liability, XCU coverage (required of subcontractors involved in utility work, excavation, mechanical, electrical and/or plumbing work), and products/completed operations. Additionally, such insurance shall not contain restrictions or exclusions for subsidence or any type of earth movement, if

DSL  D L S

6

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

subcontractor's role involves excavation, residential construction of any kind, or third-party action over claims. In addition, if the Excluded Party's Commercial Liability Policy contains a Wrap-Up Exclusion, the exclusion shall state that exclusion does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement if a consolidated (wrap-up) insurance program in which you are enrolled has been provided by the prime contractor/project manager or owner of the construction project (downstream party) are enrolled in a 'controlled (wrap-up) insurance program' with respect to the 'bodily injury' or 'property damage' described above at such location. Such requirement must apply for the applicable Wyoming Statute of Repose Period.

CGL Insurance Limit requirements of certain subcontractors may be less than the above if agreed to by the Owner and Contractor in writing with reference to the specific Subcontractor or trade.

**Umbrella/Excess Limits:** Subcontractors may satisfy these Subcontractor Minimum Insurance Limits by any combination of primary liability and excess liability coverage that results in the same protection to Owner and its affiliates.

B.    **Additional Terms Applicable to Contractor's Insurance**

1.    Unless stipulated otherwise by Owner and Contractor, Contractor agrees to maintain continuous coverage for the above insurance during the entire course of Contractor's Work, from prior to the commencement of performance of the Work through the warranty period as agreed upon between Owner and Contractor, and during the term of the OCIP, whichever ends later.

2.    Commercial Auto Insurance policy provided by Contractor shall name the following as Additional Insured and Additional Insured Endorsements shall be provided:

• Cody Lane Development Corp

The required Additional Insured Endorsements shall be delivered to Owner prior to the earlier of commencement of Contractor's Work or its entry onto the Project.

3.    Contractor's General Liability, Commercial Auto Insurance and Workers' Compensation, Contractor's Equipment policies shall provide waiver of subrogation endorsements in favor of the above named Additional Insureds. Contractor waives all of its rights of recovery, and waives all rights of recovery (including but not limited to subrogation) of all its insurers and against Owner for damages that are covered by the OCIP. Contractor further waives all of its rights of recovery, and waives all rights of recovery (including but not limited to subrogation) of its insurers under the non-OCIP insurance policies maintained by Contractor in connection with its Work on the Project, against Owner. Contractor shall cause its respective insurance policies as required above to contain such waivers of subrogation, by endorsement, consent or otherwise. A waiver of subrogation shall be effective as to any individual or entity even if such individual or entity (1) would otherwise have a duty of indemnification, contractual or otherwise; (2) did not pay the insurance premium directly or indirectly; and (3) whether or not such individual or entity has an insurable interest in the property damaged.

4.    The Project is an OCIP. Contractor attests that its general liability policy does not include any exclusion of coverage for Contractor's work and operations away from and/or adjacent to the OCIP Project (off-site), such as its own premises, work performed by others on Contractor's behalf, and third party claims arising outside the Project.

5.    One or more certificates of insurance in forms acceptable to Owner, as well as copies of all Additional Insured endorsements required by this Exhibit, shall be furnished to Owner prior to

DSL  D & S

.92410 I 0070908- 0000I

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

commencement of the Work and thereafter as the coverages are renewed during the period during which the coverages are required to be maintained and thereafter prior to General Contractor's performance of any correction or curative work or work relating to any corrective or curative work or services by others. Complete copies of insurance policies required by this Exhibit shall be provided to Owner upon written request. Contractor shall provide Owner with thirty (30) days prior written notice for cancellation, material change by endorsement, and non-renewal of coverage of its General Liability, Auto, Workers' Compensation employer's liability policies, including its Professional Liability policy, if required. Contractor shall provide Owner written notice within ten (10) days for non-payment of premium. If a policy is cancelled or non-renewed, Contractor shall immediately provide replacement certificates and endorsements for the replacement coverage, consistent with the requirements of this Addendum. Any delay or failure on the part of Owner in enforcing this requirement shall not be deemed a waiver of, or estoppel to assert, the requirement or the obligation on the part of Contractor or any other party to provide insurance.

6.      Contractor's, its subcontractors' and their sub tier contractors' enrollment into the OCIP is mandatory unless specifically stated otherwise by the OCIP Policy. Contractor shall take all necessary steps to cooperate with Program Administrator to enroll its subcontractors and their sub tier contractors into the OCIP. Contractor assumes full responsibility for its subcontractors and sub tier contractors and the Work that they do. Contractor assumes full responsibility for any and all subcontractors' and sub tier contractors' compliance with and, where required, the submission to Owner of all insurance requirements set forth in the Agreement, as well as all other requirements contained in this Addendum, the Agreement and the OCIP Insurance Manual.

7.      Nothing contained in these insurance provisions or elsewhere in the Contract Documents shall relieve the Contractor or any of its subcontractors and their sub tier contractors of their respective obligations to exercise due care in the performance of their duties in connection with the Work and to complete the Work in strict compliance with the Contract Documents.

8.      If at any time Contractor's or Subcontractors' insurance fails to meet the requirements stated herein, all payments may be held until the non-compliance has been corrected to Owner's satisfaction and/or may be used by Owner to cure the non-compliance. In the event Contractor fails to secure or maintain any policy of insurance required under these insurance requirements, Owner, at its sole discretion and election, may terminate this Contract, and Owner shall retain all rights and remedies hereunder for breach of the Agreement. Contractor agrees that Owner's failure to ascertain that Contractor or its Subcontractors have not strictly complied with the requirements set out in this Exhibit shall not constitute a waiver of Contractor's or its Subcontractors' obligations set out herein.

9.      None of the requirements contained in these insurance requirements as to types, limits or acceptability of insurance coverage to be maintained by Contractor are intended to, and shall not in any manner, limit or qualify the liabilities and obligations assumed by Contractor under the Agreement or at law, including, without limitation, Contractor's indemnification obligations and liability in excess of the limits of the coverages required herein. No forbearance, act or omission by or on behalf of Owner, including, without limitation, permitting Contractor, its subcontractors and or any of their sub tier contractors to commence Work or to continue Work, or releasing any payment, or receiving any certificates, endorsements, waivers, policies or other insurance documents or information, not in compliance with any provision of these insurance requirements or any of the other Contract Documents, shall constitute a release of, waiver of or estoppel to assert any right of Owner under any of the Contract Documents or otherwise, nor a release of, waiver of or estoppel to assert any duty or obligation owed by Contractor or its subcontractors or any of their sub tier contractors, under the Contract Documents or otherwise. Owner shall not be obligated to review certificates of insurance or to advise Contractor of any deficiencies in coverage. Owner's receipt of an insurance certificate from Contractor shall not be deemed a waiver of Owner's right to enforce the terms of the Agreement nor a waiver of Contractor's obligation to obtain the coverages required herein.

DSL    D.S

111002410 1 0070998- 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**C.    Subcontractor Default Insurance (SDI)**

Contractor has procured and shall maintain at all times during performance of the Work on the Project the Subcontractor Default Insurance Policy detailed and described in the attached Exhibit D-1.  Contractor's Subcontractor Default Insurance costs allocable to the Project shall be billed to the Owner in an amount not to exceed the charge out rates agreed to by the Parties in Exhibit G.

**D.    Payment and Performance Bonds**

1.    The Contractor shall furnish separate bonds covering the faithful performance of the Contract and the payment of obligations arising thereunder. The amount of each bond shall be equal to one hundred percent (100%) of the Guaranteed Maximum Price, and such amount shall be adjusted as the Guaranteed Maximum Price is adjusted pursuant to the Contract Documents. The identity of the surety shall be acceptable to the Owner in its reasonable discretion. The Contractor shall deliver the required bonds to the Owner not later than five (5) business days following the execution of the Guaranteed Maximum Price Amendment.

2.    Any Change Order, Construction Change Directive, order for a minor change in the Work or other Modification under the Contract shall not be subject to inspection or approval by any surety on any required bond. The surety on such bond, by issuing the bond, expressly waives its right to approve, and consents to, any such Change Order, Construction Change Directive, order or Modification.

3.    The surety on any required bond shall be bound to mediate and litigate any disputes between and among it, the Owner, Owner's separate consultants and contractors and their subconsultants and subcontractors, Lessee, Lessee's design professionals, consultants and subconsultants, contractors and subcontractors and their sureties, Contractor, Subcontractors, Subcontractors' sureties, Architect, Architect's consultants, and other persons or entities under contract or otherwise engaged to furnish labor, services, materials or equipment for the Project or Lessee's tenant improvement work in the same way and to the same extent that the Contractor shall be bound to mediate and litigate any disputes between and among such parties. The surety shall be bound by the mediated agreement in the same way and to the same extent that the Contractor shall be bound by the Agreement.

4.    Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made .

5.    With the Owner's prior written approval, the Contractor may require one or more Subcontractors to furnish payment and performance bonds covering faithful performance of the particular subcontract and payment of obligations arising thereunder.

DSL   D ᴜ S

111092410 1 007099X- 00001

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE



X<sup>L</sup> **Insurance**

# Policy

DSL    D ₑ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Alabama | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
|---|---|
| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |

$\mathcal{DSL}$

PN CW 01 0719

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

$D$ & $\varsigma$

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

| New Mexico | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
|---|---|
| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.<br><br>**WARNING: All Workers Compensation Insurance:**<br>Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of:<br>1. obtaining any benefit or payment,<br>2. increasing any claim for benefit or payment, or<br>3. obtaining workers' compensation coverage under this act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |
| Pennsylvania | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |

DSL

PN CW 01 0719

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

D ι S

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

DSL

D.S

© 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

## PRIVACY POLICY

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

## Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the AXA XL insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

## Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

DSL

PN CW 02 0119

D ᴸ S

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Page 1 of 3

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and

- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

DSL D e S :0119

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you. We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

DSL D & S 10119

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## NOTICE TO POLICYHOLDERS

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1]. Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions embargoes or export controls applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions, embargoes or export controls law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC or the applicable regulator. Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

*DSL*

PN CW 05 0519

©2019 X.L. America, Inc. All rights reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*D ₴ S*

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## POLICYHOLDER DISCLOSURE

### NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019; AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

Terrorism Coverage Premium - Included at no additional charge.

$D \epsilon \zeta$

$DSL$

Includes copyrighted material of National Association of Insurance Commissioners, with its permission.
PN104 01 15 T

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE



 **Insurance**

**Regulatory Office**
Dept: Regulatory
505 Eagleview Blvd., Suite 100
Exton, PA 19341-1120
Telephone: (800) 688-1840

**Company Providing Coverage:  Indian Harbor Insurance Company**

PROJECT ATTACHING

# *Subcontractor Default Insurance*
### POLICY DECLARATIONS

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS.

Policy Number:   CSD7422005

Renewal of:   Not Applicable

Item 1. | Insured: | STO Building Group
| Address: | 330 West 34th Street, 12th Floor
| | New York, NY 10001

| Producer Name: | Willis Towers Watson Insurance Services West, Inc.
| Address: | 500 North Akard Street, Suite 4300
| | Dallas, Texas 75201

Item 2.   **Policy Period:**

From:   January 1, 2021      To:   January 1, 2022

at 12:01 A.M. Standard Time at the **Insured's** address shown in Item 1.

Item 3.   Limits of Insurance:

a.   Variable Loss Limit:   Not Applicable   % of the **Contract Amount**

Each Loss Limit:   $   See Endorsement #12

*DSL   D ε S*

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

| | | | | |
|---|---|---|---|---|
| c. | Aggregate Limit: | $ | 150,000,000 | |
| **Item 4.** | **Indirect Cost Sublimit of Insurance:** | $ | 10,000,000 | per **Loss** |
| **Item 5.** | **Deductible:** | $ | 5,000,000 | each and every **Loss** |

**Item 6.**    **Co-payment Deductible Amount:**

| | | | |
|---|---|---|---|
| a. | Co-payment Percentage: | | 20% |
| b. | Co-payment Layer Amount: | $ | 3,000,000 |
| c. | Maximum Co-payment Amount: | $ | 600,000 |

**Item 7.**    **Policy Retention Aggregate:**    $ 7,500,000    Adjustable upwards only, at a rate of $/$1,000 of **CoveredSubcontract(s) or Purchase Order Agreements.**

**Item 8.**    **Deposit Premium:**    $ Not Applicable    Premiums do not include taxes and surcharges.

**Item 9.**    **Premium Rate:**    $ See Endorsement #13    Per $1,000 of **Covered Subcontract(s) or Purchase Order Agreements.**

**Item 10.**    **Interim Percentage:**    95    %

**Item 11.**    **Scheduled Projects:**    Refer to the reports as specified in Section 9. Definitions, Item m.

**Item 12a.**    **Contract Amount Maximum:**    $ 60,000,000

**Item 12b.**    **Contract Amount Minimum:**    $ Not Applicable

**Item 13.**    **Reporting Period:**    Quarterly

**Item 14.**    **Estimated Enrollment:**    $ 1,800,000,000

**Item 15.**    **ENDORSEMENTS ATTACHED AT POLICY ISSUANCE:**

| Endorsement Number | Endorsement Form Number | Endorsement Title |
|---|---|---|
| | IL MP 9104 0314 IHIC | In Witness Indian Harbor Insurance Company |
| | KSX 050 0216 | Subcontractor Default Insurance Coverage Form |
| 1 | XL-NYSOP 0118 | Service of Process |
| 2 | KSX 413 0515 | Additional Insured Endorsement |
| 3 | KSX 401 0515 | Indirect Costs Agreed Amount Endorsement |
| 4 | KSX 402 0515 | Early Reporting Endorsement |
| 5 | KSX 407 0915 | Project Contingency Endorsement |
| 6 | KSX 408 0515 | Recovery Funds Sublimit Endorsement |
| 7 | KSX 416 0515 | Claims Expert Sublimit Endorsement |
| 8 | KSX 421 1015 | Joint Venture Endorsement |
| 9 | KSX 435a 0816 | Claim Reporting Period Endorsement |

DSL

KSX 000 0719

D t S

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

| 10 | KSX 440a 0219 | Combined Self Performed Work and Bid Default Endorsement |
| 11 | KSX 605 0515 | Extended Residential Exclusion Plus Wrap Up Endorsement |
| 12 | KSX MANUS 0515 | Tiered Limit Endorsement |
| 13 | KSX MANUS 0515 | Tiered Premium Rate Endorsement |
| 14 | KSX MANUS 0515 | Manuscript Shared Limit & Policy Retention Aggregate Endorsement |

_____

Authorized Representative

DSL   D ɛ S

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT: REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Joseph Tocco
President

Toni Ann Perkins
Secretary

DSL    D. S

IL MP 9104 0314 IHIC

©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.     Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

PROJECT ATTACHING

# *Subcontractor Default Insurance*

COVERAGE FORM

Words in bold have special meaning; refer to Section **9. DEFINITIONS.**

## 1. INSURING AGREEMENT

The Company will indemnify the **Insured** for **Loss** after application of the Deductible and Co-payment Deductible amounts as stated in Item 5. and 6. of the Declarations and subject to the Retention Aggregate stated in Item 7. of the Declarations, but only to the extent of a **Default of Performance** by the **Insured's Subcontractor/Supplier** as respects any **Covered Subcontract or Purchase Order Agreement.** The amount paid by the Company will be subject to the Limits of Insurance stated in Item 3. of the Declarations and will not be eroded by the Deductible and Co-payment Amounts stated in Item 5. and 6. of the Declarations page.

## 2. LIMITS OF INSURANCE

a. The Company will never pay more than the Aggregate Limit of Insurance listed in Item 3.c. of the Declarations. This Aggregate Limit of Insurance is the most the Company will pay regardless of the number of:

(1) **Insured(s)**;

(2) **Subcontractor(s)/Supplier(s)**;

(3) **Covered Subcontracts or Purchase Order Agreement(s)**;

(4) **Scheduled Project(s)**; or

(5) claims made or suits brought.

b. The Aggregate Limit of Insurance listed in Item 3.c. of the Declarations is the most the Company will pay for the sum of all **Loss(es)** in excess of the Deductible and Co-payment Deductible Amount from all **Defaults of Performance** as respects all **Covered Subcontracts or Purchase Order Agreements** executed during the **Policy Period**.

Once the Aggregate Limit of Insurance in any **Policy Period** is completely exhausted, the Company shall have no further obligation to indemnify the **Insured** for **Loss(es)**.

c. Subject to Section 2.b. above, the most the Company will pay for any one **Loss** will be the lesser of:

(1) the Variable Loss Limit Factor times the **Contract Amount**; or

(2) the Each Loss Limit of Insurance listed in Item 3.b. of the Declarations.

In the event the Variable Loss Limit Factor is listed as "Not Applicable" or "N/A", the most the Company will pay for any one **Loss** will be the Each Loss Limit of Insurance listed in Item 3.b of the Declarations.

d. Subject to Section 2.c. above, the Company will not pay more than the Indirect Costs Sublimit of Insurance shown in Item 4. of the Declarations for all **Indirect Costs** from any one **Loss.** Any amounts that the Company pays to indemnify **Indirect Costs** under this Section 2.d. will erode the Each Loss Limit of Insurance applicable to the coverage provided for any one **Loss.**

## 3. DEDUCTIBLE AND CO-PAYMENT DEDUCTIBLE AMOUNTS

a. The Deductible, if any, listed in Item 5. of the Declarations is the amount of each **Loss** that is to be borne by the **Insured** with respect to each and every **Loss** to which this Policy applies.

b. The **Insured's** Co-payment Deductible Amount, if any, is listed in Item 6. of the Declarations and applies to each **Loss** after the application of the Deductible.

c. The **Insured's** total liability for all Deductible and Co-payment Deductible Amount for all **Losses** to which this insurance applies will not exceed the Policy Retention Aggregate listed in Item 7. of the Declarations.

d. The **Insured's** rights and duties in the event of a **Default of Performance** apply regardless of the application of the Deductible and Co-payment Deductible Amount.

*DSL  D₊S*

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

e.  If any payments are made by the Company under this Policy for any **Loss** covered by this Policy, the Deductible(s) shown in the Declarations apply regardless of whether any other policies issued by the Company or any other carrier also apply, and must be paid by the **Insured**.

### 4.  EXCLUSIONS
This insurance does not apply to any **Loss**, or portions thereof:

a.  Caused by any **Subcontractor/Supplier** who is in or to whom the **Insured** has issued a written notice of **Default of Performance**, and said default has not been cured as of the first day of the **Policy Period**.

However, if such **Default of Performance** was disclosed to the Company in advance of binding this Policy, the Company may, at the Company's sole discretion, agree to add coverage for any such **Subcontractor/Supplier** via endorsement to this Policy, in which case this exclusion will not apply for that **Subcontractor/Supplier**.

b.  Arising from any **Covered Subcontract or Purchase Order Agreement** for which a payment and/or performance bond has been provided and the **Insured** is an obligee of such bond(s).

c.  To the extent that the **Loss** is caused by any dishonest or fraudulent act or omission, or any intentional misrepresentation committed by the **Insured**.

d.  Arising from any **Covered Subcontract or Purchase Order Agreement** that is purchased, assumed, or otherwise acquired by the **Insured** from any other person or entity, or sold or otherwise transferred or assigned by the **Insured** to any other person or entity unless specifically agreed to in writing by the Company.

e.  Of any type, however caused, arising directly or indirectly, out of:

(1) war, including undeclared or civil war;

(2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority.

f.  Arising from nuclear reaction or nuclear radiation or radioactive contamination.

g.  Arising out of the failure of a **Subcontractor /Supplier** to render professional services, but only with respect to their providing engineering, architectural or surveying services in their capacity as an engineer, architect or surveyor.

Professional Services include:

(1) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

(2) supervisory or inspection activities performed as part of any related architectural or engineering activities.

However, this exclusion does not apply to:

(1) normal supervisory duties of a general contractor or **Subcontractor/Supplier** on a construction project; or

(2) a **Default of Performance** by a **Subcontractor/Supplier** engaged by the **Insured** whose work is primarily construction, but who may also provide incidental professional services necessary for the completion of the construction services required by the contract.

h.  Arising, either directly or indirectly, from **Bodily Injury**.

i.  To the extent that the **Loss** includes damages awarded by a court that are punitive in nature, such as:

(1) punitive or exemplary damages; or

(2) double or treble damages (or any other multiple of actual damages).

### 5.  COVERAGE TERRITORY
This insurance only applies to claims made or brought in the Unites States (including its territories and possessions) and Canada for Loss(es) arising from projects located in the United States (including its territories and possessions) and Canada.

### 6.  CLAIMS
a.  The **Insured** bears the burden of proving that it has complied with all terms and conditions of this Policy and that the **Loss** is recoverable under this Policy.

DSL   D & S

© 2016 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

Exhibit 2
Page 2 of 9

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

b. Notice of **Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Insured** becomes aware that a **Subcontractor /Supplier** is in **Default of Performance** or is **Insolvent**.

c. In the event of a **Loss**, the **Insured** must submit to the Company a satisfactory **Proof of Loss**. Submission of a **Proof of Loss** must be made at the earlier of:

   (1) ten (10) years after the substantial completion of the **Covered Subcontract or Purchase Order Agreement**;

   (2) the expiration of any right to seek recovery under any **Covered Subcontract or Purchase Order Agreement** in connection with a **Default of Performance** covered by this Policy; or

   (3) the expiration of any statute of limitation or statute of repose applicable to recovery against the **Covered Subcontract or Purchase Order Agreement** or to the **Loss**.

d. The Company's indemnification of the **Insured's Loss** will be calculated as follows, subject to the Limits of Insurance and the provisions of this Policy:

   (1) calculate the amount of **Loss** and then subtract any **Indirect Costs** in excess of the sublimit on Item 4. of the Declarations page;

   (2) subtract the Deductible from the amount determined in Item (1) above;

   (3) take the lesser of the amount determined in Item (2) above or the Co-payment Layer Amount as stated in Item 6.b. of the Declarations and multiply by the Co-payment Percentage stated in Item 6.a. of the Declarations (if any);

   (4) subtract the amount in Subparagraph 6.d.(3) above from the amount determined in Subparagraph 6.d.(2) above;

   (5) take the amount determined in Item (4) above and apply the lesser of the following Limits:

      (i) the Variable Loss Limit Factor times the **Contract Amount**; or

      (ii) the Each Loss Limit of Insurance, as applicable.

In the event the Variable Loss Limit Factor, shown in Item 3.a. of the Declarations is listed as "Not Applicable" or "N/A", then the Each Loss Limit of Insurance will apply.

e. The Company will indemnify the **Insured** within thirty (30) days of receipt of a satisfactory **Proof of Loss**. In the event the **Insured** provides the Company with documentation presented as a **Proof of Loss** that the Company finds deficient, the Company will notify the **Insured** of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a **Loss** within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the **Insured** of a deficiency in a **Proof of Loss**, the Company will pay any covered amount, up to the Each Loss Limit of Insurance as stated in Item 3.b. of the Declarations, for which the **Proof of Loss** is not deficient.

f. If the **Insured** pays **Loss(es)** over a period of time greater than thirty (30) days, the **Insured** may submit interim **Proofs of Loss**. If an amount would constitute a **Loss** except that the amount of the **Loss** has not been finally determined, the Company will indemnify the **Insured** for the Interim Percentage as stated in Item 10. of the Declarations, of the **Loss** payment which would have been payable as calculated above, after the Company accepts a satisfactory **Proof of Loss**.

g. The **Insured** must immediately return any payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the **Loss** does not arise out of a **Default of Performance**.

h. The **Proof of Loss** and any amounts claimed as covered **Loss(es)** under this Policy are subject to audit by the Company in accordance with Section **8. CONDITIONS**, Item i., **Inspection and Audit,** of this Policy.

i. In the event that the **Insured** and the Company cannot agree that a claim is a **Loss**, or cannot agree on the amount of **Loss** the **Insured** has incurred or paid, either party may commence proceedings in accordance with Section **8. CONDITIONS**, Item c., **Dispute Resolution**, of this Policy.

**7. SUBROGATION AND RECOVERIES**

a. In the event of any payment by the Company under this Policy, the Company shall receive, to the extent of such payment, all of the **Insured's** rights of recovery and other remedies against all persons, entities or organizations with respect to such payment.

$D \cdot S$  $DSL$

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

b.  Unless otherwise agreed to by the Company and the **Insured**, the Company shall, at the Company's option, pursue all recovery and subrogation actions for **Losses** paid.

c.  The **Insured** must take all reasonable steps to preserve the Company's rights of recovery against the persons, entities or organizations identified in Section 7.a. hereto, and the **Insured** shall do nothing to prejudice such rights.

d.  The **Insured** must cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the **Insured** because of **Loss** to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a **Subcontractor/Supplier** or its property.

e.  After payment of the **Loss**, any funds or salvage recovered will be paid to the Company and shared between the **Insured** and the Company in the following order:

    (1)  the Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses;

    (2)  next, if any funds remain, the Company will be fully reimbursed for the **Loss** amount the Company paid in excess of the sum of the Deductible and Co-payment Deductible Amount as listed in Item 5. and Item 6. of the Declarations, respectively; and

    (3)  next, if any funds remain and the **Insured** paid a Co-payment Deductible Amount, then the **Insured** and the Company will share, based on the Co-payment Deductible Amount listed in Item 6. of the Declarations, any remaining sums until the amount of the Company's payment of the **Loss** and the Company's cost of recovery have been fully reimbursed.

    Sums remaining after all payments in Subparagraphs 7.e.(1) through 7.e.(3) hereto, if any, shall be retained solely by the **Insured**. The application of amounts recovered as described above applies regardless of any designation of amounts by the **Subcontractor/Supplier** or any other party.

8.  **CONDITIONS**

    a.  **Conditions of Coverage**
    As a condition precedent of coverage provided under this Policy, the **Insured** warrants and agrees:

    (1)  to cease awarding contracts to any **Subcontractor/Supplier** that is in **Default of Performance** and for so long as the **Subcontractor/Supplier** is in **Default of Performance**, or until agreed to in writing by the Company;

    (2)  upon becoming aware of the **Insolvency** or **Default of Performance** of any **Subcontractor/Supplier**, immediately take all reasonable and timely actions necessary to preserve any rights of recovery against such **Subcontractor/Supplier**, including but not limited to establishing the debt owed by the **Subcontractor/Supplier** to the **Insured** as a valid obligation of the **Covered Subcontract or Purchase Order Agreement or Purchase Order Agreement** in accordance with any applicable statutes and procedures;

    (3)  to use all reasonable measures to prevent and to mitigate **Loss** at all times; and

    (4)  following the delivery of Notice of Loss to the Company, to execute, upon the Company's request, an assignment of all right, title, and interest arising under any **Covered Subcontract or Purchase Order Agreement**, including without limitation any legal or equitable claim or chose in action against any **Subcontractor/Contractor** to whom the **Insured** has issued a notice of **Default of Performance** and to cooperate, in accordance with the terms and conditions of this Policy, in the Company's prosecution of any legal actions the Company deems appropriate against such subcontractor.

    b.  **Action Against the Company**
    No one may bring legal action against the Company under this Policy unless all terms of the Policy have been complied with and such action is commenced by the later of:

    (1)  seven (7) years following the date of termination of the **Covered Subcontract or Purchase Order Agreement or Purchase Order Agreement** or the date of substantial completion of the **Covered Subcontract or Purchase Order Agreement** entered into during the **Policy Period**; or

DSL    D e S

© 2016 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

(2) one (1) year after the Company's first disposition of a specific claim which is the basis for the action or proceeding.

c. **Dispute Resolution**

Any dispute or other matter in question arising between the **Insured** and the Company arising under, out of, in connection with or in relation to this Policy shall be submitted to mediation by a third mediator acceptable to both the **Insured** and the Company. In the event that such mediation does not successfully resolve such dispute, the dispute will be submitted to arbitration within thirty (30) days of a request by either party to the other for such arbitration. The parties hereby agree to pursue such arbitration though the American Arbitration Association (AAA) in accordance with its then existing Commercial Arbitration Rules.

The parties further agree that from the list of arbitrators provided by the AAA a panel of three (3) neutral arbitrators shall be agreed upon. In the event of disagreement as to the panel or any member thereof, the selection of that arbitrator or those arbitrators shall rest with the AAA. A decision in writing signed by a majority of the arbitrators, when served upon both parties, shall be binding upon both and judgment thereon may be entered in any court having jurisdiction thereof.

The arbitrators shall not be required or obliged to follow judicial formalities or the rules of evidence except to the extent required by governing law which is agreed between the parties to be the state law of the situs of the arbitration as herein agreed. Any decision of the arbitrator(s) shall be subject to the Aggregate Limit of Insurance and the Each Loss Limit of Insurance as stated in Item 3. of the Declarations. The parties shall submit their respective cases to the arbitrators within such period as may be mutually agreed between the parties or failing such agreement, within thirty (30) days of the appointment of the panel of arbitrators.

The arbitrators shall make an award in writing within forty-five (45) days of the date on which the respective cases should have been submitted. The parties shall share equally in the payment of the fees of the arbitrators and the remaining costs of the arbitration shall be paid, as the award shall direct. Any arbitration shall take place in New York unless otherwise agreed. Failure by the party receiving the request for arbitration to agree to such arbitration or state their reasons for not being prepared to submit to such process within the thirty (30) days following the receipt of the ~~request~~ for arbitration, shall be adjudged an ~~~~ ~~~~tance of the other party's position and the

terms associated therewith and an agreement to take such action as would be consistent with such acceptance.

The parties hereto agree that they have entered into this agreement by virtue of this clause to provide for a means of quickly settling disputes without resorting to litigation, but this agreement in no way infringes on any rights to take such legal action accorded in the Service of Process Endorsement of this Policy, the sole effect and intent of which is to provide, without waiver of any defense, an ultimate assurance of the amenability of the Company to due process in certain courts with respect to a claim hereunder following an arbitration decision determining that such amount is due. The parties agree however, that unless and until an award has been rendered by such panel of arbitrators, no other action or legal proceeding shall be commenced in respect of any claim hereunder except with regard to resort to judicial intervention to enforce the terms of this Dispute Resolution clause.

Nothing contained herein shall be construed to allow the arbitrators or any court or any other forum to award punitive, exemplary or any similar damages. By entering into this agreement to arbitrate, the parties expressly waive any claim for punitive, exemplary or similar damages. The only damages recoverable under this agreement are compensatory damages.

The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

d. **Assignment**

This Policy may not be assigned unless agreed to by the Company in writing, and via endorsement to this Policy.

e. **Cancellation**

(1) the Company is not permitted to cancel this Policy except for:

(i) Nonpayment of premium;
(ii) As provided in Section **8. CONDITIONS**, Item g. **Change in Composition of the Insured**;
(iii) As provided in Section **8. CONDITIONS**, Item h. **False or Fraudulent Statements, Reports or Claims Concealment**; or
(iv) Upon repeated violations in the application of the **Insured's Qualification Procedures**. In the event of repeated violations in the application of

*DSL    D ε S*

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

the **Qualification Procedures**, the Company will send the **Insured** a notification of the Company's intent to cancel this Policy by certified mail. This notification will delineate the violations of the **Qualification Procedures** for which the Company is cancelling the Policy, and will provide the **Insured** thirty (30) days to provide a cure. If the **Insured** has not provided a reasonably satisfactory cure during this period, the Policy will be cancelled thirty (30) days after the notification which initiated the cure period.

(2) in the event of such cancellation under Subparagraphs 8.e.(1)(i) or 8.e.(1)(ii) above, the Company must deliver via certified mail to the Sole Agent (as defined in Section 8.m. below) a written notice stating that not less than ten (10) days after the date of the notice such cancellation shall be effective.

(3) if the Policy is canceled, a return of premium will be made to the **Insured**. The amount of return premium will be calculated as the Policy premium paid less the premium attributable to all **Covered Subcontracts** on **Scheduled Projects** subject to this Policy and executed during the **Policy Period** prior to the effective date of cancellation.

(4) the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. The Company's cancellation of this Policy will not affect coverage under this Policy for **Loss** arising out of a **Default of Performance** under any **Covered Subcontract Or Purchase Order Agreement** on a **Scheduled Project** executed during the **Policy Period** prior to the date of cancellation.

f.  **Changes**
Notice to any agent or by any other persons shall not affect a waiver or a change in any part of the Policy or stop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of the Policy.

g.  **Change in Composition of the Insured**
The **Insured** must notify the Company within thirty (30) days in writing if, during the **Policy Period**, the **Insured** consolidate, merge with, or sell all or substantially all of the **Insured's** assets to any other person or entity, or if another person or entity should acquire beneficial ownership of shares having a majority of the ordinary voting

power in the election of directors. Upon receipt of such notice, the Company may at the Company's option cancel this Policy effective thirty (30) days after the date of such change in the composition of the **Insured**.

h.  **False or Fraudulent Statements, Reports or Claims Concealment**
If the **Insured** makes any statement, report, or claim known to be false or fraudulent, or if the **Insured** knowingly conceals any material fact, the Company may, at the Company's option, void this Policy. All claim amounts paid shall be returned to the Company with interest by the **Insured** upon demand. All premium paid by the **Insured** hereunder shall be returned by the Company. The conditions contained in Section 8.h. represent the sole reasons by which the Company may void this Policy.

i.  **Inspection and Audit**
The Company is permitted, but not obligated, to inspect, sample and monitor the **Insured's** property or operations, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters or other documentation or records (including all electronic files, documents and records) in whatever form and wherever situated in the **Insured's** possession or control relating to or connected with this Policy, a claim hereunder, a **Loss** or any transaction between the **Insured** and a **Subcontractor/Supplier** or a person, organization or entity completing a **Covered Subcontract or Purchase Order Agreement**. At the Company's request, the **Insured** must take any and all reasonable steps to obtain such information in the possession of others relating to or connected with this Policy or any **Loss**. This section does not apply to information which the **Insured** has been required by a court order or federal agency to provide restricted access.

The Company will treat the **Insured's** proprietary information as confidential.

j.  **Other Insurance**
This insurance is excess only and noncontributing over any other insurance available to the **Insured**, whether such other insurance is stated to be primary, pro-rata, contributory, excess, contingent, or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of insurance provided in this Policy and is scheduled by endorsement to this Policy.

When this insurance is excess over other insurance, we will pay only the amount of the **Loss**, if any, that exceeds the sum of:

*DSL   D ₑ S*

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

(1) The total amount that all such other insurance would pay for the **Loss** in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all such other insurance.

In the event we are required to share with other insurance by a court of competent jurisdiction, each insurer shall contribute equal amounts until it has paid its applicable limit of insurance or none of the **Loss** remains, whichever comes first.

k.  **Premium Audit**
The premium shown in Item 8. of the Declarations is a deposit premium only. At the close of each reporting period the Company will compute the total premium due and send notice to the Sole Agent. Premium amounts invoiced will be total premium due less the premium paid to date. The Company will additionally complete periodic audits of completed **Scheduled Projects**. At the completion of these audits total premium will again be calculated and invoices will be issued for any amounts over or under the total paid premium to date. A final premium audit will be completed once all **Scheduled Projects** have been completed.

l.  **Examination Under Oath**
At the Company's request, the **Insured** shall permit the Company to question under oath the **Insured** and its agents, and to obtain verified answers under oath at such times as may be reasonably required, concerning any matter relating to this insurance or the **Insured's** claim, including, without limitation, the **Insured's** books and records

m.  **Sole Agent**
The **Insured** named in Item 1. of the Declarations shall act on behalf of all **Insured(s)** for all purposes, including but not limited to the payment or return of premium, receipt, and acceptance of any endorsement issued to form a part of this Policy, complying with all applicable notice provisions, and giving and receiving notice of cancellation or non-renewal.

9.  **DEFINITIONS**
a.  **Balance of the Subcontract or Purchase Order Agreement Price** means the **Contract Amount,** less the amount paid to the **Subcontractor /Supplier.**

b.  **Bodily Injury** means any:

(2) pain, suffering, mental anguish, or emotional injury or distress of any kind

sustained by any person, including death resulting from any of the foregoing at any time.

c.  **Contract Amount** means the total amount of the **Covered Subcontract or Purchase Order Agreement,** plus any amounts to which the **Subcontractor/Supplier** is entitled, including any adjustments in accordance with the **Covered Subcontract or Purchase Order Agreement**.

d.  **Covered Subcontract or Purchase Order Agreement** means those written, binding agreements executed on a **Scheduled Project** by the **Insured** and the **Insured's Subcontractor /Supplier**, setting forth an agreed scope of work, schedule and price, as such may be amended from time to time or as otherwise defined by endorsement to this Policy. **Covered Subcontracts or Purchase Order Agreements** include written, binding purchase order agreements signed by the **Insured** and a vendor/supplier for the sale of materials or equipment to be incorporated into a **Scheduled Project**.

However, an agreement or other document that:

(1) does not require as its primary purpose at least one of the following:

a.  the supply or the installation of any systems or equipment to be incorporated into a **Scheduled Project** or materials to be incorporated into a **Scheduled Project**; or

b.  the performance of other construction work on a **Scheduled Project**; or

(2) is more than thirty-six (36) months in length; or

(3) exceeds the **Contract Amount** Maximum set forth in Item 12a. of the Declarations; or

(4) is less than the **Contract Amount** Minimum set forth in Item 12b. of the Declarations at the time of execution

shall not be deemed a **Covered Subcontract or Purchase Order Agreement** unless specifically agreed to in writing in advance by the Company and endorsed to this Policy.

bodily injury, sickness, disease; and/or

DSL  D & S

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

e.  **Default of Performance** means failure of the **Subcontractor /Supplier** to fulfill the terms of the **Covered Subcontract or Purchase Order Agreement** as determined by the **Insured** or a legally binding authority. A determination by a legally binding authority shall supersede any previous determination.

f.  **Indirect Costs** mean costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** and that are not specifically included in Definition **i. Loss,** Items (1) through (4). **Indirect Costs** include, but are not limited to, those costs and expenses paid by the **Insured** for liquidated damages, job acceleration, and extended overhead.

g.  **Insolvency/Insolvent** means any of the following steps, or equivalent steps, that have been taken by or against a **Subcontractor/Supplier** by or in a court having jurisdiction over the **Subcontractor/Supplier's** affairs or pursuant to a statute applicable to the **Subcontractor /Supplier** and its creditors:

 (1) bankruptcy or **Insolvency** is adjudicated against the **Subcontractor/Supplier**.

 (2) voluntary or involuntary proceedings are initiated under Chapter 7 or Chapter 11 of the Federal Bankruptcy Code of the United States or any similar statute in another country.

 (3) a court order is issued or the **Subcontractor /Supplier** accepts a voluntary resolution for the winding-up or liquidation of the **Subcontractor/Supplier's** affairs.

h.  **Insured** means the person(s) or entity(ies) listed in Item 1. of the Declarations or stated as an Insured by endorsement to this Policy.

i.  **Loss** means the costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** under the terms of a **Covered Subcontract or Purchase Order Agreement,** less the unpaid **Balance of the Subcontract or Purchase Order Agreement Price,** including any amounts retained or recovered by the **Insured** with respect to the **Covered Subcontract or Purchase Order Agreement** of the defaulted **Subcontractor /Supplier.** Such costs and expenses are:

 (1) costs of completing **Subcontractor/ Supplier's** obligations under the **Covered Subcontract or Purchase Order Agreement,** including amounts the defaulted

**Subcontractor/Supplier** is required to pay under the **Covered Subcontract or Purchase Order Agreement** to third parties.

(2) costs of correcting defective or nonconforming work or materials.

(3) legal and other professional expenses paid by the **Insured** and reasonably incurred in relation to the **Subcontractor/Supplier Default of Performance.**

(4) costs, charges, and expenses paid by the **Insured** in the investigation, adjustment, and defense of disputes and directly related to a **Subcontractor/Supplier Default of Performance.**

(5) **Indirect Costs.**

Multiple **Defaults of Performance** by the same **Subcontractor/Supplier** on one or more **Covered Subcontract or Purchase Order Agreements** executed during a **Policy Period** shall be considered to be a single **Loss.**

**Loss(es)** will be attributed to the **Policy Period** in which the **Scheduled Project** was reported or endorsed, not the year(s) in which **Loss(es)** are actually paid by the **Insured.**

j.  **Policy Period** means the period of time listed in Item 2. of the Declarations or any shorter period of time arising as a result of the cancellation of this Policy in accordance with Section **8. CONDITIONS,** Item **e. Cancellation,** of this Policy.

k.  **Proof of Loss** means a written description and any other supporting evidence reasonably required by the Company, including the applicable **Covered Subcontract or Purchase Order Agreement,** notice of **Default of Performance,** and any other documents which demonstrate the claim is a covered **Loss** and quantify the amount of the **Loss.**

l.  **Qualification Procedures** mean the criteria that the **Insured** has represented that the **Insured** will adhere to in order to assure that the **Subcontractor/Supplier** will be able to carry out the terms of the **Covered Subcontract or Purchase Order Agreement.**

m.  **Scheduled Project** means the construction project(s) shown on reports provided to the Company by the **Insured,** or otherwise included by policy endorsement.

DSL   D e S

KSX 050 0216

© 2016 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

Exhibit B

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

n.  **Subcontractor/Supplier** means:

(1) any legal entity which has entered into a **Covered Subcontract or Purchase Order Agreement** with the **Insured**. **Subcontractor /Supplier** shall not include any subsidiary of the **Insured** now existing or hereafter formed or acquired, whether partially or wholly owned or controlled, or any subsidiary of a subsidiary (whether direct or indirect), or partnership, joint venture or corporation of the **Insured**.

(2) the receiver, trustee, liquidator, administrator, or similar representative of any **Subcontractor/Supplier** as described in Item n.(1) above, or its creditors, or the **Subcontractor/Supplier** as described in Item n.(1) above, as debtor in possession under Chapter 11 of the Federal Bankruptcy Code or any similar statute in another country.

(3) any successor to such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item n. (1) and (2) above.

(4) any corporation and other entity controlling, controlled by, or under common control of such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item n. (1), (2) and (3).

DSL   D ᵋ S

© 2016 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## ENDORSEMENT #1

This endorsement, effective 12:01 a.m., January 1, 2021 forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

## SERVICE OF PROCESS

The Superintendent of Insurance of the State of New York is hereby designated the true and lawful attorney of the Insurer upon whom may be served all lawful process in any action, suit or proceeding arising out of this Policy.  The Insurer further designates:

> Sarah Mims
> General Counsel
> 505 Eagleview Boulevard, Suite 100
> Exton, PA 19341-1120

as its agent in New York to whom such process shall be forwarded by the Superintendent of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this Policy remain unchanged.

DSL    D t S

XL-NYSOP 0118

© 2018 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #2**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**ADDITIONAL INSURED ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

The following are added as **Insureds** to this Policy:

Global Infrastructure Solutions, Inc.
Govan Brown & Associates, Ltd.
Layton Construction Company, LLC
L.F. Driscoll Company, LLC
Pavarini McGovern, LLC
Pavarini North East Construction Co., LLC
Structure Tone, LLC
Structure Tone Southwest, LLC

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D ᵉ S

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## ENDORSEMENT #3

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### INDIRECT COSTS AGREED AMOUNT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

In consideration of additional premium of $Included, it is hereby understood and agreed that in the event of a covered **Loss** under this Policy, for which the **Insured** has provided adequate **Proof of Loss** for **Loss** as defined in Section 9. **DEFINITIONS**, Item i. (1) - (4) of the Policy, the **Insured** shall be entitled to an additional amount of recovery equal to ten percent (10%) of the **Loss** as defined in Section 9. **DEFINITIONS,** Item i. (1) – (4) of the Policy, but not more than $500,000, that shall be deemed to compensate the **Insured** for **Indirect Costs** for which no **Proof of Loss** shall be required.

If the **Insured** is claiming **Indirect Costs** that are more than the above amount, the **Insured** shall be required to document all **Indirect Costs,** and will be compensated for those that are in excess of the above amount in accordance with Section 6. **CLAIMS** of this Policy.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL   D ι S

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.  Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #4**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EARLY REPORTING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

If the **Insured** gives the Company written notice within five (5) business days from the time:

1.    they send written notification to a **Subcontractor/Supplier** that it is in **Default of Performance** under the **Covered Subcontract or Purchase Order Agreement**; or

2.    they become aware that the **Subcontractor/Supplier** is **Insolvent**;

The Company will waive the Co-payment Deductible Amount as listed in Item 6. of the Declarations.

In order for such waiver to apply, the insured must:

1.    Provide XL risk engineering and claims staff reasonable and timely access to the project site, project management staff, and all documents and records associated therewith.

2.    Provide notice to XL in advance of any and all actions they take in conjunction with curing the default.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL   D.S

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #5**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PROJECT CONTINGENCY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

The following is added at the end of Section 6. **CLAIMS**, Item d:

> For the purpose of calculating the amount the Company will indemnify the **Insured** for **Loss**, the availability or existence of project contingency funds arising from the construction contract between the **Insured** and the project owner, shall not be included in the calculation, nor shall such project contingency funds be considered in determining the amount of the **Loss** as that term is defined in Section 9. **DEFINITIONS**, Item i. unless specifically endorsed to this Policy.
>
> However, the availability or existence of any line item project contingency funds arising from the construction contract between the **Insured** and the project owner put in place to specifically address the elevated risk associated with an individual **Covered Subcontract or Purchase Order Agreement** or a **Subcontractor/Supplier** will be considered in the calculation of loss as outlined under Section 6. **Claims** Item d. and will reduce the amount of **Loss** indemnified under this Policy.
>
> Nothing contained in this Endorsement shall in any way limit the **Insured's** obligations for the Deductible and Co-payment Deductible Amounts as listed in Item 5. and 6. of the Declarations.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D • S

KSX 407 0915

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## ENDORSEMENT #6

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### RECOVERY FUNDS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

Section **7. SUBROGATION AND RECOVERIES** is deleted and replaced by the following:

7.    **SUBROGATION AND RECOVERIES**

a.    In claims expected to remain within the deductible, a sublimit of up to $10,000 per loss and $25,000 in the aggregate will be provided for the **Insured's** recovery costs. Retentions do not apply and this coverage does not erode retention aggregates or aggregate limits. These costs are not considered in the calculation of **Loss.** Any costs incurred over and above the sublimit are a normal component of **Loss** and will be utilized in the indemnification calculation shown in Section 6. **CLAIMS,** Item d.

b.    In the event of any payment by the Company under this Policy (not including Item a. above), the Company shall receive, to the extent of such payment, all of the **Insured's** rights of recovery and other remedies against all persons, entities or organizations with respect to such payment.

c.    Unless otherwise agreed to by the Company and the **Insured**, the Company shall, at the Company's option, pursue all recovery and subrogation actions for **Losses** paid in excess of the deductible.

d.    The **Insured** must take all reasonable steps to preserve the Company's rights of recovery against the persons, entities or organizations identified in Section 7.a. hereto, and the **Insured** shall do nothing to prejudice such rights.

e.    The **Insured** must cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the **Insured** because of **Loss** to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a **Subcontractor/Supplier** or its property.

f.    After payment of the **Loss**, any funds or salvage recovered will be paid to the Company and shared between the **Insured** and the Company in the following order:

(1)    the Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses or payments under the sublimit available in Item a. above.

*DSL*

*D e S*

KSX 408 0515

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 2

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

(2)  next, if any funds remain, the Company will be fully reimbursed for the **Loss** amount the Company paid in excess of the sum of the Deductible and Co-payment Deductible Amount as listed in Item 5. and Item 6. of the Declarations, respectively; and

(3)  next, if any funds remain and the **Insured** paid a Co-payment Deductible Amount, then the **Insured** and the Company will share, based on the Co-payment Deductible Amount listed in Item 6. of the Declarations, any remaining sums until the amount of the Company's payment of the **Loss** and the Company's cost of recovery have been fully reimbursed.

Sums remaining after all payments in Subparagraphs 7.f.(1) through 7.f.(3) hereto, if any, shall be retained solely by the **Insured**. The application of amounts recovered as described above applies regardless of any designation of amounts by the **Subcontractor/Supplier** or any other party.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D = S

© 2015 X.L. America, Inc. All Rights Reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #7**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**CLAIMS EXPERT SUBLIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

The following is added to the end of Section **6. CLAIMS**

Additionally, in the event of a **Loss** the **Insured** will have an additional sublimit of $20,000 per loss and $20,000 in the aggregate, as shown below, for costs and expenses incurred through outside expert consultants used in investigating and documenting loss, with the Company's prior approval of the vendor (which shall not be unreasonably withheld). Retentions do not apply and this sublimit does not erode retention aggregates or aggregate limits. These costs are not considered in the calculation of **Loss.** Any costs incurred over and above the sublimit listed above are a normal component of **Loss** and will be utilized in the indemnification calculation above.

Claims Expert Sublimit of Insurance:    $ _20,000_____    per **Loss** and in Aggregate

Date Endorsement Issued:    _January 14, 2021_____

All other terms and conditions of this Policy shall remain the same.

DSL    D ∊ S

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #8**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**JOINT VENTURE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

Section **9. DEFINITIONS**, Item h. **Insured** is amended to include the following:

The **Insured** with regard to its participation in any legal entity including a limited liability company or joint venture, in which the **Insured** has an ownership, controlling, or beneficial interest or any joint venture in which such **Insured** participates, and in which such **Insured** exercises control over prequalification and subcontracting procedures, but only to the extent of the **Insured's Covered Subcontracts or Purchase Order Agreements** are executed by such legal entity or joint venture.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D ⸱ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## ENDORSEMENT #9

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 Issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### CLAIM REPORTING PERIOD ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

In consideration of premium paid, the following changes are made to this policy:

The following definitions are added to Section **9. DEFINITIONS**:

**Residential Project Claim Reporting Period** means the length of time shown in the Declarations Page of this Policy after the substantial completion of the **Covered Subcontract or Purchase Order Agreement**.

**Non-Residential Project Claim Reporting Period** means the length of time shown in the Declarations Page of this Policy after the substantial completion of the **Covered Subcontract or Purchase Order Agreement**.

**Residential Project** means any **Scheduled Project** where at the time of execution of any **Covered Subcontract or Purchase Order Agreement** the intended use after substantial completion is one or more single family or multifamily residential units the ownership or right of occupancy interest of which, including stock or leasehold, is transferable by sale or otherwise.

**Residential Project** does not include any structure that functions predominantly as non-owned apartments, time-shares, a hotel, a motel, nursing home, an assisted living senior housing care facility, a college campus dormitory, or government or military housing.

The following items are added Declarations Page of this policy:

**Residential Project Claim Reporting Period:**        N/A        Years from substantial completion.

**Non-Residential Project Claim Reporting Period:**    3,6, or 10*    Years from substantial completion.

*As selected and documented on the quarterly reports provided by the **Insured**.

Section **6. CLAIMS**, Paragraph c. is hereby replaced in its entirety by the following:

c.  In the event of a **Loss**, the **Insured** must submit to the Company a satisfactory **Proof of Loss**. Submission of a **Proof of Loss** must be made at the earlier of:

(1) the expiration of the **Residential Project Claim Reporting Period** on any **Scheduled Project** that is a **Residential Project**;

(2) the expiration of the **Non-Residential Project Claim Reporting Period** on any **Scheduled Project** other than a **Residential Project**;

DSL   D&S

© 2016 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

(3) the expiration of any right to seek recovery under any **Covered Subcontract or Purchase Order Agreement** in connection with a **Default of Performance** covered by this Policy; or

(4) the expiration of any statute of limitation or statute of repose applicable to recovery against the **Covered Subcontract or Purchase Order Agreement** or to the **Loss**.

Date Endorsement Issued:    January 14, 2021 _____

All other terms and conditions of this Policy shall remain the same.

As indicated on the quarterly reports provided by the **Insured.**

*DSL    D ᴸ S*

© 2016 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

ENDORSEMENT #10

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### COMBINED SELF-PERFORMED WORK AND BID DEFAULT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

The following changes are made to the policy:

Section 1. **INSURING AGREEMENT** is deleted and replaced by the following:

1.    **INSURING AGREEMENT**

The Company will indemnify the **Insured** for **Loss** after application of the Deductible and Co-payment Deductible amounts as stated in Item 5. and Item 6. of the Declarations and subject to the Policy Retention Aggregate stated in Item 7. of the Declarations, but only to the extent of a **Default of Performance** by the **Insured's Subcontractor/Supplier** as respects any **Covered Subcontract or Purchase Order Agreement** or a **Bid Default** by the **Insured's Subcontractor/Supplier** on a **Bid** submitted to and accepted by the **Insured** during the **Policy Period** on a **Scheduled Project**. The amount paid by the Company will be subject to the Limits of Insurance stated in Item 3. of the Declarations and will not be eroded by the Deductible and Co-payment Deductible Amounts stated in Item 5. and Item 6. of the Declarations page.

Section 2. **LIMITS OF INSURANCE** is deleted and replaced by the following:

2.    **LIMITS OF INSURANCE**

a.    The Company will never pay more than the Aggregate Limit of Insurance listed in Item 3.c. of the Declarations. This Aggregate Limit of Insurance is the most the Company will pay regardless of the number of:

(1)    **Insured(s)**;

(2)    **Subcontractor(s)/Supplier(s)**;

(3)    **Covered Subcontracts or Purchase Order Agreement(s)**;

(4)    **Scheduled Project(s)**; or

(5)    claims made or suits brought.

b.    The Aggregate Limit of Insurance listed in Item 3.c. of the Declarations is the most the Company will pay for the sum of all **Loss(es)** in excess of the Deductible and Co-payment Deductible Amount from all **Defaults of Performance** as respects all **Covered Subcontracts or Purchase Order Agreements** executed during the **Policy Period** and all **Bid Defaults** by the **Insured's Subcontractor/Supplier(s)**.

DSL   D•S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Once the Aggregate Limit of Insurance in any **Policy Period** is completely exhausted, the Company shall have no further obligation to indemnify the **Insured** for **Loss(es)**.

c.    Subject to Section 2.b. above, the most the Company will pay for any one **Loss** will be the lesser of:

(1)    the Variable Loss Limit Factor times the **Contract Amount**; or

(2)    the Each Loss Limit of Insurance listed in Item 3.b. of the Declarations.

In the event the Variable Loss Limit Factor is listed as "Not Applicable" or "N/A", the most the Company will pay for any one **Loss** will be the Each Loss Limit of Insurance listed in Item 3.b of the Declarations.

d.    Subject to Section 2.c. above, the Company will not pay more than the Indirect Costs Sublimit of Insurance shown in Item 4. of the Declarations for all **Indirect Costs** from any one **Loss.** Any amounts that the Company pays to indemnify **Indirect Costs** under this Section 2.d. will erode the Each Loss Limit of Insurance applicable.

e.    Subject to Section 2.c. above, the Company will not pay more than ten percent (10%) of the specific price stated in the **Bid** for any one **Bid Default**. Any amounts that the Company pays to indemnify **Bid Defaults** under this Section 2.e. will erode the Aggregate Limit of Insurance available under this Policy.

Section 9. **DEFINITIONS** Item i. **Loss** and Item n. **Subcontractor/Supplier** are deleted and replaced by the following:

i.    **Loss** means the costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** under the terms of a **Covered Subcontract or Purchase Order Agreement** or a **Bid Default** by the **Insured's Subcontractor/Supplier** on a **Bid** submitted to and accepted by the **Insured** during the **Policy Period** on a **Scheduled Project**, less the unpaid **Balance of the Subcontract or Purchase Order Agreement** Price or Bid, including any amounts retained or recovered by the **Insured** with respect to the **Covered Subcontract or Purchase Order Agreement** or **Bid** of the defaulted **Subcontractor/Supplier**. Such costs and expenses are:

(1)    costs of completing **Subcontractor/Supplier's** obligations under the **Covered Subcontract or Purchase Order Agreement**, including amounts the defaulted **Subcontractor/Supplier** is required to pay under the **Covered Subcontract or Purchase Order Agreement** to third parties or costs and expenses caused by a **Bid Default**, equal to the difference between the amount specified in the **Subcontractor/Supplier's Bid** and the larger amount for which the **Insured** contracts with another **Subcontractor/Supplier** to complete the **Subcontract or Purchase Order Agreement** covered in the **Bid**, plus the **Insured's** expenses incurred to obtain the replacement contract.

(2)    costs of completing **Subcontractor/Supplier's** obligations under the **Covered Subcontract or Purchase Order Agreement**, including amounts the defaulted **Subcontractor/Supplier** is required to pay under the **Covered Subcontract or Purchase Order Agreement** to third parties. The cost of completing the **Subcontractor/Supplier's** obligations may include costs incurred by the **Insured** to self-perform the uncompleted work under the **Covered Subcontract or Purchase Order Agreement**, including a reasonable amount for overhead and profit which amount shall not exceed, on a percentage basis, the percentage of overhead and profit the defaulted **Subcontractor/Supplier** received as outlined in the contract between the **Insured** and the defaulted **Subcontractor/Supplier**, or if no such provision exists, in the same proportion as that included in the original contract documents between the **Insured** and the Owner for the **Insured's** profit and overhead. In no event shall the amount of overhead and profit exceed fifteen percent (15%) of the cost to complete the uncompleted work.

*DSL*    *D ∗ S*

© 2019 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

(3)     costs of correcting defective or nonconforming work or materials. The cost of completing the **Subcontractor/Supplier's** obligations may include costs incurred by the **Insured** to self-perform correcting any defective or nonconforming work under the **Covered Subcontract or Purchase Order Agreement**, including a reasonable amount for overhead and profit which amount shall not exceed, on a percentage basis, the percentage of overhead and profit that the defaulted **Subcontractor/Supplier** received as outlined in the contract between the **Insured** and the defaulted **Subcontractor/Supplier**, or if no such provision exists, in the same proportion as that included in the original contract documents for the **Insured** and the Owner for the **Insured's** profit and overhead. In no event shall the amount of overhead and profit exceed fifteen percent (15%) of the cost to correct the defective or nonconforming work.

(4)     legal and other professional expenses paid by the **Insured** and reasonably incurred in relation to the **Subcontractor/Supplier Default of Performance**.

(5)     costs, charges, and expenses paid by the **Insured** in the investigation, adjustment, and defense of disputes and directly related to a **Subcontractor/Supplier Default of Performance**.

(6)     **Indirect Costs**.

Multiple **Defaults of Performance** by the same **Subcontractor/Supplier** on one or more **Covered Subcontract or Purchase Order Agreements** executed during a **Policy Period** shall be considered to be a single **Loss**.

**Loss(es)** will be attributed to the **Policy Period** in which the **Scheduled Project** was reported or endorsed, not the year(s) in which **Loss(es)** are actually paid by the **Insured**.

n.     **Subcontractor/Supplier** means:

(1)     any legal entity which has entered into a **Covered Subcontract or Purchase Order Agreement** with the **Insured** or offered a **Bid** to the **Insured** which the **Insured** has accepted. **Subcontractor/Supplier** shall not include any subsidiary of the **Insured** now existing or hereafter formed or acquired, whether partially or wholly owned or controlled, or any subsidiary of a subsidiary (whether direct or indirect), or partnership, joint venture or corporation of the **Insured**.

(2)     the receiver, trustee, liquidator, administrator, or similar representative of any **Subcontractor/Supplier** as described in Item n.(1) above, or its creditors, or the **Subcontractor/Supplier** as described in Item n.(1) above, as debtor in possession under Chapter 11 of the Federal Bankruptcy Code or any similar statute in another country.

(3)     any successor to such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item n. (1) and (2) above.

(4)     any corporation and other entity controlling, controlled by, or under common control of such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item n. (1), (2) and (3).

The following definitions are added to Section 9. **DEFINITIONS**:

**Bid** means an offer to perform an agreed scope of work, including a schedule and a stated price for work, labor, goods, services, or an offer to provide materials at a specific price and subject to stated specifications.

DSL  D↓S

© 2019 X.L. America, Inc. All Rights Reserved. May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

However, a bid that:

(1)     does not require as its primary purpose at least one of the following:

    a.     the supply or the installation of any systems or equipment to be incorporated into a **Scheduled Project** or materials to be incorporated into a **Scheduled Project**; or

    b.     the performance of other construction work on a **Scheduled Project**; or

(2)     is more than thirty-six (36) months in length; or

(3)     exceeds the **Contract Amount** Maximum set forth in Item 12a. of the Declarations; or

(4)     is less than the **Contract Amount** Minimum set forth in Item 12b. of the Declarations at the time of execution

shall not be deemed a **Bid** unless specifically agreed to in writing in advance by the Company and endorsed to this Policy.

**Bid Default** means the failure of **Subcontractor/Supplier** after the receipt of the executable contract forms by the **Subcontractor/Supplier**, to execute and enter into contract(s) required by the terms of a **Bid** submitted by the **Subcontractor/Supplier** to the **Insured** and accepted by the **Insured** within ten (10) days or the time outlined in such **Bid**.

Date Endorsement Issued:     January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL  D.S

© 2019 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #11**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**EXTENDED RESIDENTIAL EXCLUSION ENDORSEMENT – PLUS WRAP-UP**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

Section **4. EXCLUSIONS** is amended to include the following exclusion:

    Arising from a **Residential Project**, not concurrently covered under a general liability contractor controlled insurance program (CCIP) throughout construction, or otherwise endorsed to this Policy for coverage.

Section **9. DEFINITIONS** is amended to include the following definition:

    **Residential Project** means any **Scheduled Project** where at the time of execution of any **Covered Subcontract or Purchase Order Agreement** the intended use after substantial completion is one or more single family or multifamily residential units the ownership or right of occupancy interest of which, including stock or leasehold, is transferable by sale or otherwise or which at any time has been converted to one or more such single family or multifamily residential units.

    **Residential Project** does not include any structure that functions predominantly as non-owned apartments, time-shares, a hotel, a motel, nursing home, an assisted living senior housing care facility, a college campus dormitory, or government or military housing.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D. S

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

ENDORSEMENT #12

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**TIERED LIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

The following is added to **Item 3 Limits of the Insurance:**

In the event a **Loss** occurs on a single **Scheduled Project** which has **Covered Subcontract or Purchase Order Agreement** values totaling $15,000,000 or less, such **Loss** will be subject to an **Each Loss Limit** of $15,000,000.

In the event a **Loss** occurs on a single **Scheduled Project** which has **Covered Subcontract or Purchase Order Agreement** values totaling $15,000,001 or greater, such **Loss** will be subject to an **Each Loss Limit** of $50,000,000

In the event of a **Loss** that includes a **Default of Performance** on multiple **Scheduled Projects,** any of which individually has **Covered Subcontract or Purchase Order Agreement** values totaling $15,000,001 or greater, such **Loss** will be subject to a $50,000,000 **Each Loss Limit,** otherwise a $15,000,000 **Each Loss Limit** will apply. The **Aggregate Limit** still applies as stated on the **Declarations Page.**

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D e S

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**ENDORSEMENT #13**

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**TIERED PREMIUM RATE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

For **Scheduled Projects** with **Covered Subcontract(s) or Purchase Order Agreement** values totaling $15,000,000 or less, the premium rates are as follows:

$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 3 years.
$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 6 years.
$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 10 years.

For **Scheduled Projects** with **Covered Subcontracts or Purchase Order Agreement** values totaling $15,000,001 or greater, the premium rates are as following:

$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 3 years.
$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 6 years.
$ per $1,000 of **Covered Subcontract(s) or Purchase Order Agreement** for any **Scheduled Project** for which the **Insured** has elected to purchase a Claim Reporting Period of 10 years.

Date Endorsement Issued:    January 14, 2021

All other terms and conditions of this Policy shall remain the same.

DSL    D ι S

KSX MANUS 0515
© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

ENDORSEMENT #14

This endorsement, effective 12:01 a.m., January 1, 2021, forms a part of

Policy No. CSD7422005 issued to STO Building Group

by Indian Harbor Insurance Company.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**SHARED LIMIT & POLICY RETENTION AGGREGATE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

In consideration of the premium paid, the Policy is amended as follows:

One set of Aggregate Policy Limits and one Retention Aggregate applies to the following Policies:

CSD7422005

CDS7422006

A **Loss** related to a **Default of Performance** by the same **Subcontractor/Supplier** on both CDS7422006 and CSD7422005 shall be limited to $50,000,000 USD total.

On a total Aggregate Loss basis under the two policies there is a maximum sublimit of $150,000,000 USD in total Aggregate Loss. Once the combined $150,000,000 USD Aggregate Limit of Insurance in any **Policy Period** is completely exhausted, the Company shall have no further obligation to indemnify the **Insured** for **Loss(es)** under either policy.

Date Endorsement Issued:  ___January 14, 2021_____

All other terms and conditions of this Policy shall remain the same.

D&S

DSL

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission. Exhibit D-1

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Exhibit E
5/28/21

## HOBACK CLUB CONDOMINIUMS

### FUNDS CONTROL AGREEMENT

This Funds Control Agreement ("*Agreement*") is made and entered into effective as of ___May 28, 2021___ ("*Effective Date*") by and among CODY LANE DEVELOPMENT CORP., a Wyoming corporation ("*Cody Lane*"), DDRM JACKSON LLC, a Wyoming limited liability company (the "*Development Manager*"), LAYTON CONSTRUCTION COMPANY, LLC, a Utah limited liability company (the "*General Contractor*"), LA MESA FUND CONTROL & ESCROW, INC., a California corporation ("*La Mesa*") and WYOMING TITLE AND ESCROW, INC., a Wyoming corporation ("*Escrow Agent*").

WHEREAS, Cody Lane is the owner and developer of the Hoback Club Condominiums, a residential condominium project with an address of 3355 West Cody Lane in Teton Village, Wyoming, to be located on the real property legally described on Exhibit A attached hereto, and to be shown on the Final Plat of Hoback Club Condominiums to be filed in the Office of the County Clerk of Teton County, Wyoming (the "*Plat*") and described in the Condominium Declaration for the Hoback Club Condominiums (the "*Declaration*") to be recorded contemporaneously with the Plat, and all supplements and amendments thereto (the "*Property*").

WHEREAS, Cody Lane is selling condominium units on the Property to Buyers ("*Buyers*") pursuant to certain Contracts to Buy and Sell Real Estate Real Estate (the "*Sales Contracts*"), and Cody Lane has designated Escrow Agent as the title company and escrow agent under the Sales Contracts pursuant to the Sales Contract.

WHEREAS, Section II of each Sales Contract requires that the Buyer thereunder delivers progress payments ("*Deposits*") against the Purchase Price to the Escrow Agent via wire transfer of immediately available funds to a non-interest bearing account in accordance with the Progress Payment Structure set forth therein and attached hereto as Exhibit B for reference.

WHEREAS, Section II of each Sales Contract also requires that the Deposits remain in an escrow account with the Escrow Agent for the benefit of the Buyer thereunder and shall not be released for any purpose until such time as Cody Lane has commenced construction of the Property, as evidenced by both issuance of a valid permit from Teton County to commence construction and the mobilization of the General Contractor ("*Commencement of Construction*").

WHEREAS, Section II of each Sales Contracts provides that the Buyer understands and agrees that some and/or all of the Deposits may be held and/or used by Cody Lane in connection with the construction and development of the Property, and that accordingly, the Buyer should expect that the Deposits will not remain in the escrow account with the Escrow Agent for the benefit of the Buyer following Cody Lane's Commencement of Construction.

WHEREAS, La Mesa is a Department of Business Oversight licensed and bonded independent California escrow company that provides construction disbursement, inspections and lien release services on residential, commercial and governmental construction projects.

DSL    D t S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

WHEREAS, General Contractor is licensed to perform construction in Teton County and the Town of Jackson, Wyoming (Gen Class A License # 5952), and General Contractor and Cody Lane is entering into the AIA A133-2009 Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price and accompanying AIA A201-2017 General Conditions of the Contract for Construction for the construction of the Property ("*Construction Contract*").

WHEREAS, IBI Group, a California partnership (the "*Architect*") is licensed to perform Architecture in Wyoming (license #C-3199), and Architect and Cody Lane have entered into the AIA B101-2017 Standard Form of Agreement Between Owner and Architect, dated October 1, 2019 ("*Design Agreement*"). Among other obligations, the Design Agreement requires Architect to review the General Contractor's monthly Applications for Payment and issue Certificates for Payment (each, a "*Certificate for Payment*").

WHEREAS, Cody Lane has entered into a separate Loan Agreement (Line of Credit), dated as of August 4, 2020, which was increased by a Modification Agreement dated January 21, 2021 (as amended, the "*Loan Agreement*"), with First Republic Bank, as lender ("*FRB*") with a maximum amount available of $20,000,000 ("*Line of Credit*").

WHEREAS, for the purpose of ensuring the proper release and disbursement of the Deposits following Cody Lane's Commencement of Construction in connection with the construction and development of the Property, Cody Lane desires that La Mesa provide construction disbursement, inspections and lien release services ("*Fund Control Services*") on the terms and conditions set forth herein.

NOW THEREFORE, for and in consideration of the mutual promises, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows.

## ARTICLE I
### Application for Payment and Draw Requests

1.1    Contractor Application for Payment.

a.    Submission of Application for Payment. Throughout the construction of the Property, and in accordance with the Construction Contract, the General Contractor shall prepare and submit to La Mesa, Development Manager, Architect, and Cody Lane on or before the twenty-fifth (25th) of each billing month an Application for Payment in the form of an AIA Document G702 Application and Certificate for Payment and AIA Document G703 Continuation Sheet (collectively, the "*Application for Payment*") including all subcontractor and supplier invoices and required lien waivers.

b.    Inspection of Application for Payment by La Mesa. La Mesa will, as an advisor to Cody Lane and within five (5) days after receipt of the Application for Payment, review the Application for Payment and inspect the Property for the purpose of verifying that the Application for Payment 1) accurately reflects the amount of

DSL

D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

work completed during the time period applicable to such Application for Payment and the cost thereof is consistent with the current payment due under such Application for Payment, or 2) requires adjustments, in which case La Mesa shall detail the required adjustments in a written report related to the progress of the work. La Mesa's inspection of the Property pursuant to this provision is not for the purpose of determining the quality of work, compliance with state and local building codes or regulations, building contract compliance, or overall craftsmanship of the work. Within such five (5) day period, La Mesa shall notify Cody Lane and the Development Manager in writing of its findings pursuant to this provision and whether the lien waivers provided by the General Contractor are consistent with the prior payments made and whether there are any missing or insufficient lien waivers (including per Section 1.1.d below unconditional lien waivers for the payments subject to the applicable Application for Payment), which may trigger the withholding of payments in accordance with Section 3.2 of this Agreement (collectively the "*Preliminary La Mesa Approval Notice*"). La Mesa, Cody Lane and Development Manager shall have two (2) days to review the Preliminary La Mesa Approval Notice in order to address any discrepancies and to coordinate with the Architect in its preparation of the Certificate of Payment, and La Mesa shall revise the Preliminary La Mesa Approval Notice accordingly and prepare the "*Final La Mesa Approval Notice.*"

c.    Architect's Certificate of Payment. In accordance with the Construction Contract, the Architect shall, within seven (7) days after receipt of the Application for Payment, either (1) issue to Cody Lane a Certificate for Payment in the full amount of the Application for Payment, with a copy to the Contractor; or (2) issue to Cody Lane a Certificate for Payment for such amount as the Architect determines is properly due, and notify the General Contractor, Development Manager and Cody Lane of the Architect's reasons for withholding certification in part as provided in Section 9.5.1 of the General Conditions to the Construction Contract; or (3) withhold certification of the entire Application for Payment, and notify the General Contractor, Development Manager and Cody Lane of the Architect's reason for withholding certification in whole as provided in Section 9.5.1 of the General Conditions to the Construction Contract. Concurrently with the issuance of the Certificiate of Payment, Cody Lane shall provide General Contractor with the Final La Mesa Approval Notice.

d.    30 Day Lag for Unconditional Lien Waivers. The parties acknowledge that the delivery of unconditional lien waivers may lag an additional thirty (30) days beyond the payment due date of the related Application for Payment. The Construction Contract requires payments by the 25th day of the month following the billing month, which payment due date is also the date that the next Application for Payment is due. Accordingly, unconditional lien waivers will not be required with respect to any progress payment until the Application for Payment for the month following the month the progress payment is made.

1.2    Development Manager Draw Request, Monthly Report and Draw Request Summary; Review and Approval. Within five (5) days of the later to occur of Development Manager's receipt of the

DSL    D ᵉ Ꞩ

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Final La Mesa Approval Notice and Architect's Certificate for Payment, the Development Manager shall deliver the related Application for Payment to La Mesa and Cody Lane along with a draw request substantially in the form attached hereto as Exhibit C (the "**Draw Request**"), along with a draw request summary substantially in the form attached hereto as Exhibit C (the "**Draw Request Summary**"). The Draw Request shall include the Architect's Certificate for Payment with the General Contractor's Application for Payment (as may be adjusted) and shall include invoices from third party vendors under agreements with Cody Lane (other than the General Contractor) for other soft and hard costs, all of which make up the Draw Request, and shall provide a monthly report of the financial development budget and forecast through final completion of construction, current status of construction, planned schedule milestones, risks and opportunities and change orders (the "**Monthly Report**"). The Draw Request shall reflect the soft and hard costs payable for the billing month including the amount payable under the included Application for Payment for the period applicable to such Application for Payment. Within three (3) days of receipt of the Draw Request, Monthly Report and the Draw Request Summary, the same shall be reviewed and approved by La Mesa, Roger Osness, Marty Breen and Stanley Castleton on behalf of the Development Manager, and Robert S. DesLauriers as the Owner Representative, and then subsequently executed by David C. Saunders on behalf of Cody Lane. If either La Mesa or Cody Lane has a reasonable objection to the Draw Request, Monthly Report, or the Draw Request Summary, the objecting party shall promptly notify the other parties of the reason for such objection and may withhold its approval and execution of the Draw Request Summary until the objection has been resolved to the reasonable satisfaction of all such parties. Any objections pursuant ot the preceding sentence shall be resolved within three (3) days of the notice of such obejction. Any objections related to the Application for Payment shall be governed by the Construction Contract.   Notwithstanding this Section 1.2, the payment provisions in the General Conditions to the Construction Contract shall be unchanged.

1.3     Draw Request Summary to Escrow Agent. La Mesa will submit the Draw Request Summary to the Escrow Agent within 1 day of its receipt of the fully executed Draw Request Summary. Nothwithstanding its receipt of the Draw Request Summary, Escrow Agent shall have no obligation or responsibility to determine the sufficiency thereof as defined by this Agreement, and Escrow Agent shall be entitled to rely upon the submission as an affirmation by the parties hereto that it is accurate and complete, and that the conditions to its issuance have been met.

1.4     Notice to Escrow Agent of Progress Milestones. Upon the issuance of the Final La Mesa Approval Notice and Architect's Certificate for Payment, each confirming that the construction has met or exceeded the Progress Payment Structure referenced in Exhibit B attached hereto, Cody Lane and the Development Manager shall provide the Escrow Agent written notice of the occurrence of the following construction progress milestones: (a) Commencement of Construction, (b) construction of the Property is twenty five percent (25%) complete, (c) construction of the Property is fifty five percent (55%) complete, and (d) the Closing Date. Copy Lane shall also notify the Buyer under each Sales Contract, with a copy to Escrow Agent, to make the required deposit in accordance with the Progress Payment Schedule set forth in the Sales Contract and attached hereto as Exhibit B.

1.5     Effect on Construction Agreement. It is not the intention of the parties that the regular Application for Payment process under the Construction Contract will be handled through the Escrow Account or Trust Account established by this Agreement. Rather, for the benefit of General Contractor and Cody Lane, the Escrow Agent has been requested to provide escrow services to facilitate the receipt of funds deposited by the Buyers, and move said funds into the escrow established by this Agreement. Cody Lane and General Contractor intend that the funds on deposit under this Agreement shall be in an

DSL

D e S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

amount sufficient to pay General Contractor all amounts owing to General Contractor under the Construction Contract and all amounts expected to become owing to meet the Minimum Cashflow Requirement, with such amounts only being disbursed as allowed by this Agreement. However, excepting the obligation to receive funds from the Buyers and move the funds into the Escrow Account for disbursement in accordance with this Agreement, Escrow Agent shall have no obligation to ensure that the amounts deposited are sufficient to pay all amounts actually owing to General Contractor under the Construction Contract or all amounts expected to become owing to meet the Minimum Cashflow Requirement. Cody Lane and the General Contractor agree that this Agreement meets the requirements for the Evidence of the Owner's Financial Arrangements in Section 2.2 of the General Conditions to the Construction Contract.

## ARTICLE II
## ESCROW ACCOUNT; TRUST ACCOUNT

2.1     Designation of the Escrow Agent. Subject to the terms, provisions and conditions of this Agreement and the Sales Contract, Escrow Agent is the designated escrow agent with respect to the escrow of the Deposits. Escrow Agent hereby accepts the obligations and duties of Escrow Agent with regard to the retention requirements within the Sales Contract and this Agreement and the disposition of the Deposits in accordance with the terms, provisions and conditions of this Agreement, and agrees to serve as Escrow Agent hereunder.

2.2     Deposit and Administration of Escrow Funds. The Deposits shall be retained by Escrow Agent in a non-interest bearing account in accordance with the Sales Contract and this Agreement ("*Escrow Account*"). Cody Lane shall ensure that all Deposits from Buyers are deposited into the Escrow Acount. Escrow Agent agrees to hold the funds deposited into the Escrow Account subject to the terms and conditions of this Escrow Agreement. Escrow Agent shall not distribute or release funds from the Escrow Account except in accordance with the express terms and conditions of this Agreement.

2.3     Reporting of Escrow Account Balances. Escrow Agent shall provide to Cody Lane, Development Manager, La Mesa, and General Contractor (i) at periods occurring no less than at each interval for Deposits required in the Progress Payment Structure set forth in the Sales Contract and attached hereto as Exhibit B, a status report organized by each condominium unit subject to a Sales Contract indicating the Deposits received in the Escrow Account; and (ii) at periods occuring immediately following each monthly funding of the amount of the Draw Request Summary to the Trust Account, a status report indicating the total balance of Deposits remaining in the Escrow Account.

2.4     Trust Account. La Mesa shall utilize an established trust account at FRB (the "*Trust Account*"), which will be solely utilized for the purpose of receiving Deposits from the Escrow Agent in accordance with this Agreement and for the payment of costs set forth on Applications for Payments and Draw Requests. The Trust Account shall be bonded and insured for not less than four million dollars and no cents ($4,000,000.00). Only La Mesa shall have signing authority on the Trust Account. Cody Lane and Development Manager shall have complete access to all information concerning the Trust Account, including account statements, its balance, all deposits and disbursements, and interest accrued. Upon General Contractor's request, La Mesa shall provide a statement detailing any withheld amounts remaining in the Trust Account related to Sections 1.1.d and 2.5 of this Agreement.

DSL    D c S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

2.5     <u>Missing Lien Waivers</u>. If the Final La Mesa Approval Notice indicates that there are missing or disputed lien releases, then the Draw Request will include the entire amount requested in the relevant Application for Payment, and the Escrow Agent will fund the Draw Request in its entirety, but La Mesa shall hold in the Trust Account amounts equal to the missing or disputed lien releases from the disbursement to the General Contractor until such a time that such lien releases are provided by General Contractor. Within five (5) days after receipt of such missing or disputed lien waivers, La Mesa shall release the withheld funds to complete the payment in full of the relevant Application for Payment.

**ARTICLE III**
**DISBURSEMENT OF DEPOSITS FROM ESCROW ACCOUNT TO TRUST ACCOUNT;**
**PAYMENTS FROM TRUST ACCOUNT; RELEASE OF ESCROW ACCOUNT TO CODY LANE**

3.1     <u>Disbursements of Deposits from Escrow Account to Trust Account</u>. Within three (3) days of Escrow Agent's receipt of the Draw Request Summary in accordance with Section 1.3 above, Escrow Agent shall disburse from the Escrow Account the total amount of the "Monthly Draw Request" set forth in the Draw Request Summary (the "***Monthly Disbursement***"). The Monthly Disbursement shall be delivered by wire transfer of immediately available funds to the Trust Account pursuant to wire instructions provided by La Mesa to the Escrow Agent.

3.2     <u>Payments by La Mesa from Trust Account</u>. Within five (5) days upon the arrival of the Monthly Disbursement in the Trust Account, but not later than the twenty fifth (25th) of the month after the billing month in accordance with the Construction Contract, La Mesa shall pay all amounts owed under the Application for Payment and Draw Request applicable to such Monthly Disbursement. However, La Mesa shall withhold amounts equal to (a) amounts for which required lien waivers are not provided as further described in Section 2.5 above and   (b) amounts identified as disputed in the Monthly Disbursement and hold such withheld amount(s) in the Trust Account until such a time that Cody Lane, Development Manager, and La Mesa approve the lien releases provided by General Contractor or release of other disputed funds, at which point La Mesa shall then release the withheld funds to complete the payment in full of the affected Application for Payment. For purposes of providing La Mesa all necessary details regarding amounts owed, the Development Manager shall provide a summary of invoices to be paid and to whom shall be included with each Draw Request. La Mesa shall timely pay all such invoices (less amounts withheld pursuant to 3.2(a) and 3.2(b) and collect from the General Contractor all lien waivers from all vendors supplying materials or services, and provide the Escrow Agent a copy of all lien waivers upon receipt.

3.3     <u>Release of Deposits in Escrow Account to Cody Lane</u>. Upon Final Completion and Final Payment as each such term is defined in the Construction Contract, the Escrow Account shall only be disbursed and released to Cody Lane as follows:

a.     *Upon Demand by Cody Lane*. When, and only when, the General Contractor notifies La Mesa and the Escrow Agent in writing that the General Contractor has received Final Payment, Escrow Agent is authorized and instructed to distribute and release portions of the remaining Escrow Account to Cody Lane in accordance with the following provisions:

*DSL*

*D* ᴇ *S*

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

i.      Cody Lane shall submit a written notice (an "**Owner Notice**") to the General Contractor, Escrow Agent and La Mesa that Cody Lane is entitled to receive all or a specified portion of the Escrow Account.

ii.     Within five (5) business days following the General Contractor's receipt of the Owner Notice from Cody Lane, the General Contractor may submit to La Mesa and the Escrow Agent a written notice of objection to the release of Escrow Account. If La Mesa and the Escrow Agent do not receive a written notice of objection from the General Contractor, then the Escrow Agent shall release the requested portion of the Escrow Account to Cody Lane. Escrow Agent is expressly authorized and instructed to release said funds without further instruction or authorization of the parties and may conclusively rely upon the timing of its receipt of the Owner Notice.

iii.    If the General Contractor objects to the release of any portion of the Escrow Account to Cody Lane, then Escrow Agent shall release the undisputed portion of the Escrow Account and retain the disputed portion of the Escrow Account until the dispute is resolved by the General Contractor and Cody Lane. Upon resolution of the dispute, Cody Lane shall either resubmit the Owner Notice in accordance with Section 3.3(a) above or the General Contractor and Cody Lane shall submit joint instructions in accordance with Section 3.3(b) below. If the General Contractor and Cody Lane are unable to resolve the dispute, then the disposition of the portion of the Escrow Account shall be determined in accordance with Section 3.3(c) below.

b.      *As Mutually Directed by General Contractor and Cody Lane.* Upon receipt of duly executed instructions from both the General Contractor and Cody Lane (the "**Parties' Release Notice**"), the Escrow Agent shall distribute and release amounts from the Escrow Account, or a portion thereof, in accordance with the Parties' Release Notice.

c.      *In Accordance with Court Order.* If General Contractor and Cody Lane are unable to resolve a dispute regarding the release of a portion of the Escrow Account, then in accordance with the provisions of the Construction Contract, the parties shall submit the matter to a court of competent jurisdiction. Upon receipt of a final order or judgment by the court, which order or judgment has either not been appealed within the time provided by applicable law for appeal or has been upheld by the highest court to which an appeal of such order or judgment may be taken, Escrow Agent shall distribute and release the Escrow Account in accordance with such final order or judgment.

## ARTICLE IV
## CONCERNING LA MESA

4.1    Obligations of La Mesa; Payment. La Mesa, by its execution of this Agreement, covenants and agrees to faithfully perform and fulfill its obligations created hereby, pursuant to the terms, provisions and conditions hereof. As compensation for the services provided by La Mesa hereunder, Cody Lane shall pay La Mesa: (i) an initial fee of Twenty Five Thousand Dollars and No Cents ($25,000.00) within ten (10) days of the General Contractor's commencement of construction pursuant to the Construction Contract; (ii) for the subsequent fifteen (15) months of construction, a monthly fee of Nine Thousand Dollars and No Cents ($9,000.00); and (iii) thereafter for the remaining term of this Agreement, a monthly fee of Ten Thousand Dollars and No Cents ($10,000.00) (collectively, the "**Fund Control Fees**") ). Cody Lane shall also pay La Mesa an inspection fee of Two

DSL    D e S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Thousand Five Hundred and No Cents ($2,500.00) per site inspection conducted by La Mesa purusant to this Agreement. Except as otherwise provided in this Agreement, no individual or entity other than La Mesa is entitled to receive funds from the Escrow Account until after Final Completion and Final Payment as each such term is defined in the Construction Contract. Amounts to be paid to La Mesa shall be included in the Minimum Cash Flow Requirement defined below.

4.2    Limitations of Liability.

a.    La Mesa shall not be responsible for and does not guarantee that (1) the construction of the Property shall be performed in accordance with any applicable contract requirements, or at all, (2) any job cost, for which La Mesa is not responsible pursuant to this Agreement, shall be paid, and liens, stop notices or bond claims will not be asserted with respect thereto.

b.    La Mesa is providing inspections of Applications for Payment, written verification of construction progress, review and approval of monthly Draw Requests and Monthly Reports, and payments and disbursements to vendors based on information provided by other parties to this Agreement. Cody Lane shall hold La Mesa, its owners and officers, harmless and indemnify them against any claims resulting from Cody Lane's negligence or willful misconduct. La Mesa's liability, and Cody Lane's hold harmless and indemnification liability, shall be limited to the amount of any payments and disbursements from the Trust Account made (1) without authorization of Cody Lane or (2) as a result of La Mesa's negligence or willful misconduct.

4.3    Termination of Trust Account. Following Final Completion and Final Payment, Cody Lane may terminate the Trust Account by written notice to La Mesa, and upon the termination of the Trust Account La Mesa shall return all undisbursed funds in the Trust Account to Cody Lane, and La Mesa will be discharged of any further obligations under this Agreement. Upon termination, Cody Lane will pay La Mesa for the portion of the Fund Control Fees earned but not yet paid as of the date of such termination.

ARTICLE V
CONCERNING ESCROW AGENT

5.1    Cody Lane, Development Manager, General Contractor (but only to the extent of their obligations under the Construction Contract) and La Mesa acknowledge and agree that Escrow Agent shall have no responsibility or obligation to receive or affirm construction invoices, inspections, permits, lien waivers or any other documents or information from any party performing or continuing construction on the Property during the term of this Agreement, nor confirm or assure compliance with any government or regulatory rules, regulations, statutes or other authority concerning the approval and/or permitting of said construction nor confirm that any of the construction performed on the Property has been completed in a workmanlike fashion. Escrow Agent's sole responsibility is to disburse the Deposits as demanded and authorized herein.

5.2    Cody Lane, Development Manager and La Mesa acknowledge that Escrow Agent shall have no responsibility or obligation to determine whether the Draw Request for some or all of the Deposits is in accordance with the terms and conditions of this Agreement and the construction draws/schedule set forth in the Sales Contracts. Rather, Escrow Agent may rely entirely upon the demand and instructions set forth in the Draw Request to release the Deposits, which shall serve as an acknowledgment that all conditions precedent to the release of said funds have been met.

DSL    D.S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

5.3     Cody Lane, Development Manager, General Contractor and La Mesa acknowledge that Escrow Agent shall have no obligation to determine whether the Deposits are sufficient to complete the construction contemplated for the Property, as set forth in the Sales Contracts, or any other agreement or understanding as between Cody Lane, Development Manager, La Mesa and the buyers of the condominiums being constructed on the Property.

5.4     Cody Lane, Development Manager and La Mesa acknowledge that Escrow Agent shall not be responsible for the validity of any documents delivered to it pursuant hereto, may act and rely conclusively upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or instructions hereunder, believed by Escrow Agent to be authorized, has been duly authorized so to do.

5.5     Cody Lane, Development Manager and La Mesa expressly acknowledge and understand that that there may be intervening events which could impair or preclude any party's ability to complete this Property, such as insolvency, and that should this Property and related escrows fail to consummate for any reason whatsoever, including but not limited to the failure, refusal or inability of Cody Lane to deliver title to any condominium or any real property comprising the Property, Escrow Agent shall have no liability or responsibility whatsoever for recovery of the funds disbursed in accordance with this Agreement.

5.6     Cody Lane, Development Manager General Contractor and La Mesa acknowledge that in the event that Escrow Agent receives any levies, garnishments, claims or demands as to some or all of the Deposits from creditors of Cody Lane, Development Manager and La Mesa, including but not limited to state or federal taxing authorities or judgment creditors, Escrow Agent may, only if directed by court order, remit funds to such creditors. Cody Lane, Development Manager and La Mesa expressly agree to hold Escrow Agent harmless from any such release of funds to such creditors. In the event Escrow Agent receives any such levies, garnishments, claims or demands, it shall promptly notify Cody Lane, Development Manager, General Contractor and La Mesa of its receipt thereof, including its intended response thereto, so that Cody Lane, Development Manager, General Contractor and La Mesa may respond or object to such levies, garnishments, claims or demands, should they choose to do so. So long as such levies, garnishments, claims or demands are not the result of General Contractor's acts or omissions under the Construction Contract, the General Contractor may object to any such levies, garnishments, claims or demands if the same shall diminish Cody Lane's obligation to maintain the Minimum Cashflow Requirement and Cody Lane is unable to make payments to General Contractor as required under the Construction Contract.  Notwithstanding the foregoing, in the event the Escrow Agent receives any such levies, garnishments, claims or demands, it reserves the right to withhold an amount equal to such levies, garnishments, claims or demands from disbursements pursuant to the terms of this Agreement until such time as such levies, garnishments, claims or demands or resolved or withdrawn.

5.7     In the event of any dispute among Cody Lane, Development Manager, General Contractor (but only pursuant to the terms of the Construction Contract) and/or La Mesa concerning the Agreement or Deposits to be released hereunder that results in the parties unable to mutually instruct Escrow Agent concerning disbursement of the Deposits, Escrow Agent shall have the exclusive right to file an action in interpleader requiring the parties to answer and litigate their several claims and rights among themselves. Cody Lane, Development Manager, General Contractor and La Mesa further acknowledge and agree that in the event such action is filed, they jointly and severally agree to pay Escrow Agent's costs, expenses and reasonable attorney's fees expended or incurred in such interpleader action.

DSL    D ₜ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

5.9    Cody Lane, Development Manager, and La Mesa expressly agree to indemnify and hold Escrow Agent harmless from any claims or demands resulting or arising from Escrow Agent's disbursement of Deposits in accordance with this Agreement, but not for claims or demands arising from Escrow Agent's negligence or willful misconduct.

5.10    Cody Lane, Development Manager, and La Mesa expressly agree that Escrow Agent shall be compensated in the amount of $1,500 per month for its performance of services under this Agreement, which shall be due, payable and paid at the same time as the making of the Monthly Disbursement. This amount shall be included in each Draw Request and Le Mesa will issue the payment to Escrow Agent upon its receipt of each Monthly Disbursement.

**ARTICLE VI**
**LINE OF CREDIT**

6.1    <u>Initial Paydown of Line of Credit</u>. Development Manager shall include a funding request in the first Draw Request following commencement of construction by the General Contractor, in an amount sufficient to pay down the outstanding balance of the Line of Credit. Upon receipt of funds from Escrow Agent, La Mesa shall remit the approved payment to FRB as instructed by Cody Lane.

6.2    <u>Purpose of Line of Credit</u>. Cody Lane shall maintain the Line of Credit in good standing and available for use as a secondary source of funding for the Property in the event the Deposits are insufficient to fund the Draw Requests or to meet the Minimum Cashflow Requirement (as defined below) of the General Contractor. The Deposits from Buyer will be used as the primary source of funding for the Property.

6.3    <u>General Contractor's Right to Payment Not Affected</u>. Notwithstanding anything to the contrary in this Agreement, neither General Contractor's right to payment, General Contractor's remedies for failure of payment under the Construction Contract, nor the amount of payment to which General Contractor is entitled shall be limited in any way by this Agreement nor limited to or by the amount of funds available in the Escrow Account or the Line of Credit.

**ARTICLE VII**
**CASHFLOW PROJECTIONS**

7.1    <u>Initial Cashflow Projection</u>. The initial cashflow projection shall be based upon the Construction Contract amount, all other hard and soft costs of Cody Lane, and the construction schedule and shall be prepared as follows (the "***Initial Cashflow Projection***"): (i) with respect to the construction costs required for such projection, General Contractor and Development Manager shall independently determine such costs and then jointly reconcile such costs in good faith, and (ii) with respect to all other hard and soft costs of Cody Lane, the Development Manager in good faith shall determine such costs. In the event the General Contractor and Development Manager cannot agree on a reconciliation of the construction costs in the Initial Cashflow Projection, then each party shall propose an independent construction cashflow expert and upon agreement of the selection of the independent cashflow expect, each party agrees to accept the findings of the independent cashflow expert. Upon Escrow Agent's receipt of the Initial Cashflow Projection from Cody Lane, including any reconciliations made by General Contractor and Development Manager, and as a condition precedent to General Contractor's obligation to commence any work under Section 2.2.1 of the Construction Contract, the Escrow Agent shall

DSL    D ε S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

confirm in writing to Cody Lane, Development Manager, General Contractor, and La Mesa the Escrow Account balance, which shall be an amount not less than the Minimum Cashflow Requirement (as defined in Section 7.3 below).

7.2     Updated Cashflow Projections. On a monthly basis, the Initial Cashflow Projection shall be updated based upon the Construction Contract amount and the construction schedule as adjusted by any executed change orders, and Cody Lane's anticipated hard and soft costs of Cody Lane, and shall be prepared as follows (the "**Updated Cashflow Projection**"): (i) with respect to the construction costs required for such projection, General Contractor and Development Manager shall independently determine such costs and then jointly reconcile such costs in good faith, and (ii) with respect to all other hard and soft costs of Cody Lane, the Development Manager in good faith shall determine such costs. In the event the General Contractor and Development Manager cannot agree on a reconciliation of the construction costs in the Updated Cashflow Projection with, then each party shall propose an independent construction cashflow expert and upon agreement of the selection of the independent cashflow expect, each party agrees to accept the findings of the independent cashflow expert.

7.3     Establishing the Minimum Cashflow Requirement. At the time of each Draw Request, the amount equal to the subsequent three (3) month period included in the then current Updated Cashflow Projection shall become the minimum cashflow requirement ("**Minimum Cashflow Requirement**").

7.4     Compliance with the Minimum Cashflow Requirement. Cody Lane shall ensure that the Minimum Cashflow Requirement is at all times met by a combination of the following: a) current Escrow Account balance; and b) currently available balance on the Line of Credit.

**ARTICLE VIII**
**CONCERNING GENERAL CONTRACTOR**

8.1     Evidence of Financial Arrangements. General Contractor and Cody Lane agree that this Agreement and the disclosure and reporting of Escrow Account balances as noted in Section 2.3 herein constitute satisfactory compliance with Section 2.2 of the Construction Contract, provided that for the avoidance of doubt the Cody Lane acknowledges and agrees that as required by Section 2.2.3 of the Construction Contract,  "After the Owner furnishes evidence of financial arrangements under this Section 2.2, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor."

**ARTICLE IX**
**GENERAL PROVISIONS**

9.1     Notice. Any notice, demand or communication required, permitted, or desired to be given hereunder must be in writing and'it must be sent by: (i) certified mail, postage prepaid, with a return receipt requested (ii) hand delivery or (iii) a recognized overnight courier service (i.e., Fed Ex, United Parcel Service, etc.), to the applicable party's address below or to such other address as such party may otherwise direct.

DSL   D。S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Cody Lane:

Cody Lane Development Corp.
Attn: David C. Saunders
P.O. Box 734
Teton Village, Wyoming 83025
Email: david@d-saunders.com

With a copy to:

Wylie Baker LLP
Attn: Amberley Baker
60 East Simpson Avenue (physical)
P.O. Box 4211 (mailing)
Jackson, Wyoming 83001
Email: amberley@wyliebaker.com

And

Stoel Rives LLP
Attn: C. Andrew Gibson
760 SW Ninth Ave., Suite 3000
Portland, Oregon 97205
Email: andrew.gibson@stoel.com

Development Manager:

_____

_____

_____

_____

Escrow Agent:

Wyoming Title and Escrow
Attn: Christina Feuz and Liz Jorgensen
211 E. Broadway Avenue (physical)
P.O. Box 4429 (mailing)
Jackson, WY 83001
(307) 732-2983
Email:  christina@wyomingtitle.com
        liz@wyomingtitle.com

La Mesa:

La Mesa Fund Control & Escrow, Attn: Marcus Carter
_____

8419 La Mesa Blvd. #B
_____

La Mesa, CA 91942
_____

(616) 644-8500, Email: marcus@lmfce.com
_____

DSL    D ᴸ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

General Contractor:    Layton Construction Company, LLC
9090 Sandy Parkway
Sandy, Utah 84010
Attention: President
Email: _____

With a copy to:

Layton Construction Company, LLC
9090 Sandy Parkway
Sandy, Utah 84010
Attention: General Counsel
Email: _____

And

Parr Brown Gee & Loveless
101 South 200 East, Suite 700
Salt Lake City, Utah 84101
Attention: Roger D. Henriksen
Email: rhenriksen@parrbrown.com

All notices given hereunder shall be deemed to have been received (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via e-mail; (iii) on the following day after delivery to Federal Express or similar courier or the Express Mail service maintained by the United States Postal Service for next day delivery; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed. Any party may change its address for the purpose of this Section by giving the other parties written notice of its new address in the manner set forth above.

9.2    <u>Successors and Assigns</u>. No party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Agreement shall inure to the benefit of and shall be binding upon the successors, heirs and permitted assigns of the parties hereto.

9.3    <u>Governing Law; Venue</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Wyoming, without giving effect to the principles of conflict of laws thereof. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the courts of the County of Teton, State of Wyoming. This Agreement was negotiated by both parties hereto. As such, this Agreement shall not be construed against or in favor of any party by virtue of which party drafted the Agreement or any portion thereof. All parties hereby waive any and all right to a trial by jury. Any and all claims, disputes, or controversies between them related to or arising

DSL    D.S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

out of this Agreement shall be resolved in the courts of Teton County and all issues shall be tried and found by the court and not a jury.

9.4     Severability. If any part of this Agreement is declared by any court or other judicial or administrative body of competent jurisdiction to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

9.5     Time of Essence. Time is expressly of the essence in the enforcement and compliance with all terms and conditions of this Agreement.

9.6     Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

9.7     Entire Agreement. This Agreement contains the entire understanding between the parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions, including any previously executed reservation agreement or letter of intent. All exhibits hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein. Notwithstanding the foregoing, in the event of a conflict between Cody Lane and General Contractor regarding this Agreement and the Construction Contract, the Construction Contract shall control.   A breach of this Agreement shall constitute non-compliance with "Evidence of the Owner's Financial Arrangements" in Section 2.2 of the General Conditions of the Construction Contract unless Cody Lane and General Contractor otherwise agree in writing.

9.8     Parties in Interest. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement to any persons other than each party hereto and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third persons to any party hereunder. No provision of this Agreement shall give any third persons any right of subrogation or action over or against any party hereto. It is the intention of the parties named herein and signatories hereto that no person, not a party signatory to this Agreement, shall have the right to look to La Mesa or the Escrow Agent for any disbursement hereunder, under a third party beneficiary theory or otherwise, and that La Mesa and the Escrow Agent owes no duty to any such third party to make any disbursement or to perform any of their other respective obligations set forth herein.

9.9     Section and Paragraph Headings. The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

9.10    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and both of which together shall constitute the same instrument. Facsimile

DSL    D ᴄ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

signatures, electronic signatures or scanned and emailed signatures shall be considered as original signatures and are legally binding counterparts of this Agreement and all ancillary documents executed or delivered in connection with this Agreement may be executed and signed by electronic signature by any of the parties to this Agreement, and delivered by electronic or digital communications to any other party to this Agreement, and the receiving party may rely on the receipt of such document so executed and delivered by electronic or digital communications signed by electronic signature as if the original has been received. For the purposes of this Agreement, electronic signature means, without limitation, an electronic act or acknowledgement (e.g., clicking an "I Accept" or similar button), sound, symbol (digitized signature block), or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record. The parties intend to be bound by the signatures of the electronically mailed or signed signatures and the delivery of the same shall be effective as delivery of an original executed counterpart of this Agreement. The parties to this Agreement hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature, and hereby agree that such electronically mailed or signed signatures shall be conclusive proof, admissible in judicial proceedings, of the parties' execution of this Agreement.

9.11    Attorneys' Fees. If any litigation, arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall recover as a part of the judgment its reasonable attorneys' fees, expert witness fees and other fees and costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

9.12    Time Calculations; Funds. Unless otherwise indicated, all periods of time referred to in this Agreement shall refer to calendar days and shall include all Saturdays, Sundays and state and national holidays; provided that if the date or last date to perform any act or give any notice with respect to this Agreement shall fall on a Saturday, Sunday or state or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or state or national holiday. Business days do not include any Saturday or Sunday, nor shall any business day include any legal holiday recognized in the State of Wyoming. All amounts due under this Agreement shall be paid by the responsible party in collected U.S. Funds.

9.13    Termination. This Agreement shall terminate when all amounts in the Escrow Account have been released and distributed in accordance with this Agreement, or upon the written agreement of General Contractor and Cody Lane and notice of such agreement to all other parties hereto.

[signature page follows]

DSL    D ᴸ S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

DocuSign Envelope ID: 4B34E9C7-A44B-4525-BD58-C9767FB541AD

IN WITNESS WHEREOF, each of the parties hereto has executed this Escrow Agreement as of the Effective Date.

Cody Lane Development Corp.,
a Wyoming corporation

By: _____
Name: David C. Saunders
Title: Chief Executive Officer

Layton Construction Company, LLC,
a L_____ npany

By _____
Name: David S. Layton
Title: President

WYOMING TITLE AND ESCROW, INC.,
a Wyoming corporation

By: _____
Name: _____
Title: _____

DDRM Jackson LLC,
a Wyoming limited liability company

By: _____
Name: STANLEY R CASTLETON
Title: CEO

La Mesa Fund Control & Escrow, Inc.
a California corporation

By: _____
Name: _____
Title: _____

DSL    D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

IN WITNESS WHEREOF, each of the parties hereto has executed this Escrow Agreement as of the Effective Date.

Cody Lane Development Corp.,
a Wyoming corporation

By:_____
Name:_____
Title:_____

DDRM Jackson LLC,
a Wyoming limited liability company

By:_____
Name:_____
Title:_____

Layton Construction Company, LLC,
a Utah limited liability company

By:_____
Name:_____
Title:_____

La Mesa Fund Control & Escrow, Inc.
a California corporation

By:_____
Name:_____
Title:_____

WYOMING TITLE AND ESCROW, INC.,
a Wyoming corporation

By:_____
Name: Liz Jorgenson
Title: Manager / VP

DSL    D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

IN WITNESS WHEREOF, each of the parties hereto has executed this Escrow Agreement as of the Effective Date.

Cody Lane Development Corp.,
a Wyoming corporation

By:_____
Name:_____
Title:_____

DDRM Jackson LLC,
a Wyoming limited liability company

By:_____
Name:_____
Title:_____

Layton Construction Company, LLC,
a Utah limited liability company

By:_____
Name:_____
Title:_____

La Mesa Fund Control & Escrow, Inc.
a California corporation

By:_____
Name: _Marcus R. Larson_
Title: _President_

WYOMING TITLE AND ESCROW, INC.,
a Wyoming corporation

By:_____
Name:_____
Title:_____

DSL    D&S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

**Exhibit A**
**Legal Description**

DSL   D & S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

Exhibit B

| Payment: | Milestone: |
|---|---|
| Initial payment (together with the application of the reservation deposit, if any, 10% of the Purchase Price) | Within 3 days of the Effective Date |
| Second payment (15% of the Purchase Price) | Within 5 days following notice from Cody Lane that it has achieved Construction Commencement (as defined below) |
| Third payment (30% of the Purchase Price) | Within 5 days following notice from Cody Lane that it has written notification from the Architect and the Funds Manager that construction is twenty five percent (25%) complete |
| Fourth payment (25% of the Purchase Price) | Within 5 days following notice from Cody Lane that it has written notification from the Architect and the Funds Manager that construction is fifty five percent (55%) complete |
| Final payment (balance of the Purchase Price) | Closing Date* |

\* Pursuant to the Sales Contracts and subject to the right to postpone closing as further set forth in the Sales Contract, the closing of the transaction contemplated by each Sales Contract (the "*Closing*") shall take place at the offices of the Title Company within fourteen (14) days following the later to occur of (i) receipt by Cody Lane of a Certificate of Occupancy for the Unit issued by Teton County, a partial or temporary Certificate of Occupancy that applies to the Unit issued by Teton County, or such other approval or permit issued by Teton County that otherwise permits the occupancy of the Unit for its intended purpose and (ii) the recordation of the Plat in the Office of the County Clerk of Teton County, Wyoming (the date upon which the event described in either (i) or (ii) occurs is referred to herein as the "*Closing Date*"); provided however that in no event shall closing be scheduled later than twelve (12) months following the Outside Date.

DSL    D.S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

<u>Exhibit C</u>

**<u>Draw Request Summary</u>**

DSL    D·S

DocuSign Envelope ID: 9BCA2C87-E5EF-478F-8D2F-48FAC0C4D4EE

**Draw Request Summary**
**Hoback Club**
**Teton Village, WY**
**xx/xx/202x**

**Purpose:**  Approval to wire funds from Wyoming Title escrow account to La Mesa Fund Control trust account, in accordance with Article 3.1 of the Funds Control Agreement.
These funds will be used by La Mesa to pay vendors and consultants approved in the project draw request, in accordance with Article 3.2 of the Funds Control Agreement.

**Billing Month:**    xx/xx/202x                    **Draw Request Amount:**          $ x,xxx,xxx

| **Approval & Signatures** |
|---|

**Prepared By:**
Development Manager, DDRM Jackson, LLC -  Roger Osness,      Marty Breen,      Stan Castleton

Signatures:    _____    _____    _____

**Reviewed / Approved By:**
Owner Representative, DesLauriers Real Estate, LLC - Rob DesLauriers

Signature:    _____

**Reviewed / Approved By:**
La Mesa Fund Control & Escrow Inc. - Jeremy McFarland

Signature:    _____

**Reviewed / Approved By:**
Cody Lane Development Corp Inc., Hoback Club Owners - David Saunders

Signature:    _____

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

A133

Exhibit F

Responsibility Matrix

| # | Function | E | FC | A | DM | OR | O | Conditions |
|---|---|---|---|---|---|---|---|---|
| 1 | Contracts for third party Design, Construction, Consultant or other | | | | P | R | A | |
| 2 | Day-to-Day requests & Directives to Architect | | | | M | R | | (1) As needed |
| 3 | Change Directives to Architect | | | | M/P | R | A | (1) |
| 4 | Day-to-Day Requests & Directives to Contractor | | | P | M | R | | (1) As needed |
| 5 | Contractor's Potential Change Orders ("PCO") | | | R | M/A | R | | (1) |
| 6 | Construction Change Directive to Contractor ("CCD") | | | A | M/A | R | | (1) |
| 7 | Owner Change Order ("OCO" w/recommendation by DM & OR) | | | A | P | R | A | (2) |
| 8 | Directives to DM to Study or Implement Owner/Buyer CR's | | | | | M | A | |
| 9 | Directives to Architect & Contractor to Study or Implement Owner/Buyer CR's | | | | M | R | A | (1) |
| 10 | Management of Scope Change Allowance for Owner/Buyer CR's | | | | M | R | A | (1) |
| 11 | Contractor's Application for Payment & Onsite Progress Observation | | R/A | R/A | R/A | R/A | A | Monthly |
| 12 | Developer's Monthly Draw Request & Project Report | | R/A | | M/A | R/A | A | Monthly |
| 13 | Escrow of Buyer Deposits / Release Monthly to FC | M | | | | | | Monthly |
| 14 | Funding of Developer's & Contractor's Monthly Draws | | M | | A | A | | Monthly |
| 15 | Lien Waiver Management | | M | | R | R | | Monthly |

(1) Development Manager shall make binding commitments on behalf of Owner to third party vendors under contract with Owner as follows: A) Individual Commitments= up to a maximum of $750,000, B) Aggregate of Outstanding Commitments = up to a maximum of $2,000,000, C) Commitment thresholds in A and B will be replenished upon Owner's execution of Change Order or Agreement.

(2) Development Manager will provide to Owner with each Owner Change Order a transmittal explaining the reasons for the costs and the funding that will be used in the Approved Project Budget. This transmittal will also be reviewed by Owner Rep and approved prior to Owner's approval.

| | Entities: |
|---|---|
| A | Architect |
| DM | Development Manager (DDRM Jackson, LLC - Marty Breen as Rep.) |
| E | Escrow holder of Buyer Deposits (WY Title and Escrow) |
| FC | Fund Control & Dispersements (La Mesa Fund Control) |
| O | Owner (Cody Lane Development Corp.) |
| OR | Owner Representative (Jackson Realty, LLC - Rob Deslauriers as Rep.) |

| | Actions: |
|---|---|
| A | Approve and/or Execute |
| M | Manage and Direct |
| P | Prepare and/or Negotiate |
| R | Review and Recommend |

DSL    D.S

DocuSign Envelope ID: 9BCA2C67-E5EF-478F-8D2F-48FAC0C4D4EE

## EXHIBIT G

### CONSTRUCTION MANAGER CHARGE OUT RATES

1.    Construction Manager's Health Insurance costs attributable to the Project will be billed to the Project pursuant to the following charge out rates:

Health Insurance costs shall include but not be limited to the following coverages related medical, dental, and vision.

*The below dollar amount per hour for Individual Plan or dollar amount per hour for Family Plan to be applied to each enrolled employee's straight time billable hours.*

*Hourly Medical Rates - $9.64/hr for family coverage, $3.96/hr for employee only. Dental is at $0.24/hr.*

| Coverage | Monthly Rates | Hourly Rates | Dental |
|----------|---------------|--------------|--------|
| Emp | $685.84 | $3.96 | $0.24 |
| Fam | $1,671.40 | $9.64 | $0.24 |

2.    Construction Manager's Subcontractor Default Insurance costs attributable to the Project will be billed to the Project pursuant to the following charge out rates:

*1% of enrolled subcontract costs. (Non-enrolled subcontractors will be bonded as included in the GMP Amendment.)*

DSL    D.S

111070993.1 0070998-00001