Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
(307) 634-0985 (fax)
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

Jeffrey B. Charkow
Owen K. Newman
Alex W. Karasik
John D. Cooke
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
(312) 499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
awkarasik@duanemorris.com
jdcooke@duanemorris.com
cjchasin@duanemorris.com

ATTORNEYS FOR PLAINTIFF
CODY LANE DEVELOPMENT CORP.

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP., <br><br> Plaintiff, <br> v. <br><br> LAYTON CONSTRUCTION COMPANY, LLC, <br><br> Defendant, Counter-Claimant, and Third-Party Plaintiff. | Case No. 24-CV-00064-KHR |
| Related Third Party Claims. | |

## EXPERT WITNESS STATEMENT OF SCOTT MALONEY

In accordance with Judge Rankin's Procedure for Presentation of Direct Testimony by Witness Statement, Cody Lane Development Corp. ("Cody Lane") provides the following written statement of Scott Maloney's direct testimony for trial. Cody Lane also requests the Court admit the exhibits which he relies upon or references and which are listed on its exhibit list or submitted as demonstratives.

1.   I am a licensed architect and the owner and founder of K2M Design, Inc. I am a licensed architect in 50 jurisdictions and have over 29 years of professional experience as an architect, during which time I have acted as the Architect of Record on over 3,000 projects. I am a member of the American Institute of Architects, am certified by the National Council of Architectural Registration Boards, and am LEED accredited.

2.   Through the projects I have been involved in, I have extensive experience with the roles and responsibilities of Owners, Architects, Construction Managers, and General Contractors under a variety of contracting frameworks, including the American Institute of Architects (AIA) forms that comprise the contracts in this case.

3.   I have experience providing expert analysis and testimony evaluating the responsibilities and performance of architects, engineers, contractors, and owners against industry standards and contractual responsibilities.

4.   This experience includes, but is not limited to, leading the evaluation of the performance of the Construction Manager as Constructor on two confidential projects at the Kennedy Space Center. My role on those projects was to evaluate construction claims from the Construction Manager against the Government that focused on "enhanced" project requirements during construction and the validity of change orders used in the process.

5.    My experience also includes quantifying the disputed progress of roof construction at the Northampton Campus of the VA and opining on architectural standards of care in connection with multiple hospitality and residential properties such as the Beacon, numerous Marriott branded properties, and Miami Beach hotels.

6.    I have a bachelor of science degree and a bachelor of architecture degree from Kent State University. Prior to starting K2M Design, Inc. in 2001, I worked for a large Architecture, Engineering, and Construction Management firm named the V Group where I specialized in criminal justice and civic project types for the 5 years that I worked there.

7.    As a licensed architect serving as an expert in this matter, I have been asked to evaluate and opine on Layton's execution of the Hoback Club Project from an architect's perspective. I have done so based on the documents that were provided to me and my review of the construction management protocols governing the interface between Layton's responsibilities and the Architect on this Project.

8.    My opinions are expressed in this witness statement, in the accompanying presentation and demonstrative exhibits that I prepared and will reference during this statement, and in my Expert Report and Rebuttal Report.

9.    It is my opinion, based on industry standards and my professional experience, that Layton did not execute the Project with the care, diligence, or resources required under its Contract with Cody Lane or industry standards, resulting in significant delays to the schedule and associated cost-increases.

10.    Layton was retained by the Owner to act as the Construction Manager as Constructor (also known as a Construction Manager at Risk or CMc).  CMc is a project delivery method where the Construction Manager is involved early in the design and

preconstruction process, advising on costs, schedules, and constructability, before

subsequently transitioning to assume the responsibility for construction quality and

subcontractors, often under a Guaranteed Maximum Price contract. This approach to

contracting provides the benefits of early contractor involvement, but also sees the

construction manager taking on the construction risks of the Project.

11.    The Owner, Construction Manager as Constructor, and Architect each had a role to play

in the process of building this project, as shown in slides 8 and 9 of my presentation.

12.    Layton's responsibilities are set forth in the Contract Documents, including the AIA A133

Owner/CMc Agreement and A201 General Conditions and the drawings, specifications,

addenda, and subsequent modifications incorporated into the Contract.

13.    Under this contractual framework the Construction Manager has both administrative and

operational responsibilities. The Construction Manager is responsible for ensuring the

Contract Documents are understood, correctly implemented, continuously updated, and

used as the metric for the Work.

14.    In order to meet these obligations, the Construction manager must thoroughly review the

Construction Documents (drawings, specifications, addenda, and modifications) before

and during construction, identify any conflicts, ambiguities, or omissions, and promptly

report them to the Architect and Owner.

15.    The Construction Manager is responsible for performing the Work as required by the

Contract Documents, including ensuring that all materials, assemblies, and systems

match the specified quality, dimensional, and performance requirements. The Contractor,

however, retains responsibility for the means and methods of its own work, for delegated

components of the design, and for the field routing of its installations.

4

16.     The Construction Manager is responsible for ensuring that all subcontractors and suppliers are provided with the relevant portions of the Contract Documents, and for coordinating their work to prevent conflicts, overlaps, or gaps between two or more subcontractors scopes of work.

17.     The Construction Manager is responsible for monitoring construction to verify that it conforms to the Contract Documents and for rejecting non-conforming work and requiring its correction before work proceeds.

18.     The Construction Manager acts as the liaison between its subcontractors on the Project, the Architect, and the Owner. In practice, this means that the Construction Manager is responsible for reviewing shop drawings, product data, and samples provided by its subcontractors for compliance with the Contract Documents before submitting them to the Architect. The Construction Manager is also responsible for ensuring that long-lead and critical components are procured in time to meet schedule and specification requirements.

19.     The Construction Manager also manages changes to the work, including incorporating modifications (such as change orders, CCDs, or amendments) into the working set of Contract Documents and ensuring that those changes are communicated to all relevant trades and implemented.

20.     The Construction Manager is responsible for the means and methods of construction, so long as those means and methods are consistent with the Construction Manager's contractual obligations to the Owner (including, but not limited to, meeting the Contract schedule, proceeding in the best interests of the Owner, issuing and executing against a recovery schedule, and proceeding with the work even if the work is subject to a dispute.

DM3\22351093

Although the architect is responsible for defining what is to be built, the Construction Manager is responsible for determining how it will be built. This requires sequencing and planning to ensure that the work can proceed efficiently, with minimal conflicts, and in compliance with the Contract Documents.

21.   Layton's standard of care on this project was that of a reasonably prudent Construction Manager as Constructor (CMc) performing services under similar circumstances, consistent with the requirements of the AIA A133 Agreement and the incorporated A201 General Conditions. This standard required Layton to exercise appropriate professional judgment in planning, coordinating, and executing the Work; to thoroughly understand and implement the Contract Documents; to proactively manage sequencing, logistics, and procurement; and to maintain effective quality control to prevent non-conforming work. It further required Layton to anticipate foreseeable construction constraints, maintain necessary site logistics and temporary facilities, coordinate trades to support efficient progress, and correct deficiencies promptly. Meeting this standard requires competent, organized, and diligent management consistent with accepted construction industry practices for a project of this size, complexity, and delivery method.

22.   In construction disputes, the term "responsible party" is used to refer to the entity with contractual, professional, or statutory obligations for the planning, execution, or oversight of the work and who may be held accountable for deficiencies, errors, omissions, or failures to meet the standard of care.  Slide 9 of my presentation sets forth the responsibilities of the Owner, Architect, and Construction Manager as Constructor as the responsible party for their respective roles on the Project.

DM3\22351093

23.     Layton, as the Construction Manager as Constructor, was responsible for overseeing the work, managing subcontractors, and delivering a complete project in accordance with the Contract Documents. Layton, as the CMc, is the responsible party for all construction execution, trade coordination, scheduling, subcontractor performance, and compliance with the Contract Documents. All trade contractors working under Layton are their agents or delegates and fall within Layton's umbrella of responsibility and standard of care.

24.     The scope of Layton's responsibilities as CMc were described in the Contract Documents, including the A133 Agreement and A201 General Conditions.

25.     The responsibility of Arcadis, the Architect, was described in the Owner/Architect Agreement (AIA form B101). These responsibilities included primary services such as schematic design, design development, preparation of construction documents, and contract administration. The Architect's services are further expanded upon in the AIA A201 General Conditions of the Contract for Construction and include contract administration, observation of work, review of submittals, rejection of non-conforming work, and the limited ability to change the work. The A201, however, expressly excludes from the Architect's responsibility "control over or charge of construction means, methods, techniques, sequences, or procedures."

26.     The Architect was required to perform these services with the prevailing professional standard of care. Specifically, it is my opinion that the Owner/Architect Agreement provided that Arcadis would provide services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.

DM3\22351093

27.   The Architect and its consultants are a responsible party for errors and omissions in design documents and, within their standard of care, for compliance with all governing codes, ordinances, laws, and statutes. The Architect is responsible for monitoring the progress of construction and the quality of Work, and for notifying the Owner and Contractor upon identification of non-conforming work during site-observations or delays or deficiencies in the Contractor's submissions to the architect. The Architect is responsible for the services rendered by their retained subconsultants unless those subconsultants were separately contracted by the Owner.

28.   The Owner, Cody Lane Development Corporation, has responsibilities primarily related to Project funding, program clarity, timely decision-making, and change management. The Owner's actions are subject to standards of reasonableness and good faith in exercising its discretion and rights under the Contract.

29.   Specifically, the A133 Contract requires the Owner to provide information regarding the requirements for the Project and to make decisions with reasonable promptness, to provide reasonable evidence that it has made financial arrangements to fulfill its obligations under the Contract, to establish and maintain a budget for the Project, and to provide certain Tests, Surveys and Reports.

30.   The Owner, including the Owner's development manager, are responsible for issuing the Owner's directives, timely decision making, providing funding, and any impacts resulting from Owner-initiated scope changes or interference.

31.   As shown in Slide 2 of my presentation, the standard of care applicable on this project required Layton to exercise appropriate professional judgment in planning, coordinating, and executing the Work with competent, organized, and diligent management consistent

with accepted construction industry practices for a project of this size, complexity, and delivery method.

32.     It is my opinion that Layton failed to meet this standard of care. Specifically, I believe that Layton's Project Execution suffered from Layton's failure to coordinate and integrate with the Architect, failure to maintain a realistic and coordinated construction schedule, inadequate preconstruction transition to construction, poor management of the submittal and architectural review sequences, unauthorized changes and deviations from the contract, insufficient oversight and coordination with its subcontractors, and non-conforming work.

33.     It is my opinion that Layton failed to properly execute the Project and that performance failures relating to staffing and coordination, schedule, cost input, document execution, and oversight of the work contributed to significant Project disruption.

**Failure to Coordinate and Integrate with the Architect**

34.     Layton failed to coordinate and integrate its work with the Architect. Under Exhibit B to the AIA A133, Layton was responsible for providing preconstruction services to the Owner. These services included conducting a document review in which Layton would "Review construction documents created by the design team for thoroughness, constructability, conflicts, errors, and omissions." Layton's obligations also included conducting a constructability review, in which Layton would "Provide constructability reviews, evaluation and analysis of major systems (structural, MEP, FA/FP), and material selection suggestions." Exhibit B further provided that Layton would develop complete cost estimates for the Project and a "CPM construction schedule to include all construction activities and completion date."

9

35. Once the Project began, AIA 133 Section 2.1.2 required that the Construction Manager "shall also provide recommendations consistent with the Project requirements to the Owner and Architect on constructability; availability of materials and labor; time requirements for procurement, installation and construction; and factors related to construction cost including, but not limited to, costs of alternative designs or materials, preliminary budgets, life-cycle data, and possible cost reductions."

36. Layton did not meet these obligations. Numerous avoidable construction issues emerged as a result of Layton's failure to provide sufficient pre-construction input regarding the adequacy of the design and its constructability. A specific example highlighting this failure is PCO 0389 Duct Penetration Shaft Framing ($189,118), which was submitted by SMC to cover the cost of framing and drywall work necessary to enclose duct shafts in accordance with the original contract documents, specifically on sheet M600 and General Note 16 on AG013. Had the work been coordinated in a BIM model in the preconstruction effort this scope would not have been missed.

37. The transition from design to construction on this Project was disjointed, a problem exacerbated by frequent changes in Layton's Project personnel including Jacob Keith (preconstruction manager) and Paul Nelson (the superintendent during preconstruction). These key positions turnover created loss of project knowledge and continuity between preconstruction and construction, increased errors and rework, caused disruption to established workflows and processes, led to delays due to onboarding and learning curves, reduced ability to anticipate and manage risks, and caused an overall reduction in Layton's productivity and efficiency. For example, out of 100 RFIs issued between 8/16/22 and 10/3/22 (i.e. RFI 800-899) there were 43 RFIs issued specific to design

10

clarifications that should have been resolved in preconstruction. These RFIs were issued at least 14.5 months after the start of construction.

**Failure to Maintain a Realistic and Coordinated Construction Schedule**

38.    The Contract required Layton to develop and maintain a realistic and coordinated construction schedule. Specifically, A133 Section 2.1.3 provided that "the Construction Manager shall prepare and periodically update a Project schedule for the Architect's review and the Owner's acceptance…. The Project schedule shall coordinate and integrate the Construction Manager's services, the Architect's services, other Owner consultants' services, and the Owner responsibilities and identify items that could affect the Project's timely completion. The updated Project schedule shall include the following: submission of the guaranteed Maximum Price proposal; components of the Work; times of commencement and completion required of each Subcontractor; ordering and delivery of products, including those that must be ordered well in advance of construction; and the occupancy requirements of the Owner."

39.    Section 01.3200 of the Project Specifications further provided details regarding the required elements of Layton's schedule submittal, including that Layton's schedule must reflect all discrete parts of the project that can be identified for scheduling purposes.

40.    Project documents and the continued slippage of Project milestones, however, show that Layton did not maintain an effective schedule or proactively manage the coordination of the critical path. Between Amendment 4 and Layton's termination, every schedule that Layton submitted showed that Layton would fail to meet the Substantial Completion date. Following termination SMC was retained under a successor agreement to complete the project and was required to establish new logistical frameworks, labor management,

site controls, and coordination protocols to stabilize and advance the work. The

adjustments made by SMC to their general conditions were not elective or enhancement-

based; rather, they were corrective measures in response to widespread deficiencies in

Layton's project execution, deficiencies that included improper sequencing, inadequate

subcontractor oversight, missed coordination opportunities, and non-conforming

construction work. These conditions necessitated extended durations, overlapping

mobilizations, and increased site management, all of which materially escalated the

general conditions burden (i.e. the project-wide indirect costs necessary to support

construction operations) . PCO 4010, 4134, and SMC Original General Conditions (S-

001) were general conditions costs borne by the Owner to complete the work.

41.     Although Layton has claimed that this was due to delays outside Layton's scope of work,

Layton did not properly submit and obtain Owner approval of substantiated extension-of-

time claims based on a demonstrated impact to the critical path to extend its time to

complete the work.  I understand from multiple documents that Layton refused to issue

timely and supported delay claims as well as recovery schedules.

42.     I also understand, from the deposition testimony of Mike Malarkey and Erwin Watt of

Cumming group, and from the expert report of Bill Ibbs, that Layton's

contemporaneously-submitted schedules did not include all of the activities impacting the

critical path of the work and that Layton was repeatedly informed of this fact. In

particular, it is my understanding that Layton did not include schedule impacts associated

with its replacement of the Densglass sheathing on the exterior of the building, the

schedule impacts of denied first-work-in-place evaluations, and the need for acclimation

prior to beginning certain finishing work.

43. Upon execution of Amendment #4, Layton committed to a project completion date of May 31, 2024. From the time of Amendment #4's execution to the time of termination, Layton lost 301 days of progress in their schedule updates from April 27, 2023 – February 26, 2024, nearly 1 day for every day on site as shown in slide 31 of 31 in the presentation.

**Inadequate Preconstruction Cost Input and Budget Control**

44. Turning to Slide 3, Layton was obligated to provide timely and reliable estimates of the Cost of the Work and to provide recommendations to keep the Project within budget. These estimates were necessary to inform the Architect's design decisions and ensure alignment between the development of the design and the Project's financial parameters.

45. Specifically, Section 2.1.6.2 of the A133 Contract required:

As the Architect progresses with the preparation of the Schematic Design, Design Development and Construction Documents, the Construction Manager shall prepare and update, at appropriate intervals agreed to by the Owner, Construction Manager and Architect, estimates of the Cost of the Work of increasing detail and refinement and allowing for the further development of the design until such time as the Owner and Construction Manager agree on a Guaranteed Maximum Price for the Work. Such estimates shall be provided for the Architect's review and the Owner's approval. The Construction Manager shall inform the Owner and Architect when estimates of the Cost of the Work exceed the latest approved Project budget and make recommendations for corrective action.

46. Layton failed to provide meaningful cost feedback during critical design phases. Layton's estimating reports were delayed and sometimes inconsistent, impairing the Architect's ability to make scope of system adjustments aligned with the Owner's budget goals. And Layton's estimates ultimately proved to be inaccurate, as shown by the disconnect between Layton's budgets, the final GMP, and the subsequent subcontractor settlements that were entered into following Layton's termination. The preconstruction service agreement noted (5) estimates were to be prepared in advance of the GMP, the original

13

GMP contract was then set for $235,225,982, Amendment #4 modified that amount to $242,103,488, and there was an additional $32,609,383 in sub settlements required to re-commence the work post Layton termination. Layton's GMP estimate was thus off by $39,486,889 from the base GMP established after (5) cost estimates were complete by Layton, even before accounting for the costs that SMC incurred to complete the work after Layton was terminated.

**Poor Management of Submittals and Review Sequences**

47.     As part of the design and construction process, the Architect is responsible for reviewing and approving shop drawings and submittals provided by Layton and its subcontractors. The Architect's ability to review those submittals relied on the timely and coordinated delivery of complete packages, pursuant to the schedule that Layton developed for those submittals.

48.     Section 3.12.5 of the AIA A201 Contract required Layton to "review for compliance with the Contract Documents, approve, and submit to the Architect, Shop Drawings, Product Data, Samples, and similar submittals required by the Contract Documents, in accordance with the submittal schedule."

49.     Section 3.12.8 of the AIA A201 Contract further required that Layton's Work be "in accordance with approved submittals."

50.     Unfortunately, the documents that I reviewed show that Layton's submittals were routinely submitted out of sequence or in an incomplete condition. One example of this is that Layton submitted the shop drawings for the elevator installation after construction of the elevator shafts had begun. As a result, Layton failed to timely identify that the Elevator Manufacturer's proposed opening dimensions were inconsistent with the as

14

constructed work. To correct this, Layton had to chip out the concrete at the elevator door openings and redesign the elevator openings. Layton subsequently sought compensation for this added work in PCO 0160.R2 – Shear Wall Openings, which was valued at $282,049.

51.    Layton's failures to comply with the submittal schedule and to ensure the compliance of submittals prior to their submission resulted in schedule delays, design misalignments, and construction defects that required the rework of numerous non-conforming items.

**Unauthorized Changes and Deviations from Contract Documents**

52.    Layton was required to construct the Project in accordance with the Contract Documents. Section 3.3.1 of the AIA A201 Agreement requires that all work "conform to the Contract Documents," and Section 3.12.8 prohibits substitutions of materials or systems without formal approval. Section 7.1.1.1. of the AIA A201 Agreement expressly recognizes that only the designated Owner's representative has authority to authorize changes to the work.

53.    Notwithstanding those requirements, there have been multiple identified incidents in which work deviated from the approved drawings. One such incident is described in IBI Obs Report dated 23.06.22 regarding Ext Sheathing (Insulation), which identified exterior stud cavities that had not been insulated in accordance with the Contract Documents. Insulation also had to be removed so that Monokote Fireproofing could be installed as specified on the perimeter eaves, as reflected in PCO 4043.

54.    Another deviation from the approved drawings concerned Layton's failure to install vibration and seismic controls for the MEP systems as defined in Specification Section 230548. At the time of termination this work had not been completed despite most of the

systems having already been installed without seismic controls, resulting in the need to

reopen wall cavities to install seismic anchors

55.    Deviations from the approved drawings also resulted from Layton's poor quality control.

For instance, the floor slabs that Layton poured were not flat and level. As annotated in

my evaluation of PCO 4036, the cost of leveling work to correct these variations

exceeded $286,000—more than a 108% increase over Layton's GMP expectation—

indicating poor scope control and weak subcontractor oversight. Such deviations

constitute a fundamental breakdown in project execution and disregard the contractually

established processes for managing change and the planning and orderly progress of the

work. Additionally, there have been instances in which Layton has mischaracterized the

availability of specified materials, causing Layton, the Architect, and the Owner to spend

unnecessary time and resources investigating alternative materials that were never

required.

56.    Another example of this is the siding for the project, which was specified to be Harvest

Timber Specialties' Windswept Bevel Pre-Stained Spruce/Pine Siding. The Wildland

Urban Interface Code required that this product be pressure treated; but I understand that

Layton represented to the Owner that the Windswept product could not be pressure

treated and requested to use a fir or cedar product instead. My understanding is that the

Owner and Layton both invested significant time investigating these alternatives, and

Layton even purchased one of these alternatives, only for it to turn out that the

Windswept product was able to be pressure treated. Layton's error resulted in additional

costs reflected in PCO 4048.

57. Finally, I would be remiss if I did not mention the roof issues. As is reflected in the stop-work order issued, Layton's installation of the roof failed to comply with the design drawings and the manufacturer's instructions.

**Insufficient Oversight and Coordination of Subcontractors and Non-Conforming Work**

58. Layton, as the Construction Manager, is responsible for both coordinating its subcontractors and for ensuring that their work conforms to the Contract and meets or exceeds industry standards. Section 3.3.1 of the AIA A201 Contract requires Layton to supervise and direct the work using its best skill and attention.

59. Under the A201 General Conditions, Layton is explicitly responsible for the means, methods, quality, and conformity of its work.

60. Section 3.3.1 of the AIA A201 requires that "The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention." It further requires that "The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences, and procedures, and for coordinating all portions of the Work under the Contract."

61. Section 3.5.1 further requires that "The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective…" Article 3.1.2 of the AIA A201 similarly requires that "The Contractor shall perform the Work in accordance with the Contract Documents."

62. And, finally, Section 3.3.2 establishes that "The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their

agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its subcontractors."

63.    In this case, there were numerous deficiencies in workmanship, including inconsistent finishes, incomplete installations of designed assemblies, and a failure to coordinate the routing of MEP (mechanical, electrical, and plumbing) systems through the BIM coordination process or field routing. Examples of these deficiencies in workmanship include Layton's failure to protect the roof's Sharkskin membrane per manufacturer requirements, out of plumb walls that prevented the installation of stone, and the installation of incorrectly placed steel reinforcing in the indoor pool and the outdoor spa #2.

64.    The frequency and severity of these issues are reflected in the significant volume of non-conforming work items and demonstrate that Layton provided inadequate oversight and quality control of its subcontractors and failed to ensure that their work was contractually compliant. As I will discuss later, I do not credit Layton's argument that these items were merely work in progress; work that is incorrect is not just incomplete and should be proactively identified and resolved immediately, rather than waiting until work has been completed and the defect covered by subsequent work.

65.    One of the largest non-conformances on the project was Layton's failure to manage the execution, inspection, and documentation of critical roof assembly components which resulted in substantial project delays. The costs of correcting that non-conformance were captured in PCO 4008 Roof Dismantle and Replacement and in related PCO-4002 Bravo Roof Material Freight, which related to additional freight costs associated with the rework of the roof.

66.    Another PCO that resulted from non-conforming work was PCO 4088 TKE Elevator

Escalation. PCO 4088 included $150,000  in costs to modify the elevator entrance frames

in accordance with CCD 24 for to account for the differences between the TKE Elevator

submittals and the as constructed elevator shear walls.

67.    My review identified multiple causes of non-conforming work throughout the Project

including deviations from the Contract Documents, unauthorized substitutions, and

deficient workmanship. These recurring defects reflect a pattern of inadequate

supervision and quality control by Layton and represent a clear departure from the

standard of care required of Layton as the Construction Manager under the Contract.

68.    Failure to fulfill these responsibilities results in non-conforming work, which the Owner

is entitled to require be removed and replaced at the Contractor's expense.

69.    Through my review of the documents I have identified six distinct categories of non-

conforming work on this Project, which are shown on slide 5 of my presentation:

- Unapproved material substitutions—instances in which the materials used did not

  match the architect-approved submittals and substitutions were made without

  Architect or Owner approval. For example, PCO 4190 arose when the kitchen

  equipment supplier provided kitchen hoods not originally specified in the design

  that were incompatible with the specified control panels. As a result, the initially

  procured control panel was incompatible and a control panel specific to the

  incorrect hoods had to be procured and installed, including associated

  programming and labor.

- I am also aware of testimony concerning Layton's unauthorized use of staples and

  duct tape to secure Armaflex pipe insulation in the place of the approved and

manufacturer-specified adhesives. My understanding from the testimony is that it was necessary to reopen walls that had already had drywall installed so that this improper installation could be corrected.

- Inadequate Craftsmanship and Finish—The quality of finish carpentry, millwork, and installed elements failed to meet the specifications or industry workmanship standards. As already referenced, the defects in the work included walls out of plumb, floors out of level, and errors in the installation and protection of the exterior, including the Densglass and the Roof.  I also understand from the testimony that Layton failed multiple First Works in Place reviews, including three successive First Works in Place reviews for plaster and the First Work in Place for millwork.   At a more granular level, several examples of Layton's defective craftsmanship are contained in non-compliance notices from the Architect dated 09/25/23 which reflect inadequate balcony waterproofing at the exterior soffit framing and VPL coated Densglass that was not in place. Per submittal detail SD04, waterproofing is to lap over VPL on balcony fascia condition which was not attained in the general conditions. IBI Site Visit Rpt 8 (10.5.23) also noted imperfections in the construction that were covered with "fillers," This is the result of construction tolerances exceeding the design standards, creating larger gaps between materials that had to be filled.

- Deviations from Approved Drawings—The as-constructed building deviated from the design documents without coordination with the architect's team.  A prime example of this is Layton's previously-mentioned failure to install seismic protection on MEP systems, which was required by the specifications.  Another

example of this is the roof, which as previously described deviated from requirements regarding the staggering of insulation and the fastening of materials. Yet another example of Layton's deviations from design drawings is the piping to Indoor Pool and Outdoor Spa #2, which was not buried to the depth specified by the trenching requirements for the Project and, upon excavation, was found to have defectively installed rough piping and reinforcing steel that did not follow the design plans prepared by Aqua Design International.

- Failure to Correct Known Deficiencies—Non-conforming work identified in the non-conformance log and observation reports was left unaddressed for extended periods. The most egregious example of this is the roof. Layton failed to manage the execution, inspection, and documentation of critical roof assembly components. Multiple deficiencies were cited by the Inspector of Record, including:

  - The installations of the self-adhered vapor retarder (*SharkSkin Ultra SA*) and roofing underlayment (*VaproShield SlopeShield Plus*) membranes were found to be inconsistent with the manufacturers' installation instructions and project specifications
  - Polyiso insulation was installed without staggering joints as required by contract documents, and without required inspections or approvals.
  - Improper fastening of the nail base and polyisocyanurate insulation layers further exacerbated the deficient conditions of the roofing system.
  - The plywood substrate board, which serves as the substrate for the self-adhered vapor retarder, showed signs of delamination suggesting improper installation.

  These led to a Stop Work Order, forced demolition of installed materials, and significant cost impacts exceeding GMP allowances. Despite multiple opportunities, Layton failed to resolve nonconforming conditions, leaving the roof

21

without meaningful progress between the issuance of the stop work order on September 2023 and Layton's termination in March 2024.

- Scope Misalignment Among Trades - Several building systems were installed without clear coordination, leading to conflicts and incomplete enclosure details. Had Layton implemented a complete BIM model and an appropriate BIM coordination process, many of the coordination issues would have been avoided such as those associated with the shear wall openings at issue in PCO 0160.R2, where rebar columns had to be cut out between traction elevator frames and the wall repoured due to the previously discussed failure to coordinate between the concrete contractor and the elevator supplier. Another example of Layton's scope misalignment is PCO 4144, which addresses a scope gap involving a section of ceiling at the entrance to the P2 garage. The issue originated from a misunderstanding between subcontractors: one (Prestige) interpreted the ceiling as exterior wood and excluded it, while the other (Brochsteins) interpreted it as interior wood and also excluded it.

- Installation of Incomplete Components—there were systems that were installed and known to be incomplete, requiring removal or modification to meet design intent and operational function. An example is as noted in 23.10.03 IBI Site Visit Rpt 6 (9.25.23) - Lutron plate/switch/outlet that was included in the mockup was rejected. The correct system was the Lutron Palladiom Metal Graphite finish per specifications. Additionally, the USB outlets were missing and the switch that was installed was not required as boot and glove dryers would be controlled directly at manufacturer supplied switch.

70.    Layton had a contractual obligation to perform the Work in "an expeditious and economical manner consistent with the Owner's interests" and "in accordance with the Contract Documents." Based upon my review of the Project record, it is my professional opinion that Layton failed to uphold its duty to install conforming work by installing work that deviated from the Contract Documents, proceeding with unapproved substitutions, allowing deficient workmanship to remain uncorrected, and failing to coordinate subcontractor scope and quality.

71.    These failures led to increased costs, schedule delays, and degradation in Project quality. They also impaired the Architect's ability to enforce design intent and effectively administer the Contract.

72.    The quantity and breadth of non-conforming work on this Project, and especially the impacts to the roof, the eaves, exterior sheathing, and exterior components, were so extensive that the necessary corrections could not be accomplished within the remaining construction season, causing work to extend into the next winter. Following Layton's termination, SMC and its subcontractors inherited a project that was materially behind schedule and burdened by widespread non-conforming work most critically within the building envelope. This delay resulted in additional cold-weather construction costs such as cold-weather protection, temporary heating, and other winter condition measures reflected in PCOs 4249, 4253, 4261, 4271, 272, 4274, and 4274.1. PCO 4249, for instance, related to the added cost to shrink-wrap the vertical sides of the building, which was necessary because the exterior was not yet completed. PCO 4271 similarly concerned temporary enclosures around chimneys necessary so that masonry work could proceed. The prolongation of the work into winter, and need to protect the work, were a

23

direct and foreseeable consequence of Layton's failed obligation to remedy defective and non-compliant work in a timely manner.

**BIM**

73.    As Construction Manager, a key part of Layton's coordination responsibilities included leading the Building Information Modeling (BIM) process for the Project.  In a project of this magnitude and complexity, BIM should serve as the single source of truth for constructability, the digital rehearsal of construction. The absence of that diligence by the Construction Manager represents a deviation from industry-standard practice and a failure of preconstruction coordination obligations under the AIA A133 and A201 agreements.  When used properly, BIM enables early detection of spatial and system conflicts through clash detection, which identifies points where components occupy the same physical space (e.g., a duct intersecting a beam, conduit through structural steel, or plumbing lines through rated walls).

74.    As I show on Slide 14, BIM is a digital representation of the physical and functional characteristics of a facility. According to the American Institute of Architects (AIA), BIM is defined as "a model-based technology linked with a database of project information." BIM is more than just a design tool. It is a collaborative process that allows architects, engineers, and construction manager as constructors, contractors, and subcontractors to plan, design, construct, and manage buildings and infrastructure more efficiently.

75.    Revit is a widely used BIM software developed by Autodesk. It enables multidisciplinary design processes and supports architectural, structural, and MEP modeling within a single, integrated project environment. Revit is the authoring platform used to develop

24

BIM models, and it supports various Levels of Development (LOD) that indicate the maturity and detail of the model.

76. A BIM model is used throughout construction for:

    a. Trade coordination and constructability reviews

    b. Scheduling (4D) and cost estimation (5D)

    c. Prefabrication and procurement

    d. Site logistics and phasing

    e. Operations and facilities management post-completion

77. During the preconstruction phase, the Construction Manager as Constructor (CMc) is responsible for leading coordination efforts, integrating subcontractor input into the BIM model, and conducting clash detection to resolve potential conflicts before construction begins.

78. Per AIA standards (referencing AIA Document E202 and G202 standard documents), a Level 400 BIM model represents a model with fabrication-level detail. Elements modeled to LOD 400 include: specific dimensions, sizes, shapes, and placement; connection and interface details; shop drawing-level information; and data sufficient for fabrication, installation, and construction. The different levels of BIM modelling are described on Slide 15 of my presentation.

79. Level 400 modeling is typically used by subcontractors for coordination, procurement, and installation purposes. The intent is to provide a highly accurate model that allows for coordination and clash detection to prevent field conflicts.

80. Clash detection is the process of identifying conflicts or interferences between building systems (e.g., structural vs. mechanical ducts, piping penetrations in slabs, or plumbing

vs. electrical conduit). It is typically conducted using software such as Navisworks, which can integrate various trade models to visualize and detect overlapping elements. The benefits of clash detection include preventing costly rework in the field, reducing construction delays, improving installation sequencing, and enhancing interdisciplinary coordination

81.    The Construction Manager as Constructor (CMc) is responsible for model coordination and clash detection. This includes gathering trade input, managing the model, running clash detection, and leading issue resolution. Failure to fulfill this responsibility, particularly on a Project of this size and complexity, deviates from the industry standard of care and may be considered a breach of duty under the CMc's A133 Agreement §1.4 indicates *"The Architect has supplied the Construction Manager with BIM electronic files for the project for the convenience of the construction manager and at its request to carry out the work on its project."*

82.    For a $250 million luxury multifamily condominium project delivered under a Construction Manager as Constructor (CMc) delivery model, the acceptable standard of care relative to BIM use and clash detection coordination is as follows:

   a.    Leadership in BIM Coordination: The CMc must lead the BIM process, including BIM Execution Planning, subcontractor participation, and model management.

   b.    Trade Model Integration and Clash Detection: The CMc is responsible for integrating subcontractor models and running regular clash detection using tools like Navisworks.

   c.    Conflict Resolution Pre-Construction: The CMc must identify and resolve design and spatial conflicts during preconstruction.

d.  Use of Level 400 Model: The CMc must ensure models meet LOD 400 and are used to drive field layout and coordination.

e.  Documentation and Accountability: The CMc must document clash detection activities and issue resolution.

f.  Compliance with A201 General Conditions: The CMc must coordinate the work (§ 3.3.1), manage coordination drawings (§ 3.3.1), maintain the Project schedule (§ 3.10.1), and prevent construction inefficiencies through coordination of the work (§ 3.3.1).

83.  Had Layton fulfilled its standard of care obligations associated with BIM usage, as is typical in projects of this complexity and scale, the extensive coordination issues noted across thousands of RFIs, PCOs, CCDs, and ASIs could have been mitigated. The absence of effective clash detection and model integration suggests a fundamental failure in Layton's role to engage trade contractors in model input and coordination, conduct routine clash detection during preconstruction, and use the model for constructability analysis and sequencing.

84.  Of particular note is the fact that Layton's Project Manager admitted in his deposition that Layton's subcontractors' review of the BIM model lagged behind construction progress in some instances.  I am also aware of documents suggesting that Layton's subcontractors were not fulfilling their obligations with respect to BIM modeling and clash detection. The lag in subcontractor BIM participation was not a minor administrative issue it was a systemic coordination failure that undermined the very tool designed to prevent costly field conflicts. By allowing subcontractor modeling to fall behind, Layton forfeited the proactive coordination advantage that BIM provides, leading to reactive construction,

extensive rework, and schedule slippage.  Had the BIM Execution Plan been properly enforced in accordance with AIA E203/G202 industry accepted protocols and Layton's contractual coordination duties, many of the project's conflicts, RFIs, and non-conforming conditions could have been identified and resolved digitally, avoiding the months of delay and cost escalation that followed.

85.    As I discuss on slide 16, this lack of diligence directly contributed to systemic coordination breakdowns observed throughout the Project such as RFI-0232 P2 Area 3 SS Ceiling Conflicts, RFI-0379 P2 A3 Lighting Fixture Conflict, RFI-0394 L2 A2 Lighting Fixture Conflict, and RFI-0600 Electrical Panel Conflicts (multiple units). By not leveraging the BIM model as intended per AIA standards and contract expectations, Layton failed to prevent foreseeable construction conflicts, leading to costly field rework, schedule delays, and additional claims. Two examples of this—both of which have previously been mentioned—are PCO-0389 – Duct Penetration Shaft Framing and PCO 0160.R2 – Shear Wall Openings.  Both of the issues described in these PCO's would have been avoided had a BIM system and appropriate clash detection been timely utilized by Layton and its trade partners.

86.    BIM, particularly at Level 400, is a critical tool for construction coordination. Its proper use is an expected standard of care for any CMc managing a complex, multi-discipline project. The failure to adequately develop, utilize, and manage the BIM process in this case represents a significant lapse in professional responsibility and best practices. A properly executed BIM coordination effort would have dramatically reduced the volume of reactive documentation and conflict seen throughout the project.

**Layton's Improper Use of Construction Manager as Constructor's Contingency**

87.    As I discuss on Slide 17, during development of a Guaranteed Maximum Price

Amendment, §2.2.1 of the AIA133 Agreement required that Layton include a defined

contingency amount which was to be used by the Construction Manager as Constructor to

cover those costs considered reimbursable but not included in a Change Order in order to

carry out the full original intent of the Contract Documents. §2.2.4 further specifies that

this contingency may be used to cover:

      a.    Costs caused by gaps between Subcontractors' scopes of work,

      b.    Costs caused by nonperformance by Subcontractors,

      c.    Costs resulting from material price escalations resulting from

unanticipated events.

88.    Identification gaps in subcontractor scope buyout can occur during and/or after the

subcontractor buyout process, even well into the construction phase.

89.    This contingency is specifically purposed to protect the project schedule from delay by

allowing the Construction Manager as Constructor to expediently remedy subcontractor

scope conflicts or gaps in scope, subcontractor performance issues to include acceleration

of the Work through overtime or weekend work, or from unexpected material price

escalations.

90.    When a gap in subcontractor scope was identified, even if that gap was disputed by

Layton, Layton missed opportunities to request usage of this contingency to supplement

the subcontractor and protect the project schedule while the dispute was resolved.

91.    In all cases, use of this contingency is only permitted upon request by the Construction

Manager as Constructor and the approval of the Owner per §2.2.4.2 of the AIA A133

Agreement. In instances where Layton failed to obtain Owner approval prior to resolving subcontractor scope or schedule issues, the Owner is still afforded the contractual right to review and approve or reject the proposed use of the contingency. Upon rejection of any contingency requests where the Work was already authorized by Layton, Layton carried the financial responsibility for these unapproved costs while ensuring continued compliance with the project schedule.

92.    During the project, several subcontractors were continually not meeting workmanship quality expectations or installing unapproved material requiring correction of the Work. Layton missed opportunities to request usage of this contingency to strategically protect the project schedule through directing those subcontractors to recover the Work and the schedule through allowable overtime or even by supplementing that subcontractor with additional manpower to ensure the Work is done correctly and quickly while financial responsibilities are being determined.My review identified multiple PCOs were funded by Owner contingency but were in fact attributable to Layton's failure to properly perform design reviews, insufficient coordination with the architect, or lack of proper oversight and management during construction, examples of which are reflected on Slide 18.

93.    For instance, PCO 4012 pertains to the provision of a temporary climatization system including spot coolers, heaters, and generators to support the interior completion of the Hoback Club project, particularly the installation of millwork, prior to the permanent mechanical systems being operational. This PCO could have been avoided had Layton appropriately structured its work. PCO 4012.001 accounts for a labor cost associated with

maintaining the temperatures and PCO 4012.002 is an extension of time for the same item as 4012.

94.     The same is true of PCO-4088, the TKE elevator escalation PCO that has been previously discussed. The escalation costs reflected in that PCO resulted from Layton's failure to meet the prescribed project and procurement schedules.

**Layton's Failure to Adequately Manage the Project**

95.     On a project of this magnitude, Layton, as CMc, is responsible for implementing and maintaining an organized administrative structure to manage the flow of information between the design team, owner, subcontractors, consultants, and suppliers. As I describe on Slide 19, these duties include:

    a.  Tracking, processing, and distributing RFIs, ASIs, CCDs, OCOs, PCOs, submittals, and meeting minutes

    b.  Maintaining clear documentation logs and decision histories

    c.  Ensuring timely responses and coordination of action items

    d.  Managing construction software platforms (e.g., Procore, BIM 360) for document control

96.     Failure to maintain a baseline standard of care in administration, including information processing and coordination follow-through, reflects a breach of duty and was likely a root cause of early delay, cost escalation, and disputes on this Project. A later example of this deficiency was the failure to maintain adequate measures to finish constructing the project site. PCO 4003 included the reinstallation of the manhoist to serve the project. A new pad had to be constructed to achieve SMC's logistics plan after the previous hoist was removed by Layton leaving the construction site without vertical lifting capabilities.

Layton's removal of critical logistics equipment prior to project readiness, combined with overall project duration impacts, created a foreseeable need for replacement infrastructure that is attributable to a failure to mitigate risk and poor project logistics management part of Layton's standard of care in administering the project.

97.     As defined by §7.3.1 of the AIA A201 General Conditions, a CCD is a formal document issued by the Owner that directs the CMc to proceed with a change in the Work *prior to* agreement on cost or time adjustment. It is a tool used when the Owner and Construction cannot agree on the price or schedule impact of a change, but the work must proceed to avoid delay.

98.     The CCD process is intended to be an exception, not a standard operating procedure used selectively to address urgent matters while preserving project momentum in the face of disagreement or incomplete information. Effective use requires disciplined documentation, timely decision-making, and prompt resolution of cost and time impacts. On this project, rather than pricing changes through the normal PCO process, Layton repeatedly pressed for the issuance of CCDs, resulting in nearly 1,000 CCDs during their tenure. Layton's original Construction Manager testified that it was his belief that Layton should not proceed with work described in an RFI response without receiving a CCD. This requirement is not reflected anywhere in the Contract. The resulting volume of CCDs is well beyond what is reasonable for a project of this nature and reflects poor management and inadequate coordination of the change process that contributed to inefficiency and avoidable administrative burden.

99.     On a project of this complexity the quantity of RFIs and the volume of RFIs on a

particular item (e.g. multiple RFIs issued for one item) reflects a breakdown in

construction management's core responsibilities:

a.  Failure in Preconstruction Planning: A well-coordinated and constructible design,

vetted during preconstruction, should not result in thousands of RFIs and

unilateral directives.

b.  Lack of Trade Coordination: Layton's role included ensuring that scopes are

understood, sequenced, and integrated as part of their preconstruction services. A

flood of CCDs often means trades are working without clear direction, leading to

costly rework and claims. An example of this is PCO-1375 HM Frame Joint

Sealant which was a result of out of sequence work between the masonry

contractor and the door frame contractor.

c.  Distraction from Execution: Managing thousands of directives and RFIs placed a

substantial administrative burden on the project; however, this did not relieve

Layton of its contractual responsibility for effective project execution. The

excessive volume of documentation appears to have been used by Layton as a

means to shift focus away from timely and proper construction delivery, yet

Layton remained obligated to maintain proactive oversight and ensure the work

progressed in accordance with the contract requirements.

d.  Erosion of Accountability: Layton's use of CCDs shifted the burden of clarity and

cost control away from Layton, passing unresolved issues downstream to trades

and the Cody Lane rather than resolving them collaboratively.

    e.   RFIs: Layton issued duplicative or successive RFIs that could have been asked and resolved in one single RFI. One such duplicative RFI request is RFI-0316 (DDC Control Power), which would not have been necessary had Layton read the specification properly, and subsequent RFI-0381 (DDC Control Power) which would have been unnecessary had Layton provide read the specification and proceeded accordingly. Another example is RFI-1455 and RFI-1521 L3 Ski Lobby Coffee Machine, which asked nearly identical questions relative to the water supply needs for a coffee machine which were all previous documented in the submittal review.

100.   In short, the overuse of administrative procedures is a symptom of the CMc's failure to coordinate, communicate, and manage the Project effectively. Rather than being a steward of the process, Layton was a traffic cop in a jam they helped create.

101.   As I show on Slide 20, a typical construction management organizational structure on this Project should include:

    a.   A Project Executive who provides overall leadership and client liaison

    b.   A Senior Project Manager who provides daily project leadership over administrative responsibilities.

    c.   A Project Manager and Assistant Project Managers who provide daily oversight over administrative responsibilities and team management. This may also include the role of "trade manager."

    d.   Project Engineers who coordinate documentation, track submittals, and manage the RFI process.

e.  BIM/VDC Managers who oversee model coordination and clash detection by subcontractors and ensure that issues are being resolved in advance of the Construction schedule.

f.  Schedulers who develop the project schedule and update it regularly based on developments in the field.

g.  Field Superintendent(s) who provide on-site supervision and coordination for Layton's subcontractors.

h.  A QA/QC lead who is responsible for ensuring that Layton's execution matches the Contract Documents and the design intent.

102.  Of particular note, in my experience a project of this scale would be expected to have 8-10 Project Engineers based on the GMP amount (i.e. one project engineer per $25-40M in cost). On this Project, the complexity, volume of documentation, and extent of customization might well have required additional Project Engineers beyond that.

103.  From my understanding, Layton only assigned two project engineers to this Project at most points in time, which would be wholly inadequate for a Project of this magnitude. I also understand from deposition testimony that one of those Project Engineers—Bill Desmet—had no prior experience as a Project Engineer or with residential construction, and that his only prior experience concerned the interior fit out of existing commercial office spaces.  Refer to slide 24 of 33 in my presentation for the review of the project engineer role during the course of the work.

104.  Consistency in personnel is critical. Frequent turnover or gaps in staffing can lead to communication breakdowns, missed deadlines, and poor record-keeping directly impacting on construction quality and schedule adherence. In preconstruction, the most

important administrative roles include the BIM/VDC manager, estimator, scheduler, and coordination lead. During construction, RFI and submittal management, schedule maintenance, and trade coordination are vital to ensure the work proceeds logically and efficiently. Consistency in Superintendents is imperative for this Project as they are the central authority on site execution, trade coordination, and daily decision-making. They are the keystone between design intent and field reality. The frequency of turnover in most positions led to a large shortfall in continuity as decisions were made on the project and as a result the administrative burden increased with repetitive tasks such as duplicate RFIs.

105.    On a project of this size and complexity, superintendent continuity is essential to maintaining field discipline, schedule adherence, quality assurance, and trade coordination. Despite this, it is my understanding that Layton had five separate senior superintendents on this Project.

106.    Given the multiple challenges Layton faced on the exterior of this project, including non-conformance issues with both the roof and Densglass, I would also note that the exterior superintendent changed three times on this project. From deposition testimony, I understand that at least one of these superintendents was removed from the Project so he could be transferred to a different division and project within Layton. The non-conforming roof and exterior wall work, including deficiencies in DensGlass and membrane installations, is directly attributable to repeated turnover of exterior superintendents. This turnover resulted in minimal quality control, lack of continuity in addressing known issues, and no sustained ownership to resolve documented deficiencies, allowing non-conforming conditions to persist and compound.

107.    The turnover of superintendents during Layton's tenure represents a fundamental breakdown in site leadership and Project continuity. This level of inconsistency herein predictably resulted in:

- Gaps in knowledge transfer

- Repeated rework of logistics plans

- Loss of trust and momentum among subcontractors

- Inconsistent prioritization

- Delays due to new learning curves

- Lack of enforcement of previously made commitments

- Inconsistent enforcement of standards

- Incomplete or undocumented field corrections

108.    Both the overburdening of administrative employees and high management turnover on this Project significantly contributed to the failures in quality, schedule, and coordination throughout the duration of the Project.

**Termination**

109.    The Owner terminated Layton on March 4, 2024. After reviewing the record, I conclude that this termination resulted from Layton's repeated and substantial breaches of the Contract Documents that hindered Project execution, as evidenced through both the numerous delays to the Project and the frequency of non-conforming work.

110.    Section 14.2 of the AIA A201 General Conditions permits the Owner to terminate the Contractor if the Contractor:

    1.    Repeatedly refuses to supply enough properly skilled workers or proper materials;

DM3\22351093

2.  Fails to make payment to Subcontractor or supplier in accordance with the respective agreements between the Contractor and the Subcontractors or suppliers,

3.  Repeatedly disregards applicable laws, statutes, ordinance, codes, rules and regulations, or lawful orders of a public authority, or

4.  Otherwise, is guilty of a substantial breach of a provision of the Contract Documents.

111.  From my perspective as an architect, Layton's failure to adhere to the Contract compromised the integrity of the design intent, disrupted the administration of services as required by the Contract, and obstructed the architect's coordination efforts.

112.  Based on my evaluation of the supporting documents and the provisions of Section 14.2, I have separated Layton's breaches of the contract provisions that impacted the Architect's performance of its work into the following categories, which are reflected on Slide 11 of my presentation:

a.  Chronic Performance Deficiencies and Non-Conforming Work. These issues required frequent rejection and documentation by the Architect, delaying progress and impairing efficient contract administration. Examples include the installation of defective or incomplete materials (in violation of A201 Section 3.5.1), repeated quality control failures (in violation of A201 section 3.5.1), failure to correct known deficiencies (in violation of A201 Section 12.2), and unauthorized substitutions (in violation of A201, section 3.4.2).

b.  Failure to Properly Supervise and Coordinate Subcontractors. Layton's lack of oversight over its subcontractors disrupted inspections and field conformance

evaluations, creating burdens on the design teams. Examples of Layton's failure to properly supervise and coordinate its subcontractors include its poor trade coordination leading to conflicts and delays (in violation of A201 section 3.3.1), scope misalignments between trades (in violation of A201 section 5.3), and the mismanaged phasing and sequencing of the work (in violation of A201 section 3.3.1).

c. Inadequate Project Scheduling and Duration Management. Layton's delays interfered with observation schedules and complicated the coordination of mock-ups and field installations. Examples of Layton's failures in this regard include its failure to maintain a reliable construction schedule (in breach of A201 section 3.10.1), its refusal to provide a recovery schedule (in violation of A201 section 3.10.5), and its inability to manage its self-established deadlines (in violation of A201 section 3.10.3). This is represented on slide 31 of my presentation which shows after Amendment #4's execution Layton lost 301 days in (10) months.

d. Refusal to Cooperate with the Architect and Owner. Layton impeded the Architect's ability to perform site visits, reviews, and approvals by obstructing design team activities, failing to provide requested information (A201 section 3.12.61), and engaging in hostile or non-collaborative behavior (in violation of A133, section 9.6).

e. Cost Management and Change Order Disputes. Layton's conduct forced the architect to allocate additional resources to validate change requests, disrupting other responsibilities, as a result of Layton's inflated or unsupported change order

submissions (in violation of section 7.3.4) and lack of cost transparency and

controls (in violation of A133 section 6.11.1).

113.    From the perspective of an architect, these cumulative failures represent a breach of the

Construction Manager as Constructor's standard of care and a violation of the

fundamental responsibilities outlined in the A133 Agreement and the A201 General

Conditions. These shortcomings interfered with the Architect's role as contract

administrator and substantiate the Owner's decision to terminate for cause under Section

14.2.1 of the A201 general conditions.

**Subcontractor Settlements**

114.    After Layton's departure from the Project, the Owner (via the replacement CMc, SMC)

entered into twelve settlements with Layton's subcontractors on the Project to resolve

their outstanding claims, for a total sum of $37,107,635. The subcontractors involved in

these settlements include RK Mechanical, IMS, Allegheny Millwork, Standard Drywall,

American Stone, Mountain Heights, CEM Aquatics, Structures Hardscapes Specialties,

Inc., Specialty Systems, Inc., Trimark Raygal, Inc., Phaze, and Greiner. A table listing

these subcontractors, their general scopes, and the amounts of the subcontractor

settlements with them is shown on slides 29-30 of my presentation.

115.     From my review, these negotiated financial agreements between SMC and its

subcontractors sought to reconcile issues related to unanticipated work, field conditions,

cost overruns, scope gaps, duration impacts, general conditions (i.e. the costs of being on

site to perform the work), or work rejected prior to Layton's termination.

116.    I reviewed each of these subcontractor settlements including the costs substantiated by

Project documentation, an appropriation of each item, and whether the cost is the

responsibility of Layton or Cody Lane. As part of this review, I inspected the documents listed within each subcontractor settlement to determine what drove the need for the change in the work.

117. Based on the supporting documents, I separated each component of the Subcontractor Settlements into the following categories:

a. Project Duration Impacts: Costs associated with time extensions or schedule impacts that prolong general conditions such as site supervision, temporary facilities, and Project management overhead largely resulting from non-conforming work remediation and the resulting remaining work.

b. Inefficiency in Construction: Loss of labor productivity due to disrupted workflow, overcrowding of the work site, rework, or stacking of trades (scheduling multiple trades to work simultaneously in the same area) caused by miscoordination or delays.

c. Drain Waste – Bid Error: Refers to underestimations or omissions in the original bid, particularly in plumbing system. This item is specific to RK Mechanical only.

d. Non-Conforming Work: Work that fails to meet Contract requirements, specifications, or code. If corrected by others, cost responsibility often lies with the original party who installed it.

e. Weather: Delays or cost claims due to adverse weather.

f. Non-CCD Claims: Claims for changes that were not previously authorized by a Construction Change Directive (CCD). These may lack prior written authorization and thus could be considered unauthorized or unsupported.

g.  Layton Directed Work: Work explicitly directed by Layton as the CMc that did not follow the A201 Article 7 change order procedure including failure to receive approval prior to the Work occurring.

h.  Back Charges: Costs charged to the subcontractor for work performed by others to correct their errors or to meet schedule. Must be backed by written notice and cost documentation.

i.  Make Ready Work: Preparatory work needed to correct or complete incomplete or non-conforming work to make the work ready for follow-on trades. This type of work often overlaps with non-conforming work.

j.  Target Acceleration (Overtime): Costs incurred to meet or accelerate Project milestones originally contemplated by Layton but implemented by SMC.

k.  CCD Related Claims (7.4): Minor changes in the Work as directed by the Owner or Architect that are consistent with the intent of the Contract Documents but do not involve an adjustment to the GMP or an extension of Contract Time. These would typically have a $0 cost or use of the CMc contingency. They are not a change instigated by Cody Lane.

l.  Previously Rejected Claims: These are PCOs that Layton had issued and ownership rejected by means of the PCO process or Layton rejected directly. It is my opinion that these amounts are not chargeable to Layton.

m.  CCD Related Claims (7.3.3.3): A change in the Work directed by the Owner with concurrence from the Architect, prior to agreement on terms of the adjustment, if any, to the GMP and/or the Contract Time. Costs are determined in a manner agreed upon between the parties. This represents that the Owner has changed the

Contract Documents by changing the scope and that ownership agrees that there will be a change in the GMP or time to complete. It is my opinion that these amounts are not chargeable to Layton.

118.    I categorized each component of the subcontractor settlements using the above categories. Starting with the agreed amount reflected in the Subcontractor Settlement, I subtract those amounts that fall into categories that I conclude are not costs attributable to Layton, including CCD Related Claims (7.3.3.3.) and Previously Rejected claims.

119.    As part of that analysis, I also reviewed each Subcontractor Settlement to determine whether the costs in question were caused by Layton's contractual non-compliance or resulted from Layton's impacts to the Project schedule and execution.

120.    Tables and narratives explaining this analysis for each of the Subcontractor Settlements can be found in the Subcontractor Resolution Detail spreadsheet that has been provided as an exhibit.

121.    Based on this analysis, I ultimately conclude that Cody Lane paid $32,609,383 in Subcontractor Settlement amounts that are attributable to, and the responsibility of, Layton.

122.    From my review, I have determined that $9,732,948 of the RK Mechanical Subcontractor Settlement (SCO # 041) is Layton's responsibility. The majority of the costs contained in this Subcontractor Settlement stem from Layton's failure to meet its contractual responsibilities such as the ceiling framing conflicts, Drain Waste Vent system miscalculations, and fire safety system adjustment. All of these issues were foreseeable and should have been accounted for during preconstruction coordination and Layton's buyout process. To the extent these items weren't timely identified, they should have

been addressed using Layton's contingency. Instead, reactive field decisions, disjointed scheduling, and poor trade coordination led to inefficiencies and substantial cost escalation. From an architectural standpoint, these costs reflect mismanagement, not owner-directed change for which Cody Lane should bear responsibility.

123.    It is my conclusion that $35,059 of the IMS Subcontractor Settlement (SCO # 004) is the result of gaps in planning, trade buyout, and constructability review that reflect a breach of Layton's standard of care under the Contract and that it resulted from preventable Project duration impacts and inefficiency that demonstrate a systematic breakdown in Project execution and risk mitigation.

124.    I determined that $2,589,698 of the Allegheny Millwork Subcontractor Settlement (SCO # 027) is also Layton's responsibility, because the settlement costs stem from Layton's failure to manage subcontractor exclusions and scope alignment during buyout. Improper storage of materials and unresolved coordination issues led to additional ceiling material damage, further resulting in avoidable costs that are Layton's responsibility. Layton's failure to plan, schedule, and oversee its work constituted a clear deviation from its contractual responsibilities to properly manage the Project.

125.    My evaluation found that $3,017,355 of the Standard Drywall Subcontractor Settlement (SCO # 046) is attributable to Layton, primarily as the result of coordination-related rework, trade damage repair costs, and field modifications that reflect failures in Layton's performance. In particular, the repeated need for T&M work and corrections suggests systemic subcontractor coordination issues and insufficient scope coordination that could have been avoided with proper planning and subcontractor oversight.

126.     The American Stone Company of Texas Subcontractor Settlement (SCO # 019) resulted

from Layton's failure to incorporate the design intent, as clarified in the mock-up process,

into the subcontractor buyout scope and execution plan. Subsequent mismanagement and

poor coordination led to multiple subcontractor remobilizations, resulting in redundant,

avoidable general condition costs that could have been prevented had Layton properly

sequenced the work.

127.     The Mountain Heights Hardwood Floors, Inc. Subcontractor Settlement (SCO # 006)

costs are Layton's responsibility should have been included in Layton's GMP

Amendment. The additional costs originate not from a change in scope but from poor site

management and subcontractor execution. Layton's mismanagement, particularly its

failure to coordinate site readiness, manpower, and material logistics, resulted in

avoidable shipping, storage, and inspection costs. These inefficiencies reflect the CMc's

failure to meet the expected standard of care with regards to the management of the work.

128.     It is my opinion that $364,763 of the CEM Aquatics Subcontractor Settlement (SCO

#003) costs are attributable to Layton and should have been included in Layton's GMP

Amendment. The Subcontractor Settlement results in part from work that was improperly

executed, rejected, and had to be redone. It is also driven by cost escalation and adverse

working conditions caused by the accumulated delays to the Project. These impacts could

have been mitigated or avoided had Layton effectively managed the schedule and

engaged in proactive oversight and coordination.

129.     It is my opinion that the Structural Hardscapes Specialties, Inc. Subcontractor Settlement

(SCO # 003) was within Layton's scope of work and that any additional costs reflect

Layton's failure to manage and execute that scope as agreed. This settlement results

entirely from cost escalation resulting from the increased Project duration, which could have been avoided with proper scheduling and coordination by Layton.

130.    It is my opinion that the Specialty Systems Inc. Subcontractor Settlement (SCO # 029), with the exception of two owner-directed changes, is Layton's responsibility. Setting aside those Owner changes totaling $70,561, the remainder of the settlement largely resulted from the cost of base-scope work that should have been identified by Layton and coordinated between trades. The resulting failure to do so, and the use of premium time resulting from delays caused by Layton's envelope installation errors, resulted in additional avoidable costs.

131.    It is my opinion that the Trimark Raygal, Inc. Subcontractor Settlement (SCO # 005) of $140,932 largely (92%) results from the extension of the Project schedule as a result of Layton's performance. These costs are Layton's responsibility because they are the result of Layton's failure to coordinate, plan, and manage the Project schedule, leading to avoidable Project duration impacts, labor cost escalation, and inefficiencies. The remainder of the settlement relates to Subcontractor claims against Layton that are unrelated to change directives.

132.    It is my opinion that $1,046,981 of the Phaze Concrete, Inc. Subcontractor Settlement (SCO # 042) is Layton's responsibility. A large part of this settlement result from SCO 27 and SCO 28, both of which relate to Layton's base-scope work and were approved by Layton following termination. Many of the remaining items within SCO # 042 resulted from poor coordination, ineffective planning, and schedule mismanagement that can be directly traced to Layton's failure to meet its contractual obligations.

133.    It is my opinion that $14,962,224 of the Greiner Subcontractor Settlement (SCO 065) is Layton's responsibility. Most of the line items in this settlement reflect inefficiency claims, missed scopes of work, the impacts of trade stacking, extended general conditions, repeated remobilizations resulting from poor construction sequencing, or coordination failures that fall squarely within Layton's responsibilities as CMc.

**Post-Termination PCOs Relating to Layton's Scope**

134.    Following Layton's termination, the Owner had to resolve multiple PCO's resulting from Layton's time on the Project. This includes a mixture of PCOs that were prepared by Layton during the Project, and PCOs that arose after the Project but resulted from conduct and decisions by Layton.

135.    I analyzed these PCOs, reviewing Layton's contractual compliance, impact on the schedule and execution, the reasonableness of the costs incurred, and the ultimate responsibility for those costs, and categorized them using the same categories used to evaluate the Subcontractor Settlement amounts.

136.    I found that most of these amounts resulted from Non-Conforming Work, Make Ready Work, and Non-CCD related work caused by Layton's failure to plan and coordinate the work and, in particular, its premature decision to remove manlifts prior to stone deliveries.

137.    In total, I identified $32,609,383 in post-termination costs that resulted from Layton's pre-termination breaches of the Contract.  A summary of the PCOs I analyzed, descriptions of the subject matter of those PCOs, the categories those PCOs fell into, and the costs I conclude are in Layton's scope of responsibility can be found In the accompanying Chart summarizing my PCO analysis. A more detailed analysis is

contained in pages 76–150 of my report, which is excerpted separately and incorporated by reference into my testimony.

138. The following are summaries of my analysis of the most significant of these PCO.

139. PCO 0162.R2, with a value of $282,049, resulted from a structural revision to increase elevator door rough opening on floors P1-5 on concrete shafts including cutting out rebar columns between traction elevator frames and executing a pour back. The need to revise elevator shaft openings and rework elevator column framing, as directed in CCD-24 / ASI-1034, stems from Layton's failure to procure the elevator contractor in a timely manner. Without the elevator contractor's input, critical dimensional and coordination requirements were not confirmed before concrete was poured, resulting in misaligned or incorrect shaft openings. As CMc under the A133 Agreement, Layton was responsible for coordinating known building components and trade requirements including elevator rough openings and ensuring this information was incorporated into the work prior to irreversible construction activities.

140. Layton did not demonstrate proper scope management and cost control. The modifications required under ASI 1034 were avoidable with early coordination between structural and elevator design scopes. Layton failed to reconcile shaft dimensions and elevator vendor requirements in preconstruction. The scope of cutting, rebar removal, and column reconstruction suggests poor oversight in trade buyout and review of structural design against vendor specifications. This issue was preventable. The dimensional misalignment between structural openings and elevator equipment was foreseeable. Through proactive planning, proper document review, and engagement with elevator vendors and structural engineers, Layton could have ensured accurate rough-in

dimensions, avoiding the structural rework later required that partially caused the project duration impacts. The costs presented are the direct result of deficient project oversight, not an owner-directed change or unforeseeable condition.

141.    PCO 389 in the amount of $189,118 covered the cost of framing and drywall work necessary to enclose duct shafts in accordance with revised drawings and AE responses to RFIs 815 and 815R1. The requirement to enclose these shafts was clearly indicated in the original contract documents, specifically on sheet M600 and General Note 16 on AG013.

142.    The work was reasonably inferable from the design documents, requirement of code for shaft enclosures, and should have been accounted for during subcontractor buyout and scope development. The AE's first RFI response was clear, and the follow-up RFI simply requested dimensions for implementation. Layton did not ensure appropriate interpretation and incorporation of this information into subcontractor scopes. A detailed review of the drawings and notes during buyout, along with effective oversight by Layton that carried into the project, would have captured this scope and prevented it from becoming a change request. The scope was clearly part of the contract documents and should have been included in the subcontractor's buyout with Layton.

143.    PCO 4007 and 4007.1, in the amount of $506,209, encompass the unplanned rebuilding and extended rental of scaffolding due to project duration impacts and resequencing of the project. This includes the cost of dismantling and reconstructing scaffold systems, as well as the continued rental of scaffolding equipment across multiple time periods, including March 13 through June 26, 2024 (captured under PCO 4007), and again from June 27 through August 23, 2024. Additional projected rental costs are expected to continue through the period of September 2024 to January 2025 to maintain safe and accessible working conditions. The scope also includes the application of weather wrapping to the building to protect the work-in-place and

allow trades to proceed during inclement weather. This protective measure became necessary as the project extended into colder months due to the prolonged enclosure schedule.

144.    The scaffolding rental and weather wrapping, including any extensions and reinstallation, fell under the CM's logistics and site management responsibilities per the A133 Exhibit A. These elements are fundamental to maintaining site access and protection and are not additional Owner-driven scope. Layton failed to maintain the project pacing necessary to achieve the April 30, 2024, completion date established in Amendment 4. This loss of momentum reflects deficiencies in staffing, sequencing, and adherence to the baseline schedule. This created a cascading effect that required the scaffolding to remain in place longer.

145.    In addition to inefficiency, significant rework was required due to non-conforming or incomplete work, necessitating that the scaffolding remain in place well beyond the originally planned period. The need to correct and complete these items directly extended scaffold usage, generating additional costs that could have been avoided with proper coordination, quality control, and execution during the initial installation.

146.    Based on the review of the documentation, contract terms in the A133 and A201 Agreements, and the standard of care for Construction Managers as Constructors, PCO 4007 and PCO 4007.1 resulted from Layton's failure in execution, coordination, and planning. These costs represent a recoverable claim against Layton and demonstrate deficiencies in project delivery that fall below the expected standard of care

147.    PCOs 4008, 4008.1, 4008.5, and 4008.6, with a combined value of $6,410,215, all related to the correction of the roof defects.  PCO 4008 encompassed an allowance for Demolition of existing roof, replacement of roofs R1, R4, and R7 including snow fence, supply and install gutter and downspout, and an allowance for temporary housing for roofing workers and staff. PCO 4008.1 included an additional amount above and beyond the allowance in PCO 4008 to complete those activities.  PCO 4008.5 addressed the removal and replacement of Densglass at the eaves and

dormers of the roof, and PCO 4008.6 covered the installation of temporary EPDM to protect the underlayment of the roof from extended weather exposure.

148.   AIA A133 and AIA A201 obligates the Construction Manager to perform work in compliance with the Contract Documents and to correct rejected or non-conforming work as noted in the general analysis of this report. The Stop Work Order issued by the Inspector of Record (IOR) and rejection of Layton's proposed remedies by the AHJ (SAFEbuilt) directly reflect that portions of the installed roof were not compliant with contract documents or accepted construction standards.

149.   Layton did not demonstrate proper scope management.  Layton failed to manage the execution, inspection, and documentation of critical roof assembly components. Multiple deficiencies were present in Layton's work, including that:

   a.     The installations of the self-adhered vapor retarder (*SharkSkin Ultra SA*) and roofing underlayment (*VaproShield SlopeShield Plus*) membranes were found to be inconsistent with the manufacturers' installation instructions and project specifications

   b.     Polyiso insulation was installed without staggering joints as required by contract documents, and without required inspections or approvals.

   c.     Improper fastening of the nail base and polyisocyanurate insulation layers further exacerbated the deficient conditions of the roofing system.

   d.     The plywood substrate board, which serves as the substrate for the self-adhered vapor retarder, showed signs of delamination suggesting improper installation.

150.   Despite multiple opportunities, Layton failed to resolve nonconforming conditions or to escalate disagreements with the IOR to a higher authority such as the State Building Code Commission, a path that might have mitigated the conflict. There was an extended period of time that left this matter unsolved.  Based on the reviewed documents and timeline references, the roof dismantle and replacement issue spanned a period of at least 10 months from the initial observation of non-conforming work to rejection of a recovery plan called "Path Forward." The resolution of this roof issue culminating in complete removal and replacement of improperly installed work took at

51

least 16 months from first warning signs to formal cost approval, with substantial project disruption and direct cost impact. The Scheduling Expert's report should be referenced to define the real impact.

151. It is my professional opinion that the work captured in PCO 4008 and its associated demolition and reconstruction scope is not attributable to Owner-directed changes, unforeseen conditions, or scope expansion. Rather, these costs and disruptions are the direct result of Layton Construction Company's failure to execute and manage the roofing scope in accordance with the contract documents, applicable codes, and industry standards. This opinion is based on the following points:

a.  Non-Conforming Installation Practices - Layton installed SharkSkin vapor barrier and rigid insulation under winter conditions without proper manufacturer-required substrate preparation, including installation over wet and uninspected plywood. This work was not submitted for inspection prior to coverage, violating standard inspection protocols.

b.  Staggered Insulation - Regarding the staggered Polyiso insulation, SAFEbuilt and the Architect stated that the contract documents included the requirement for the layers of Polyiso insulation to be staggered and that Layton had not followed the contract documents. The drawings show 3 lines on the roof detail R-1 that imply that the insulation is staggered. (see Sheet AG013 – Exterior Wall and Roof Assembles) In Specification number 07 2100 thermal Insulation no mention of specific installation instructions for the Polyiso insulation are provided in Part 3 Execution although the Polyiso insulation type is mentioned in Part 2 Products, therefore showing that the Polyiso insulation is included in this section and not elsewhere in the specifications. No additional reference standards for Polyiso insulation were provided in Part 1 section 1.03 Reference Standards, although a shop drawing and manufacturer's installation instructions are required by section 1.04 Submittals. Additionally, SAFEbuilt has reference the IECC 2012 Code section 402.1.4.1.3 (which is not present in the 2012 code)

52

however, Arcadis references Section 402.2 Specific Insulation Requirements (Prescriptive) which states "Where two or more layers of continuous insulation board are used in a construction assembly, the continuous insulation boards shall be installed in accordance with section C303.2.  If the continuous insulation board manufacturer's installation instructions do not address installation of two or more layers, then the edge joints between each layer of continuous insulation board shall be staggered."  Section C303.2 states "All materials, systems and equipment shall be installed in accordance with the manufacturer's installation instructions and the international building code."

c.    Ignored Inspection Requirements - Layton failed to request and document the necessary layer-by-layer inspections for the roofing assembly, as required by the AHJ (SAFEbuilt) and outlined in observation reports. This led to a Stop Work Order and complete rejection of the installed assembly.

d.    Deviation from Contract Documents - Plywood and insulation were not installed per contract details (e.g., lack of staggered insulation joints, improper substrate preparation, penetrations through vapor barrier), resulting in performance deficiencies and an obligation under AIA A201 for the CMc to correct work not conforming to contract requirements.

e.    Improper Work Planning and Execution - Layton's submitted "Path Forward" documents failed to provide an acceptable recovery plan or satisfy the AHJ's conditions for acceptance. These repeated shortcomings demonstrate a lack of control over means, methods, and quality assurance—responsibilities held solely by the CMc under the A133 agreement.

152.    Layton is responsible for the non-conforming roof work and the resulting need for dismantling and full replacement of the assembly. Under AIA A201, it is the Construction Manager's duty to correct work not performed in accordance with the Contract Documents prior to Substantial Completion. In this case, Layton was asked to fix the roof and failed to do so which had

53

substantial project impact.   Furthermore, A133 Exhibit A entrusts the Construction Manager with the coordination, execution, and quality control of all construction activities. Cody Lane should not bear the financial burden of correcting work that failed to meet contractual and code requirements.

153.    PCO 4009, with a value of $639,682, covers the cost for the reinstallation and extended rental of a manhoist and crane rental and mast installation, including associated labor, dismantling, and freight. The manhoist was required from April 1, 2024, through October 30, 2024 (7 months), and the crane from May 1, 2024, through October 30, 2024 (5 months). This scope was a direct consequence of duration impacts in completing vertical transportation (elevators) and Layton's premature removal of vertical access systems.

154.    Layton did not demonstrate proper scope and planning control. The failure to meet the milestone completion date outlined in Amendment 4 (4/30/24), combined with the removal of manhoists prior to elevator completion, demonstrates a breakdown in coordination and planning. The use and management of temporary vertical access (cranes and manhoists) are CMc responsibilities under A133 Exhibit A and are a standard part of construction logistics planning.

155.    Layton had an obligation under the contract to manage temporary systems, including manhoists and cranes, in a manner that supports the project schedule. The premature removal of vertical access prior to the readiness of elevators is a clear sequencing failure. This disruption not only affected site logistics but also added substantial avoidable costs.

156.    The requested amount of $639,682 represents a cost that should be recoverable against Layton due to their mismanagement. This aligns with the CMc's duty to mitigate risks and maintain schedule continuity as outlined in its AIA contract obligations.

157.    PCO 4012, 4012.001, and 4012.002, with a combined value of $840,537, pertain to the provision of a temporary climatization system including spot coolers, heaters, and generators to support the

interior completion of the Hoback Club project, particularly the installation of millwork, prior to the permanent mechanical systems being operational.

158. Per AIA A133, Exhibit A, Layton is responsible for managing and sequencing the work to avoid foreseeable issues and ensure that permanent building systems are in place when needed to support follow-on trades. In this case, Layton failed to develop and implement a plan to provide climatization to the rooms prior to millwork installation. As a result, temporary conditioning had to be installed to allow millwork to proceed. This need arose directly from Layton's planning and sequencing deficiencies and was within their retained risk under the GMP. The Cumming review further indicates that the buyout for this scope was inadequate to properly support the millwork installation, confirming the shortfall in Layton's execution.

159. Layton has not demonstrated proper scope management or cost control. Temporary climatization could have been avoided had the permanent systems been completed on schedule, and there is no evidence of sufficient preemptive measures to address the risk. PCO 4012 arose from Layton Construction's failure to procure and provide the required conditioning to the building for the installation of millwork.

160. PCO 4088 relates to cost increases for the TKE elevators, including material and labor cost escalations ($460,812), storage costs ($163,530), the cost of modifying the entrance frames to fit the rough openings ($150,000), and changing the manufacturer of the hydraulic elevators ($39,291).

161. The material and labor escalations, as well as added storage costs, fall under Layton's contractual responsibilities per A133 Exhibit A. These costs resulted from Layton's failure to meet the prescribed project schedule, a core obligation under the A133 Agreement.

162. With regards to the hydraulic elevators, Layton failed to demonstrate adequate scope management. MEI did not provide sufficient design criteria for the hydraulic elevator compliance

review, and Layton did not resolve this gap. Ultimately, TKE assumed responsibility for the scope and completed the work at added cost.

163.    The modification of entrance frames was necessitated by a discrepancy between the structural shaft rough openings and the elevator requirements, indicating a lack of coordination and planning by Layton.

164.    The $738,195 requested under PCO 4088 is largely attributed to non-conforming work and other execution failures under Layton's management. The escalated costs for material and labor ($460,812) and prolonged storage ($163,530) stem from Layton's inability to adhere to the prescribed project schedule in violation of the A133 Agreement, Amendment 4, which obligate Layton to work to a define substantial completion date of February 23, 2024.  Additionally, the $150,000 for entrance frame modifications arose due to discrepancies between structural rough openings and elevator requirements—a clear coordination failure per A201 §3.1.1. While the $39,291 credit from the manufacturer change partially offsets the total, the overall costs reflect a failure in preconstruction planning, design verification, and risk mitigation. The elevator design transition from MEI to TKE further highlights inadequacies in Layton's scope oversight.

165.    PCO 4155, valued at $436,488, relates to the erection, dismantling, freight, and extended rental of a tower crane for the period of November 2024 through April 2025. The extended crane duration and the necessity for additional rental were driven by remediation of non-conforming work following Layton's termination before the project could be completed.

166.    In reviewing project execution, a critical deficiency in construction management logistics was identified. Layton removed the material hoists from the site without implementing an alternative means for vertical transportation of materials. At the time of removal, substantial work remained in multiple areas of the building, including the distribution of approximately 700 slabs of stone to various floors.  This is a task not reasonably achievable by manual stair transport without severe inefficiency, increased labor costs, and heightened safety risks.

167.    Proper construction management requires maintaining logistical systems that enable trades to perform their work efficiently and in sequence with the project schedule. Material hoists and cranes are essential tools for transporting large, heavy, or fragile components to their point of installation. Removing these systems while significant finish work remained demonstrated poor planning and a lack of coordination with trade contractors.

168.    Following Layton's removal from the project, SMC decided to reinstall the tower crane to restore adequate material handling capabilities. This step was necessary to allow subcontractors to complete their work in a timely and safe manner, mitigating the inefficiencies caused by the absence of proper vertical transportation. The premature removal of this equipment materially hindered project progress and is indicative of inadequate logistical planning and oversight by Layton.

169.    The extended tower crane rental and associated costs identified in PCO 4155 were a direct result of Layton's inadequate construction management logistics and premature removal of essential material handling equipment. In my analysis, however, I did identify $197,523.06 in costs duplicated between this PCO and PCO 4009. I therefore conclude that Layton's responsibility for the contractual violations within this PCO is limited to $238,961.94.

170.    PCO 4216, valued at $115,492, relates to the additional housing costs that Prestige (the siding and metal panel subcontractor) incurred due to Layton's failure to deliver the project on time. Layton's non-conforming work and non-execution caused subcontractors to remain on-site longer than originally planned, resulting in avoidable extended housing costs. This prolongation was a direct consequence of remedying defective and / or incomplete work and this PCO is a direct result of that extension.

171.    PCO 4272, valued at $166,856, concerns the costs to design and build temporary covers over the pool and spa so that installation could continue during the winter months. This cost is a direct consequence of Layton's failure to adhere to the project schedule in the A133 Agreement. This

DM3\22351093

project duration impact forced construction activities into the winter season, resulting in costs that were otherwise avoidable. Under the standard of care expected of a Construction Manager as Constructor on a project of this magnitude, Layton should have anticipated and mitigated this risk through proper scheduling and project oversight. As such, these costs should not be borne by the Owner or the replacement Contractor.

172.    Similarly, PCO 4274 and 4274.1 relate to the cost for site maintenance and snow removal during the 2024-2025 winter season.  As with PCO 4272, the prolongation of construction into another winter season resulted in costs that were avoidable and attributable to Layton's delays to the completion of the work.

173.    While I have refrained from detailing every PCO I analyzed, I would refer the Court to my presentation and the accompanying exhibits, which set forth my detailed analysis and explanations and highlight additional issues in Layton's performance, including scope gaps, unauthorized deviations from the specifications, and craftsmanship defects.

174.    I would also note that 26 of the PCO's I reviewed in my report had a value of below $10,000. These PCO's—summarized on Page 76 of the excerpt from my report—generally reflect a combination of coordination clarifications, trade damage recovery, material upgrades, and responses to field conditions that required changes in design.

175.     The majority of these PCOs involve scope elements that are reasonably inferable under the GMP and fall within Layton's responsibilities as Construction Manager as Constructor per A133 Exhibit A. Items such as coordination clarifications, field-driven revisions, and trade damage repairs are typical responsibilities assumed by the CMc under the GMP, unless specifically excluded. Moreover, cold-weather provisions, fireproofing, and trade coordination are standard CMc duties.

176.    Many of these change events, such as termination detail clarifications, humidifier circuitry, fire-rated treatments, soffit flashing, and rework due to field conditions stem from coordination lapses

and failure to reconcile design intent with constructability. These are foreseeable coordination issues that should have been resolved in preconstruction through proper constructability reviews and subcontractor engagement.

177.    Several represent gap work that falls within the Construction Manager as Constructor's contractual responsibility to identify and resolve. It does not constitute a change in Owner-directed scope and therefore should not be treated as an Owner Change Order. The work reflects coordination and field adjustment duties that are standard under Layton's obligations per the A133 Agreement.

178.    This collection of PCOs represents scope items that should have been reasonably anticipated, coordinated, or resolved without change order costs under Layton's contractual responsibilities. The work includes field clarifications, minor repairs, and coordination gaps, such as ceiling framing, fire treated assemblies, humidifier circuitry, soffit flashing, and trade damage recovery, all of which are standard obligations for Layton under AIA A133 Exhibit A.

179.    These items are typically handled through field coordination and constructability reviews, not escalated into cost-bearing changes. Their elevation to PCOs reflects Layton's failure to execute proper preconstruction planning, BIM-based coordination, and on-site oversight. While the individual scope elements are not major, their cumulative effect highlights systemic management and administrative breakdowns.

## Rebuttal Opinions

1.    In the course of my engagement, I also had occasion to review and opine on Expert Reports prepared by Layton's retained experts. I do not agree with those reports and wanted to inform you of some of my opinions with regards to matters they raised.

## The Volume of RFIs and CCDs

2.    Layton's Experts repeatedly reference the volume of Architect Supplemental Instructions ("ASI"), Requests for Information ("RFI"), and Construction Change Directives ("CCD")

and argue that these were being used to advance the design, as though that is somehow a misuse of those documents. To the contrary, it is entirely appropriate for RFIs and CCDs to lead to design changes and is in fact the purpose of these contract mechanisms. An ASI or RFI allows for refinement of the design, while a CCD is used to authorize the implementation of the design before financial terms are agreed to.

3.    An RFI is a formal written request from the contractor to the architect (or engineer/owner) seeking clarification on the construction documents, specifications, or field conditions. An RFI is used when the Contract Documents are unclear, appear inconsistent, vary from field condition, or require further explanation. It is not intended as a substitute for careful reading of the documents or as a means for the Architect to direct the Construction Manager's means or methods of performing the work.

4.    An ASI is a written instruction issued by the architect to clarify or interpret the Contract Documents without affecting contract cost or time. It is typically issued on AIA Form G710. An ASI is used for minor clarifications, interpretations, or additional details such as correcting small errors, clarifying dimensions, or providing details omitted without affecting scope. An ASI does not allow the architect to direct work that changes the contract sum or contract time—that is separately done via the CCD process.

5.    A CCD is a written order prepared by the architect and signed by the owner, directing the contractor to perform a change in the work before agreement is reached on adjustment to contract sum or time. (See AIA A201 §7.3). A CCD is used when immediate work is required and there is not yet agreement on cost/time impact. This Provides a mechanism to avoid delay while preserving the owner's right to negotiate pricing later.

6.    Submittals and Shop Drawings are documents prepared by the Contractor so that the Architect may review and approve how the Contractor intends to fulfill the design documents, whether that be in the form of approving specific suppliers or products or reviewing and approving the detailed fabrication and installation plans that determine how work will be built and installed to ensure that they are consistent with the Contract Documents and design intent.

7.    A common theme throughout Layton's expert reports is an attack on the Architect for issuing design changes in the "wrong" way.

8.    Wright, on Page 23 of his report, argues that the Owner was "inappropriately and improperly changing the design through RFIs Process." Vlahos, on Page 19 of his report, similarly argues that "IBI improperly used Shop Drawings to communicate design revisions and coordination of Construction Documents."

9.    These opinions demonstrate a fundamental misunderstanding of the RFI and submittal process and are inconsistent with industry practice.  The industry standard is to reply to a RFI and to review a submittal with feedback to a construction manager or their trade contractors.  Should comments or a response be made, that inherently changes the design because a response is provided that's in addition to documents provided previously.

10.    The RFI mechanism exists so that the CM can ask questions about the design, including how multiple elements fit together or how conflicts during the construction process should be resolved. For example, there were multiple RFIs on this Project where Layton requested to move a wall or ceiling to provide additional space for field-routed MEP installations.

11.    It is entirely reasonable for the response to a question about the design to include a revision to that design. Certainly, in a highly customized building with intricate detail, it is not surprising to have a design professional "modify" the design in response to an RFI. Indeed, it is hard to see how the Architect could answer a RFI requesting a design change or raising circumstances that could be resolved through such a change (e.g. a request to lower a ceiling to help resolve a MEP conflict) without, in fact, changing the design through its response.

12.    The same is true with respect to Vlahos' arguments regarding shop drawings.

13.    Shop drawings are a critical tool in the construction process. They are a subcontractor's detailed depiction of how specific elements of the design will be fabricated, assembled, and installed. These drawings are reviewed by the architect/engineer to verify conformance with the design intent, identify coordination issues between trades, and clarify conditions that cannot be fully represented in design drawings alone.

14.    It is standard practice for design professionals to issue clarifications, coordination notes, and minor adjustments during the shop drawing review process. Section 3.12.8 of the AIA A201 General Conditions specifically acknowledges the architect's role in reviewing and commenting on shop drawings, product data, and samples to ensure consistency with the design intent and Contract Documents. This review often requires modifications to improve coordination, field constructability, or integration of multiple systems.

15.    Using shop drawings to document and communicate coordination refinements is not only common but essential on projects of this scale and complexity. Large, highly detailed projects often involve thousands of shop drawing submittals. The review process provides an industry-accepted mechanism to close the loop between design intent and

specific means/methods of construction. To suggest that this practice is "improper" reflects a misunderstanding of the collaborative design–construction process to ensure the Owners vision is executed as intended.

16. The Architect's use of shop drawing reviews to confirm design intent, provide clarifications, and address coordination issues is consistent with industry standards and AIA contract provisions. These reviews do not substitute for the requirements of the Construction Documents; rather, they serve as the essential, final layer of coordination between design professionals and trade contractors. Far from being improper, this process ensures that the Project can be executed accurately, efficiently, and in alignment with the Owner's intent.

17. While I do not believe that the Owner or Architect misused the RFI, CCD, or submittal processes on this Project, I do believe that the volume of RFIs and CCDs speaks to a failure in Layton's construction management.

18. On a project of this complexity, the sheer volume of RFIs, and in some cases multiple RFIs for the same issue, reflects a breakdown in core construction management responsibilities, including preconstruction planning and trade coordination.

19. First and foremost, the volume of RFIs shows a breakdown in pre-construction planning. Exhibit B to the AIA A133 obligated Layton to provide preconstruction services to the Owner, including a document review of the construction documents for "thoroughness, constructability, conflicts, errors, and omissions" and a constructability review. Constructability reviews are meant to provide the designer with practical feedback on how details can be built, helping the design team refine drawings to avoid inefficiencies.

20.     A well-coordinated, constructible design vetted between the Construction Manager and

        the Architect during preconstruction should not have resulted in thousands of RFIs or

        unilateral Owner Construction Change Directives resulting from non-Owner-related

        changes. The volume of RFIs thus demonstrates a failure of Layton's performance in

        preconstruction.

21.     Layton, as the Construction Manager as Contractor, was responsible for ensuring that its

        subcontractors' scopes of work were complete and inclusive of all Work identified in the

        basis documents prior to subcontract execution. Following subcontract execution, Layton

        was responsible for ensuring that its subcontractors' work was properly sequenced and

        integrated into the Project.

22.     Even with the large quantity of RFIs, with 25 units, public spaces, back-of-house areas,

        and site work available, there was ample work for subcontractors to continue progressing

        with the Work while awaiting responses to RFIs. Excessive RFIs, standing alone, do not

        mean that Layton did not have work available to perform. There is no cogent explanation

        from Layton why the work couldn't proceed on other fronts while RFIs were pending.

        Given the unique nature of each unit, each required its own sequence and was largely

        independent of the other units in the building. When (2) units—units 205 and 206—are

        singled out as causing delay to the overall Project, Layton should have moved off from

        these and finished the other 23 units and balance of the facility.

23.     Managing thousands of directives placed an administrative burden on the Project, but this

        did not relieve Layton of its contractual duty to maintain effective Project execution. It is

        my understanding from Layton's Project Schedules that in the last ten months of

        Layton's involvement in the Project, nearly a day of delay to the critical path occurred

64

every day that work was performed, underscoring Layton's failure to provide proactive oversight and proper subcontractor management. I also understand, from the Ibbs Report, that these delays were caused by Layton and its subcontractors and were not the result of Owner changes. This Project was not without distraction. Layton and the Owner could have managed the administrative burden better from the onset with administrative personnel dedicated to management of these items for all parties.

24.     Layton, moreover, directly contributed to the volume of RFIs and CCD's and resulting disruptions to the Work. As referenced previously, multiple RFIs were submitted on identical issues that should have been consolidated into a single, comprehensive inquiry.

25.     To the extent the Owner requested a change via CCD—as was the Owner's contractual right under Article 7 of the AIA A201—Layton was responsible for assessing the resulting cost and schedule impacts, proposing those to the Owner, and, if necessary, filing a claim under Article 15 when a dispute arose. Layton failed to contemporaneously assert such impacts.

26.     There is nothing in the CCDs, PCOs, and / or RFIs establishing that RFIs were a cause of the delay on the Project.

27.     The true indicator of Layton's construction management failure is not simply the volume of RFIs, CCDs, and ASIs, but the pattern and redundancy within them. On this Project, multiple RFIs were issued on the same issue, CCDs were repeatedly generated to resolve routine field coordination items, and ASIs reiterated clarifications to the design documents that should have been anticipated through preconstruction constructability reviews and certainly understood and clear at the time of the GMP Amendment #4. This pattern demonstrates that issues were not being resolved at their source and were instead

recycled through additional paperwork thus creating unnecessary administrative burden. Such redundancy is not reflective of Project complexity alone; it is symptomatic of poor subcontractor coordination, lack of decisive management by the Construction Manager, and failure by the Construction Manager to proactively engage subcontractors in resolving conflicts. In effect, the repetitive nature of these documents shows that the CM allowed the same problems to persist and even repeat, consuming time and resources while distracting from both proper oversight and timely execution of the work.

28.    After execution of GMP Amendment #4 on 4/14/2023 and prior to Layton's termination on 3/12/24, a total of 462 Construction Change Directives were issued to Layton. Of those directives issued, Layton properly submitted the related PCO proposal information for only 246 CCDs.  I reviewed each of those CCD's and categorized them based on their reason for issuance and also reviewed the PCOs to determine how many CCD's Layton informed the Owner would have a schedule impact (as it was required to do under the Contract).

29.    A table summarizing that analysis can be found on slide 28 of my presentation.

30.    Of the 246 PCO's submitted, over 60% of these did not impact the Project schedule either through Layton's own assessment of schedule impact within the PCO or based on the reason for issuance and category of the change (e.g. dimensional clarification only). Layton was contractually responsible for assessing the change of Work identified in the CCD and providing to the Owner an assessment of impact to the Contract Time of GMP via the PCO proposal. Simply put, it was Layton themselves who agreed that a majority of these CCD's did not impact the construction schedule. This agreement is inconsistent

with the assertion that the total number of CCDs somehow impacted Layton's work, as demonstrated by reviewing Layton's PCO proposals.

31.    In the remaining 40% of the PCO's, Layton assessed and defined the alleged schedule impact as noted in each PCO document (e.g. +2 days). I did not independently evaluate whether or not Layton's claimed schedule impacts were substantiated to the extent required by the Contract Documents.

32.    For the remaining 216 CCD's, Layton did not submit a corresponding PCO. Given Layton's prior and subsequent compliance with the requirements of the Contract, I can only assume that Layton did not believe that these CCDs had schedule or cost impacts that would require issuance of a PCO. Nevertheless, Article 7.3.4 indicates that, in the absence of a prompt response or disagreement from the Construction Manager on the method of adjustment to the Guaranteed Maximum Price of Contract Time, the method of determining the impact to the Contract Time or Guaranteed Maximum Price is the responsibility of the Owner with the Architect's assistance.

33.    As such, if Layton were to dispute the methods used to determine impact to the Guaranteed Maximum Price or Contract Time, the Contract directs Layton through Article 7.3.4 to file a claim using the provisions of Article 15. For the 216 CCD's that Layton did not submit a corresponding PCO for, there is no related documentation showing that Layton indicated disagreement with the method used for determining impact and no related documentation of Article 15 claim. Article 15.1.3 requires a Claim to be initiated "within 21 days after occurrence of the event giving rise to such claim." Layton's claim of impact from these CCDs months after the occurrence of the event is

67

inconsistent with the intent of the Contract requirement and diminishes the purpose of Article 15.

34. Relative to RFIs and my analysis of the RFI log we see that 1174 RFIs may have been issued after Amendment #4. Of these, 960 were noted in the log as having been answered, with 390 answered within (10) calendar days of issuance. The calculation by Layton's experts that the average response time was 19 days appears correct but fails to factor in those RFIs that were answered significantly sooner or the impact of the limited number that took significantly longer to answer. It also fails to factor in the complexity of any RFI, aggregating them all as if all were equal.

**Sufficiency of Design**

35. Layton's experts contend that the design of this Project was incomplete and that the Architect therefore failed in its duties.

36. It is misguided to attribute construction challenges to alleged deficiencies in architectural, interior design, or engineering documents. Layton was intimately involved in this Project for over two years prior to signing GMP Amendment #4. By approving that amendment, Layton affirmed it's understanding and acceptance of the basis design documents whose scope, detail, and quality were well known and integrated into Layton's construction planning process during the design phase. Attempting to now characterize these same documents as incomplete or inaccurate disregards the fact that Layton developed its entire GMP proposal based on those documents. As a seasoned contractor with design-assist obligations and preconstruction involvement, Layton had ample opportunity and a contractual responsibility to review, coordinate, and raise issues during preconstruction and, further, through the first year of construction as evidenced by the issuance of

multiple conformance sets. If Layton believed the documents were inadequate or incomplete, it should have expressed that fact and declined to agree to a GMP price based on those documents.

37. Layton's experts also appear to argue that the Architect failed to meet its standard of care. Construction documents need not list every possible material or product detail on the drawings themselves; many are properly addressed in the Project manual or performance specifications. The standard of care allows architects to provide performance criteria (e.g., strength, fire rating, finish) rather than prescriptive callouts for every item.

38. The AIA B101 (§2.2) requires architects to perform services consistent with the professional skill and care of peers in similar circumstances. This means providing a reasonably complete and coordinated set of documents, not a perfect or exhaustively detailed set. If a call-out was omitted, but adequate direction was provided elsewhere (e.g., in specifications or schedules), the documents still satisfy professional standards.

39. The architect has a duty to coordinate consultants and produce a reasonably consistent set of documents. However, the architect is not strictly liable for every consultant omission or error. The standard of care is reasonableness and consistency with peer practice, not perfection.

**The Meaning of Non-Conforming Work**

40. From my review of Layton's expert reports, it is also clear to me that Layton is trying to conflate the separate concepts of "work in progress" and "non-conforming work."

41. Work in progress refers to construction that is incomplete but otherwise being executed in accordance with the Contract Documents. At interim stages, such work may appear unfinished, but it is still capable of progressing naturally to a final, compliant state

without having to remove or redo any of the work. For example, drywall that is hung but not yet taped and painted remains work in progress.

42.    Non-conforming work, by contrast, is work that has been installed, placed, or executed in a manner that does not comply with the requirements of the Contract Documents, applicable codes, or accepted standards of practice. This includes deviations in material, dimensions, tolerances, or workmanship that cannot be cured merely by further progression of the work. Instead, non-conforming work typically requires correction, removal, or replacement to achieve compliance.

43.    In this matter, the Owner and Architect have identified numerous instances of non-conforming work. While the Contractor asserts that these items are simply "work in progress," such a characterization is not accurate where the installed condition already reflects a departure from the contract requirements. Both the Owner Representatives (including multiple independent inspection firms) and the Architect are seasoned professionals who understand the natural course of construction. While it is reasonable to expect some items to be in progress, there is no justification for Layton to disclaim responsibility for nearly all instances of contractual non-compliance identified simply by claiming it intended to fix the problem. It is important here to note that Layton's experts, although they assert that the nonconformances were improperly categorized, do not identify any specific NCR report that they believe is incorrectly categorized as a nonconformance.

44.    The appropriate test is whether the work, as presently performed, can reasonably achieve compliance through ordinary completion, or whether it already constitutes a deviation requiring corrective action. The latter, by definition, is non-conforming work. One of the

most impactful, clear and egregious examples of incorrectly executed work that is non-conforming is the Roof Installation. In my Expert Report I analyzed PCO 4008—the PCO concerning nonconforming work on the roof—stating "The Stop Work Order issued by the Inspector of Record (IOR) and rejection of Layton's proposed remedies by the AHJ (SAFEbuilt) directly reflect that portions of the installed roof were not compliant with Contract Documents or accepted construction standards." WJE's report similarly established that " the originally installed roof assembly contains multiple construction deficiencies that compromised its performance (a.k.a non-conforming work)," including improper installation of roofing membranes, improper sequencing of the assembly layers, inadequate fastening of insulation and substrate layers, discontinuities in the air and water barrier systems, and damage and microbial growth requiring remediation.  Kerns specifically determined that remediation would require complete removal and replacement of affected components, which, again, is the very definition of non-conforming work.

45.     The extensive rework performed by the SMC/Beck team following Layton's termination reinforces that this was not just a matter of incomplete work, but of improper installation and not following the requirements of the Contract Documents. It is evident that Layton failed to implement an effective Quality Control and subcontractor coordination process, an issue likely exacerbated by frequent management turnover and inadequate Project staffing.

**Responses to Specific Points in Layton's Expert Reports**

46.     In addition to my general critiques of Layton's expert reports, there are a few specific points from each that I would like to address.

**Caruso's Opinions**

47.    There are several aspects of Caruso's report that I disagree with. First, Caruso attempts to argue, on page 6 of his report, that Layton was not contractually required to provide a recovery schedule because "the issuance of CCDs was not under Layton's control".

48.    GMP Amendment #4 reset the Project and established a new Substantial Completion deadline of April 30, 2024. From that point forward, Layton submitted 10 schedule revisions in 10 months, each of which showed a delayed completion and which cumulatively totaled 301 delay days. There is no dispute that each schedule Layton submitted after Amendment #4 showed completion would be delayed. And I am aware of no evidence that the Owner granted Layton an Extension of Time after Amendment #4. I therefore understand that the Contract did require Layton to submit a recovery schedule, and that if Layton disagreed or believed the CCDs excused their performance they nevertheless had an obligation to continue performing under the contract while resolving that claim.

49.    I also do not agree that the issuance of CCDs somehow excused Layton's performance. Layton appears to be using administrative processes brought forward after GMP Amendment #4 to mask their inability to complete the Project on time. But, as referenced previously, the requests for extensions of time associated with the CCD's Layton submitted PCOs for do not justify the delays to Layton's completion of the Project. Under these circumstances, the Owner is fully within their right to terminate and, in this period, evaluate and challenge the payment application completion percentages (as would be the lender).

DM3\22351093

50.    Caruso, on Pages 14 and 15 of his report, attempts to argue that Cody Lane believes Layton had an obligation to anticipate the issuance of CCDs caused by "terrible construction documents" or that Cody Lane had some duty to recognize and issue design changes and delayed Layton's work by failing to do so.

51.    These arguments take no responsibility for Layton's own inherent responsibility to recover the schedule after 10-months of day-for-day delays to construction. The quality of the documents was well known by Layton after 2+ years working on the Project in pre-construction and during construction. It's impractical to conceive Layton had thousands of unknown issues after execution of GMP Amendment #4 given the level of construction completion yet still accepted GMP Amendment #4 which established a revised guarantee of cost and schedule. A core driver of the delay was the fact that the building was not watertight and environmentally controlled, which prevented installation of the interiors from being able to proceed.

52.    Pages 22-35 of Caruso's report raise numerous delays that are specific to Unit 205 and 206. These are 2 units of 25 plus all the common and back of house space. These two units could have been sectioned off and left until alone while all other areas of the building were addressed. No one single unit is part of critical path for the entire job much less these two units. Furthermore, given the high level of customization within this building, it should have been anticipated unit Owners would make numerous modifications, even after the predetermined modification period had expired. These modifications could delay the completion of a unit interior but would not have delayed the Project as a whole.

53.   Finally, On Page 42 of his report Caruso opines that "Layton offered an appropriate means to mitigate the delays caused by Construction Change Directives *through* the implementation of overtime, which Cody Lane rejected." I am unaware of any instance in which the Owner stopped Layton from implementing overtime, although I understand the Owner refused to accept liability for Layton's use of overtime to recover Layton's unexcused delays.  In any event, this statement mischaracterizes Layton's obligations with respect to the provision of labor. Layton had a commitment to meet the schedule within GMP Amendment #4 and should have anticipated all workforce requirements on the Project to meet this guarantee. If Layton disagreed with the terms of a change, Layton's recourse was to file a claim per AIA A201 Article 7.3.4 and Article 15, which was not done and may represent concession or acceptance of the Owner's position. And, having been delayed, Layton had a contractual obligation to prepare a Recovery Schedule and to recover its delays.

**Wright's Opinions**

54.   There are several opinions within Terry Wright's report that I disagree with.

55.   On Page 5 of his Report, Mr. Wright introduces the term "complete design", which he defines as "the entire scope of work that can be identified and all the associated details needed for the Project. Every detail needed to convey the design intent and how the work scope needs to be constructed must be accounted for within the design." Throughout his report, it appears that Mr. Wright asserts that a complete design was required for Layton to advance its work.

56.   In practice, there is no such thing as a "complete" design, especially on a Project of the complexity and magnitude of the Hoback Club. To suggest every detail is needed in the

design documents would render the entire submittal/shop drawing process or any aspect

of delegated design unnecessary. In a Project of this quality and character, it is necessary

for the Design Professional(s) and Construction Professionals (CMc, GC, trades,

suppliers, etc.) to work together to achieve the "intent" of the Contract Documents as is it

never the expectation that design documents define and identify "all the associated details

needed for the project".

57.    The standard of care applicable to architects does not require a complete design, and the

Contract that Layton agreed to here expressly contemplated that design would be

incomplete, with Article 2.2.2 of AIA A133 stating that "to the extent that the Drawings

and Specifications are anticipated to require further development by the Architect, the

Construction Manager shall provide in the Guaranteed Maximum price for such further

development…"

58.    Mr. Wright also opines that there was an "extremely large number" of RFIs on this

Project caused by "the lack of a reasonably complete, coordinated, or constructible

design."  I disagree with this characterization; the number of RFIs on a project really

depends on the contractor itself and to what degree they will advance work by making

decisions in the interpretation of the design versus asking for prior permission. The

amount of RFIs issued were not "extremely large" given the complexity of the work,

especially when factoring in the count of RFIs that the CMc should have solved in the

field. The statement that the design was not constructible also defies logic, as the design

has in fact been successfully built by a different contractor.

59.    On Page 10 of his report Mr. Wright asserts that at the time of termination Layton had

submitted 1400 PCOs based on CCDs totaling approximately $46 million. Of this, Mr.

Wright claims the Owner had only agreed to pay $13.5 Million. This is misleading in numerous respects.

60. First off, the majority of the PCOs Mr. Wright references were issued prior to Amendment 4 and therefore were resolved by that agreement. Layton only issued 248 PCOs following Amendment 4.

61. While Wright references $32 million in unapproved PCOs, those PCO's were not requested until the time of termination.

62. Layton submitted a payment application days before termination with a PCO value of $10,816,168, and its final payment application submitted in April 2024 contained a further $21,999,568 in PCO value.

63. These previously uninvoiced PCOs could not have impacted Layton's performance on the Project, and are therefore irrelevant.

64. I also disagree with Mr. Wright's contention, on Page 17, that Layton had to add additional staff members to deal with RFIs, CCDs, PCOs, and ASIs caused by insufficient design. To the contrary, as previously stated it is my opinion that Layton had understaffed the Project and that the staff Layton added were always required for it to meet its contract obligations.

65. Mr. Wright also appears to opine, on Page 24 of his report, that it was inappropriate for the Owner or Architect to require that Layton participate in design charettes or pre-submittal review conferences with the design team as part of the submittal review process. Layton, however, was part of the Project during the design/preconstruction phase. During the preconstruction phase, they were fully aware of basic Division 1 specifications that govern submittals. Additionally, in highly custom buildings, it is not

surprising to see collaborations between the design professional and various trades impacted by a particular design component to charette solutions for the work. Many times, a charette is performed in preconstruction which leads to a mockup of the item, to a review of the item, and then to implementation across the entire Project. Had Layton performed these, many intricate details could have been considered and coordinated long before it was time to apply them in the field.

**Vlahos' Opinions**

66.    I generally disagree with the conclusions that Mr. Vlahos reaches in his expert report, but would like to draw your attention to several specific discrepancies.

67.    On Page 8 of his report while describing Amendment 4, Vlahos claims that "As part of Amendment # 4, the Owner represented to Layton that the Construction Documents were sufficiently complete and the Project could be completed based upon the re-baselined schedule and the current design documents." He makes similar assertions on Pages 10, 14, and 21 of his report.

68.    I am unaware of any portion of Amendment # 4 establishing such a commitment. Nor could the Owner make such a commitment. Although the Owner is required to approve the design documents and confirm that the scope and design are acceptable to it, an Owner would never know whether or not the documents are "sufficiently complete" from a Contractor's perspective. It was ultimately Layton's contractual duty under Article 2.2 of the AIA A133 Agreement to verify, through its own preconstruction services, that the design documents were developed enough for pricing and execution and whether or not they were complete. By signing GMP Amendment # 4, Layton expressly accepted this responsibility.

69.    It is also important to note that the design documents as of Amendment # 4 were, largely, the same design documents in place prior to Amendment # 4. Layton therefore waived all claims related to the completeness of incompleteness of those documents when it entered into Amendment 4.

70.    Layton was intimately involved in this Project for over two years prior to signing GMP Amendment #4. By approving that amendment, Layton affirmed it's understanding and acceptance of the basis design documents whose scope, detail, and quality were well known and integrated into Layton's construction planning process during the design phase. Attempting to now characterize these same documents as incomplete or inaccurate serves more as a deflection than a legitimate cause as Layton developed an entire GMP proposal based on those documents.

71.    In high-end residential and ultra–high net worth condominium projects, it is customary that design refinement continues through the construction documentation and coordination phases. This is not evidence of disorder or unpredictability, but a recognized and necessary aspect of tailoring bespoke residences to owner expectations. Industry practice standards such as those embodied in the AIA documents (AIA B101 and A201) recognize that adjustments and detailing are inherent in complex, high-value design projects. These refinements are expected and should be accounted for in both the design management process and the construction manager's (CM's) planning.

72.    The Project design and documents were coordinated and issued with the CM's active involvement throughout the design phase. The CM was engaged early, provided preconstruction services, and was therefore fully aware of the design intent, scope, and progressive refinements as they occurred. Under AIA A133 and A201, the CM has an

obligation to provide cost advice, constructability input, and scheduling recommendations during design. This role ensures that when the Project transitions into construction, the CM is not encountering "surprises," but rather the natural evolution of the project they have been tracking and advising upon for months.

73.     The design development and construction documentation revisions on this Project were neither arbitrary nor excessive. They followed normal professional practice and owner-driven requirements common to high-value residential projects. The CM's claim that evolving design impaired subcontractor efficiency fails to recognize that the CM had contractual responsibility to manage those impacts through accurate GMP development, clear communication with subcontractors, and proactive coordination. The AIA standards place that risk squarely on the CM-at-Risk the very purpose of the delivery method is to allocate such management responsibilities to the CM, not to shift them back to the Owner or Architect.

74.     Lastly, as previously mentioned, The Owner is required to approve the design documents and attest the scope & Design shown is acceptable but they would never know if the design documents are technically complete to the Construction Manager's satisfaction (for example - if the mechanical sheets needed to show duct support details). That is precisely why the CMc model includes preconstruction review.  To support a Guaranteed Maximum Price, it was ultimately the Architect and the Construction Manager's professional duty under Article 2.2 of the AIA A133 Agreement to verify, through their preconstruction services, that the documents were adequately developed enough for pricing and execution, as well as the level of completion of the documents.

75.    A major point of disagreement between myself and Mr. Vlahos appears to the architect's standard of care on the Project. Vlahos' first opinion is that "The Owner's Architect failed to timely deliver a reasonably complete, coordinated, and constructible design." This opinion relies on Vlahos' belief that "when an architect enters into an agreement with an owner, the architect's responsibility on a project is to deliver a design for the project that is complete and coordinated in all respects."

76.    In saying this, Vlahos misstates the standard of care under AIA contracts. Under AIA contracts, such as those in place here, the Architect's obligation is to exercise reasonable professional skill and care. This standard of care does not require the architect to guarantee a design free from any errors, omissions, or later refinements.

77.    Vlahos is also incorrect to the extent he suggests the Architect is responsible for warranting constructability. Responsibility for warranting constructability rests with the Construction Manager, because it is the CM who controls means and methods, sequencing, and trade coordination. This is consistent with the fact that "constructability review" was one of Layton's preconstruction scopes of work.

78.    On Page 10 of Vlahos Report, Vlahos opines that *"The owner refused to accept an acceleration schedule that would result in additional time and cost being submitted by Layton and failed to provide direction on how to proceed. In absence of any direction from the Owner, Layton proceeded with construction using Amendment #4 to try and avoid further delays."* I find this statement to be incorrect in multiple respects.

79.    First and foremost, the Owner in fact provided Layton with direction, repeatedly requesting a recovery schedule that I understand was never provided. And, as Vlahos

admits, what the Owner rejected was not the acceleration schedule itself, but responsibility for the costs of achieving that schedule.

80.    In any event, Layton's assertion that the Owner "refused to accept an acceleration schedule" is also misleading because it was Layton's obligation to provide a recovery schedule in circumstances where completion was delayed and not otherwise excused by an extension of time. From the date of GMP Amendment #4 (April 14, 2023) through the subsequent 10 calendar months, Layton accrued 301 days of delay, nearly a day lost for every day worked. This magnitude of slippage reflects Layton's own inability to properly oversee and manage the work, maintain manpower, and implement their own reset schedule that all parties agreed to in GMP Amendment #4.

81.    Layton created the new baseline schedule included within GMP Amendment #4 with full knowledge of the Project's current conditions, outstanding concerns, subcontractor quality & performance, and remaining work. It was Layton's contractual obligation under Article 3.10 of the AIA A201 Agreement to manage and adhere to that schedule. The Owner was not obliged to accept open-ended acceleration proposals that increased cost and time but instead could hold Layton accountable to the terms of the contract and the re-baselined schedule they had already committed to.

82.    The record demonstrates that despite repeated opportunities to recover the schedule and properly manage the Work, Layton failed to implement the coordination, planning, and consistent manpower necessary to execute the Work. GMP Amendment #4 itself provided the directive framework to complete the Work, one that Layton failed to perform against.

83.    301 days of schedule delay over 10 months is direct evidence of systemic mismanagement by Layton, not Owner refusal to cooperate or delays in responding to

RFI's. Layton's obligation was to deliver the Project under the GMP Amendment #4 schedule. Their failure to do so underscores a breach of their contractual obligation to manage the schedule and coordinate the Work effectively.

84.    Vlahos' report is also critical, on Page 15, of the number of changes to the interiors of the Living Units, claiming that "numerous revisions were developed by the Interior Designer and IBI related to the interiors of the Living Units" and that these revisions were one of "the challenges Layton was faced with by addressing re-design revisions that occurred on the Project."

85.    It is entirely expected and common in projects of this scale and character that numerous revisions would be developed by the Interior Designer and Architect during Construction Administration (CA). The Hoback Club Project features highly custom unit designs and one-of-a-kind finishes. By their very nature, these elements require detailing at a Level of Development 400 or higher, meaning finite construction details and installation clarifications are worked out as trades prepare their shop drawings and begin implementation of the Work

86.    In projects of this type, it is neither unusual nor inappropriate for the design team to issue additional design information during CA. Custom interiors and luxury residential design often demand iterative refinements to ensure precise execution of the Owner's vision. Revisions at this stage reflect the natural progression of coordinating field conditions, evolving design decisions, and integrating high-end materials, not deficiencies in the design process. To suggest otherwise misrepresents standard architectural and interior design practice on complex, bespoke projects such as this.

87.    The volume of interior revisions is not evidence of design shortcomings; it is an indicator

of a highly tailored project where every detail is refined to achieve the unique and

exacting quality demanded by the Owner. This is consistent with industry norms for

luxury developments and falls squarely within the Architect's role during Construction

Administration.

88.    Vlahos report' also identifies, on Page 18, a number of RFI's that Vlahos claims related to

changes required to meet building codes and applicable laws and regulations. As is

detailed on page 18 of my rebuttal report, I reviewed those RFIs and concluded that none

of them were the direct result of a code related matter.

89.    Another error in Vlahos' opinions rests in his assertion, on Page 21 of his report, that

there were numerous design changes caused by the Architect's failure to meet WELL

space Program Requirements. In fact, the Architect's Contract with the Owner expressly

stated that the Project "is not planning to pursue or expected to achieve certification

through the WELL Building Standard" and there is no reference to that standard in the

AIA A133 agreement with Layton. And, although Well Building Standards were

originally referenced in the Contract specifications, that reference was removed prior to

Amendment 4.

90.    I also disagree with Vlahos' analysis of industry standard with respect to the electrical

drawings. On Page 23 of his report, Vlahos writes "The entire set of electrical

construction drawings was re-issued due to design revisions, deficiencies, lack of

coordination and document controls by the Architect. The various sets of electrical

drawings failed to identify all revisions through clouding of locations, which is an

industry standard practice. This delayed the progress of Work and required additional administrative staff to identify revisions for the various iterations of documents."

91.    It is common in construction projects, especially those with complex systems such as electrical, to re-issue drawings in whole or in part. This may occur for multiple legitimate reasons: (a) to incorporate approved revisions into a single coordinated set, (b) to ensure all parties are working from the same base documents, and (c) to avoid confusion caused by multiple overlapping addenda, RFIs, and partial sheets. This process serves the contractor by consolidating updates and clarifications into one authoritative set, thereby reducing the risk of error.

92.    While clouding revisions on drawings is a recognized industry practice during the design and bidding phases, it is not an absolute industry standard once conformed or consolidated documents are issued. When an entire drawing set is reissued, it is often impractical and sometimes misleading to cloud every change, particularly when prior revisions have already been incorporated or when coordination adjustments affect multiple backgrounds. Instead, professional practice allows the architect to provide revision descriptions in the title block, addenda, or change order log. Contractors are expected to track changes through these mechanisms, not solely through revision clouds.

93.    Additionally, industry standard per the American Institute of Architects (AIA) documents, including AIA A201 and related commentary, do not require every revision to be clouded once the project is in construction. The standard is to clearly identify revisions in a manner that allows the contractor to reasonably incorporate them. Whether through revision schedules, addenda, or conformed sets, the intent is clarity, not perfection. The responsibility for document control is shared between the architect issues coordinated

84

revisions and the construction manager to ensure subcontractors and field staff use the current set.

94.    As a matter of course, "conformed documents" are a consolidated record set of Contract Documents re-issued during construction to incorporate addenda, accepted change orders, or approved revisions for ease of use in the field. They do not represent a "new" design, but a restated and coordinated compilation of the already-approved design intent. By their nature, conformed documents are not "perfect"; they are administrative tools intended to simplify contractor reference and reduce ambiguity.

**DATED** February 4, 2026.

CODY LANE DEVELOPMENT CORP.

By:  _/s/ Jeffrey B. Charkow_
Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P.O. Box 1208
Cheyenne, WY 82003-1208
Phone: 307-634-7723
Fax: 307-634-0985
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

Jeffrey B. Charkow
Owen K. Newman
Alex W. Karasik
John D. Cooke
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
Phone: 312-499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
awkarasik@duanemorris.com
jdcooke@duanemorris.com
cjchasin@duanemorris.com

*Attorneys for Plaintiff*
*Cody Lane Development Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of February, 2026, I electronically transmitted the foregoing document to the Clerk of Court of the U.S. District Court, District of Wyoming, using the CM/ECF system for filing. Based on the records currently on file the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

*/s/ Jeffrey B. Charkow*

Duane Morris LLP

DM3\22351093