Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
(307) 634-0985 (fax)
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

Jeffrey B. Charkow
Owen K. Newman
Alex W. Karasik
John D. Cooke
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
(312) 499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
awkarasik@duanemorris.com
jdcooke@duanemorris.com
cjchasin@duanemorris.com

ATTORNEYS FOR PLAINTIFF
CODY LANE DEVELOPMENT CORP.

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant, Counter-Claimant, and Third-Party Plaintiff. | Case No. 24-CV-00064-KHR |
| Related Third Party Claims. | |

**EXPERT WITNESS STATEMENT OF DR. WILLIAM IBBS**

## I. Introduction

1. In accordance with Judge Rankin's Procedure for Presentation of Direct Testimony by Witness Statement, Cody Lane Development Corp. ("Cody Lane" and/or "Owner") provides the following written statement of Dr. William Ibbs's direct testimony for trial. Cody Lane also requests the Court admit the exhibits which he relies upon and which are listed on its exhibit list.

### A. Dr. William Ibbs Biographical and Expert Credentials

2. I am a professor emeritus and former group leader of the Construction Management program in the Civil Engineering Department at the University of California at Berkeley. I taught courses and conducted research in the construction management area for thirty-four years, including such topics as scheduling, labor productivity analysis, cost management and accounting, and project management.

3. My consulting firm, The IBBS Consulting Group, Inc. ("Ibbs") and I have worked on some of the biggest, most complex projects globally, consulting on loss of productivity (LoP), scheduling, and other construction-related matters. I chair the American Society of Civil Engineers (ASCE) Committee, which established the industry standard Identifying, Quantifying, and Proving Loss of Productivity.

4. In this capacity, I have been deposed and testified in over forty matters pertinent to this case. That includes US federal and state courts, Canadian courts, and domestic and international arbitrations. My testimony has never been excluded through a Daubert motion.

5. My experience in these matters includes fifty-plus years of relevant industry experience, including design, construction, teaching, and researching unique and complex projects. As

a practicing engineer, I was a member of teams that designed nuclear power plants and hospitals in seismically active zones. I also served as a project engineer and project manager on industrial projects such as automotive, papermaking, food processing, and pipeline projects.

6. As a university professor, I taught construction management principles to thousands of students over a forty-year career. I also collected and analyzed cost, schedule, and productivity data on thousands of construction projects worldwide. That work resulted in a methodology for quantifying productivity loss arising from project changes known as the Ibbs Curves method. That methodology is now an accepted industry standard and has been accepted in trials and arbitrations such as the Panama Canal.

7. I am the chair and lead author of the ASCE's "Identifying, Quantifying, and Proving Loss of Productivity" Industry Standard.

8. My credentials are provided in more detail within my detailed curriculum vitae (Exhibit P1228 at 49).

**B. Scope of Engagement**

9. On or about April 3, 2025, Jeffrey Charkow, an attorney then with the firm, Harris Winick Harris LLP and now with Duane Morris LLP, engaged me through my consulting firm The IBBS Consulting Group, Inc., and on behalf of Cody Lane.

10. My assignment was to investigate and opine on causes of delays and the performance of Layton Construction Company, LLC ("Layton" and/or "Contractor") on the Hoback Club Project (the "Project" and/or "Hoback") for the limited period between the data date of the April 4, 2023 Amendment 4 re-baseline schedule and Layton's last day on the Project, March 11, 2024.

11. As part of this assignment, I was also asked to provide an opinion on whether Cody Lane's termination of Layton was justified as set forth in Cody Lane's March 4, 2024 notice of termination.

12. I performed my initial analysis and presented my initial set of findings and opinions in a report dated August 15, 2025 and titled "Evaluation of Contract Termination" (Exhibit P1228).

13. I subsequently issued a second report on September 26, 2025 titled, "Expert Rebuttal Report" (Exhibit P2446) where I provided a response to the assertions made in an expert report submitted by Thomas Caruso, Mark Resolve, Inc. titled "Schedule Delay Analysis" and dated August 15, 2025 (Exhibit P2426).

**C. Materials, Sources and Report Supplements**

14. I have reviewed numerous Project documents, including, but not limited to, Contract Change documents, cost data, letters, emails, schedules, and various reports. I also visited the project site and interviewed several individuals who were directly involved in the project, including Erwin Watt, Mike Malarkey, Simon Wadsworth of Cumming; Peter Frahm of DDRM; and Tedd Stately of Beck. After I submitted my Rebuttal Report on September 26, I had the opportunity to review expert rebuttal reports submitted by Layton on the same day as well as the transcripts for various depositions conducted after that date, including Cumming personnel Erwin Watt and Mike Malarkey, Layton's expert Tom Caruso, and Layton's scheduler Preston Robertson.

15. I also reviewed the various Agreements entered into between Cody Lane and Layton. These included the Preconstruction Agreement dated April 15, 2020 (Exhibit P0060), the modified A133 Standard Form Agreement effective May 28, 2021 (Exhibit J0004) and the

modified A201 General Conditions of the Contract for Construction effective the same date (Exhibit J0005).

16. The parties also agreed, and I reviewed, four separate Amendments to the Agreements, including and of particular relevance to my engagement, Amendment No. 1 which set forth the Guaranteed Maximum Price and Amendment No. 4 which increased the Guaranteed Maximum Price, extended the date for Substantial Completion and set forth an agreed re-baseline schedule (Exhibits J0006, J0011).

17. While I am not an attorney and none of my opinions should be considered legal opinions, as I mentioned previously, I have significant educational and practical experience with matters involving construction law and contracts, and on that basis, offer certain perspectives with respect to the Contracts, the Parties' various obligations and their performance (or lack) thereof.

## II. Layton's Termination

18. Cody Lane terminated Layton as the Contractor on the Hoback Club Project by a notice dated March 4, 2024 and effective March 11, 2024 (Exhibit J0020). Cody Lane's notice of termination cited multiple breaches of the Agreement between Cody Lane and Layton. These breaches, or grounds for termination can be summarized in four categories: (1) Schedule, (2) Quality, (3) Manpower and Supervision, and (4) Pay Applications.

19. My review and analysis related primarily to the grounds for termination contained in categories one and three, Schedule and Manpower and Supervision. In particular, I reviewed and have expressed opinions regarding:

- Layton's failure to progress Work in accordance with the approved Construction Schedule because of delays for which Layton is responsible;

- Layton's failure to take corrective measures to restore the progress of the Work to the approved Project Schedule and to provide a Recovery Schedule as requested by Cody Lane;
- Layton's failure to promptly proceed with the Work pursuant to Cody Lane's CCDs and Layton's failure to proceed diligently with performance of the Contract pending resolution of disputes;
- Layton's failure to furnish at all times an adequate supply of workers and materials; and
- Layton's failure to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

20. I also express various opinions with respect to Layton's quality issues to the extent they impact on or interface with issues of schedule and manpower.

21. In short, it is my opinion, based on my review and analysis, that Layton's termination was justified by persistent and compounding failures in schedule, project management and performance of their contractual obligations as set forth in Cody Lane's notice of termination. These deficiencies not only delayed the Project but also compromised its integrity, cost efficiency and alignment with the Owner's expectations for a high-end luxury development.

## III. Schedule Analysis and Layton's Failure to Progress Work in Accordance with the Approved Construction Schedule

22. As part of my engagement, I performed a detailed schedule analysis using Layton's Project schedules, and in particular, the Amendment 4 re-baseline schedule from April 4, 2023 (Exhibit J0011 at 7-189) and Layton's updates to that schedule from May 2023 until March

11, 2024. For each schedule, I reviewed not only Layton's .pdf schedule submittals, but their native format schedules using Primavera P6 Software.

23. I conducted my review and analysis in accordance with the terms of Agreement between Layton and Cody Lane as well as the Guidelines of AACE International (Association for the Advancement of Cost Engineering) Recommended Practice Number 29R-03, Recommended Practice for Forensic Schedule Analysis (Exhibit P0003).

24. My review and analysis found systemic deficiencies in Layton's planning, execution, quality control and schedule management. It also found that between the execution of Amendment 4 and Layton's termination in March 2024, Layton caused, at a minimum, 185 calendar days of delay to completion of the Project due to just two of their many Project impacts – impacts for which Cody Lane is not responsible. My analysis also concluded that the remaining delays on the Project were likely caused by further Layton impacts as well as some Owner-related delays.

**A. Contractual Requirements: Critical Path Method Scheduling**

25. The modified A201 agreement between Layton and Cody Lane requires at Section 3.10.1 that Layton prepare the construction schedule for the Work using the "critical path method" (Exhibit J0005 at 18) ("CPM"). Section 01 3200 of the Technical Specifications sets out even further detail regarding the obligation to schedule the work using the critical path method (Exhibit J0596 at 35).

26. In the following paragraphs I present a simplified overview (or refresher) to the reader of the CPM method.

27. The method starts with a clear and complete understanding of the contractor's scope of work. That scope of work is subdivided into a series of tasks or activities. The duration of

those activities are then typically expressed in terms of "days" (perhaps calendar days or work days, depending on the contract's requirements) and are in many cases, "resource loaded", where the number of manhours, equipment and material resources are assigned to each individual activity. The method also requires that the planner determine the sequence in which the activities will be constructed, called the schedule logic.

28. A simple example for the installation of an underground pipeline is shown in Figure 1 below. The first column is just the short-hand label for each activity. The following two columns list the activity description and duration. The last column indicates the logic; e.g. Mobilization must start and complete before Foundation Excavation can begin. Schedule logic is typically an expression of physical constraints, the sequence with which the work is intended to be performed, and the degree of concurrency and/or overlaps between operations.

| Activity | Description | Duration | Predecessor |
|---|---|---|---|
| A | Mobilize | 5 | -- |
| B | Excavate Foundation | 9 | A |
| C | Trench Drainpipe | 25 | A |
| D | Form & Rebar Foundation | 10 | B |
| E | Install Drainpipe | 2 | C |
| F | Pour Foundation Concrete | 5 | D |
| G | Backfill Drainpipe Trench | 6 | B, E |
| H | Closeout | 8 | F, G |

*Figure 1 (Exhibit P3007)*

29. With that information, a network diagram can be drawn; see Figure 2 below. The boxes represent the activities and the arrows represent the logic. Note that Activity B (Excavate

Foundation) and Activity E (Install Drainpipe) must start and finish before Activity G (Backfill Drainage Trench) can start.




*Figure 2 (Exhibit P3008)*

30. The next step is to calculate the earliest start ("ES") (in Blue) and earliest finish time ("EF") (in Green) for each activity, using the duration ("DUR") (in Gray) for each activity. In our example, and as shown in Figure 3 below, the ES for Activity A is set to "Day 0" and then because it requires 5 days of work, Activity A will finish on Day 5 (EF = ES + DUR). Because of the logic in this example, Activities B and C, which are independent of one another, can each start immediately thereafter at the end of Day 5 and finish on Days 14 and 30, respectively. The same process is followed throughout the rest of the next network, and in this example we can see Activity H will finish at the earliest on Day 46. This process is called the Forward Pass.




*Figure 3 (Exhibit P3009)*

31. One of the main purposes of constructing a CPM schedule is to understand which activities and activity sequence(s) are critical, that is to say activities or sequences which if delayed would delay the completion date. The CPM schedule also identifies the degree of delay flexibility (float) for each activity. Establishing float for each activity requires calculating the latest start and finish dates by which each activity can be performed without delaying the overall project completion date. This calculation is called the Backward Pass.

32. The Backward Pass is performed by setting the Late Finish (LF) (in Red) of Activity H = 46, the same as its EF. The process is then reversed, meaning Activity H's Late Start (LS) (in Yellow) is 46-8 = Day 38 and so forth. This is exemplified in Figure 4 below.




*Figure 4 (P3010)*

33. When that Backward Pass is finished, we can see that some activities have different ES and LS dates; e.g. Activity B's ES = 5 and its LS = 14. That means that these activities can start as early as Day 5 or as late as Day 14 without delaying the Project's completion date. This flexibility in start dates is called Total Float (TF) (see Figure 5 below in Orange), and in this particular case there are 9 days (14-5) of TF. This float could be used to delay the start of an activity or extend its duration, as long as it finishes on Day 14.




*Figure 5 (P3011)*

34. Conversely the ES and LS (and the EF and LF) for some activities are identical, namely Activities A, C, E, G, and H. They are the critical path activities. Any delay in a start or an extension to the duration will lead to the project's completion taking longer than Day 46. The critical path in this diagram is depicted below (Figure 6) with red arrows. This is the sequence of activities which must be performed on time, otherwise the project will be delayed.




*Figure 6 (Exhibit P3012)*

35. In the above examples, the activities are treated in the manner of a finish-to-start relationship, meaning that a preceding activity must completely finish before its successor can begin. However, that is not always an accurate representation. In general, there are four different types of scheduling logic: Finish-to-start (FS), Start-to-start (SS), Finish-to-finish (FF) and Start-to-finish (SF). Additionally, there may be instances where time lags are required as part of the relationship. For example, there may be a 2-day lag between the Finish of one activity and the start of its successor, which we represent as FS=2, or there may be a 5-day lag between the start of two activities, represented as SS=5.

36. All the activities in the above examples had simple Finish-to-Start, 0 day lag relationships (FS=0). Adding some more complicated relationships (a Start to Start with a 30-day lag between activities B and E) to that network results in Figure 7 below. The result is that 1) the overall duration of the network has changed from 46 days to 51 days; and 2) the critical path has changed from Activities A-C-E-G-H to Activities A-B-E-G-H.




*Figure 7 (Exhibit P3013)*

37. On a complex project like the Hoback Project, the CPM schedules can become even more complex (and realistic) representations of the project (Layton's Amendment 4 Re-Baseline Schedule contained 8,890 schedule activities and 16,451 logic relationships). For example, it is customary to focus not only on the "longest path" but also the paths that are "near critical" because they represent risk to the project. Also, adding weather (e.g. shutdown periods for cold weather), resource loading such as labor requirements, as well as resource constraints such as labor availability is critical to a contractor's ability to account for changes in labor productivity, forecasted labor and resource requirements.

38. The Hoback Project Technical Specification 01 3200, as attached to the Contract, identifies the minimum requirements for Layton's CPM Schedule:

- *CPM Schedule Preparation: Prepare a list of all activities required to complete the Work. Using the startup network diagram, prepare a skeleton network to identify probable critical paths*
  - *Activities: Indicate the estimated time duration, sequence requirements and relationships of each activity in relation to other activities. Include estimate time frames for the following activities:*

      - *Preparation and processing of submittals.*
      - *Mobilization and demobilization.*
      - *Purchase of materials.*
      - *Delivery.*
      - *Fabrication.*
      - *Utility interruptions.*
      - *Installation.*
      - *Work by Owner that may affect or be affected by Contractor's activities.*
      - *Testing and commissioning.*
      - *Punch list and final completion.*
      - *Activities occurring following final completion.*
   - *Critical Path Activities: Identify critical path activities, including those for interim completion dates. Scheduled start and completion dates shall be consistent with Contract milestone dates.*
   - *Processing: Process data to produce output data on a computer-dawn, time-scaled network. Revise data, reorganize activity sequences, and reproduce as often as necessary to produce the CPM schedule within the limitations of the Contract Time.*
   - *Format: Mark the critical path.*
- *Contract Modifications: For each proposed contract modification and concurrent with its submission, prepare a time-impact analysis using a network fragment to demonstrate the effect of the proposed change on the overall project schedule.*
- *Initial Issue of Schedule: Prepare initial network diagram from a sorted activity list indicating straight "early start-total float." Identify critical activities. Prepare tabulated reports showing the following:*
   - *Contactor or subcontractor and the Work or activity.*
   - *Description of activity.*
   - *Main events of activity.*
   - *Immediate preceding and succeeding activities.*
   - *Early and late start dates*
   - *Early and late finish dates.*
   - *Activity duration in workdays.*
   - *Total float or slack time.*
- *Schedule Updating: Concurrent with making revisions to schedule, prepare tabulated reports showing the following:*
   - *Identification of activities that have changed.*
   - *Changes in early and late start dates.*
   - *Changes in early and late finish dates.*
   - *Changes in activity durations in workdays.*
   - *Changes in the critical path.*
   - *Changes in total float or slack time.*
   - *Changes in the Contract Time.*

(Exhibit J0596 at 37-38, § 2.3)

39. Not only is it important to ensure that the baseline schedule realistically represents the work as it is actually progressing and to incorporate reasonable duration and logic forecasts of future work, but it is equally important to perform periodic schedule updates that maintain and update the work as it is actually progressing. To that end, Industry recommended practices, like AACE 53R-06, Schedule Update Review – as Applied in Engineering, Procurement, and Construction (Exhibit P0001), establish objective expectations for how project schedules are created, updated, reported and analyzed. They provide a neutral benchmark for evaluating whether scheduling practices reflect accepted professional care. Use of such standards is crucial for large, complex projects like Cody Lane's.

40. AACE 53R-06 provides specific guidance regarding incorporation of changes in the work into schedule updates:

> *"All changed items in the schedule should be considered and not just changes on the critical path. Changes made in one review period may not manifest themselves as a critical change until a later date. At a minimum, the schedule update review should include any changes in the following items:*
>
> - *Scheduling software system checks: …*
> - *Work breakdown structure (WBS): …*
> - *Activity data: …*
>     - *Data analysis: …*
>     - *Progress analysis: …*
>     - *Milestone analysis: …*
> - *Relationships: …*
> - *Activity logs, memos, or notebooks …*
> - *Overall review items: …"*

(Exhibit P0001, AACE #53-06, pgs. 12-13)

41. Technical Specification, Section 01 3200, as attached to the Contract echoes these requirements:

- Contractor's Construction Schedule Updating: At monthly intervals update schedule to reflect actual construction progress and activities…
  - Revise schedule immediately after each meeting or other activity where revisions have been recognized or made. Issue updated schedule concurrently with the report of each such meeting.
  - Include a report with updated schedule that indicates every change, including, but not limited to, changes in logic, durations, actual starts and finishes, and activity durations.

(Exhibit J0596 at 39)

42. Critically, and as I will discuss later, Section 01 3200 requires that "for each proposed contract modification and concurrent with its submission, [Layton] prepare a time-impact analysis using a network fragment to demonstrate the effect off the proposed change on the overall project schedule." (Exhibit J0596 at 38).

43. The Technical Specification also requires that Layton "Identify critical path activities, including those for interim completion dates." (Exhibit J0596 at 37)

44. AACE 49R-06 provides recommended practices for "Identifying the Critical Path" and explains that "…recommended practice (RP) for Identifying the Critical Path … The critical path method (CPM) is used to apply logic to determine a complete and functional project." (Exhibit P0002).

45. The recommended practice continues, "The list of critical path activities often changes from schedule update to schedule update as activity status is revised and the schedule is recalculated. Any activity associated with the CPM schedule that is delayed long enough can eventually become critical, regardless of its original status." (Exhibit P0002, AACE #49R-06, pg. 3). For example, as applied to our sample case, while activity F is not shown on the critical path, if the start of activity F is delayed beyond its late start date, in this case

day 38, completion of activity F will begin to delay the final activity (activity H) and will therefore become the critical path. This is demonstrated in Figure 8 below.




*Figure 8 (Exhibit P3014)*

46. In the above example, activity F's start is delayed 20 days and actually starts on day 44 instead of its early start date on day 24 and 6 days after its late start date on day 38 (thereby reducing its total float to -6). Even assuming activity F completes within its planned 5-day duration, activity H cannot start until activity F completes on day 49. This results in an extension to the overall program from 51 to 57 days and a 6-day critical path delay. Also note that following the 20-day delay to activity F, activity G has fallen off of the critical path and now has 6 days of total

47. The dynamic nature of CPM schedules and the critical path is why AACE recommends that an analyst "identify and explain all relative delayed start and extended durations of activities that are critical or near-critical". (Exhibit P0003, AACE 29R-03, p. 43). To focus on just the longest-path can result in not understanding how the critical path can change

month-to-month and how other paths that are near-critical affect the project's risk and jeopardize its completion date.

48. While Layton's schedules were deficient in many, significant respects, as a general rule, they appear to have been prepared using CPM methodology, and I did not see any evidence that Layton disputed the requirements for using CPM methodology on the Project.

**B. AACE 29R-03 Recommended Practice for Forensic Schedule Analysis**

49. The Association for the Advancement of Cost Engineering International ("AACE") is one of the industry's leading professional organizations dedicated to best practices in construction scheduling, cost estimating, and project control.

50. AACE sets the benchmark for matters key to the Cody Lane project and dispute, including the initial development and ongoing maintenance of project schedules. It also sets the recommended practices for forensic analysis of large, complicated project schedules such as Cody Lane's schedules. These recommended practices include the industry definition of and application of key terms and protocols, such as activity definition, duration, logic, float, and recommended delay analysis methodologies.

51. I performed my CPM analysis of Layton's project schedules from the Amendment 4 re-baseline schedule through the March 11, 2024 update schedule under the guidelines of AACE recommended practice AACE 29R-03, Forensic Schedule Analysis, which adopts the industry-accepted schedule delay analysis principles and recommended practices (Exhibit P0003).

52. AACE 29R-03 explains that its purpose "is to provide a unifying reference of basic technical principles and guidelines for the application of critical path method (CPM) scheduling in forensic schedule analysis." (Exhibit P0003). The recommended practice

(RP) sets out recommended protocols for several methods of schedule delay analysis, including those applied by Mr. Caruso and me as part of our analyses.

53. The RP acknowledges that "No forensic schedule analysis method is exact." But, it stresses that "The level of accuracy of the answers produced by each method is a function of the quality of the data used therein, the accuracy of the assumptions, and the subjective judgments made by the forensic schedule analyst." (Exhibit P0003, AACE 29R-03, 1.2(e)). The RP expressly recognizes that "Any analysis method, no matter how reliable and meticulously implemented, can fail if the input data is flawed." (Exhibit P0003, AACE 29R-03, 2).

54. As part of ensuring the quality of data, the RP provides four "source validation protocols": (1) Protocol 2.1. Baseline Schedule validation; (2) Protocol 2.2, As-Built Schedule validation; (3) Protocol 2.3, Schedule Updates validation; and (4) Protocol 2.4, Identification and Quantification of Discrete Impact Events and Issues. (Exhibit P0003, AACE 29R-03, 2)

55. Protocols 2.1 and 2.3 are of particular relevance to my analysis, and I performed these validation tests as part of my initial review. The results of these validation tests not only provided critical information regarding Layton's performance of its schedule obligations; they also are important to selection of the most appropriate methodology for the delay analysis. There is no evidence in the record that Mr. Caruso applied any of these protocols. In fact, Layton's expert, Mr. Caruso, has stated that he has generally not tested for or applied any of these protocols, as discussed below, which violates industry best practices.

### i. AACE Protocol 2.1 Baseline Validation

56. AACE 29R-03 explains that "The baseline schedule is the starting point of most types of forensic schedule analyses. Even methods that do not directly use the baseline schedule … often refer to the baseline for activity durations and initial schedule logic. Hence, assuring the validity of the baseline schedule is one of the most important steps in the analysis process." It is a reference point (Exhibit P0003).

57. Instead of validating the baseline schedule, Mr. Caruso's analysis assumed its validity, and indeed in his September 26, 2025 rebuttal to my August report, Mr. Caruso argues that "Ibbs' opinions regarding the Re-Baseline Schedule … are of no practical consequence." (Exhibit P2430 at 10). Mr. Caruso argues that this is so because, "The Re-Baseline Schedule, with its imperfections and alleged flaws, was agreed to by Cody Lane and Layton per Contract Amendment No. 4, and formed the basis of Cody Lane's alleged findings in its Letter of Termination." (Exhibit P2430, Caruso Rebuttal, pgs. 10-11). Mr. Caruso also notes that Cody Lane and its consultant, Cumming, reviewed and commented on the schedule as it was being developed. (Exhibit P2430, Caruso Rebuttal, pg. 11)

58. Mr. Caruso is correct that both parties agreed to accept the Re-baseline schedule and that Cody Lane and Cumming provided comment during its development. And that it was ultimately incorporated into and attached with Amendment 4. As such, it became the Contract schedule.

59. But just because the Parties agreed to the Re-Baseline schedule does not mean that it is appropriate for use in a forensic analysis – without any validation of its suitability. This is particularly true for a Re-Baseline schedule where the schedule contains both as-built

progress information as well as forecasted schedule activities and logic (as opposed to an original Project baseline that would not contain or rely on as-built progress data).

60. Moreover, a review by a third-party Owner representative like Cumming will never match the rigor and insight of the Contractor and his scheduler. The baseline (or in this case, the Amendment 4 re-baseline) schedule depends upon project context, familiarity with and direct collaborative access to subcontractors and vendors, preferred means-and-methods, etc. It is understood in the industry that an Owner's representative will only be able to perform an "over-the-shoulder", high-level review, especially on a schedule that has more than 8,000 activities and dozens of logic paths.

61. The RP sets out, and I performed the following baseline validation protocols:

- Ensure that the baseline schedule is the earliest, conformed plan for the project. If it is not the earliest, conformed plan, be prepared to identify the significant differences and the reasons why the earliest, conformed plan is not being used as the baseline schedule.
- Ensure that the work breakdown and the level of detail are sufficient for the intended analysis.
- Ensure that the data date is set at notice-to-proceed (or earlier) with no progress data for any schedule activity that occurred after the data date.
- Ensure that there is at least one continuous critical path, using the longest path criterion that starts at the earliest occurring schedule activity in the network (start milestone) and ends at the latest occurring schedule activity in the network (finish milestone).

- Ensure that all activities have at least one predecessor, except for the start milestone, and one successor, except for the finish milestone.
- Ensure that the full scope of the project/contract is represented in the schedule.
- Investigate and document the basis of any milestone dates that violate the contract provisions.
- Investigate and document the basis of any other aspect of the schedule that violates the contract provisions.
- Document and provide the basis for each change made to the baseline for purposes of rectification.
- Ensure that the calendars used for schedule calculations reflect actual working day constraints and restrictions actually existing at the time when the baseline schedule was prepared.
- Document and explain the software settings used for the baseline schedule.

62. Figure 9 below sets out the results of my review of Mr. Caruso's report in this context:

| MRI Analysis vs SVP 2.1 Baseline Validation Which Requires | Pass | Fail | IBBS Comments |
|---|---|---|---|
| | | | |
| 1. Ensure that the baseline schedule is the earliest, conformed plan for the project. | ✓ | | The April 4, 2023 Re-Baseline is the agreed baseline for the Amendment No. 4 contract. |
| 2. Ensure that the work breakdown and the level of detail are sufficient for the intended analysis. | | ✗ | There was significant missing rework from the April 4, 2023 Re-Baseline schedule. |
| 3. Ensure that the data date is set at notice-to-proceed (or earlier) with no progress data for any schedule activity that occurred after the data date. | ✓ | | The data date was set to April 4, 2023. |
| 4. Ensure that there is at least one continuous critical path, using the longest path criterion that starts at the earliest occurring schedule activity in the network (start milestone) and ends at the latest occurring schedule activity in the network (finish milestone) | ✓ | | There was at least 1 continuous critical path. |
| 5. Ensure that all activities have at least one predecessor, except for the start milestone, and one successor, except for the finish milestone. | ✓ | | Confirmed. |
| 6. Ensure that the full scope of the project/contract is represented in the schedule. | | ✗ | The Re-Baseline Schedule is missing the DensGlass Replacement activities. |
| 7. Investigate and document the basis of any milestones dates that violate the contract provisions. | ✓ | | None observed. |
| 8. Investigate and document the basis of any other aspect of the schedule that violates the contract provisions. | | | None observed. |
| 9. Document and provide the basis for each change made to the baseline for purposes of rectification. | N/A | N/A | Not applicable. |
| 10. Ensure that the calendars used for schedule calculations reflect actual working day constraints and restrictions actually existing at the time when the baseline schedule was prepared. | ✓ | | Confirmed. |
| 11. Document and explain the software settings used for the baseline schedule. | | ✗ | MRI does not explain the software settings. |

*Figure 9 (P3015)*

63. As shown, Layton's Re-baseline Schedule failed several key components required to validate the schedule for forensic analysis. Importantly, Layton's Re-baseline schedule did not address significant project issues which were known to Layton at the time of the Re-baseline, including and perhaps most importantly the need to replace substantial portions of the previously installed exterior sheathing, or DensGlass. (Simply, DensGlass is the portion of exterior construction between the siding and interior insulation.)

**ii. AACE Protocol 2.2 As-Built Validation**

64. Mr. Caruso acknowledged that not only did he accept the Re-Baseline schedule as-is, he also did not perform any validation or detailed examination of the As-Built schedule that he used as the basis for his analysis. Instead, like the Re-Baseline Schedule, Mr. Caruso chose to rely on his client's representation that the As-Built schedule was complete and accurate. Cody Lane, on the other hand, is relying on my analysis which did follow and base its conclusions on these protocols. My analysis demonstrated that the activities

missing from the re-baseline, when properly modeled, alter the critical path. Had Mr. Caruso performed the source data validation, he would have recognized that a more detailed period-by-period window analysis with some data correction is necessary.

**iii. AACE Protocol 2.3 Schedule Update Validation**

65. IBBS implemented the SVP 2.3 update validation protocols by:

**a.** Reviewing project records to evaluate the reliability of the statusing data. Project records showed many of Layton's self-inflicted project impacts that were not included and modeled in the April 4, 2023 re-baseline and subsequent schedules. These omissions precluded IBBS from being able to validate the Layton schedules and complete the MIP 3.3 observational analysis. IBBS added several of Layton's ongoing impacts to applicable updates which validated the specific schedules for use in the MIP 3.7 modeled analysis.

**b.** Assembling all schedule updates to cover the entire analysis period from start to finish.

**c.** Using officially submitted schedule updates.

**d.** Ensuring that the update chain started with a validated baseline. In this case the April 4, 2023 re-baseline.

**e.** Checking on the consistency of the actual start and finish dates assigned to each schedule activity from update to update.

**f.** Identifying all changes to each update made that extended, reduced, or changed the longest path or the controlling path to the contractual milestones.

66. The image below outlines the results of the SVP 2.3 validation protocols.

| MRI Analysis vs SVP 2.3 Update Validation | Pass | Fail | IBBS Comments |
|---|---|---|---|
| a. Reviewed project records to evaluate the reliability of the statusing data. | | ✗ | Failed to review all field reports contemporaneously to document failures requiring rework |
| b. Assembled all schedule updates to cover the entire analysis period from start to finish. | ✓ | | All updates were assembled and covered the entire Amendment No. 4 period. |
| c. Used officially submitted schedule updates. | ✓ | | Confirmed. |
| d. Ensured that the update chain started with a validated baseline. In this case the April 4, 2023 re-baseline. | ✓ | | The update chain started with the agreed upon April 4, 2023 re- baseline. |
| e. Checked on the consistency of the actual start and finish dates assigned to each schedule activity from update to update. | | ✗ | There was no update-to-update analysis performed for each activity. |
| f. Identified all changes to each update made that extended, reduced, or changed the longest path or the controlling path to the contractual milestones. | | ✗ | There was no update-to-update analysis performed that assessed the contemporaneous changes and their effect on the critical path. |

*Figure 10 (Exhibit P3016)*

### C. Types and Selection of Methodology for Schedule Delay Analysis

67. AACE 29R-03 details several types and methodologies for schedule delay analysis, as set forth in Figure 11 below:

| Taxonomy | 1 | RETROSPECTIVE | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | OBSERVATIONAL | | | | | | | MODELED | | | | | | | |
| | 3 | Static Logic | | | Dynamic Logic | | | | Additive | | | | Subtractive | | | |
| | 4 | 3.1 Gross | 3.2 Periodic | | Contemporaneous Updates (3.3 As-Is or 3.4 Split) | | 3.5 Modified / Reconstructed Updates | | 3.6 Single Base[2] | | 3.7 Multi Base[1] | | 3.8 Single Simulation | | 3.9 Multi Simulation[1] | |
| | 5 | | Fixed Periods | Variable Windows | All Periods | Grouped Periods | Fixed Periods | Variable Windows | Global Insertion | Stepped Insertion | Fixed Periods | Variable Windows or Grouped | Global Extraction | Stepped Extraction | Fixed Periods | Stepped Extraction |
| Common Names | | As-Planned vs As-Built | Window Analysis | | Contemporaneous Period Analysis, Time Impact Analysis, Window | Contemporaneous Period Analysis, Time Impact Analysis, Window Analysis | Contemporaneous Period Analysis, Time Impact Analysis | Window Analysis, Time Impact Analysis | Impacted As Planned, What-If | Time Impact Analysis, Impacted As-Planned | Time Impact Analysis | Window Analysis, Impacted As-Planned | Collapsed As-Built | Time Impact Analysis, Collapsed As-Built | Time Impact Analysis, Collapsed As-Built | Time Impact Analysis, Window Analysis, Collapsed As-Built |

*Figure 11 (Exhibit P3017)*

68. There are three types of analysis that are particularly relevant to this matter: (1) MIP 3.1, As-Planned vs. As-Built; (2) MIP 3.3, Contemporaneous Windows or Time Impact Analysis; and (3) MIP 3.7 Time Impact Analysis (TIA). As I've already mentioned, the Contractual Technical Specification 01 3200 required that "For each proposed contract modification and concurrent with its submission, [Layton] prepare a time-impact analysis using a network fragment to demonstrate the effect of the proposed change on the overall schedule." (Exhibit J0596 at 38).

**i. MIP 3.1, As-Planned vs. As-Built**

69. Mr. Caruso utilized an as-planned vs as-built methodology to perform the analysis presented in his August 15, 2025 report, "Schedule Delay Analysis". (Exhibit P2426). His analysis concluded that changes to Unit 205 caused 282 calendar days of delay to the Project. His analysis also identified a secondary critical path delay, Unit 206, which he concluded caused 275 days of delay to the Project.

70. AACE 29R-03, MIP 3.1 defines the as-planned vs as-built methodology as "an observational technique that compares the baseline or other planned schedule to the as-built schedule or a schedule update that reflects progress." (Exhibit P0003, MIP 3.1(A)). The methodology "compares the dates and the relative sequences of the activities and tabulates the differences in activity duration, and logic ties and seeks to determine the causes and explain the significance of each variance." (Exhibit P0003, MIP 3.1(A)).

71. Prior to performing an as-planned vs as-built analysis, MIP 3.1 recommends performance of Protocol 2.1 baseline schedule validation, Protocol 2.2 or 2.3 as-built or update validation (depending on whether the expert is comparing the baseline to a final as-built or a baseline update schedule) and Protocol 2.4, delay ID and quantification. (Exhibit P0003,

MIP 3.1(C)). It is my opinion that Mr. Caruso did not perform any of these validation protocols.

72. The RP also sets out a series of "Minimum Recommended Implementation Protocols":

**Step 1**: "Identify the baseline or other schedule that will form the as-planned schedule." The RP stresses that the expert should validate that the baseline "reflects the full scope of work [and] includes proper logic from the start of the project through completion….".

**Step 2**: Progress the comparison "from the earliest activities' planned dates to later dates."

**Step 3**: "The analysis should advance through the comparison by identifying for each activity: (a) delayed starts, (b) extended durations, and (c) delayed finishes."

**Step 4**: "Arithmetic calculations performed at the start and completion of each as-built activity provide a detailed view of the relative delay of every as-built activity. The most delayed series of activities can be ascertained using this method and can often be used as a starting point for identifying the as-built critical path."

**Step 5**: "Simultaneous delays … should be identified and confirmed as being on the critical path."

**Step 6**: "As the analysis continues and advances through the as-planned schedule, it is likely that it will become less accurate since contemporaneous adjustments to the contractor's plan will supersede the original logic. For this reason, particular care must be exercised during the analysis of the later stages of the project."

**Step 7**: "Extended durations that extend the Late Finish Date for any activity should be examined for the cause. This will determine the cause of the delays along the critical path."

**Step 8**: "Similarly, any duration with shorter than planned durations may indicate reductions in work scope or acceleration by the contractor."

**Step 9**: "If time extensions have been granted, they should be considered both at the time they were granted and at the end of the analysis."
(Exhibit P0003, MIP 3.1(E))

73. The RP also notes however, that the above minimum protocols are "applicable only to relatively simple cases and should not be used for long duration cases or where there are significant changes between the original planned work scope and the final as-built scope." (Exhibit P0003, MIP 3.1(E)).

74. The RP does not recommend or consider one methodology to be "better" than another, but it does set out a summary of considerations and caveats for each of the various methodologies. For MIP 3.1, those caveats and conclusions are as follows:

- MIP 3.1 Summary of Considerations in Using the Minimum Protocol
    - Suitable for analyzing short projects with minimal logic changes.
    - Can be performed in a manner that is easy to understand and simple to present.
    - Technically simple to perform compared to other MIPs
    - Can be performed with very rudimentary schedules and as-built data.
    - As-built activities must be closely correlated with as-planned activities
    - As-built data used must be accurate and validated.
    - Does not, by itself, identify the as-built critical path.
- MIP 3.1 Caveats in Using the Minimum Protocol
    - Not suitable for project durations extending into multiple dozens of update periods.

- Not suitable for projects built in a manner significantly different than planned. The rate of error increases as the incidence of change increases.
- Not suitable for complicated projects with multiple critical paths.
- Does not consider the possibility of critical path shits either within periods or across the project.
- Susceptible to unintentional or intentional manipulation by choice of as-built data that is incorporated into schedule.
- May fail to identify all critical delays or time extensions, and typically does not adequately consider concurrency and pacing issues.
- Does not consider that changes to original baseline schedule may have been the actual cause of delay instead of the identified delay issues.
- Not suited for clearly demonstrating acceleration.

75. With the designated as-built (termination) schedule differences from the re-baseline schedule, the defective logic, the erroneous actual dates, the missing activities, and the level of project complexity, MIP 3.1 is clearly not a suitable delay analysis method for this project.

76. As I will discuss later, not only do I not believe that a simple as-planned vs as-built analysis is inappropriate for analyzing delay on this Project, it is also my opinion that in performing such an analysis, Mr. Caruso failed to meet even the minimum protocol standards rendering his analysis inaccurate and unreliable.

**ii. MIP 3.3, Contemporaneous Windows Analysis**

77. While neither Mr. Caruso or I used an MIP 3.3 analysis, it is my opinion that given the Project complexity and its dynamic nature plus the added and changing activities, an

observational window analysis, such as MIP 3.3 would have been the preferred analysis method.

78. The RP explains that "MIP 3.3 is a retrospective technique that uses the project schedule updates to quantify the loss or gain of time along a logic path that was or became critical and identify the activities responsible for the critical delay or gain. Although this method is a retrospective technique, it relies on the forward-looking calculations made at the time the updates were prepared." (Exhibit P0003, MIP 3.3(A)) "MIP 3.3 is an observational technique since it does not involve the insertion or deletion of delays but instead is based on observing the behavior of the network from update to update and measuring schedule variances based on essentially unaltered, existing schedule logic." (Exhibit P0003, MIP 3.3(A)).

79. The RP requires validation of both the baseline schedule and the various update schedules per Protocols 2.1 and 2.3.

80. My performance of validation Protocols 2.1 and 2.3 identified significant, material deficiencies with the Re-Baseline Schedule as well as Layton's updates to that schedule and I determined that the schedules were inadequate for forensic analysis using the MIP 3.3 protocols.

**D. Implementation of MIP 3.7, Time Impact Analysis (TIA)**

81. The RP defines MIP 3.7 as:

> *"a modeled technique since it relies on a simulation of a scenario based on a CPM model. The simulation consists of the insertion or addition of activities representing delays or changes into a network analysis model representing a plan to determine the hypothetical*

*impact of those inserted activities to the network. Hence, it is an additive model.*

*MIP 3.7 is a multiple base method, distinguished from … a single base method. The additive simulation is performed on multiple network analysis models representing the plan, typically an update schedule, contemporaneous, or recreated. Each base model creates a period of analysis that confines the quantification of delay impact.*

*Because the updates typically reflect non-progress revisions, it is a dynamic logic method as opposed to a static logic method.*

*MIP 3.7 is a retrospective analysis since the existence of the multiple periods means the analyst has the benefit of hindsight."*

(Exhibit P0003, MIP 3.7)

82. The MIP 3.7 method involves the contemporaneous and prospective modeling of schedule changes (impact events such as added rework activities) that demonstrate how a project's disruptive events affect the critical path. The method uses the project's "unimpacted" update schedule nearest to the start of the impact event. The impact event is then modeled in a copy of this schedule creating the "Impact" schedule. The "Impact" is then compared to the "Un-Impacted" schedule. The duration (variance) between schedule completion dates of these two schedules quantifies the overall schedule impact. The MIP 3.7 method may also be referred to as a Time Impact Analysis, or TIA.

83. Mr. Caruso criticizes use of the MIP 3.7 model as a 'simulation', and 'theoretical', concluding that the MIP 3.7 model does not identify "actual delay" as required by the

parties Agreement. It is worth noting that, with the exception of the very last completely actualized project as-built schedule, it is always understood that the 'planned' portion of the work for every schedule baseline and every schedule update is a 'simulation' and 'theoretical'. Even in the as-planned vs. as-built analysis which Mr. Caruso performed, the method compares the asserted as-built to a 'simulation' and 'theoretical' as-planned. In MIP 3.7, the analyst utilizes the last update, which represents the Contractor's plan for the remaining work, and models the already known delay and minimally makes the required corrections retrospectively based on actual contemporaneous project documents. There is nothing theoretical about this.

**i. Implemented Protocols**

84. In performing my analysis, I relied on the MIP 3.7 recommended implementation protocols by:

- Recognizing all contract time extensions granted.
- Identifying and quantifying delays that were evaluated, including source documents on which they are based.
- Selecting the as-planned network to be utilized as the "un-impacted schedule". I utilized Layton's unmodified update schedules.
- Identifying the schedule updates, that correlated to the beginning of each analysis interval.
- Inserting an activity into the "un-impacted schedule" to represent the selected delay.
- Ensuring that the impact events are chronologically inserted into the proper updated schedules.
- Calculating the new schedule created using the "un-impacted schedule" with the fragnet or activity inserted.
- Zeroing out the durations of all activities in the added fragnet and verify that when calculated, there is no change to the completion date from the un-impacted schedule completion date.
- Ensuring that the resulting schedule has at least one continuous critical path, using the longest path criterion that starts on April 4, 2023 and ends at Substantial Completion,

- Tabulating each change made to an update schedule to create the impacted schedule.
- Using both the longest path and the least float criteria to identify the controlling chain of activities.
- Creating a new analysis period with each significant change in the critical path chain of activities.
- Correlating the impacted schedule with each available contemporaneous update, identifying hindsight for establishing remaining durations for the incomplete fragnet activities.
- Quantifying net delays and gains.
- Preparing a tabulation that summarizes the variances quantified for each analysis period.

**ii. Protocol 2.4, Selection of Delays for Analysis**

85. AACE 29R-03, Protocol 2.4, Identification and Quantification of Discrete Delay Events and Issues notes that "the approach of the [Protocol] is to maximize the reliable use of the source data as opposed to assuring the reliability or the accuracy of the substantive content of the source data. The best accuracy that an analyst can hope to achieve is an objective reflection of the facts as represented in documents, data and witness statements." (Exhibit P0003)

86. Consistent with the Protocol, I conducted a detailed review of the Project record, relying on contemporaneously prepared documentation, including reporting and observations by the Owner's consultant Cumming, correspondence between Layton and the Owner or the Owner's representatives and Layton's periodic schedule updates. I also interviewed several of the people who were on the Project and witnessed the events, including Erwin Watt, Mike Malarkey and Simon Wadsworth of Cumming, Peter Frahm of DDRM and Tedd Stately of Beck. And since submitting my report, I've had further opportunity to review the depositions of Layton's own personnel, including Preston Robertson, as well as Cumming personnel, Erwin Watt and Mike Malarkey, and DDRM's Marty Breen.

87. Another specific form of documentation that I reviewed were activity-level variance (ALV) reports which show the difference between a schedule activity date, duration, or float in one schedule compared to another schedule. For example, a comparison of Layton's July 21, 2023 vs June 19, 2023 schedule updates showed that Layton failed to start 91 activities of available work between July 21 and June 19.

88. Review of these activities shows that for example, Layton intended to start Exterior Wall Structure Finishes GL-25 P1 Exterior Wall Structure activities during the period between June 19, 2023 and July 21, 2023. Review of the ALV shows that in fact, Layton failed to start any of these activities during this time period. The ALV comparison in Figure 12 below shows these activities slipping 23 working days.

| Activity ID | Activity Name | OD | Start | Finish | BL1 Start | BL1 Finish | VS | VF |
|---|---|---|---|---|---|---|---|---|
| Exterior Wall Structure Finishes Updated 2022.08.22 | | | | | | | | |
| GL-25 Exterior Wall Structure | | | | | | | | |
| GL-25 P1 Exterior Wall Structure | | | | | | | | |
| A112410 | Mechanical Trim Exterior/Flashing | 2 | 11-Apr-23 A | 24-Jul-23 | 11-Apr-23 | 20-Jun-23 | 0 | -23 |
| A112360 | Install Drainage Mat | 1 | 25-Jul-23 | 25-Jul-23 | 21-Jun-23 | 21-Jun-23 | -23 | -23 |
| A112390 | Install Windows/Doors | 1 | 25-Jul-23 | 25-Jul-23 | 21-Jun-23 | 21-Jun-23 | -23 | -23 |
| A112430 | Knight Wall Installation | 1 | 25-Jul-23 | 25-Jul-23 | 21-Jun-23 | 21-Jun-23 | -23 | -23 |
| A112420 | Install Exterior Stone | 10 | 26-Jul-23 | 08-Aug-23 | 22-Jun-23 | 06-Jul-23 | -23 | -23 |
| A112460 | Install Exterior Wood Siding | 1 | 18-Aug-23 | 18-Aug-23 | 22-Jun-23 | 22-Jun-23 | -40 | -40 |
| A112480 | Install Balcony Stone Flooring | 5 | 21-Aug-23 | 25-Aug-23 | 23-Jun-23 | 29-Jun-23 | -40 | -40 |
| A112490 | Install Balcony Glass Railing | 5 | 28-Aug-23 | 01-Sep-23 | 30-Jun-23 | 07-Jul-23 | -40 | -40 |




*Figure 12 (Exhibit P3018)*

89. As the Protocol cautions, "It is important for an analyst to not prejudge criticality, nor limit the collection process to only those delays perceived to affect the critical path…" (Exhibit P0003, AACE 29R-03 at 35). With that in mind, and as the impacts relevant to the analysis period had already occurred, I identified and evaluated the start and finish dates of the various missing impacts, identified the concurrency of the various impacts, and modeled the two impacts which span the analysis period. As other Layton-caused impacts span at least the analysis period, concurrent with all the other delays, it was not necessary to

analyze them for this work scope. I note that my analysis left intact all of Layton's asserted Owner delays.

90. Alternatively, Mr. Caruso chose to merely review the impacts that LAYTON CHOSE to include in their schedule updates – almost exclusively related to RFIs and CCDs. Mr. Caruso's approach mirrored that of Layton's schedulers during the Project.

91. In addition to the various impacts that Layton chose to include in their monthly schedules, my review identified at least 26 Layton impacts and issues that I reference in my August 2025 report that may also contribute to additional delay if added and properly forecasted in Layton's update schedules. Based on my review of the factual record and discussions with Project personnel, chiefly including Erwin Watt, Mike Malarkey, and Marty Breen, I focused my review and analysis on Layton's replacement of as much as 80% of exterior Densglass and Layton's extended failure to pass a First Work in Place inspection for interior Plaster application.

92. Other significant issues that I observed and believe should be included in any full analysis of Project delay include:

- Armaflex Tape – Duct Tape
- Conditioned space for millwork
- Failed Tile FWIP
- Fireplace Coordination & None-Cert Labor Removing/Installing Flues
- Ongoing water intrusion and mold remediation
- Roofing Installation failures and ultimate replacement
- Elevator shaft design and construction
- Window Test Failures

### iii. Incorporation of Layton's Replacement of more than 80% of the exterior DensGlass into the Schedule

93. For purposes of my review and analysis, it was important for me to identify the following information regarding the DensGlass repairs:

- The date by which Layton knew or should have known about the need to replace significant amounts of the installed DensGlass
- The sequence and as-built dates associated with Layton's replacement of DensGlass in a manner consistent with the original DensGlass installation schedule activities
- The schedule activities directly impacted by DensGlass replacement
- Whether, and if so, to what extent Layton incorporated or accounted for the DensGlass replacement in their update Schedules

#### g. When Layton knew or should have known about the need to replace a significant amount of damaged DensGlass

94. Prior to Amendment 4, the independent third-party inspector, SafeBuilt, first raised concerns about the adequacy of winter protection in Safebuilt Observation Report #17 issued on or about 18 January 2023. (Exhibit P0168) The report detailed ice buildup against DensGlass that had yet to have any moisture barrier installed and noted that such conditions could cause damage to the DensGlass and recommended replacement of damaged areas and waterproofing. The report included, among others, the following observations:




Photo dated: 01/17/2023.

Area 2 level 1 (see snapshot 1)

**Observation:** ice may cause damage to the DensGlass, especially on edges or exposed areas without the yellow sheathing.

**Recommendations**: replace any damaged areas before covering with waterproofing.

| | |
|---|---|
|  | Photo dated: 01/17/2023.<br><br>See snapshot 3 for location.<br><br>**Observation**: DensGlass may be damaged from weather<br><br>**Recommendation:** Replace damaged DensGlass |




Photo dated: 01/17/2023.

See snapshot 3 for location.

**Observation**: DensGlass may be damaged from weather

**Recommendation:** Replace damaged DensGlass



Photo dated: 01/17/2023.

Area 2 level 2 (see snapshot 2for location)

**Observation**: DensGlass fill strip may have been damaged and covered with weatherproofing product.

**Recommendation**: remove and replace any areas that has damaged DensGlass and insure the area around the window opening is "flush" without defects or damaged DensGlass. The metal window shroud needs to be installed flush and true to the sheathing.

*Figure 13 (Exhibit P3019, excerpted from Exhibit P0168)*

95. Between January 18, 2023 and May 23, 2023, SafeBuilt issued at least four more observation reports highlighting the potential and later, actual damage to the installed DensGlass (SafeBuilt Reports 21, 23, 25 and 27 dated February 16, March 3, March 17 and April 13, 2023, Exhibits P0177, P1244, P2157 and P1249 respectively). Ultimately, on May 23, 2023, SafeBuilt issued a Stop Work Order:

> *Under the authority of the Building Official Nick Chand, it has been determined that the proper protocol for repair or replacement of damaged DensGlass has not been followed per code or recommendations of the manufacture … and It has been determined by the building inspector Richard Novasio that damage to DensGlass has been concealed without inspections …*

(Exhibit P0247)

96. Prior to receiving the Stop Work Order, Layton sought and on April 3, 2023, received advice from the DensGlass manufacturer regarding repair and replacement of weather damaged DensGlass. The manufacturer's advice stated that while they did not publish a repair guide, there were two standards they recommended to determine the proper repair method: GA-231 Assessing Water Damage to Gypsum Board and GA-225 Repair of Fire-Rated Gypsum Panel Product Systems. (Exhibit P0203). The manufacturer noted that GA-231 would "help assess if the sheathing can be repaired" and GA-225 "can help you determine the appropriate repair method." (The manufacturer also noted that "If there is doubt about the repair method or the physical condition of the sheathing, the sheathing should be replaced in the areas of concern." (Exhibit P0203).

97. GA-231, which the manufacturer recommended to help assess if the sheathing can be repaired, echoed the manufacturer's advice stating in all caps lettering: "IF THERE IS EVER DOUBT ABOUT WHETHER TO KEEP OR REPLACE GYPSUM BOARD THAT HAS BEEN EXPOSED TO WATER – REPLACE IT." (Exhibit P0206).

98. Based on the manufacturer's instructions and the notifications of damage and concerns from SafeBuilt throughout the winter, it is my opinion that Layton knew or should have known that it would have to replace significant portions of DensGlass by the time it signed Amendment 4 and before the Amendment 4 re-Baseline date of April 4, 2023. My analysis however, takes a more conservative approach giving all benefit of the doubt to Layton by using the date when SafeBuilt approved a replacement procedure (that included the sequence and as-built dates associated with Layton's replacement of DensGlass in a manner consistent with the original DensGlass installation schedule activities.

### h. The sequence and as-built dates associated with Layton's replacement of DensGlass in a manner consistent with the original DensGlass installation schedule activities

99. The Re-baseline schedule contains a series of activities associated with the original installation of the DensGlass sheathing:

| Activity ID | Activity Name | Orig Dur | Start | Finish |
|---|---|---|---|---|
| **GL-25 L1 Exterior Wall Structure** | | | | |
| A112500 | Frame Exterior Wall | 3 | 25-Jul-22 A | 27-Jul-22 A |
| A118970 | Start Exterior Wall Sequence | 0 | 25-Jul-22 A | |
| A112520 | Install Sheathing | 1 | 12-Sep-22 A | 21-Nov-22 A |
| A112530 | Install Liquid Flashing | 1 | 30-Nov-22 A | 02-Dec-22 A |
| A112540 | Install Air Barrier | 1 | 01-Dec-22 A | 02-Dec-22 A |
| A112580 | Install Windows/Doors | 1 | 13-Dec-22 A | 31-Jan-23 A |
| A112600 | Mechanical Trim Exterior/Flashing | 2 | 01-Mar-23 A | 06-Apr-23 |

*Figure 14 (Exhibit P3020)*

100. As the above excerpt (Figure 14) shows, the schedule divided Exterior Wall Structure, and the included activity for DensGlass installation, Install Sheathing, among various levels (in this case, L1) and by area (in this case, GL-25). The activities specific to installation of

DensGlass are also sequenced as follows: (1) Install Sheathing; (2) Install Liquid Flashing; (3) Install Air Barrier and (4) Install Windows/Doors. And as denoted by the actual Start and Finish dates (where a date is followed by the letter "A" for actual, as opposed to the planned start and finish dates), it is clear this is the sequence in which they performed the work.

**i. The successor schedule activities directly impacted by DensGlass replacement**

101. In interviews with Project personnel, other experts and review of Project documentation, I concluded that replacement of DensGlass not only required removal and replacement of the exterior sheathing, but it had a significant impact on interior work as well. Specifically, replacement of DensGlass from an exterior wall required Layton to (1) remove the damaged DensGlass, (2) remove any Drywall installed on the interior portion of the wall; and (3) remove the spray foam insulation between the two. Notably, the spray foam insulation was required to be applied from the interior onto the installed DensGlass which is why any previously installed drywall had to be removed prior to replacing the exterior DensGlass. If drywall had not yet been installed, it could not proceed with installation until after replacement. It also required the erection of scaffolding on the exterior of the building which impeded exterior site work.

102. Based on this review, I determined that the "second side drywall" activities within the various units were so impacted by DensGlass repair work that they could not finish until the associated DensGlass replacement finished.

**j. Whether, and if so, to what extent Layton incorporated or accounted for the DensGlass replacement in their update Schedules**

103. Layton included at least 1,686 activities modeling RFIs and CCDs throughout the project. By contrast, Layton used 32 activities to model RFI 1516, which included work per individual unit. Layton also used 36 activities to model CCD 483, which also included work per individual unit. Layton's extent of modeling self-inflicted failure and rework was limited to four activities associated with DensGlass replacement, which they incorporated into their June 26, 2023 submitted schedule update. (Exhibit P0311).

104. Modeling the entire DensGlass replacement with only four activities lacked the necessary level of detail to apply proper logic. Furthermore, the logic modeled for the four activities was defective, as it failed to account for the correct installation sequence. Moreover, the duration for each of the four activities modeled was very understated. Additionally, at least some of the actual dates progressing the activities were demonstrably wrong. The defective level of detail, logic, durations, and actual dates render Mr. Caruso's approach invalid and analysis erroneous.

105. For example, Figure 15 below illustrates how the planned logic (yellow bars) between the DensGlass and the Second Side Drywall for Unit 106 is missing.




*Figure 15 (Exhibit P3021)*

106. Figure 16 below demonstrates how the DensGlass was not complete until after November 29, 2023 despite the schedule reflecting that it was complete back in August 2023.




*Figure 16 (Exhibit F3022)*

107. Mr. Caruso's analysis is not only hampered by Layton's failure to properly account for the impacts in their schedule, but Mr. Caruso himself only focuses on the planned or yet to complete DensGlass replacement activities that remained in the March 11, 2024 update and stated that "MRI did not find that any Densglass activities were controlling Substantial Completion in Layton's March 11, 2024 Schedule Update." (Exhibit P2426 at 18).

108. Mr. Caruso's approach therefore failed to account for the effect the added DensGlass Replacement activities would have on the critical path between the Amendment No. 4 - April 4, 2023 Re-Baseline update through the March 11, 2024 update. As I will explain later, when DensGlass replacement activities are properly included within the analysis, the

DensGlass Replacement activities impact the critical path up to 105 CDs from the April 4, 2023 Re-Baseline schedule.

**k. Ibbs MIP 3.7 Analysis of DensGlass Replacement**

109. Based on the above review, I incorporated the required DensGlass Replacement scope of work into the Amendment No. 4 Re-Baseline Schedule. In so doing, the defects in Layton's incorporation of DensGlass rework into the schedule, and the manner in which Layton overstated RFI and CCD impacts within the schedule required certain adjustments to the schedule. I adjusted the following Layton schedules in order to model the missing DensGlass and Plaster Impacts.

- April 4, 2023 ReBaseline Schedule – I added a DensGlass impact activity due to missing DensGlass replacement work. The result of the adjustment was a 105 calendar day impact to the critical path.
- August 14, 2023 Update – I added a Plaster impact activity because Layton failed to contemporaneously account for plaster failures documented in various field reports. The result of the adjustment was a 59 calendar day delay to the critical path.
- January 8, 2024 Update – I modeled an additional Plaster impact cut off at the March 11, 2024 termination schedule to further account for ongoing plaster failures through April 2024. The result of the adjustment was a 21 calendar day delay to the critical path.

**iv. Incorporation of Layton's Plaster FWIP Inspection Failures into the Schedule**

110. Like the DensGlass impacts, I conducted a detailed review into the following issues as part of preparing an analysis of Layton's Plaster FWIP Inspection Failures:

- The date when Layton first failed the Plaster FWIP Inspection and when Layton ultimately passed the Plaster FWIP inspection allowing them to proceed with plaster installation activities.
- If and to what extent Layton accounted for the failed FWIP inspections in the schedule.

**a. Layton's Failed Plaster FWIP Inspections**

111. Layton's Amendment 4 Re-Baseline Schedule called for Layton to begin plaster application in the various units, starting with Unit 106 on May 22, 2023 and completing across all units on October 20, 2023. Layton's schedule includes the activity "Install Plaster" scheduled to follow predecessor activities, "Tape and Texture", "Prime and Paint" and "Millwork Layout". Layton's schedule did not include or account for a First Work in Place Inspection as a mandatory predecessor to installing plaster. But, Section 09 2523(1.04)(C) of the Project submittals specifically required Layton to perform such a mockup, and have it pass inspection prior to proceeding with plaster installation (Exhibit J0597 at 278-279).

112. Layton completed a plaster mock-up in Unit 106 and submitted for FWIP inspection on June 23, 2023. The Owner provided Layton with a formal report on July 11, 2023 identifying the various defects identified during the inspection and requiring Layton to prepare additional samples, complete additional mock-ups and submit for a second FWIP inspection (Exhibit P0320).

113. Layton submitted mockups in Unit 106 and Unit 108 for a second FWIP inspection on September 21, 2023 but again, the quality of the plaster application was unacceptable and was rejected. The formal report dated September 30, 2023 noted that "Per Specification Section 09 2523 Plaster Lime Finish 1.04B Quality Assurance – requires all installers to be Texston certified. LCC to arrange with Texston, Berg and Southwest to provide training

and documentation of certifications. LCC to arrange with SWP for a third plaster work in place, an additional coat of plaster can be applied over the prior work in place. Once 3d work in place is complete Texston (Ofer), SWP, LCC, DDRM and IBI/Arcadis to review." (Exhibit P2121).

114. The third FWIP inspection occurred on October 30, 2023. The formal report, issued on November 3, 2023, while noting that representatives from Layton's subcontractor, Berg as well as the plaster sub-subcontractor, Southwest did not attend, approved the mock-ups in 106 and 108 albeit with certain exceptions (Exhibit P0597).

115. Ultimately, Layton commenced plaster installation in Unit 106 on or about December 6, 2023 (Exhibit P1124) although they did not complete the work in Unit 106 until February 16, 2024 (Exhibit P0841), and at the time of termination, had not completed any further units.

**b. If and to what extent Layton included the failed FWIP inspections in their schedule updates.**

116. Layton's Amendment 4 Re-Baseline included the following interior sequence immediately relevant to installing plaster within each unit as demonstrated in Figure 17 below:

| | | | | | |
|---|---|---|---|---|---|
| A98160 | One Side Drywall Unit 106 | 5 | 18-Apr-23 | 24-Apr-23 | 0 |
| A98170 | Wall Insulation Unit 106 | 2 | 25-Apr-23 | 26-Apr-23 | 0 |
| A98190 | Second Side Drywall Unit 106 | 5 | 27-Apr-23 | 03-May-23 | 0 |
| A98200 | Tape & Texture Unit 106 | 6 | 04-May-23 | 11-May-23 | 0 |
| A109710 | Prime & Paint Unit 106 | 5 | 12-May-23 | 18-May-23 | 0 |
| A121380 | Millwork Layout Unit 106 | 1 | 19-May-23 | 19-May-23 | 0 |
| A98210 | Install Plaster Unit 106 | 5 | 22-May-23 | 26-May-23 | 0 |
| A98220 | Install Ceiling Millwork Unit 106 | 7 | 30-May-23 | 07-Jun-23 | 0 |

*Figure 17 (Exhibit P3023, derived from Amendment 4 Re-Baseline Schedule, Exhibit J0011 at 7-189)*

117. Layton's schedule included a single, 5-day activity for "Install Plaster" in each unit, with Tape & Texture, Prime & Paint and Millwork Layout as predecessor activities.

118. Layton's schedule assumed two plaster crews starting in Unit 106 (Crew 1) on 6 June 2023 and Unit 205 (Crew 2) on 31 May 2023. Plaster sequencing and start dates for the two crews were planned to proceed (for just the first two levels) as in Figure 18 below:

| Crew 1 | "Install Plaster" | | Crew 2 | "Install Plaster" | |
|---|---|---|---|---|---|
| **Unit** | **Start** | **Finish** | **Unit** | **Start** | **Finish** |
| **106** | 22-May-23 | 26-May-23 | **205** | 31-May-23 | 6-Jun-23 |
| **107** | 26-May-23 | 2-Jun-23 | **206** | 8-Jun-23 | 14-Jun-23 |
| **108** | 6-Jun-23 | 12-Jun-23 | **207** | 16-Jun-23 | 22-Jun-23 |
| **109** | 19-Jun-23 | 23-Jun-23 | **204** | 26-Jun-23 | 30-Jun-23 |
| **104** | 30-Jun-23 | 7-Jul-23 | **203** | 5-Jul-23 | 11-Jul-23 |
| **105** | 11-Jul | 17-Jul-23 | | | |
| **103** | 19-Jul-23 | 25-Jul-23 | | | |

*Figure 18 (Exhibit P3024 derived from Amendment 4 Re-Baseline Schedule, Exhibit J0011 at 7-189)*

119. The schedule accounted for this sequence by including "Install Plaster" for the following unit as a successor to the previous unit. So, Install Plaster Unit 106 was linked Finish to Start with Install Plaster Unit 107 and so forth. The schedule also identified "Install Ceiling Millwork" as a successor activity to the plaster installation.

120. Layton's Amendment 4 Re-Baseline did not include activities associated with FWIP inspections.

121. Beginning with Layton's July 21, 2023 schedule update (Exhibit P0347), Layton incorporated a series of activities that Layton contends as representative of the FWIP failure the previous month:

| Plaster FWIP (PROJECT IMPACT) | | | | | |
|---|---|---|---|---|---|
| A207340 | Plaster FWIP Report Issued to LCC Requesting New Samples from Berg | 5 | 23-Jun-23 A | 11-Jul-23 A | |
| A207330 | Plaster FWIP Conducted | 1 | 23-Jun-23 A | 23-Jun-23 A | |
| A207350 | Plaster New Samples Recieved from DDRM | 5 | 13-Jul-23 A | 13-Jul-23 A | |
| A207360 | Plaster Produce New Samples to Ship to LCC | 15 | 14-Jul-23 A | 10-Aug-23 | -98 |
| A207370 | Plaster LCC Receives New Samples from Berg | 22 | 14-Jul-23 A | 14-Aug-23 | -100 |
| A207380 | Plaster Processing and Shipping Samples to Send to IBI | 2 | 15-Aug-23 | 16-Aug-23 | -100 |
| A207390 | Plaster IBI Recieves and Begins Review of Plaster Samples | 1 | 17-Aug-23 | 17-Aug-23 | -100 |
| A207400 | Plaster IBI Review/Present to Ownership/Send Response | 15 | 18-Aug-23 | 08-Sep-23 | -100 |
| A207410 | Plaster Provide Response to Berg | 1 | 11-Sep-23 | 11-Sep-23 | -100 |
| A207420 | Plaster Berg Mobilize | 10 | 12-Sep-23 | 25-Sep-23 | -100 |
| A207430 | Plaster Updated FWIP Conducted | 10 | 26-Sep-23 | 09-Oct-23 | -100 |
| A207440 | Plaster Begin Installation on Project | 0 | 10-Oct-23 | | -100 |

*Figure 19 (Exhibit P3025, derived from Layton July 21, 2023 schedule update, Exhibit P0347)*

122. Layton linked Plaster Begin Installation (forecasted to occur on 10 October 2023) to both Crew 1 and Crew 2 "Install Plaster" activities, forecasting that plaster installation could proceed by 10 October 2023. By this time, Layton had also altered the Crew sequences for the first two floors, with forecast start and finish dates as follows:

| Crew 1 | "Install Plaster" | | | | Crew 2 | "Install Plaster" | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Re-Baseline | | 21-Jul-23 | | | Re-Baseline | | 21-Jul-23 | |
| Unit | Start | Finish | Start | Finish | Unit | Start | Finish | Start | Finish |
| 106 | 22-May-23 | 26-May-23 | 10-Oct-23 | 16-Oct-23 | 205 | 31-May-23 | 6-Jun-23 | 10-Oct-23 | 16-Oct-23 |
| 108 | 26-May-23 | 2-Jun-23 | 17-Oct-23 | 23-Oct-23 | 206 | 8-Jun-23 | 14-Jun-23 | 17-Oct-23 | 23-Oct-23 |
| 107 | 26-May-23 | 2-Jun-23 | 24-Oct-23 | 30-Oct-23 | 207 | 16-Jun-23 | 22-Jun-23 | 24-Oct-23 | 30-Oct-23 |
| 109 | 19-Jun-23 | 23-Jun-23 | 31-Oct-23 | 6-Nov-23 | 204 | 26-Jun-23 | 30-Jun-23 | 31-Oct-23 | 6-Nov-23 |
| 104 | 30-Jun-23 | 7-Jul-23 | 7-Nov-23 | 13-Nov-23 | 203 | 5-Jul-23 | 11-Jul-23 | 7-Nov-23 | 13-Nov-23 |
| 105 | 11-Jul | 17-Jul-23 | 14-Nov-23 | 20-Nov-23 | | | | | |
| 103 | 19-Jul-23 | 25-Jul-23 | 21-Nov-23 | 29-Nov-23 | | | | | |

*Figure 20 (Exhibit P3026)*

123. Layton's July 2023 schedule (with the above sequences included) showed that even assuming that Layton could pass the FWIP in time for plaster installation to start on October 10, 2023, the failed FWIP inspection was the "current longest path" with -100 workdays of float (and responsible for -143 calendar days of critical path delay). At the time, the same schedule showed Unit 205 FCU as an additional critical path with -73 workdays of float (Exhibit P0347).

124. Layton's August 2023 update showed that Unit 205 FCU overtook impacts associated with the failed plaster installation (Exhibit P2209). The August 28, 2023 schedule showed that Unit 205 FCU impacts were driving -112 days of negative float across a path of activities that included Tape & Texture, Prime & Paint, Millwork Layout and Install Plaster for Unit 205 (Exhibit P2209). Meanwhile, Layton's schedule also showed that Install Plaster Unit 106 (the previous months' longest path) had -81 days of total float, although the impact activities (representing the need for a second FWIP) showed a positive 129 days of total float (Exhibit P2209).

125. Cumming's review of Layton's August 28, 2023 schedule stated the following:

> *"Logically plaster installation cannot start until the First Work in Place (FWIP) is approved. The Current Schedule has the FWIP being approved on October 20, 2023 with the start of plaster installation beginning on September 13, 2023. The Current Schedule deleted this logic tie resulting in an earlier start to plaster installation and incorrect float."*

(Exhibit P1081)

126. Cumming also identified that Layton had incorporated the Unit 205 FCU impacts into the schedule by linking them as a finish to start predecessor to second side drywall (itself a predecessor to Install Plater) (Exhibit P1081). Layton's use of a finish to start link with second side drywall, followed by further finish to start links with tape and texture, prime and paint, and ultimately install plaster severely overstated the impact of the Unit 205 FCU changes. It is my understanding, based on interviews with project personnel and expected testimony, that it is more appropriate to link Unit 205 FCU changes as a finish to finish

link with second side drywall. It is also my understanding that because the drywall activities impacted by the Unit 205 FCU changes were in an area that did not receive plaster (they were just taped, primed and painted), they had no impact on Layton's ability to proceed with tape and texture, prime and paint or installation of plaster in Unit 205.

127. As part of my review, I have confirmed that Layton's mistaken logic ties not only overstated Unit 205 FCU impacts but also masked the impact of their failure to pass the plaster FWIP inspection. Correction of these defects, as identified by Cumming, caused L1 Interior Finishes - L1 Interior Finishes Unit 106 (CREW 1) activity A98210 - Install Plaster Unit 106 to shift back to the critical path.

128. While Layton appears to have corrected the missing logic tie between plaster FWIP and Install Plaster Unit 106 in its subsequent schedule updates, it refused to correct the overstated impacts associated with the Unit 205 FCU. The failure to correct the logic ties associated with Unit 205 FCU changes not only impacted Layton's subsequent schedule updates, but are also apparent within Mr. Caruso's as-planned vs as-built analysis where he merely accepted the logic as set forth by Layton as correct without any apparent independent assessment or validation.

129. It is my opinion that these scheduling deficiencies are so significant as to undermine Mr. Caruso's analysis and to render it inaccurate and unreliable.

**c. Ibbs incorporation of Layton's delays to Plater Installation**

130. My analysis for this period demonstrated Layton's deficient Plaster work delays. The prospective duration for the analysis was based on the as-built data observed on the March 11, 2024 update of L1 Interior Finishes Unit 108 (CREW 1) activity A98650 – Install

Plaster Unit 108. Layton's August 14, 2023 schedule update showed Install Plaster Unit 106 and 108 in a FS relationship, as highlighted in Figure 21 below:




*Figure 21 (Exhibit P3027)*

131. Layton's March 11, 2024 schedule update shows Install Plaster Unit 106 and 108 in a SS relationship, as highlighted in Figure 22 below:




*Figure 22 (Exhibit P3028)*

132. I decided to conservatively impact Unit 108 in the IBBS Modeled Layton Delay #2 - Layton's Plaster FWIP Impacts - 59 CDs. I impacted Unit 108 prospectively from August 14, 2023. Arcadis's Site Report No. 15, dated April 17, 2024 (Exhibit P1328) showed that Units 106 and 108 had plaster failures through the following:

- Unit 106 – Plaster failures through 4/17/24.
- Unit 108 – Plaster failures through 4/2/24.

133. I therefore decided to model the impact to Unit 108 since Layton's March 11, 2024 termination schedule showed Unit 108 still in progress. I conservatively selected the cutoff date for the IBBS Modeled Layton Delay #2 analysis to January 15, 2024, which is Layton's actual start date for Activity A98650 Install Plaster Unit 108. I could also have

impacted Activity A98210 Install Plaster Unit 106 first, ignored its inaccurate finish date of February 16, 2024, and modeled a larger impact out to March 11, 2024.

134. The start of Activity A98650 – Install Plaster Unit 108 was delayed from a planned start of June 6, 2023 to an actual start date of January 15, 2024 and was still in progress during Layton's March 11, 2024 Termination schedule. In this sense my analysis is understated in only impacting Unit 108 out to the March 11, 2024 cutoff date. In addition, The ARCADIS Field report dated April 4, 2024 supports my analysis by showing the current status of Unit 108 Plaster on April 2, 2024 with several areas marked "Redo" and "Repair".

135. As mentioned above, the activities leading to Plaster FWIP sequence were not introduced until the July 2023 update (Exhibit P0347). By that time, the schedule showed that the first Plaster installation activity would not start until October, 2023, and the later schedules report that the first Plaster activity did not start until December, 2023. As a conservative approach in modeling the Plaster activities using the May, 2023 schedule update (Exhibit P0249), where the Plaster FWIP activities had not yet been modeled, I applied a place-holder Finish to Start Relationship between P1 Interior Finishes Overall G18-G25 activity A70210 - Venetian Plaster and activity A98210 - Install Plaster Unit 106. The place-holder activity does not impact the analysis or the result.

136. I also made a necessary logic change scheduling activity A100480 – Second Side Drywall Unit 205 to a Finish-to-Start to a Finish-to-Finish Relationship with its predecessor activity A200390 – CCD 438 Rework, as Cumming observed the Unit 205 FCU and Second Side Drywall Unit 205 being performed concurrently during a site walk on 9/17/23 (Exhibit P1081).

137. The result, when the logic was corrected, was that L1 Interior Finishes - L1 Interior Finishes Unit 106 (CREW 1) activity A98210 - Install Plaster Unit 106 appeared on the critical path.

138. I also confirmed that even without the modeling of the DensGlass Impacts through August 10, 2023, the normalization shows the plaster activities would be controlling and on the critical path from May 22, 2023 forward. Additionally, as I've already described, Layton's initial plaster FWIP failure occurred on June 30, 2023 ultimately delaying the start of plaster work in the units until December 6, 2023. Project records also show that Layton's problems with plaster installation continued to impact the project and ensure that Layton's plaster problems remained on the critical path through March 11, 2024.

### E. Schedule Results and Opinions

#### i. Schedule Delay Analysis

139. My analysis of the Project schedules, and the impacts caused by DensGlass replacement and the failed plaster FWIP inspections, showed that out of the total 295 calendar days of delay that occurred between the April 4, 2023 re-baseline schedule and the March 11, 2024 schedule update, the DensGlass and Plaster FWIP events caused 185 days of critical path delay, pushing the project's date for substantial completion from April 30, 2024 to November 1, 2024. The remaining 110 days of delay were likely the result of other of Layton's self-inflicted issues (such as the Failed Tile FWIP, window test failures, elevator shaft design and construction defects) as well as impacts due to Owner directed change (RFIs and CCDs).

140. I also observed that there were an additional 13 calendar days of Layton-caused critical path delay not related to CCDs or RFIs between the April 4, 2023 re-baseline schedule and

the May 8, 2023 schedule update. Mr. Caruso acknowledges 11 calendar days of delay during this same time period.

**a. Layton's replacement of 80% of exterior DensGlass**

141. My analysis demonstrates that Layton's failure to adequately protect exterior DensGlass during the 2022-2023 winter and the resulting requirement to replace over 80% of the already installed materials caused 105 calendar days of delay to substantial completion between the Amendment 4 re-baseline and Layton's August 7, 2023 schedule update.

142. The following schedule summaries, excerpted from my MIP 3.7 analysis and included within Appendix C to my August 15, 2023 report.







*Figure 23 (MIP 3.7 – Delay #1 – Layton's Replacement of DensGlass Sheathing Impacts – 105 CDs, Exhibit P3029, excerpted from Exhibit P1228 at 200)*

143. The following timeline depicts significant events related to the DensGlass delay:

*Figure 24 (Exhibit P3030)*

**b. Layton's failed plaster FWIP inspections**

144. My analysis demonstrates that Layton's plaster installation failed repeatedly and had to be replaced. The plaster failures continued beyond the termination date of March 11, 2024. This resulted in 80 calendar days of delay to the substantial completion from October 8, 2024 to February 6, 2025.

145. The following schedule summaries, excerpted from my MIP 3.7 analysis and included within Appendix C to my August 15, 2023 report.



| Activity ID | Activity Name | OD | Start | Finish | BS | BF | VF |
|---|---|---|---|---|---|---|---|
| MIP 3.7 - Delay #2 - Laytons Failed Plaster FWIP - Critical Path - 59 CDs | | | | | | | |
| Executive Summary | | | | | | | |
| IBBS Modeled Layton's Impacts & Delays | | | | | | | |
| Layton's Failed Plaster FWIP | | | | | | | |
| A209950 | IMPACT - Layton's Failed Plaster FWIP | 5 | 30-Jun-23 A | 15-Jan-24 | | | |
| Milestones | | | | | | | |
| Contract Milestones | | | | | | | |
| A1070 | Substantial Completion | 0 | | 05-Dec-24* | | 08-Oct-24 | -59 |
| A69990 | Final Completion | 0 | | 21-Feb-25 | | 18-Dec-24 | -41 |
| Durations | | | | | | | |
| A72620 | Project Duration | 998 | 01-Jun-21 A | 05-Dec-24 | 01-Jun-21 | 07-Oct-24 | -59 |
| A208490 | Interior Unit Finishes Duration | 5 | 13-Jul-22 A | 15-Oct-24 | 13-Jul-22 | 01-Aug-24 | -52 |
| A208520 | Commissioing Duration | 5 | 05-Sep-22 A | 18-Nov-24 | 05-Sep-22 | 05-Sep-24 | -52 |
| OWNER HAMMOCK SCHEDULE | | | | | | | |
| Construction | | | | | | | |
| Interior Finishes | | | | | | | |
| L1 Interior Finishes | | | | | | | |
| L1 Units | | | | | | | |
| L1 Interior Finishes Unit 108 (CREW 1) | | | | | | | |
| A98650 | Install Plaster Unit 108 | 5 | 16-Jan-24 | 22-Jan-24 | 17-Oct-23 | 23-Oct-23 | -57 |
| A98660 | Install Ceiling Millwork Unit 108 | 7 | 26-Jan-24 | 05-Feb-24 | 27-Oct-23 | 06-Nov-23 | -57 |
| A98670 | Install Tile and Stone Unit 108 (CREW A) | 10 | 01-Feb-24 | 14-Feb-24 | 09-Nov-23 | 22-Nov-23 | -52 |
| L1 Interior Finishes Unit 107 (CREW 1) | | | | | | | |
| A97770 | Install Plaster Unit 107 | 5 | 23-Jan-24 | 29-Jan-24 | 24-Oct-23 | 30-Oct-23 | -57 |
| A97780 | Install Ceiling Millwork Unit 107 | 7 | 25-Jan-24 | 02-Feb-24 | 26-Oct-23 | 03-Nov-23 | -57 |
| A97790 | Install Tile and Stone Unit 107 (CREW B) | 10 | 01-Feb-24 | 14-Feb-24 | 09-Nov-23 | 22-Nov-23 | -52 |



*Figure 25 (MIP 3.7 – Delay #2 – Layton's Failed Plaster Work & Rework – 59 CDs, Exhibit P3031, excerpted from Exhibit P1228 at 203)*




*Figure 26 (MIP 3.7 – Delay #3 – Layton's Failed Plaster FWIP Continued – Critical Path – 21 CDs, Exhibit P3032, excerpted from Exhibit P1228 at 206)*

146. The following timeline depicts significant events related to the plaster failure delays:




*Figure 27 (Exhibit P3033)*

**c. Layton's other impacts**

147. The detailed MIP 3.7 portion of my analysis was limited to impacts caused by Layton's replacement of exterior DensGlass and failed FWIP plaster inspections. As I previously discussed, my review of the contemporaneous record also identified numerous other impacts that I have not incorporated into the analysis, including:

- Armaflex Tape – Duct Tape
- Conditioned space for millwork
- Failed Tile FWIP
- Fireplace Coordination & None-Cert Labor Removing/Installing Flues
- Ongoing water intrusion and mold remediation
- Roofing Installation failures and ultimate replacement
- Elevator shaft design and construction
- Window Test Failures

148. In addition to the above items, and as I discussed previously, while Layton started plaster installation on December 6, 2023, the record is clear that Layton was not progressing plaster installation in a productive manner at any time prior to their termination.

149. It is my opinion that Layton's contemporaneous schedule updates failed to include or failed to accurately account for most, if not all of these 'other impacts'. Compounding the failure, while excluding virtually all of their own impacts to the works, Layton chose to incorporate virtually all RFIs and CCDs. This imbalance caused the RFIs and CCDs impact on the work to be overstated and exaggerated. These failures rendered Layton's schedules inaccurate and unreliable both with respect to forecasting completion of future works, as well as presenting accurate as-built and impacted works.

150. Incorporation of just the DensGlass and FWIP Plaster inspections resulted in a significant shift in the critical path, and it is my opinion that incorporation of other significant impacts like those discussed above, would almost certainly result in allocation of still further critical path delay to impacts for which Layton is responsible.

151. Just as Layton's failure to incorporate their own impacts to the Project damaged the credibility of their schedules, Mr. Caruso's reliance on these schedules without any verification and merely assuming their accuracy renders his related findings and opinions equally without credibility.

**ii. Layton's manipulation of its schedules to suppress self-impacted issues and over-reporting progress**

152. As I've already discussed, Layton's project schedules, including the Amendment No. 4 Re-baseline and periodic updates, failed the prerequisite validation protocols for an industry standard observational analysis. But as part of my validation and subsequent review of the schedules I also discovered that throughout the Project, Layton systematically manipulated its schedules to suppress self-inflicted issues and impacts while embellishing CCDs and Owner responses. In addition to Layton's failure to start available work, they also underreported or misreported schedule impacts and omitted non-conforming and rework activities from schedules.

153. Layton's schedule manipulations undermined the reliability and accuracy of the submitted schedules and hindered proper project planning and recovery. Examples of Layton's schedule manipulations to direct the projects critical path away from Layton's self-inflicted rework issues to RFIs and CCDs include the following:

**a.** Missing DensGlass Replacement activities.

**b.** Missing rework activities for up to 27 documented Layton impacts.

**c.** Missing Plaster procurement activities.

**d.** Incorrect logic relationships between DensGlass Replacement and 2nd Side Drywall

**e.** Incorrect DensGlass Replacement As-Built Dates.

154. Layton eventually included 4 activities to model the DensGlass replacement workscope. By contrast, Layton included 1,686 CCD and RFI-related activities in the schedule but included only four DensGlass replacement activities in the schedule.

155. Mr. Caruso has tried to minimize this clear scheduling bias by incorrectly arguing that there was no reason to include them since they wouldn't have impacted the critical path.

156. Activities that may have possible effect on the schedule time or resources, whether they are on the critical path or not, should be appropriately modeled in the progress schedule updates. A schedule is unusable unless it is reasonably accurate and properly updated and maintained. This includes adding and properly modeling the necessary time and resource-consuming activities, no matter the outcome.

157. A schedule should be updated in good faith and without bias in order for the project to properly forecast, plan, and manage the work. Layton's refusal to add and properly model self-inflicted rework or nonconformance activities in the schedule masked Layton's delays and hindered the project's ability to perform proper time and resource planning, which caused delays.

158. Mr. Caruso's initial report indicated that he "concurs that professional judgment must be used to determine the magnitude of the deficiency and inclusion into the Schedule." (Exhibit P2426 at 21). There was a numerous amount of non-conforming activities

documented by the Owner. Similar to CCDs/RFIs, not every non-conformance issue raised will influence time or resources. However, no nonconforming work remediation activities were added to the project schedule by Layton.

159. Mr. Caruso's report also indicated that "Cumming appears to be criticizing Layton's professional judgments as those judgments pertain to the identification and inclusion of non-conforming work into the schedule. It is unclear which of the alleged non-conformances Cumming believes would have controlled the forecasted Longest Path in any Schedule Update." (Exhibit P2426 at 21).

160. The Contractor is required to include and properly model activities which consume time and resources, independent of issue/delay responsibility, and independent of whether the Contractor believes the activity would be a critical path activity or not.

161. This is similar to how Layton included hundreds of CCDs and RFIs but not all of them fell on the critical path. The schedule updates, as they are progressed, will show the critical path through the critical path method calculation. Activities which remain unprogressed may eventually become critical, even though they may not have been critical when first modeled.

162. Mr. Caruso's report also indicated that "[i]t is uncontested that the Project was behind schedule as of the date of Termination, and as with all complicated construction projects, no single entity is typically responsible for all of the delay. Design Changes, Acts of God, Third Party non-performance and Contractor delays may all contribute to a delay in the forecasted date of Substantial Completion." (Exhibit P2426 at 22). I completely agree with this assessment. Mr. Caruso, however, did not analyze or opine on the Contractor-caused

delays or nonconformance work that Layton failed to include to accurately model the schedule contemporaneously.

163. The Owner requested Layton to accurately model and maintain the schedule numerous times by appropriately including all activities that may impact the Project schedule. Layton constantly failed to properly model the schedule and thus did not meet its obligation to maintain the schedule accurately. Layton's failure in this schedule obligation renders the schedule inaccurate and unusable.

164. Upon reviewing Cumming's CCD logs, I observed that out of the 462 CCDs issued between Amendment 4 and Layton's Termination:

- 270 CCDs were issued due to Owner, scope changes, or drawings alignment; of which 19 CCDs were for deletion of scope.
- 121 CCDs were issued for clarifications.
- 13 CCDs were issued due to Buyer scope change.
- 57 CCDs were issued due to Layton request, Layton field changes, or Layton field coordination; of which 25 CCDs were by reason of non-conforming work.

165. Out of the 462 CCDs issued, 273 CCDs do not have cost or have a credit due (for reasons of a deleted or reduced scope). Over half of the CCDs were clarifications or Contractor requests that have no monetary impacts on the Contract. Layton and its experts consistently cite all the CCDs and RFIs in totality as the reason why the Project is delayed and that Owner is fully responsible.

166. Yet Layton refuses to recognize and take responsibility for its own deficiencies, mistakes. The project suffered greatly as a result of this schedule deficiencies and attempt to shift all blame to the owner. The lack of a practical, usable schedule greatly diminished the Project

Team's ability to properly plan, coordinate, and manage time, workforce, materials, and resources.

**iii. Layton's failure to properly model scope of work activities, logic, durations and actual dates in the schedule updates despite the Owner's repeated requests and directions**

167. Throughout the Project, the Owner's consultant Cumming performed detailed reviews of the Layton schedules. These reviews focused on a comparison of the information detailed in the schedules against real-time site observations documented by photographic evidence and contemporaneous observation reports.

168. Mr. Caruso criticizes Cumming's work on the Project for not providing "any type of independent Critical Path Schedule Delay Analysis, or allocation of Project Delays." (Exhibit P2426 at 22).

169. Observationally recognizing and documenting the magnitude of the omissions in Layton's schedules did not require an Independent Critical Path Schedule Analysis. The schedule reviews memorialize an observational analysis, which is an industry-accepted and -preferred practice, of the Layton update schedules by Cumming.

170. Mr. Caruso's criticism however, ignores the fact that it was not the Owner (or its consultants) responsibility to perform scheduling on the Project. To the contrary, the Agreements make clear that development and maintenance of the critical path schedule was Layton's obligation. And, to the extent that Layton believed themselves entitled to additional time, it was likewise Layton's obligation to demonstrate such entitlement with their own critical path analysis.

171. This approach is not only mandated by the Agreements but is consistent with industry practice. Mr. Caruso's arguments to the contrary, that the Owner is in some manner

obligated to perform its own independent delay analysis is not only inconsistent with the Agreements, but is not industry practice.

172. Cody Lane and Cumming review observations and criticisms are consistent with my own observations of Layton's schedules between April 4, 2023 and March 11, 2024. These observations and criticisms include:

- Layton's over-stated and misrepresented Owner Impacts.
- Layton's unsupported delay in completing CCD scope of work resulting in bloated durations.
- Layton's missed logic or misrepresentation of critical drivers from non-conformance to scope work resulting in incorrect longest path and critical paths.

173. I additionally observed other scheduling deficiencies in Layton's Amendment No. 4 schedule updates that compromised the integrity of their schedules. The errors included open-ended activities and dangling activities. Open-ended activities are activities without either predecessor logic, successor logic, or both. Depending on the open-ended activities, remedying the missing logic may show the real critical path to be different and may also expose a later completion date. Dangling activities are activities where predecessor and successor logic does not constrain the start date or the end date of an activity, which renders the activity functionally as an open-ended activity. A comprehensive analysis of each open-ended and dangling activity would be necessary to remedy each, before the schedule can be deemed reliable for forensic analysis. Mr. Caruso failed to do so. Failure to rectify these deficiencies jeopardizes any forensic analysis.

174. Layton's update schedule with a data date of April 27, 2023, contained seven open-ended activities. As an example, activity A141210 - Electrical Underground Rough Area 2 is an

open-ended activity with no successor activities. As modeled, this activity can finish anytime up to the end of the Project without any work depending on it completing first. Adding the missing logic would alter the schedule float paths and may change the critical path. Another example is activity A148340 - Acoustic Wrap Unit103 [sic] which is also an open-ended activity with no predecessor activities. As modeled, this activity can start as early as the start date of the Project without the need for any other work to be completed first. Adding the missing logic would alter the schedule float paths and may change the critical path.

175. Layton's termination schedule of March 11, 2024, contained a total of 343 dangling activities. As an example, activity A104810 - Electrical Lower Ceiling Rough Unit 401 is a dangling finish activity which says that this activity can finish anytime up to the end of the Project. This activity as modeled with a dangling finish is already delayed by 292 calendar days (total float = -292) and is a critical activity. Correcting this error would likely lead to increasing this delay and delay the Project completion even further. Another example is activity A107390 - Mechanical In Wall Unit 502 which is also a dangling finish activity, meaning that this activity too can finish anytime up to the end of the Project. This activity as modeled with a dangling finish is already delayed by 249 calendar days (total float = -249). Correcting this error would likely lead to at least increasing this delay and may also change the critical path.

176. Layton's update schedules show the Construction - L2 Interior Finishes Unit 205 (CREW 2) - CCD 438 Unit 205/305 FCU Room Relocation activities driving the critical path between the May 22, 2023 and October 2, 2023 updates. The Cumming reviews call this

work "the Unit 205 Fan Coil Unit red herring" and points-out that the 205 fan coil unit should not be forced on the critical path of the project for the following reasons:

- "Layton has made little or no attempts to mitigate these potential impacts by sequencing or comeback." (Exhibit P0575 at 3). Mitigation of such delays is mandated by the "time is of the essence" contract clause. (A201 § 8.2.1, Exhibit J0005 at 28).
- "The untimely ordering of the Mechanical equipment related to the CCD 438, and as of current 9/27/23 this equipment is still not delivered for install." (Exhibit P0575 at 3).
- "We agree that Layton is using CCD 438 as the reason for not progressing the work through the full project due to crew ties." (Exhibit P0575 at 5).

177. It was Layton's responsibility to incorporate, model and analyze all their changes to the schedule (not just the ones that they believed were the Owner's responsibility). Layton's schedules should contain accurate and complete information. If Cumming and Cody Lane's contemporaneous comments were promptly addressed and implemented, the schedule updates would have become the important planning tool that Layton missed.

## IV. Layton's Failure to take Corrective Measures and to Issue recovery Schedules

178. Throughout the period between April 4, 2023 and March 11, 2024, the Owner demanded that Layton provide a recovery schedule citing A201 §3.10.5 (Exhibit J0005 at 19). Layton however, refused to comply with the Owner's request.

179. In apparent support for Layton's refusal, Mr. Caruso argues that "It is not possible to create a Recovery Schedule or progress an agreed upon planned Recovery Period where there are continuous changes and additions to the Work." (Exhibit P2426 at 42). Mr. Caruso indicates

that because the Owner issued CCDs throughout the period, it was not possible for Layton to create a recovery schedule.

180. I have not seen any indication that Layton themselves took this position during the Project. Even if the alleged reason was true, the same reasoning would then apply Layton's constant self-inflicted non-conformance work and rework throughout the project as well. The reasoning is not true for either though. A recovery schedule can always be created by "metaphorically freezing the project" and using a specific data date to include changes, impacts, rework, nonconformance and delay activities, provided that all issues and delays are modeled and not just some of them. Even though the project is actually continuing to be constructed, this "freeze view" can allow the parties to assess the project's condition for one instant in time, which is better for the parties than having no recovery schedule whatsoever in place to review.

181. Subsequent issues, as they arise, can always be modeled and progressed to provide the project with a workable schedule. Layton's refusal to provide recovery schedules or accurately model the progress schedule caused irreparable harm to its ability to properly manage this project, incorporate changes, and mitigate delays. The overall lack of schedule control, deficient project control, and poor change management is not consistent with the level of experience and expertise Layton now boasts in their in-project expert resumes.

## V. Layton's Failure to Furnish at all Times an Adequate Supply of Workers and Materials

### A. Layton's failure to properly and accurately update the schedule severely hampered the Team's ability to properly plan and make decisions such as resources and field craft labor

182. Scheduling failures like Layton's can have broad ripple effects across a project and can impact the progression of work. This appears to be the case here. As mentioned earlier,

Layton modeled the schedule plaster installation to reflect the two crews they intended to utilize. Layton's failure to model the plaster failures and required replacement work resulted in their inability to properly plan for and prepare the required crews and other resources to perform the work.

### B. Layton materially failed to meet its contractual obligations in management of personnel and workforce staffing, work progress and industry standard workmanship

183. I investigated various documents and reports and found no evidence that Layton's workforce was idle and unable to perform work. On the contrary, reviewing the progress of work through schedule updates and commitment reports, there was a strong unfulfilled need for additional field workforce.

184. I also found no evidence where work fronts or locations were not available to Layton. In fact, Cumming's project reports in many instances indicated "no work in progress at the time of walk" at multiple locations.

185. Cumming made frequent site visits to document the progress of the work and verify Layton's schedule updates. In numerous Cumming reports, concerns were raised on their observation of discrepancy on Layton's reported actual number of field craftsmen versus what was observed is one of the factors causing the lack of progress in the committed work.

186. Cumming's walk-through is mainly to document and verify progress for review of Layton's monthly progress schedule, not to conduct headcount. Thus, it is expected that Cumming's observed headcount is an estimate at best. However, the discrepancy between Layton's "actual" and Cumming's "observed" headcount is fairly significant.

187. As the Construction Manager, Layton had responsibility for planning and coordinating with its subcontractors to schedule and provide sufficient workforce to progress the work to meet the contract requirements and per Layton's schedule.

188. It is assumed that Layton receives headcount information from each of the subcontractors who worked on the Project. Layton provides a simple bar chart showing numbers of Labor Counts. An example is shown in figure 28 below:




*Figure 28 (Exhibit P3034, derived from Cumming Report Analysis of Layton Manpower Claims, Data Date November 27, 2023, Exhibit P1086)*

189. During the course of the project, Cumming made numerous requests to Layton to provide supporting documents on the reported "actual" numbers of field craft onsite. An example of this request is found on Page 15 in Cumming's Monthly Schedule Report (Data Date: October 23, 2023): "The following are Layton's reported Daily Labor Counts. Cumming has not validated nor verified the accuracy of these counts. As previously stated, we recommend that Layton verify the reported daily counts and how they compare to the planned labor needed to deliver the project. Currently, the overall daily labor trend has decreased over the past month as reported by Layton." (Exhibit P0661).

190. Another example of this request for verification of reported labor count is found on Page 16 of Cumming's Monthly Schedule Report (Data Date: December 18, 2023): "Per Layton's report, an average of 183 tradesmen were on site in December. This represents a 22% decrease (51 tradesmen per day) from November daily average of 234 tradesmen per day. Cumming has been walking the project weekly. We believe that labor counts produced by Layton are not accurate and do not represent the actual labor on site. We would request

Layton provide documented proof of actual labor to support the submitted trade labor." (Exhibit P0744).

191. It is standard in the construction industry to provide cost codes for employees to code their time on projects on a daily basis. Project-based field timecard software is typically used to track field tradesman hours. Most payroll and/or accounting and field tracking software include tracking reports. While Layton disputed Cumming's claim that the labor count may not be accurate based on the site visits, IBBS did not find any supporting documents from Layton to confirm the reported actual headcount numbers.

192. MRI contends that the consistent addition of CCDs during the Amendment No. 4 contract was responsible for the project's float burndown and made re-forecasting the level of manpower to meet the schedules planned dates contemporaneously impossible. MRI, failing to recognize the scope, nature, resource requirement of many CCDs, again focuses on the inflated number of CCDs for this assertion but fails to acknowledge that Layton's self-inflicted issues and omitted rework activities would create the same manpower re-forecasting challenges.

193. MRI's report alleged that "Cumming does not define or quantify 'appropriate' or 'schedule expectations.' The efficient management of Subcontractor forces is based on sequential planning and resource allocations." (Exhibit P2426 at 15). Layton, as the Construction Manager, is solely responsible for providing "appropriate" manpower and resources to properly progress the schedule. Cumming simply observed a possible discrepancy between their site visit observations and Layton's submitted workforce report. Cumming made numerous requests to Layton for confirmation of the workforce, as indicated in my initial report. We found no evidence that Layton provided this verification.

194. MRI's report asserted that "[m]anpower, in remote and expensive areas such as Jackson Hole, must remain relatively uniform. The ability to utilize 'travelers' or short-term craftsmen is limited." Additionally, "Cumming apparently believes that Layton should have forecasted and placed manpower on standby to progress the average 10 CCDs received per week or for the month of August 2023, 20 CCDs per week [..]". (Exhibit P2426 at 16). MRI and Layton seem to contradict themselves. By asserting a steady stream of CCD work, MRI and Layton acknowledge the predictability of the work stream in the hands of a competent contractor. Layton's not understanding and accounting for the impact of the CCDs and not acknowledging or planning for their own self-inflicted issues is at the heart of their failure to plan for and implement a recovery schedule to mitigate delays.

195. Furthermore, there is so much non-conformance replacement and repair work that Layton knew or should have known such and should have provided additional workforce to cover all this work. This is precisely what Cumming appropriately suggested and recommended in its reports. By failing to recognize and accept that the self-inflicted rework necessitated modeling it in the schedule, Layton would not have been able to plan for and allocate the necessary resources to perform the work. IBBS did not find evidence that Layton planned for and scaled up its workforce to accommodate the non-performance and repair work added resource needs, without impacting remaining contract work. In my experience, almost every project can draw enough workers. It may require extra payments (overtime, shift work, bonuses), with the result that there are extra costs but such mitigation steps may have helped complete the project on time. It is even possible that the costs associated with such mitigation (e.g. the premium portion of overtime, loss of productivity) could have avoided this contract termination dispute.

**DATED** February 4, 2026.

CODY LANE DEVELOPMENT CORP.

By: *_/s/ Jeffrey B. Charkow_*

Jeffrey B. Charkow
Owen K. Newman
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
Phone: 312-499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
cjchasin@duanemorris.com

Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P.O. Box 1208
Cheyenne, WY 82003-1208
Phone: 307-634-7723
Fax: 307-634-0985
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

*Attorneys for Plaintiff*
*Cody Lane Development Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of February, 2026, I electronically transmitted the foregoing document to the Clerk of Court of the U.S. District Court, District of Wyoming, using the CM/ECF system for filing. Based on the records currently on file the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

*/s/ Jeffrey B. Charkow*
Duane Morris LLP