Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
(307) 634-0985 (fax)
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

Jeffrey B. Charkow
Owen K. Newman
Alex W. Karasik
John D. Cooke
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
(312) 499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
awkarasik@duanemorris.com
jdcooke@duanemorris.com
cjchasin@duanemorris.com

ATTORNEYS FOR PLAINTIFF
CODY LANE DEVELOPMENT CORP.

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant, Counter-Claimant, and Third-Party Plaintiff. | Case No. 24-CV-00064-KHR |
| Related Third Party Claims. | |

**EXPERT WITNESS STATEMENT OF ROBERT KERNS**

In accordance with Judge Rankin's Procedure for Presentation of Direct Testimony by Witness Statement, Cody Lane Development Corp. ("Cody Lane") provides the following written statement of Robert Kerns's direct testimony for trial. Cody Lane also requests the Court admit the exhibits which he relies upon and which are listed on its exhibit list.

## A. Qualifications

1) I obtained a Bachelor of Science in Architecture from University of Illinois at Urbana-Champaign in 1993, a Master of Architecture in 1995, and a Master of Science in Civil Engineering in 1996.
2) I am a registered architect in California, Colorado, and Hawaii.
3) I am affiliated with American Institute of Architects and American Society for Testing Materials International.
4) I have worked on numerous projects conducting evaluations, condition surveys, investigations, and water testing of building enclosure systems on various structures and facilities including roofing. For example, I performed a building enclosure investigation and issued a report with repair and replacement recommendations including for the roof of the San Francisco Airport.
5) I work for Wiss, Janey, Elstner Associates, Inc. ("WJE") as a Principal.
6) I was the Project Manager for the project regarding the investigation of the roof on the Hoback Club Project for WJE.
7) All of my opinions and conclusions are made with a reasonable degree of certainty in my field.
8) My opinions are expressed in this witness statement, in the accompanying figures, appendices, and photographs that I prepared and will reference during this statement,

and in my Expert Report. The documents, photographs, figures, and appendices referenced in my Expert Report are herein incorporated by reference.

## B. Background

9) The roof for the Hoback Club Project consists of: VaproShield SlopeShield Plus, self-adhered roof underlayment; H-Shield NB, polyisocyanurate nail base insulation manufactured by Hunter Panels, approximately 3-inch total thickness including 5/8-inch plywood sheathing, mechanically fastened with 9-inch long #12 fasteners; SharkSkin Ultra SA, self-adhered air/vapor barrier; 3/4 -inch thick Exterior Fire-X plywood substrate board, produced by Hoover Treated Wood Products, Inc., mechanically fastened with 2-inch long #12 fasteners; 3-inch deep (Type N) metal roof deck.

10) The Project Manual contains the following specifications for wall sheathing:

    a. Paragraph 1.1.A.1 indicates Section 061600 includes wall sheathing and roof sheathing at bridges.

    b. Paragraph 2.5.A provides: “Rigid Roof Composite Panel: Exterior, closed cell polyisocyanurate foam core and oriented strand board facing. 5/8” fire retardant treated. Used at shingle sloped roofs and standing seam metal panel roofs.” The basis-of-design product listed is H-Shield NB manufactured by Hunter Panels.

    c. Paragraph 2.7.A states: “Provide fasteners of size and type indicated that comply with requirements specified in this article for material and manufacturer.”

d. Paragraph 3.1.B states: "Cut panels at penetrations, edges, and other obstructions of work; fit tightly against abutting construction unless otherwise indicated."

e. Paragraph 3.1.C states: "Apply fasteners so heads bear tightly against face of sheathing boards but do not cut into facing."

f. Paragraph 3.1.E states: "Coordinate sheathing installation with flashing and joint-sealant installation so these materials are installed in sequence and manner that prevent exterior moisture from passing through completed assembly."

11) The Project Manual contains the following specifications for Thermal Insulation:

a. Paragraph 1.01.D. indicates Section 072100 includes board insulation above roof deck.

b. Paragraph 2.01.E states: "Insulation Over Roof Deck: Polyisocyanurate board used over roof deck in low-slope membrane roof assemblies."

c. Paragraph 2.03.B.1 states: "Polyisocyanurate Board Insulation: Rigid cellular foam complying with ASTM C1289, Type 1 [foil faced], Class 1 [non-reinforced core foam]."

d. Paragraph 2.03.B.10 specifies pre-approved basis-of-design manufacturers including Dupont, Carlisle Coatings & Waterproofing, Atlas Roofing Corporation, GAF, and Johns Manville.

12) The Project Manual contains the following specifications for Fluid-Applied Membrane Air Barriers:

a. Paragraph 1.1.A indicates Section 072726 includes “combination of wall sheathing with fluid-applied, vapor-permeable, air and water resistive membrane.”

b. Paragraph 2.2 specifies performance requirements for a fluid-applied, vapor permeable air barrier coating. The basis-of-design product listed is ExoAir manufactured by Tremco. Other pre-approved manufacturers listed include BASF and GCP Applied Technologies.

c. Paragraph 3.4.A states: “Install fluid-applied membrane air-barrier and accessory materials according to air-barrier manufacturer’s written instructions to form a seal with adjacent construction and maintain a continuous air barrier.” “Coordinate the installation of air barrier with installation of roofing membrane and base flashing to ensure continuity of air barrier with roofing membrane.” “Install air-barrier assembly on roofing membrane or base flashing so that a minimum of 3 inches (75 mm) of coverage is achieved over each substrate.”

13) The Project Manual contains the following specifications for Synthetic Shingles:

a. Paragraph 1.01.B indicates Section 073110 includes “Flexible sheet membranes for eave protection, underlayment, and valley protection.”

b. Paragraph 2.02.D states: “Underlayment: Heavy duty, highly permeable polypropylene roofing underlayment.” The basis-of-design product listed is Delta-Vent S manufactured by Dorken.

c. Paragraph 2.02.E says: “Provide a self-adhered roof air/vapor barrier at all eaves, valleys, and ridges.” The basis-of-design product listed is Ice and Water Shield manufactured by GCP.

d. Paragraph 3.03.A says: “Install eave protection membrane from eave edge to minimum 4 feet up-slope beyond interior face of exterior wall, valleys, walls & penetrations.”

e. Paragraph 3.03.A says: “Underlayment at Roof Slopes Greater Than 4:12: Install underlayment perpendicular to slope of roof, with ends and edges weather lapped minimum 6 inches; stagger end laps of each consecutive layer, and cover eave protection/valley self-adhering waterproofing membrane 100%.”

14) The Project Manual contains the following specifications for Wood Shingles and Shake:

a. Paragraph 1.01.C indicates Section 073129 includes: “Flexible sheet membranes for eave protection, underlayment, and valley protection.”

b. Paragraph 2.03.A states: “Underlayment: Synthetic non-asphaltic sheet, intended by manufacturer for mechanically fastened roofing underlayment without sealed seams.”

c. Paragraph 3.02.B states: “At Roof Slopes Greater Than 4:12 (1:3): Install underlayment perpendicular to slope of roof, with ends and edges weather lapped minimum 4 inches. Stagger end laps of each consecutive layer. Nail in place. Weather lap minimum 4 inches over eave protection.”

15) The Project Manual contains the following specifications for Metal Roof Panels:

a. Paragraph 1.01.B indicates Section 074113 includes "Underlayments."

b. Paragraph 2.07.J says: "Underlayment: Self-adhering polymer-modified sheet; 20 mil total thickness; with strippable siliconized release film on bottom side and slip resistant and UV-stable facing on top side." The basis-of-design product listed is SlopeShield Plus Self-Adhered manufactured by VaproShield.

c. Paragraph 3.04 states: "Self-Adhering High Temperature Sheet Underlayment: Install self-adhering sheet underlayment, wrinkle free, on roof insulation or substrate board, as applicable, under metal roof panels. Apply primer if required by manufacturer. Comply with temperature restrictions of underlayment manufacturer for installation. Install on entire surface of insulation or substrate board in shingle fashion to shed water, and with end laps of not less than 6 inches staggered 24 inches between courses. Overlap side edges not less than 3-1/2 inches. Extend underlayment into gutter trough. Roll laps with roller. Cover underlayment within 14 days."

16) According to the ASHRAE Handbook of Fundamentals (Chapter 25), the water content of wood materials should be maintained below 20% by weight to prevent wood decay. This is an authority utilized in the roofing industry.

17) APA-The Engineered Wood Association Technical Bulletin Number R495C (APA TB R495C) indicates in-service moisture content for structural wood panels unwetted by rain or condensation reaches equilibrium between 8 and 14%. This is an authority utilized in the roofing industry.

18) The timeline of roofing issues on the Project:

a. On November 11, 2022, IBI conducted its first site visit. Snow and cold conditions were documented. IBI's report describes 4" to 6" of snow and ice accumulation on the roof. Workers were shoveling the snow and ice off the roof potentially resulting in damage to previously installed roof membrane.

b. On June 21, 2023, IBI noted deficiencies at the eave and fascia conditions including fireproofing in such a manner that prevented the proper attachment of sheathing at eaves; sheathing, steel members, and various other underlying construction materials installed at eave conditions in a way that created gaps and failed to provide a continuous substrate for moisture and vapor barrier adhesion; and Sharkskin membrane application in a way that created instances where the membrane was unadhered, fish mouthed, damaged, wrinkled, missing, and unable to provide the intended moisture and vapor protection; ice barriers not installed at eaves or rakes; construction deficiencies in roof installation at the valleys, incorrect staggering of insulation layers, fish mouths, punctures, wrinkles, bubbles, and instances of unadhered and discolored SlopeShield Plus membrane throughout field, ridges, valleys, and rakes; construction deficiencies at the chimneys including DensGlass sheathing was wavy and wet, SlopeShield installed without turning up at the interface with the chimney.

c. On August 24, 2023, SAFEBuilt issued a notice of violation regarding the failure to follow the proper protocol for repair or replacement of the damaged roof air/vapor barrier and the lack of request for inspection and

requires a letter from the manufacturer to ensure the warranty of the Sharkskin would not be voided and for repair of the damaged barrier.

d. On September 7, 2023, the installation of the fascia was observed, and the boards were not fully installed such that the observations are treated as a mock-up instead of a first work in place. The steel beams were exposed, and fastener holes were abandoned.

e. On September 15, 2023, IBI observed ice barriers that were not installed, the valley underlayment was not installed, and discontinuities between plywood decking and structure of the eave at the transition from the fascia to the roof.

f. On September 23, 2023, SAFEbuilt issued a notice of stop work for failure to follow the proper protocol for installation of the roofing assembly such that it could not be verified as code or plan compliant; inspections were not requested; and the requested third-party inspection to verify the roof decking was not performed or submitted for review by the building official and inspector. There are additional observations regarding the plywood substrate board being exposed to winter weather and delamination prior to installation of the roof air/vapor barrier; installation of polyiso insulation and nail base insulation without staggering board joints within and/or between layers; sequencing and detailing of exterior wall sheathing, roof air/vapor barrier, and façade air/water barrier that did not conform to the drawings; and collection of construction debris on the roof air/vapor barrier.

g. On October 10, 2023, SAFEbuilt issued a notice of stop work for failure to follow the proper protocol for installation of Monokote fireproofing insulation per the manufacturer or building code; inspections were not requested; requested third-party inspections were not submitted to the authority having jurisdiction; and inspection reports were not submitted. It also observed the omission and/or removal of fireproofing on structural elements at the roof eaves at the full building perimeter.

h. On March 8, 2024, IBI observed transitions between eave beam sizes that resulted in off-set soffit framing; a structural beam extended beyond the eave beam against the structural drawings; the edge of a gable roof sloped outside of construction tolerance; there was an incorrect transition from gable roof slope to the main roof slope that resulted in off-set in deck levels at the resulting roof valley; and loose joints, cracking and misalignment in fascia board installation.

C. Methodology

19) WJE reviewed the following documents from IBI/Arcadis, the Architect of Record on the Project: Project Specifications; Notice of Non-Compliance – Roof Sheathing, dated October 15, 2022; Field Reports between November 11, 2022 and March 8, 2024; Teton H1 Conformance Set Volumes 1-2 dated June 6, 2023 (these include guidelines regarding the roof slope, roof plan, external storm drain, shake roof, main roof fascia, roof dormer, chimney, roof to wall valley, and roof hatch; Construction Change Directive 540 RE: Revised Roof Detailing, dated June 15, 2023 (which addresses details related to roof and exterior wall details at chimney

enclosures and associated ductwork); RFI-1609 Fascia Detail Map – Architect of Record Response dated June 22, 2023 (this addresses the location and extents of the roof eave fascia details); Letter Re: Response to Layton's 7/31/2023 Letter regarding Roofing dated August 18, 2023 (this addresses roof installation concerns including staggering of roof insulation board joints, nigh seal dams, roof air/vapor barrier installation, and vapor permeable roof underlayment installation); Letter RE: Response to Layton's January 16, 2024 Letter Regarding Roof-Related Non-Conformances dated January 22, 2024 (this addresses concerns of abandoned fastener holes, replacement of existing plywood decking, and remediation options for Sharkskin Roof Underlayment).

20) WJE reviewed the following documents from SAFEbuilt, Inc., the Inspector of Record on the Project: Roof and Site Observation Reports between October 13, 2022 and February 11, 2024 (these address issues such as non-conforming installation of metal roof deck at roof eaves, misalignment of metal roof deck at ridges and dormers, exposure of plywood substrate board to prolonged winter weather and subsequent installation of roof air/vapor barrier without inspection of plywood substrate board by a structural engineer or inspector of record, inconsistent spacing of fasteners used to secure the plywood substrate board to the metal roof deck, non-conforming sequencing and detailing of exterior wall sheathing, roof air/vapor barrier, façade air/water barrier, and insulation at roof eaves, removal of temporary snow cleats, installed with fasteners through the roof air/vapor barrier, and installation of roof assembly components over the roof air/vapor barrier without inspection of repairs to snow cleat fastener penetrations through the roof air/vapor

barrier by the inspector of record, non-conforming installation of polyiso insulation and nail base insulation without staggering board joints within and/or between layers, non-conforming sequencing and detailing of roof air/vapor barrier, roof underlayment, and insulation at chimney and dormer rising walls and crickets, collection of construction debris on the roof air/vapor barrier, non-conforming omission of insulation within dormer and shed eave framing cavities, non-conforming installation of nail base insulation fasteners that did not engage the metal roof deck, documentation of roof leaks, moisture staining, elevated moisture content and apparent microbial growth on exterior sheathing, non-conforming installation or omission of fireproofing at structural elements at the roof eaves); Notice of Violation dated August 24, 2023; Notice of Stop Work dated September 23, 2023; Notice of Stop Work #3 dated October 10, 2023; Letter Re: The Project, Teton Hoback H1Project/Rebuttal with Supporting Docs dated March 19, 2024 (this addresses concerns of the plywood exposure to winter weather and requirements to demonstrate the plywood remains suitable for use and rejects use of ASTM 5661 Standard Test Method for Performance of Wood and Wood-Based Floor and Roof Sheathing Under Concentrated Static and Impact Loads to demonstrate suitability); SAFEbuilt Denial Letter Dated October 20, 2023 (this rejects Layton's plan response to the notice of stop work, rejects the energy report Layton produced, and requires Layton to provide all inspection reports and requests made for each layer of applied roofing material, a detailed plan to address all individual issues, and letters that address the roof sheathing, sharkskin, snow cleats, and other concerns); and information regarding end of day "tie-ins" made with

SharkSkin roof air/vapor barrier lapping onto SlopeShield underlayment (which are incompatible materials).

21) WJE reviewed Layton's Revised roofing work plan response to SAFEbuilt notice of stop work dated November 15, 2023 where Layton agreed to remove and reinstall nailbase insulation to provide staggered board joints, to perform pull tests to evaluate the adhesion of SharkSkin and to provide a letter from SharkSkin regarding whether the work installed conforms; and to extract samples of the roof assembly to determine if the plywood can perform as designed and specified.

22) WJE reviewed the sections of Project Manual relevant to the roofing installation.

23) WJE reviewed the unsigned letter from Sharkskin dated June 1, 2023, and information from Mark Strait, a SharkSkin representative, from a site visit in July 2023 which provides that SharkSkin has a 12-month UV protection.

24) WJE conducted on-site investigations June 17-19, 2024, July 8-9, 2024, and July 16-17, 2024. The investigation included document review, visual surveys, observations at exploratory openings, moisture testing, and infrared thermographic roof surveys.

25) To review the roof, WJE performed a non-destructive evaluation of the existing roof assembly at each exploratory opening location to identify potential latent moisture within the roof assembly before removing roof components.

26) WJE followed ASTM D7954, Standard Practice for Moisture Surveying of Roofing and Waterproofing Systems Using Nondestructive Electrical Impedance Scanners to conduct its inspections.

27) WJE used a Tramex Roof and Wall Scanner to measure the electrical impedance at several locations within each 4-foot by 8-foot nail base insulation board within the opening area. The device passes a low frequency current through the roofing assembly via an electric field and when it passes through water, the impedance of the current is reduced, and the meter produces a relative value of 0-100 where higher readings equal lower impedance indicative of moisture within the roof layers.

28) WJE used a Delmhorst Navigator Moisture Mapping Meter to measure the moisture content at three layers within the roof assembly: the plywood sheathing layer of the nail base insulation, the base layer of polyiso insulation, and the plywood substrate board. Measurements were conducted at several locations within each 4-foot by 8-foot insulation board or sheathing panel within the opening area. For wood materials, a moisture content reading of between 5% and 60% is displayed with below 5% being rated low and above 60% being high.

29) WJE used a Mavic 3T drone with an integrated infrared camera in general accordance with ASTM C1153, Standard Practice for Location of Wet Insulation in Roofing Systems Using Infrared Imaging to identify thermal anomalies in the roof assembly which might indicate the presence of elevated moisture levels, air infiltration/exfiltration, and/or discontinuous insulation within the roof assemblies. This was done during the evening, after sunset, to reduce/limit solar loadings and allow for observation during optimal conditions in which the thermal gradient between the assemblies and the ambient air temperature is the largest. The temperature is consistent at this time allowing the camera to detect thermal

anomalies more readily. At the start of the survey, the exterior temperature was approximately 40 degrees Fahrenheit with low wind. Snow had fallen on the roof earlier in the day, but standing moisture was not present at the time of the survey. A generally consistent thermal profile was observed on the roofing.

30) The camera measures the infrared radiation emitted by an object, and typically a higher amount of infrared radiation emitted corresponds to a higher temperature of the object. The presence of moisture in most objects increases the thermal mass of that object and subsequently can lead to a temperature variance when compared to adjacent drier areas. Areas of higher thermal mass take longer to heat or cool and subsequently appear as a thermal anomaly within the field of the roof. Similarly, air infiltration and exfiltration through the roof assembly will increase or decrease depending upon the ambient temperatures of the interior and exterior environments, causing the relative thermal signature of these areas to result in thermal anomalies.

31) During selective demolition, WJE also documented approximate spacings and condition of fasteners used to secure the roof assembly components to the roof deck as well as the layout and spacing of roof assembly component board joints.

D. Observations

32) Exploratory Opening Number 1 was located east of Column Line 25 and between Column Line L and M at a rake edge and ridge condition. A fall arrest anchor is present within the opening area.

    a. Electrical impedance readings varied between 0 and 100 across the opening area. The highest readings (80-100) occurred downslope of the fall arrest anchor and along the rake edge.

b. The VaproShield membrane covered the entire nail base insulation at the field of the roof. At the rake edge, the membrane extended several inches beyond the field of the roof and turned down over wood blocking and a temporary weather protection tarp. The leading edge was not adhered or otherwise sealed to the blocking or tarp. At the ridge, the membrane extended several inches beyond the edge of nail base insulation and turned down onto exposed SharkSkin membrane. The leading edge was not adhered or otherwise sealed to the SharkSkin. The VaproShield membrane contained isolated wrinkles and instances of mechanical damage, including abandoned fastener penetrations, areas of peeled facer, and membrane tears. The fall arrest anchor stanchion was sealed to the VaproShield membrane with a black sealant.

c. Moisture meter readings of the plywood layer of the nail base insulation, taken through the VaproShield membrane, varied between LOW and 24%. The highest readings occurred downslope of the fall arrest anchor. Six rows of fasteners, consisting of four fasteners in each row, secured the nail base insulation to the roof deck. Row spacing varied between 6.5 inches and 10 inches. Column spacing varied between 24 inches and 27 inches. Fastener edge distances varied between 1 inch and 2 inches. Several fasteners were underdriven, overdriven, or abandoned/missing. Isolated fasteners were bent, sheared at the threaded length, and/or contained surface corrosion where the factory applied finish was damaged. Apparent microbial growth, moisture staining, and bulk water were present between the nail base

insulation and underlying polyiso insulation boards. The Tramex RWS measured an electrical impedance of 100 when placed on the undisturbed portion of the roof assembly adjacent to the visibly wet substrate. Microbial growth was present on the insulation facer at both the underside of the nail base and the top side of the polyiso insulation. Moisture staining and microbial growth were heaviest at fastener locations.

d. Moisture meter readings of the polyiso insulation varied between LOW and 22%. The highest readings occurred at the location of visibly west substrate and apparent microbial growth. Nail base insulation and polyiso insulation board joints were staggered; however, the joints between layers were not staggered. Microbial growth, moisture staining, and bulk water were present between the polyiso insulation and SharkSkin membrane. Microbial growth and moisture staining covered the majority of the facer at the underside of the polyiso insulation. Bulk water was present at the downslope edge of the exploratory opening.

e. The SharkSkin membrane covered the entire plywood substrate board at the field of the roof and extended beneath the wood blocking at the rake edge. The fall arrest anchor stanchion was not sealed to the SharkSkin membrane. Moisture meter readings of the plywood substrate board, taken through the SharkSkin membrane, varied between LOW and 11.6%. The SharkSkin membrane failed cohesively during removal preventing its removal at the entire exploratory opening area. An approximate 2 feet by 4 feet portion of the plywood substrate board was exposed to observe the existing fasteners.

Eight fasteners secured the substrate board to the metal roof deck. A regular pattern of rows and columns was not established. Horizontal fastener spacings varied between 14.5 inches and 22 inches. Vertical fastener spacings varied between 8 inches and 9 inches. No fasteners were present in the bottom right quadrant of the board.

f. The rake edge fascia consisted of a gypsum sheathing board covered with a teal-colored, fluid-applied water resistive barrier. The SharkSkin membrane on the roof overlapped onto water resistive barrier several inches. During removal of the SharkSkin membrane, portions of the fluid-applied water resistive barrier and facers of the gypsum sheathing delaminated from the sheathing's gypsum core. Metal Z-girt sub-framing, secured to the structure with screw fasteners, was installed over the fluid-applied water resistive barrier and SharkSkin. Mineral wool insulation was placed between Z-girts. Several nominal wood nailers and blocking were secured to the Z-girts to frame out the fascia for cladding installation.

33) Exploratory Opening Number 2 was located along Column Line 25 and between Column K and L at a rake edge and ridge condition.

a. The VaproShield membrane was bed in a black sealant over the rake edge blocking

b. A 6-inch x 5-inch void in the nail base and polyiso insulation boards was present at the ridge where the insulation boards on each slope were not appropriately trimmed to provide a continuous thermal barrier at the ridge.

c. WJE noted irregular construction of the ridge and rake edge substrate board and vapor barrier: at the north slope, the SharkSkin membrane was applied directly to the metal roof deck, followed by a bent sheet metal plate that capped the ridge; Plywood substrate board was installed over the sheet metal plate and stripped in with additional SharkSkin membrane. The plywood substrate board did not extend beneath wood blocking at the rake edge; the rake edge blocking was not secured into the roof deck or substrate board at the ridge; the SharkSkin membrane covering the substrate board extended vertically onto the edges of the polyiso and nail base insulation downslope; moisture staining was present on the underside of the plywood at a fastener penetration.

d. A sample of the roof membrane assembly, inclusive of all layers, was extracted for storage.

34) Exploratory Opening Number 3 was located at a valley and chimney rising wall condition at the dormer between Column Line 22 and 23 and north of Column Line L.

a. Chimney walls consisted of gypsum sheathing boards covered with a teal-colored, fluid-applied water resistive barrier. The sheathing at the south face of the chimney contained impact damage.

b. A strip of VaproShield membrane was used to transition from the field of the roof vertically onto the base of chimney walls overtop of the fluid-applied water resistive barrier (i.e., reverse lapped) approximately 10-inches.

c. A portion of the gypsum wall sheathing was removed to observe the condition behind the sheathing and into the chimney. The VaproShield field membrane transitioned vertically onto the base of chimney walls behind the gypsum sheathing approximately 8-inches. The VaproShield membrane was adhered directly to cold-formed steel studs and was unsupported between studs. The SharkSkin membrane transitioned from the field of the roof vertically onto the base of chimney walls behind the gypsum sheathing approximately 10.5-inches. The SharkSkin membrane was adhered directly to cold-formed steel studs and was unsupported between studs. The SharkSkin membrane did not extend onto the plywood substrate board or duct/vent penetrations within the chimney. Spray foam insulation was not installed within the stud track of the chimney wall assembly. Batt insulation was not placed over the plywood substrate board within the chimney.

35) Exploratory Opening Number 4 was located east of the elevator overrun shed roof between Column Line 22 and 23 and along Column Line K.

a. Elevator overrun walls consisted of gypsum sheathing boards covered with a teal-colored, fluid-applied water resistive barrier. The overrun roof was covered with Grace Ultra. Metal Z-girt were secured to the rake edge fascia of the overrun; mineral wool insulation was present at isolated locations between girts.

b. The VaproShield membrane transitioned from the field of the roof vertically onto the base of the overrun walls overtop of the fluid-applied water

resistive barrier (i.e., reverse lapped) or onto Z-girts secured to the overrun rake edge fascia.

c. The plywood layer of the nail base insulation contained impact damage surrounding screw fasteners that were underdriven.

d. The edges of the nail base insulation were cupped and not flush at missing fastener locations.

e. The walls of the elevator overrun did not contain sheathing through the full thickness of the roof assembly; structural elements covered with fireproofing were visible within the exploratory opening from the exterior. The SharkSkin membrane terminated on the plywood substrate board short of the elevator overrun walls.

36) Exploratory Opening Number 5 was located at the bottom of the valley near the intersection of Column Line H and 19 and against the elevator overrun along Column Line 15.

a. The construction was consistent with that noted at the previous exploratory openings except: the elevator overrun walls consisted of a combination of gypsum sheathing and cast-in-place concrete covered with a teal-colored, fluid-applied water resistive barrier; the VaproShield membrane transitioned from the field of the roof vertically onto the overrun walls overtop of the fluid-applied water resistive barrier (i.e., reverse lapped) approximately 9-inches; the SharkSkin membrane transitioned from the field of the roof vertically onto the base of overrun walls approximately 8-inches; rake edge construction was similar to that documented in

Exploratory Opening No. 1, however, Z-girt sub-framing and mineral wool insulation were not yet installed. Furthermore, isolated areas of the SharkSkin vapor barrier membrane were unadhered.

37) Exploratory Opening Number 6 was located at the field of the roof between Column Line 19 and 20 and Column Line L and M and was made to extract samples of the roof assembly for storage.

38) Exploratory Opening Number 7 was located at the eave of the elevator overrun shed roof between Column Line 15 and 16 and Column Line G and H. The shed roof abuts a rising wall near Column Line 15.

a. This opening was consistent with the construction documented at the previous exploratory openings except: the rising wall consisted of gypsum sheathing covered with a teal-colored fluid-applied water resistive barrier; SharkSkin Ultra SA was installed over the nail base insulation at Exploratory Opening No. 7 in lieu of the VaproShield membrane installed elsewhere; the SharkSkin membrane transitioned from the field of the roof vertically onto the rising wall overtop of the fluid-applied water resistive barrier (i.e., reverse lapped) several inches; the plywood layer of the nail base insulation delaminated from the polyiso insulation layer during removal; the SharkSkin membrane installed over the plywood substrate board also transitioned from the field of the roof vertically onto the base of the rising wall several inches; however, the fluid-applied water resistive barrier positively shingled over the SharkSkin membrane.

39) Exploratory Opening Number 8 was located at the eave and valley condition near the intersection of Column Line 15 and H. The construction at this opening was consistent with that noted at previous exploratory openings.

40) Exploratory Opening Number 9 was located at the eave and rising wall condition along Column Line 8 and between Column Line A and B.

   a. The construction was consistent with that documented at previous exploratory openings except: elevator overrun walls consisted of gypsum sheathing boards covered with a teal-colored, fluid-applied water resistive barrier; SharkSkin Ultra SA was installed over the nail base insulation at Exploratory Opening No. 7 in lieu of the VaproShield membrane installed elsewhere; the SharkSkin membrane transitioned from the field of the roof vertically onto the rising wall overtop of the fluid-applied water resistive barrier (i.e., reverse lapped) several inches; a portion of the elevator overrun wall sheathing was removed to make observations behind the sheathing and into the elevator overrun; the SharkSkin membrane installed over the plywood substrate board extended beneath the stud track and transitioned onto the concrete elevator shaft wall; the backside of the gypsum sheathing contained moisture staining and apparent microbial growth.

41) Exploratory Opening Number 10 was located in the field of the roof along Column Line C and between Column Line 6 and 7.

   a. The construction was consistent with that documented at previous exploratory openings except removal of the Sharkskin installed over the

plywood substrate board caused delamination of the uppermost ply of the plywood.

42) Exploratory Opening Number 11 was located west of the elevator overrun shed roof near the intersection of Column Line B and Column Line 4. The construction was consistent with that documented at previous exploratory openings.

43) Exploratory Opening Number 12 was located at a valley, ridge, and chimney rising wall condition at the dormer between Column Line 2 and 2 and north of Column Line C. Construction was consistent with that documented at previous exploratory openings except the Sharkskin membrane installed over the plywood substrate board was unsupported at the dormer ridge.

44) Exploratory Number 13 was located along Column Line 1 and between Column Line A and B at a rake edge and ridge condition. The construction was consistent with that documented at previous openings except moisture staining was present on the metal roof deck surrounding fastener penetrations through the deck and running down into deck flutes.

45) Exploratory Opening Number 14 was located along Column Line 3 and between Column Line B and C at a ridge condition. The construction was consistent with that documented at previous openings except Vaproshield and SharkSkin membrane were installed over a portion of the base layer of polyiso insulation.

46) Exploratory Opening Number 15 was located between Column Line 12 and 13 at an eave condition. The construction was consistent with that documented at previous openings except the insulation layer of the nail base delaminated from the

plywood layer during removal and moisture staining was present on the metal roof deck surrounding fastener penetrations through the deck.

47) Exploratory Opening Number 16 was located at the field of the roof between Column Line 18.2 and 19 and Column Line J and K. The construction was consistent with that documented at previous openings except removal of the SharkSkin installed over the plywood substrate board caused delamination of the uppermost ply of the plywood.

48) The qualitative infrared thermographic survey of accessible roof areas revealed thermal anomalies concentrated along roof area intersection at hips and valleys. A gap in the nail base insulation and polyiso insulation was identified at a ridge condition during deconstruction at Exploratory Opening Number 1. There were thermal plumes surrounding each dormer and chimney, with the most pronounced anomalies concentrated along the lower sides and bottom edges of the dormer and chimney structures. The irregular pattern of the plumes did not appear to align with variations in construction materials, which supports the likelihood of moisture being present in the roof. At Exploratory Opening Numbers 3 and 12, evidence of moisture was observed at similar locations.

## E. Roof Assessment

49) Layton and its subcontractors' construction of the roof was inconsistent with the project specifications and industry standards and has resulted in significant risks to the roof durability and health of the building occupants.

50) The combination of improper material installation, inadequate installation at transitions, and failure to install a continuous air and moisture barrier resulted in

widespread water infiltration and microbial growth within the originally installed roof assembly.

51) Layton and its subcontractors improperly installed sequencing of materials, there was inadequate fastening, and there were discontinuities in the air and moisture barrier layers that compromised the roof and adjacent building enclosure elements to resist water infiltration contributing to water infiltration and subsequent microbial growth.

52) The anomalies noted above with respect to elevated moisture content within the roof assembly were widespread and substantiated with the exploratory openings and were most pronounced at ridgelines, valleys, and chimney bases. The presence of liquid water, staining, and microbial growth at these locations confirms that water penetrated the roof and became trapped between the insulation layers, creating an environment conducive to microbial growth.

53) The installations of the self-adhered vapor retarder (SharkSkin) and roofing underlayment (VaproShield) membranes were inconsistent with the manufacturers' installation instructions and project specifications. There were numerous instances of wrinkling, fishmouths, unadhered laps, and mechanical damage. The sheet membranes were reverse-lapped or terminated without proper sealing, particularly at transitions to vertical substrates such as chimneys, rising walls, and roof eave fascia. The sheet membranes were also observed at multiple locations to be bridging gaps in between panels at ridges and other substrate transitions. These deficiencies allowed water to bypass the intended barriers and enter the roof assembly.

54) Fasteners of the nail base and polyisocyanurate insulation layers were frequently underdriven, overdriven, or missing altogether, and the fastener spacing was inconsistent with both the manufacturer's recommendations and the construction documents. These errors compromised the mechanical integrity of the assembly and created pathways for water migration. In some cases, fastener penetrations were directly associated with localized staining and microbial growth.

55) The plywood substrate board, which serves as the substrate for the self-adhered vapor retarder, showed signs of delamination and elevated moisture content at several of the exploratory openings. In some instances, removal of the vapor retarder membrane caused the upper layer of the plywood to separate, indicating prior moisture exposure and degradation.

56) Microbial growth was observed on multiple surfaces of the materials within the roof assembly, such as the facers of insulation boards.

57) The presence of elevated moisture levels indicates the roof system has failed to provide a continuous and effective air and water barrier.

58) Remediation will require:

   a. Full removal of roof areas exhibiting signs of water infiltration, microbial growth, or material delamination down to the structural metal deck, which appears to be the entire roof assembly at all roof areas, including roofing underlayment, layers of insulation, vapor retarders, and substrate boards.

   b. Thorough inspection of the exposed metal roof deck and any remaining plywood substrate. Areas showing corrosion, staining, or fastener damage

should be reviewed and evaluated for structural integrity. Any structurally compromised roof decking must be replaced.

c. Prior to reinstallation, ensure all exposed surfaces are completely dry. Engage a certified industrial hygienist and appropriate mold remediation specialist to develop a plan and clean and treat areas with microbial growth. Perform follow up testing to confirm the growth has been eliminated.

d. Install the new roofing system in accordance with the original design specifications, manufacturers' installation instructions, and industry standards. Ensure insulation board joints are properly staggered both within and between layers; fasteners are of the correct type and that they are installed at the proper spacing and depth; substrates for adhered membranes are smooth flush, and continuous; adhered vapor, air, and water barriers are installed continuously and they are properly lapped; tie-ins at all transitions are continuous and complete.

e. Follow design intent and detailing at complex transitions to ensure continuity of the air, water, and vapor barriers layers of the roof assembly with the air and weather barriers for the walls; use compatible materials and ensure positive weather-lapping of all layers.

f. Engage a third-party quality assurance inspector to monitor all phases of remediation, including providing daily inspection reports with photographs of the roof and verification of compliance with the project requirements. Require the manufacturer representatives to also review installations at regular points in the roof assembly installation process.

g. After completion, perform a follow-up infrared themographic survey and moisture testing to confirm the new roof assembly is dry.

h. Obtain updated warranties from product manufacturers confirming the new installation meets warranty requirements. Develop a periodic inspection and maintenance plan.

**DATED** February 4, 2026.

CODY LANE DEVELOPMENT CORP.

By: */s/ Jeffrey B. Charkow*


Tyler J. Garrett, WSB # 6-4400
Kari A. Hartman WSB # 8-6507
HATHAWAY & KUNZ, LLP
P.O. Box 1208
Cheyenne, WY 82003-1208
Phone: 307-634-7723
Fax: 307-634-0985
tgarrett@hkwyolaw.com
khartman@hkwyolaw.com

Jeffrey B. Charkow
Owen K. Newman
Alex W. Karasik
John D. Cooke
Chris Chasin
Duane Morris LLP
190 South LaSalle Street, Ste. 3700
Chicago, IL 60603
Phone: 312-499-6701
jbcharkow@duanemorris.com
oknewman@duanemorris.com
awkarasik@duanemorris.com
jdcooke@duanemorris.com
cjchasin@duanemorris.com


*Attorneys for Plaintiff*
*Cody Lane Development Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2026, I electronically transmitted the foregoing document to the Clerk of Court of the U.S. District Court, District of Wyoming, using the CM/ECF system for filing. Based on the records currently on file the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

*/s/ Jeffrey B. Charkow*
Duane Morris LLP