Randall B. Reed (Wyo. Bar No. 5-2863)
Erika M. Nash (Wyo. Bar No. 6-3867)
Justin Daraie (Wyo. Bar No. 7-4690)
**LONG REIMER WINEGAR, LLP**
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001
307-635-0710
rreed@lrw-law.com
jdaraie@lrw-law.com
enash@lrw-law.com

Michael T. Hoppe (pre hac vice)
Bryan S. Johansen (pro hac vice)
Sara M. Nielson (pro hac vice)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
mhoppe@parrbrown.com
bjohansen@parrbrown.com
snielson@parrbrown.com

L. Tyrone Holt (pro hac vice)
**THE HOLT GROUP, LLC**
1675 Broadway, Suite 2100
Denver, Colorado 80202
tholt@holtllc.com

*Attorneys for Defendant Layton Construction Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff / Counterclaim Defendant,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant / Counterclaim Plaintiff. | Case No. 2:24-cv-00064-KHR<br><br>The Honorable Kelly H. Rankin<br><br>Magistrate Judge Stephanie Hambrick |
| LAYTON CONSTRUCTION CO., LLC,<br>Third Party Plaintiff,<br>v.<br><br>SPRAYFOAM SOUTHWEST, INC. DBA GLOBAL ROOFING GROUP, ET AL.<br><br>Third-Party Defendants | |

**WITNESS STATEMENT OF LAYTON CONSTRUCTION, LLC EXPERT WITNESS KAMI FARAHMANDPOUR**

**Introduction and Qualifications**

1. I, Kami Farahmandpour, am the Principal Consultant and founder of Building Technology Consultants, Inc. ("BTC"), and a licensed registered professional engineer. BTC is a consulting firm specializing in forensic evaluation and repair of building enclosure systems, structural systems, and architectural elements.

2. I am a Fellow of International Institute of Building Enclosure Consultants (IIBEC), and a Fellow of National Academy of Forensic Engineers (NAFE).

3. I hold Professional Engineering licenses in the states of Illinois, Arizona, Colorado, Connecticut, District of Columbia, Florida, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Missouri, Nevada, New Mexico, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, Wisconsin and Wyoming.

4. I am also a Registered Building Envelope Consultant, a Registered Roof Consultant, a Registered Waterproofing Consultant, a Registered Exterior Wall Consultant, a Certified Construction Specifier and a Certified Construction Contract Administrator.

5. I have over forty (40) years of experience in the evaluation, investigation, testing and repair of construction materials concentrating in the area of building envelope design, construction, evaluation and repair. I have managed over 900 projects involving the evaluation and repairs of buildings. A majority of these projects have involved existing building facades, roofing and/or waterproofing systems.[1]

---

[1] My CV can be found at Trial Ex. D5515, Appendix D.

**Scope of Retention**

6. I was asked to provide an assessment of the construction of the roof at 3355 West Cody Lane in Teton Village, Wyoming (the "Project"), which is also referred to as the Hoback Club consisting of 25 residential units and several amenity spaces. Cody Lane Development Company (the "Owner"), the owner of the Project, contracted with Layton Construction Company ("Layton") in May of 2021 to construct the Project. Layton retained Sprayfoam Southwest, Inc. dba Global Roofing ("Global") as its subcontractor to build the roof. The Owner retained DDRM Jackson, LLC and Martin J. Breen ("DDRM") as the Development Manager with authority to act on behalf of the Owner for the construction of the Project, Arcadis fka IBI Group as the architect for the Project ("Architect") and SafeBuilt, Inc. ("SafeBuilt" or "IOR") to act as the inspector on behalf of the Owner.

7. I have been retained by Layton to provide testimony related to its construction of the roof on the Project and specifically to respond to criticisms made by the Owner, Architect, and SafeBuilt regarding Layton's construction of the roof as set forth in the expert report of Owner's expert Robert Kerns of Wiss Janney Elstner Associates, Inc. ("WJE").

8. As part of my investigation I reviewed copious project documents[2], physically inspected and documented the roof of the Project on three separate occasions (June 17, 2024, July 15 through 17, 2024, and July 2, 2025), met with Layton project team members, met with members of Global Roofing, consulted with and provided input on the testing process performed by Simpson Gumpertz Heger ("SGH"), and reviewed the test results compiled by SGH as part of the rebuttal expert report of Kenneth Klein.

[2] A list of the materials I was provided to assist in the development of my opinions is contained in Appendix A of my rebuttal expert report dated September 26, 2025, Trial Ex. D5515.

**Summary of Opinions**

9. The claims asserted by the Owner, Architect, and SafeBuilt (as related to the roof and outlined in SafeBuilt's stop work notice) do not have merit.

a. They mischaracterize the non-structural plywood base layer as requiring special inspection. Special inspection is not required for this non-structural element since its sole function is to support the Sharkskin layer which was intended to act as an air barrier and vapor retarder.

b. The Sharkskin layer was continuous, intact, and well-adhered at all observed locations (save for the lack of a tight seal around a tie back anchor in one location that could have been easily repaired) ) and properly functioned as a continuous air barrier and vapor retarder.

c. The thermal analysis performed by SGH showed that nailbase and polyisocyanurate insulation boards did not require staggered joints to provide the code-compliant and construction document-mandated R-value. In addition, the night seals at the non-staggered joints were compatible with the roof assembly.

d. The other issues cited in the stop work notices were part of the ongoing construction and are not grounds for stopping the work, or a valid basis for replacing the entire roofing assembly as they would have been completed prior to completing the roof.

10. Factual evidence I reviewed indicated that the Owner decided to replace the entire roof before its own consultant, WJE, started its investigation of the roof.

11. Prior to Layton's termination, there were no allegations of moisture intrusion into the roofing system as a reason for the stop work order.

12. The weather protection in place at the time of termination was removed by the replacement contractor after Layton's termination. The removal of the weather protection (scaffolding, etc.) necessarily caused damage to the top SlopeShield underlayment. The damaged and incomplete roof was then left exposed for weeks to substantial snow and rainfall from the time of Layton's termination to the time of the destructive testing.[3]

13. The most probable cause of the moisture accumulation in the roof system is from damage to the Slopeshield underlayment and the absence of protection from rain events post-termination. Regardless of the probable cause of moisture accumulation, the investigations conducted months after Layton's termination show the extent of moisture accumulation is limited to isolated locations at eaves and perimeters. For the balance of the roof assembly, the measured moisture values were within acceptable limits such that there is little to no effect on the roof assembly thermal insulation performance.

14. It is most probable that the majority of the moisture found during WJE and SGH investigations occurred after Layton's termination.

15. The design of the roofing system was incomplete as of the date of the stop work order and was not finalized until after Layton's termination. Without finalizing key aspects of design, the work on the roof could not be completed with or without the stop work order in place.

16. My assessment was conducted with the understanding that the roof assembly must comply with the intent of the construction documents and provide the intended performance and

[3] Trial Exs. D5255; D5295 (DAC Minutes); Pete Smith Deposition 103-105; Richard Schaller Deposition 76-77.

serviceability. It is my opinion that, as of the time of Layton's termination, the roof contained far less moisture than found during WJE and SGH investigations. However, even assuming that the roof was in the same condition as found through WJE and SGH investigations, it could have been repaired and completed without the need for a complete removal and replacement. Layton was prevented from repairing the roof because of a stop work order placed on the roof by the Owner's inspector of record and subsequent termination.

17. Based on my investigation, it is apparent that the Owner, its architect and the inspector of record applied unreasonable and different standards to Layton as compared to the replacement contractor. Many construction practices that Layton was not allowed to use were accepted for the replacement contractor.

18. A complete summary of my findings and conclusions can be found in my Rebuttal Expert Report, filed with the Court on September 26, 2025 (Dkt. 271-5) and listed as trial exhibit number D5515.

**<u>The Roof</u>**

19. The Project has several roof sections. The main roofs consist of steep-slope gable configurations with dormers. The steep-slope roof surfaces consist of synthetic shakes and standing seam metal roofing. There are also several small-shed roofs, and low-slope roofs. The low-slope roofs are typically covered with a thermoplastic olefin (TPO) membrane roofing system.

20. The claimed defects that have been at the center of this dispute concern the steep sloped roof with synthetic shakes (shingles), and I focus my opinions there.

21. The shingled portion of the steep sloped roof consists of five layers. From bottom to top, the design of the roof consisted of (1) the fluted steel decking, (2) a plywood roof board to

act as a substrate for the vapor retarder and air barrier, (3) the vapor retarder and air barrier consisting of a self-adhered underlayment (commonly referred to by its tradename "Sharkskin"), (4) a 4-inch-thick layer of rigid polyisocyanurate insulation board (commonly referred to herein as "polyiso"), (5) 5/8-inch thick plywood sheathing adhered to a layer of 2 3/8- thick polyisocyanurate insulation board (commonly referred to herein as "nailbase"), (6) a self-adhered rubberized underlayment (commonly referred to by its trade name "Slopeshield"), and (7) synthetic shingles (commonly referred to by its trade name "Brava"). The nailbase layer was to be mechanically fastened through all underlying layers to the steel deck using nine-inch steel fasteners, and the shingles were to be individually fastened to the nailbase. The figure below depicts the typical roofing assembly.[4] In some locations, a layer of mineral wool insulation was also specified below the steel deck.




[4] Note that the areas at issue in the roofing assembly are from the steel deck up.

**Roof Assembly R1, Architectural Sheet AG013**

At the time of Layton's termination, the completed portions of the roof consisted of the following layers down to the steel deck (e.g., shingles, gutter, and snow melt system not installed):




22. The applicable building code was the 2018 edition of the International Building Code (IBC), including Appendix J. The applicable energy code was the 2012 International Energy Conservation Code (IECC).[5] The building is designed as non-separated mixed-use (IBC Section 508.3), with five stories of Type II-A construction.

**Course of Construction by Layton**

23. Construction activities on the roof started in or about late October 2022 with installation of the plywood roof board over the steel deck. The base plywood layer attached to the metal deck was non-structural and was present solely to provide a substrate to apply the self-adhering Sharkskin air and vapor barrier.

[5] Trial Ex. J614 (Sheet AG003); Trial Ex. D5524 (SGH Report p. 9).

24. The Owner's inspector of record, SafeBuilt, approved the installation of the plywood and Sharkskin layers during November and December of 2022 before construction activity on the roof halted for the winter, with the steel deck, plywood layer, and Sharkskin serving a secondary purpose of acting as the temporary weather protection for the Project.[6]

25. Construction on the roof recommenced in approximately May of 2023 with the installation of the polyiso insulation panels over the Sharkskin, covered by the second layer of polyiso insulation panels adhered to plywood nailbase and then fastened with nine-inch fasteners through to the metal deck. The top layer of nailbase was then covered with a layer of self-adhering rubberized underlayment (SlopeShield). Where completed, the SlopeShield acted as the primary water barrier for the roof.

26. On September 23, 2023, SafeBuilt placed a stop work order on the roof, which halted its construction (the "Stop Work Order").[7]

27. To protect the roof during the winter months over the 2023-2024 winter and allow work on the roof to commence immediately upon the anticipated removal of the stop work order, Layton proposed the erection of tenting over the roof, which commenced the second week of December 2023. At the time of termination on March 11, 2024, the tenting, commonly referred to as the "Snow Globe" covered 2/3rds of the roof.[8]

28. No substantive work on the roof was performed from the time of the stop work order through the date of Layton's termination on March 11, 2024.

---

[6] Trial Ex D5503 (Inspection records); Trial Ex. D4789 (October 23, 2023 correspondence from Layton to SafeBuilt with inspection results).
[7] Trial Ex. D4686 (September 23, 2023 Safebuilt Stop Work Order).
[8] *See* Trial Ex. D5515 (BTC Report, p. 25-28, Figs. 4-6).

29. During the course of construction the Owner, SafeBuilt, and Arcadis raised various areas of concern to some areas of construction on the roof.

Alleged Warping/Potential Delamination of Plywood Over Metal Deck

30. The plywood layer installed over the steel deck was to serve as a substrate for the Sharkskin layer. Such a layer is commonly referred to as a roof board or substrate board and serves no structural purpose.[9] In fact, this plywood layer was not shown on the structural drawings.

31. The mechanical attachment of the plywood layer to the steel also served no purpose other than to keep the plywood in place until the nailbase was installed and mechanically fastened through all underlying layers to the steel deck. As a result, the method by which Layton chose to affix the plywood to the metal decking before it was permanently fastened from the top of the nailbase through the metal decking, was part of its means and methods and did not require the approval of SafeBuilt. Despite this, SafeBuilt insisted upon inspecting the fastening pattern of the plywood. This was not warranted.

32. SafeBuilt inspected and passed the plywood layer as temporary construction in November and December of 2022, telling Layton that it was "Ok to cover" with Sharkskin.[10]

33. As part of a general observation report issued by SafeBuilt, it noted that there were areas of plywood that were subject to snow and raised concerns that moisture from the snow could cause warping of the plywood and/or impair the adhesion of the Sharkskin to the plywood.[11]

34. As part of subsequent observation reports issued by SafeBuilt and Arcadis after construction on the roof recommenced in the spring of 2023, they again raised the issue of potential

[9]Trial Ex. D4993 (Architect letter dated January 22, 2024).
[10] Trial Ex. D5503 (Inspection Reports).
[11] Trial Ex. D4357 (SafeBuilt Observation Report 14 dated 12/02/22).

delamination of the plywood layer from its prior exposure to snow, which could impact its ability to act as a viable substrate to adhere the Sharkskin.[12]

<u>Alleged Wrinkles, Folds, and Fishmouths in Sharkskin</u>

35. The Owner, Architect, and/or Safebuilt likewise provided observation reports noting that the Sharkskin appeared to have wrinkles, folds, fishmouths[13], was reversed lapped[14], was not sufficiently lapped over the facia at the eaves and rakes, and/or contained penetrations around the perimeter from the removal of snow mitigation devices called snow cleats.

36. In response, after an on-site inspection of the Sharkskin on the roof, on August 3, 2023, the President of Sharkskin provided a letter noting that he inspected the roof on July 6, 2023 and stated that the Sharkskin showed no sign of deterioration, had no cracks or tears, had not dried out and was well adhered.[15] He did state that certain specific deficiencies at eaves and edges be corrected along with holes from nails or screws, which Layton agreed to perform.

37. The Owner, Architect, and/or SafeBuilt rejected this correspondence as insufficient, in part, because Sharkskin's President was not able to inspect all of the Sharkskin as some had been covered by polyiso insulation boards and/or nailbase with the knowledge of the inspector.[16]

38. These alleged deficiencies were likewise addressed by the President of Sharkskin who noted that the presence observed folds, wrinkles, and fishmouths was acceptable and would

[12] Trial Ex. D4542 (SafeBuilt Observation Reports 34 date June 26, 2023); Trial Ex. D4568 (SafeBuilt Observation Report 39 dated July 13, 2023), Trial Ex. D4535 (IBI Field Report June 21, 2023).
[13] A fishmouth refers to a slight gap at the edge of underlayment that can resemble a fish mouth.
[14] A "reverse lap" or "back lap" refers to a circumstance where the upslope edge of the self-adhered underlayment sheet is exposed, rather than being covered by another layer of underlayment in a shingled fashion.
[15] Trial Ex. D4794 (Sharkskin letter dated June 1, 2023 (Attached to 10/20 SafeBuilt Report); Trial Ex. D4548 (Letter from Layton containing July 21, 2023 letter from Sharkskin); Trial Ex. D4620 (Layton letter containing August 3, 2023 letter from Sharkskin).
[16]Trial Ex. D4794 (DDRM Letter dated Oct. 24, 2023 attaching letter from Arcadis dated October 20, 2023).

not impair the function of the Sharkskin. He also noted that noted areas of damage to the Sharkskin around the perimeter were to be fixed.[17]

39. As noted above, the letter from Sharkskin's manufacturer was rejected as insufficient.

Non-Staggering of Polyiso Insulation and Nailbase

40. The polyiso insulation boards and nailbase insulation boards measure four feet by eight feet. The manufacturer of the polyiso insulation boards and nailbase insulation boards, Hunter Panels, recommends, but does not require, that when layered on top of one another, that they be staggered both horizontally and vertically to avoid any potential gaps that can allow additional air flow through the system.

41. The polyiso insulation boards and nailbase insulation boards were installed in a horizontally and vertically staggered fashion on Area 1 of the roof, as illustrated below:




[17] Trial Ex. D4620 (Layton letter containing August 3, 2023 letter from Sharkskin).

**SGH Report D5524, Fig. 4, p. 11.**

42. During the installation of the polyiso insulation boards and nailbase insulation boards in most of Area 2 and all of Area 3, the insulation boards were horizontally staggered, but not vertically staggered. This was done to allow for the more efficient installation of "night dams", or protective measures taken at the end of a work-day to protect the roof system from water intrusion due to weather elements.[18] A picture illustrating the non-staggering of joints and night dams is below:




[2023.09.23 SafeBuilt Stop Work (CL0046012-25) p. 7.]

[18] Trial Ex. D4588 (Layton letter transmitting Global letter dated July 6, 2023).

43. The Owner, Architect, and SafeBuilt criticized the non-staggering of the polyiso insulation board and nailbase insulation board layers as not being compliant with the detail or recommendations of the manufacturer, Hunter Panels.[19]

44. There are no requirements for inspection by a third-party inspector or building official in the specification section for the insulation boards.

45. In response, Layton provided a letter from Hunter Panels indicating its approval of the installation of the two insulation board layers despite the lack of staggering and that the warranty remained intact.[20]

46. These letters were rejected by the Owner, Architect, and SafeBuilt.[21]

<u>Alleged Wrinkles, Reverse-Laps, and Fishmouths in the SlopeShield</u>

47. During the course of construction, the Owner or Architect noted alleged wrinkling and fishmouths in the SlopeShield.[22]

48. In response, Layton provided a letter from the manufacturer of the SlopeShield (Vaproshield) representing that the SlopeShield would perform as required despite the noted wrinkles and fishmouths.[23]

49. This letter was rejected as insufficient.[24]

50. In order to accommodate the required sequencing imposed by the roof's incomplete design, Layton proposed an installation sequence which involved reverse lapping of the

---

[19] Trial Ex. D4686 (9/23/23 Stop Work Order).
[20] Trial Ex. D4588 (July 31, 2023 letter form Layton transmitting Hunter Panel letters dated June 27, 2023); Trial Ex. D5089 (February 27, 2024 from Hunter Panels).
[21] Trial Ex. D4748 (Letter from Arcadis dated Aug. 16, 2023); Trial Ex. D4794 (DDRM Response to Layton work plan).
[22] Trial Ex. D4535 (IBI Field Report Dated June 21, 2023).
[23] Trial Ex. D4588 (Layton letter dated July 31, 2023).
[24] Trial Ex. D4794 (DDRM letter to Layton dated October 24, 2023).

SlopeShield or other underlayment products. The Owner and Architect also rejected any reverse lapping of the SlopeShield or other underlayment products.[25]

**The Stop Work Notice**

51. SafeBuilt issued the Stop Work Notice on September 23, 2023, halting work on the roof. The grounds for the Stop Work Order consisted of the issues raised above and allegations that inspections were not requested.

52. In response, Layton provided a detailed work plan to address the Stop Work Order on October 13, 2023.[26] The work plan provided an explanation of the actions Layton intended to take to address the concerns raised by the Stop Work Order. It also noted the prior correspondence from manufacturers accepting the as-installed materials, but also proposed various additional testing for various materials to confirm their performance. It also provided a letter from third party entity Field Verified. Field Verified performed a thermal modeling analysis of the roof without staggered insulation board joints and determined that it would still perform in excess of the code and plan requirements. It also noted that the use of a vapor barrier at the deck level negates the potential benefit of staggering the board joints because air cannot cycle through the joints. The Owner, Architect, and Safebuilt rejected the work plan as insufficient and requested additional detail.[27] The Owner, Architect, and SafeBuilt also asserted that the findings of Field Verified were biased and/or irrelevant.

---

[25] Trial Ex. D4919 (RFI 1881); Trial Ex. D9420 (RFI 1881R1); Trial Ex. D9068 (RFI 1592); Trial Ex. D9069 (RFI 1592R2).
[26] Trial Ex. D4742 (Correspondence and Work Plan from Layton dated October 13, 2023.
[27] Trial Ex. D4776 (Letter from DDRM to Layton Dated October 20, 2023); Trial Ex. D4794 (Letter from DDRM dated October 24, 2023 to Layton); Trial Ex. D4810 (Email from DDRM to Layton October 27, 2023); Trial Ex. D4840 (Letter from DDRM to Layton dated November 7, 2023).

53. Layton provided a revised work plan dated November 15, 2023, stating, among other things, that Layton

> will change the insulation panels to double stagger in any locations we don't have photo verification of the double stagger already installed. We will also address the Sharkskin adhesion claims of non-conformance by performing pull tests and fish -mouth claims by getting additional written correspondence from the manufacturer stating they have reviewed the observation reports in determining if the work installed conforms. Finally, we will take core samples of plywood to address the claims of non-conformance for the plywood delamination.

Layton also stated:

> Nothing herein is intended or should be construed as an admission of non-conformance of any work performed by or at the direction of Layton or that Layton has not fully performed as required under its agreements with DDRM. Layton expressly reserves all rights under the contracts and law.[28]

54. It does not appear that SafeBuilt provided a written response to the revised work plan.

55. Instead, the Owner provided a "preliminary list of questions" to be answered to avoid "immediate rejection" of the revised work plan and generally asserted that the plan lacked sufficient specificity, but did not provide guidance on what would be acceptable to the Owner for the removal of the stop work order.[29]

56. Answers to the questions were provided on November 28, 2023 from Layton, to which the Owner again contended did not contain sufficient detail, but did not provide guidance on what would be acceptable.[30]

---

[28] Trial Ex. D4860 (Layton Revised Work Plan dated November 15, 2023).
[29] Trial Ex. D5138 (Email from DDRM to Layton dated November 20, 2023).
[30] Trial Ex. D5138 (Email from DDRM to Layton dated November 29, 2023).

57. On a number of occasions after the Stop Work Order was put in place Layton requested direction from the Owner on how to proceed in light of Layton's claim and evidence that the work was conforming. To make progress on the construction of the roof while reserving the respective claims of the parties, Layton offered to remove and replace all alleged non-conforming plywood, Sharkskin, SlopeShield, polyiso insulation boards, and nailbase insulation boards.[31] These requests for direction and offers to move forward and fight about who was responsible later were rejected by the Owner.[32]

58. Further, SafeBuilt's statements regarding what would be required to lift the stop work order were inconsistent unreasonable and changed over time. For example, SafeBuilt inspected and accepted the plywood roof board in late 2022. Several months later, SafeBuilt issued a stop work notice citing the plywood roof board and indicating that it needed a special inspection. In January of 2024, SafeBuilt indicated that performing tests according to ASTM E661 would be acceptable to demonstrate the plywood's "integrity."[33] Layton then retained a laboratory to test the plywood in accordance with an agreed upon ASTM standard and established that the plywood passed the test.[34] In response, SafeBuilt then shifted its position and stated that the use of ASTM E661 was not appropriate and would not be accepted.[35]

[31] Trial Ex. D4822 (Correspondence from Layton to DDRM dated October 31, 2023); Trial Ex. D4826 (Correspondence from Layton dated November 1, 2023).
[32] Trial Ex. D4840 (Letter from DDRM to Layton dated November 7, 2023).
[33] Trial Ex. D5004 (SafeBuilt Letter dated January 24, 2024).
[34] Trial Ex. D5082 (Benchmark Report dated February 20, 2024).
[35] Trial Ex. D4794 (DDRM Letter dated October 24, 2023 transmitting responses).

59. Layton provided a final work plan to lift the Stop Work Order on March 1, 2024, three days prior to the notice of termination from Owner to Layton.[36] There was no response to this final work plan.[37]

**Post Termination Events**

60. Shortly after termination of Layton, DDRM took assignment of all relevant subcontractors, including Global Roofing. On April 12, 2024 DDRM provided a notice of violation to Global Roofing and demanded that it address the Stop Work order by providing a plan that included direction on items such as specific testing, the removal of all polyiso insulation boards and nailbase insulation boards, and other issues.[38]

61. On April 29, 2024 Global provided a proposed work plan while reserving the right to assert claims for additional cost at a later date.[39]

62. The next day DDRM terminated Global.[40]

63. After the termination of Layton DDRM retained SMC as a replacement general contractor. On May 29, 2024, SMC issued a letter of intent to Alliance that served as its notice to proceed with the proposed work, which was for the complete removal and replacement of the roof.[41]

**Removal of the Snow Globe**

---

[36] Trial Ex. D5097 (Layton Final Work Plan dated March 1, 2024).
[37] An assessment and response to allegations in the roof violation notice dated October 10, 2023 from SafeBuilt is contained on pages 43-48 of the SGH report, which I have reviewed and concur with. Trial Ex. D5524 (SGH Report, pp. 43-48).
[38] Trial Ex. D5207 (April 12, 2023 letter from DDRM to Global re Notice of Default).
[39] Trial Ex. D5244 (Global Termination Letter).
[40]Trial Ex. D5244 (Letter from DDRM re Global Termination).
[41]Trial Ex. D5270 (Alliance Letter of Intent May 30, 2024).

64. At the time of Layton's termination on March 11, 2024, the Snow Globe covered approximately 2/3rds of the roof. This snow globe consisted of a thick plastic sheet covering a temporary metal framework. The following photograph depicts the Snow Globe as it existed at the time of Layton's termination.




65. Shortly after taking over the construction site, SMC intentionally cut open the Snow Globe installed by Layton. Beginning in mid-April the Snow Globe was dismantled, which was completed in May of 2024.[42]

<u>Investigation by WJE</u>

66. On June 17, 2026, over three months after the termination of Layton, and several weeks after leaving the incomplete roof exposed to the elements, representatives of Owner's expert WJE, representatives from SGH, and I visited the Project to perform documentation and testing.

[42] Trial Exs. D5255; D5295 (DAC Minutes); Pete Smith Deposition 103-105; Richard Schaller Deposition 76-77.

67. Testing on the roof occurred by WJE and SGH over three time periods, June 17-June 19, 2024, July 8-9, 2023, and July15-17, 2024.

68. Over a year later, on August 26, 2025, the Owner disclosed the expert report of Robert Kerns of WJE on the roof.

69. WJE presented allegations of defects at each layer of the incomplete roof. WJE alleged that there was evidence of "delamination" of the base plywood layer, that there were fishmouths, incorrect/insufficient flashing of chimneys or other vertical transitions with Sharkskin, a lack of staggering in the polyiso insulation boards and nailbase insulation boards, poor adhesion, fishmouths, and inappropriate/insufficient flashing of chimneys or other vertical transitions with the SlopeShield layers, and the presence of under driven, over driven, or non-compliant fastening patterns.

70. Most of the emphasis in the report, however, was on moisture intrusion into the incomplete roofing system and the potential for apparent microbial growth. Specifically, WJE asserted:

> Multiple areas of elevated moisture content within the roof assembly were identified using moisture meters at exploratory openings and a drone IR survey. … The presence of liquid water, staining, and microbial growth at these locations confirms that water has penetrated the roof system and become trapped between the insulation layers, creating an environment conducive to organic growth.

Trial Ex. P1227, (WJE Report p. 31.)

71. The WJE report then made the recommendation that Cody Lane remove and replace the entire roof down to the metal deck based upon the alleged presence of moisture and microbial

growth within the roofing system.[43] By this time, however, the original roof had already been long since removed, which began immediately after testing was performed by the various experts.[44]

**Testing and Analysis Performed by SGH**

72. SGH was present for all destructive testing performed on the roof with WJE.[45] Likewise, from early June through much of July 2024, SGH staff were continuously on site observing the roof assembly removal. SGH thoroughly documented the roof and testing, took physical samples and conducted laboratory testing of the samples taken from the roof. SGH also provided careful thermal modeling to establish the ability of the as-constructed roof to provide the thermal performance required by the plans and code. The results of SGH's analysis are contained within its expert report filed with the Court on September 26, 2025.[46]

73. I provided input on the testing performed, have carefully reviewed the testing methodology and results as set forth in the SGH report, and have found them to be reliable. I have relied upon the results and analysis of SGH as part of my opinions.

74. A representative photo of the state of the roof on June 17, 2024, which was in essentially the same state of construction (although not deterioration) as of the time of the Stop Work Order and termination, is below:

[43] Trial Ex. P1227 (WJE Report p. 32).
[44] Trial Ex. D5270 (Alliance Letter of Intent May 30, 2024).
[45] Trial Ex. D5524 (SGH Report p. 5).
[46] Trial Ex. D5524 (SGH Report).



**SGH Report D5524, Fig. 2, p. 7, Photo of Roof as of 17 June 2024**.

75. The SGH field documentation process included the following specific steps:

a. Perform an initial survey of the SlopeShield underlayment conditions and assess underlayment adhesion.

b. Record fastener spacing, engagement, and installation at the H-Shield NB nailbase board and 3/4 in. plywood layer levels.

c. Document the moisture content levels:

- On the nailbase plywood using a moisture scanner placed over the roof underlayment.
- On the nailbase plywood at a selected 4 ft x 8 ft sheet using a moisture meter with non-insulated pins taking readings at 2 ft on center on the top surfaces and the underside.
- On the loose-laid polyisocyanurate insulation at a selected 4 ft x 8 ft panel using a moisture meter with insulated pins taking readings at 2 ft on center.

- On the base plywood using a moisture meter with non-insulated pins.
- Observe and document staining on the top and bottom of the polyisocyanurate facer.
- Note the condition of the SharkSkin Ultra SA underlayment and the adhesion to the plywood base layer.
- Assess the condition of the plywood base layer.
- Retain representative samples of the nailbase, polyisocyanurate, and plywood base layer; double-wrap the samples in a polyethylene bag sealed with polyethylene tape; and ship the samples to the SGH laboratory in Waltham, Massachusetts, for gravimetric testing.

76. A detailed summary of the field observations for the SGH and WJE samples, including the assessment of the SlopeShield, Sharkskin, insulation boards, and fastener location and engagement can be found at Trial Ex. D5524 (SGH Appendix I). Likewise, a detailed summary of the gravimetric laboratory testing performed by SGH can be found at Trial Ex. D5524 (SGH Appendix J). A detailed summary of the fastener calculation and analysis performed by SGH can be found at Trial Ex. D5524 (SGH Appendix K). And SGH's thermal modeling assumptions and results can be found at D5524, pp. 33-36, 51-52).

Response to Alleged Deficiencies in the Base Plywood

77. The stop work order issued by SafeBuilt on September 23, 2023 indicated that the plywood roof board had not been inspected and needed to be evaluated. That stop work order indicated that prior inspection assumed the plywood was "*temporary*" and referenced Chapter 17 of IBC. That chapter covers special inspections and tests.

78. Attachment of the plywood roof board (below the Sharkskin layer) to the steel deck was irrelevant to the performance of the roofing system. The attachment was only needed for temporary purposes, was not specified in the design documents, and was at the discretion of Layton as part of the contractor's means and methods for construction. As such, the attachment should not have been subject to inspection or rejection by IBI or SafeBuilt in the first instance.

79. Further, Section 1705 of IBC covers required special inspections and tests. Several subsections of Section 1705 cover structural components and systems such as steel construction, concrete construction, masonry construction, wood construction, soils, and many other foundation related or seismic related special inspections. Subsection 1705.5 which addresses wood construction covers "prefabricated wood structural elements and assemblies", high-load diaphragms and metal-plate-connected wood trusses.

80. Given that the plywood layer had no structural purpose, it is my opinion that a special inspection of its installation was not necessary or contemplated by the referenced section of the notice. Additionally, we have been provided with a series of text communications and confirmations of inspections that indicates the plywood layer had in fact been inspected and deemed acceptable for application of subsequent layers.[47] It is puzzling why several months after issuing that written communication, SafeBuilt indicated no requests for inspection of the plywood layer were made in the stop work order issued on September 23, 2023. Finally, if SafeBuilt considered the plywood to be temporary, it is not clear why it would require it to be inspected.

81. Further, to the extent there was concern about adhesion of the Sharkskin to the plywood or any potential warping of the plywood (which has not been shown), the plywood would

---

47 Trial Ex. D5503 (Inspection records); Trial Ex. D4789 (October 23, 2023 correspondence from Layton to SafeBuilt with inspection results).

be fully flattened once the insulation and nailbase layers were installed and mechanically fastened through to the metal deck. Such situations would have no relevance to the performance of the roof.

82. In addition, to the extent any gaps were present in the roof board layer, they would not adversely impact the function of the Sharkskin layer. This is because the Sharkskin layer was able to bridge such gaps. The Sharkskin layer could readily serve its function despite localized bridging of the material over gaps.

83. Allegations that the plywood showed evidence of delamination due to prior moisture damage is not credible. To the contrary, the pictures showing alleged delamination during removal of the Sharkskin layer during investigation by WJE occurred because the Sharkskin layer was tenaciously adhered to the plywood. A photo in WJE's report illustrates this point:




**WJE Report, Trial Ex. P1227, p. 68 fig. 58.**

84. Further, during the investigation the workers assisting WJE to remove the Sharkskin had difficulty removing it due to its tenacious bond. The bond was so strong that portions

of the plywood substrate were adhered to the Sharkskin during removal. In fact, the Sharkskin bond to the plywood was so strong that the replacement roofing subcontractor used a blow torch to expose the plywood fasteners for removal rather than trying to remove the sharkskin from the plywood:



**SGH Report Trial Ex. D5524 Fig 13, p. 31.**

85. Project specifications designate plywood as "wet" if it has in excess of 19% moisture content. SGH's laboratory testing of 8 plywood roof board samples indicated moisture content of the plywood samples taken by WJE and SGH shows moisture content of the plywood between 3.71% to 6.78%.[48]

86. The inspections confirmed that the plywood base layer installation was acceptable, generally exhibited low moisture content, and that the SharkSkin Ultra SA installation was continuous and well-adhered with no functional defects at all inspected locations. Furthermore, as

[48] Trial Ex. D5524 (SGH Report, p. 37. (Appx. J)).

SGH was on site for over a month during the initial demolition phase, they were able to observe the roof closely and saw no issues with the SharkSkin Ultra SA installation. SGH's findings were consistent with the Sharkskin inspection report conclusions that indicated that the material was intact and free of defects, was well adhered in place, and that the minor ridges had no functional impact.

87. Based upon my review of the evidence, personal inspection, and years of experience, the criticism of the plywood installation by WJE and Owner is baseless and has no relevance on the overall functionality of the roofing system.

Sharkskin Folds, Back Laps, Wrinkles, Fishmouths

88. WJE and inspection reports of Global's work included several criticisms of the Sharkskin layer application. These included alleged lack of adhesion of the Sharkskin layer to the plywood substrate, wrinkles and fishmouths, and reverse lapping of the Sharkskin.

89. The above criticisms represent a fundamental lack of understanding of the apparent intent of the Sharkskin layer. In several communications, IBI referred to the Sharkskin layer as vapor barrier[49]. The original design details for the roof referenced the Sharkskin layer as an air and vapor barrier.

90. The presence of wrinkles, fishmouths, and reverse lapping of an air and vapor barrier does not impair the Sharkskin's ability to properly serve its function, particularly when sandwiched between the plywood below it and the nailbase and insulation panels above it.

91. The Sharkskin manufacturer issued a letter indicating that the as-installed condition of the Sharkskin was acceptable with some localized repairs, which Layton agreed to perform.[50]

---

[49] *See*, *e.g.*, Trial Ex. D4535 (IBI Report No. 2 dated June 21, 2023, Figs 13, 17).
[50] Trial Ex. D4620 (transmitting August 3,2023 Sharkskin Letter).

92. WJE's investigation revealed a location at a roof tieback anchor (placed in the roof for workers to clip into while they work on and/or maintain the roof) where the Sharkskin had not been fully sealed around the roof tieback stanchion. However, continuity of a vapor retarder is not required for control of vapor diffusion in a building envelope. As to its function as an air barrier, the model building codes recognize that air barrier installation is imperfect and can have some breaches. This is why the applicable building code allows ten times more air leakage through an air barrier assembly versus air barrier material.

93. Accordingly, the issues such as reverse laps, fishmouths, and wrinkles in the Sharkskin application do not impair function, and criticisms of those issues as non-conforming is incorrect.

94. Likewise, SGH' s field investigation did not reveal any deficiencies that would not allow the Sharkskin layer to act as an effective vapor retarder or air barrier. Despite claims by DDRM and IBI that the Sharkskin layer was not properly adhered, WJE and SGH investigations revealed tenacious bonding of the Sharkskin to the plywood substrate. Nonetheless, the presence of unadhered areas, blisters, wrinkles, reverse-lapped areas and small breaches would not impact the ability of the Sharkskin layer to act as intended.

95. In fact, based upon the findings of both WJE and SGH in their field analysis the Sharkskin was performing as intended.

96. Finally, criticisms of the flashing around vertical transitions such as chimneys, dormers, and the like are, at best premature because it simply represents incomplete work rather than permanent conditions in the roofing system. The same is true of the alleged lack of sufficient overlap of Sharkskin over the facia as those areas were always contemplated as needing

remediation, which was not allowed to proceed because of the Stop Work Order. In addition, some of these criticisms are inconsistent with the Owner's subsequent acceptance of the same issues in the replacement contractor's work. Such inconsistencies in the Owner's standards for accepting work will be discussed later in this statement.

Polyiso Insulation Boards and Nailbase Insulation Boards

97. The insulation designed to be used above the roof decks was to consist of two layers of polyisocyanurate (polyiso) insulation boards. The manufacturer of the insulation boards recommends that the insulation boards be installed in a staggered manner.

98. The project specifications specified a minimum R-Value of 35 while the drawings called for an R-Value of 38.

99. The insulation installed by Global consisted of a 3-inch (total thickness) nailbase composite insulation consisting of 5/8-inch-thick layer of plywood and 2-3/8-inch-thick layer of polyiso insulation, and a 4-inch layer of polyisocyanurate insulation.

100. Pursuant to ASTM standard C1289 (Standard Specification for Faced Rigid Cellular Polyisocyanurate Thermal Insulation Board) Section 7.2, deference is to be made to the R-Value (its thermal resistance, e.g., the level of insulation provided) of a specific insulation, rather than by total thickness as the total thickness is irrelevant to the performance. For example, if a two-inch piece of insulation provides more insulation value than a four-inch piece of insulation, the material consideration is the thermal performance rather than the thickness of insulation.

101. Based upon information from the manufacturer's website, the total provided long term thermal resistance (LTTR) R-Value for the roof is R-38.6, which exceeds the requirements of the contract.

102. WJE also criticized the installation of the insulation. This criticism includes unstaggered joints and voids in certain areas such as roof ridges. The impact of unstaggered joints and voids in the insulation was also evaluated by SGH through their 2-dimensional thermal modeling. That analysis is based on calculating the U-Factor of the roof assembly, one of the three compliance paths allowed by the governing energy code.[51] BTC agrees with assumptions made for that analysis and the methodology. As indicated by SGH's analysis the effective R-Value of the roof assembly is indicated to be R-39.64 (U-Factor 0.025), even when the analysis assumed that unstaggered joints were present at every panel joint. Based on field observations, many insulation joints were in fact staggered, while some were not. SGH's analysis assumed the worst-case scenario with all joints not staggered. Despite this assumption, the analysis indicated that the as-installed assembly exceeds energy code requirements and the higher value specified in the Contract Documents. In addition, the analysis indicated that the difference in effective R-Value of staggered joints and unstaggered joints was insignificant.

103. SGH's analysis agrees with another study commissioned by Global in response to the SafeBuilt's and IBI's criticisms during construction. That study was performed by Field Verified and its results were contained in a letter dated October 23, 2023.[52] Field Verified's study used a similar methodology as SGH in analyzing the impact of staggered versus unstaggered insulation joints.

104. Importantly, WJE performed no thermal modeling of the roof and did not challenge the information provided by Layton to the Owner, the Architect, and SafeBuilt that the roof would adequately perform despite the presence of areas of non-staggered insulation boards.

---

[51] 2012 International Energy Conservation Code.

[52] Trial Ex. D4808 (Letter from Layton to DDRM and Architect dated Oct. 27, 2023 with Field Verified Report).

105. Likewise, WJE's infrared testing did not indicate thermal anomalies at unstaggered insulation joints. This further validates SGH's analysis that the impact of unstaggered joints is minimal and still provides for an assembly that performs above the minimum requirements of the energy code.

106. The issue of unstaggered joints was also addressed by the polyisocyanurate insulation manufacturer, Hunter Panels. In a letter dated June 27, 2023, Hunter Panels indicated that it "…takes no exceptions…" with the unstaggered joints. Hunter likewise warranted the performance of its product despite the presence of unstaggered joints.[53]

107. The insulation layers were staggered in many locations, but not at all locations. Where insulation was not staggered or had gaps in it, the effect of such issues is minimal due to the insulation being compartmentalized at daily cut off lines and confined between two layers of air barrier.

108. Finally, the above discussion notwithstanding, even if one assumes that the as-installed insulation layer did not comply with the contract documents, a layer of additional insulation and plywood could have been added on top of the existing roof assembly without the need for removal of any components.

109. The only repairs needed to address the criticisms related to large gaps at the ridges and hips, which I believe are valid, would consist of injecting those gaps with foam insulation. This method is commonly used to fill gaps in rigid board insulation joints.

<u>Fastening</u>

[53] Gaps were observed at the ridge and valleys due to a deficiency in design clarity. However, this issue does not justify removal of any roofing components to repair. An effective repair can be achieved by drilling small, ½-inch diameter holes along the ridge or valleys at 3- to 4-foot spacing and injecting expanding foam into the openings. Expanding foam is typically used to fill large gaps in roof insulation installations and provides a very reliable method of ensuring insulation continuity.

110. WJE also criticized the fastening of the nailbase plywood to the substrate, citing over-driven, under-driven and missing fasteners.

111. The presence of a small percentage of under-driven or over-driven fasteners does not violate standard of practice and is a common occurrence. Such installation deviations do not justify a complete removal and replacement of the roofing system and could have been addressed on a localized basis. Further, even if one assumes that the fastening of the nailbase layer was insufficient, additional fasteners could have been added without the need to remove any components.

112. SGH performed a detailed analysis of the attachment of the nailbase to the substrate. This analysis was performed based on observations and data obtained in the field and testing of various fastener capacities. SGH's analysis was more detailed and reliable than the discussion and speculations in WJE's report.

113. In fact, there was no fastener capacity analysis performed by WJE to support any criticism of the fasters used, fastener pattern, or fastener installation that could impact performance in any way.

114. BTC has reviewed SGH's data, testing and analysis of the fastening of the nailbase and agrees with its methodology and conclusions.[54] SGH' s work has demonstrated that the as-built fastening of the nailbase has ample capacity to resist anticipated loads.[55] Therefore, it is my opinion that the fastening of the nailbase layer was adequate and no repairs were needed to address such claimed deficiencies.

[54] A detailed summary of SGH's fastener testing and analysis is located at Ex. D5524 (SGH Report, Appendix K).
[55] *Id.*

115. Related, the nailbase plywood layer was to be fastened to the steel deck through the insulation layer with steel fasteners. Each sheet of plywood was to be fastened with 32 fasteners. Therefore, the roofing assembly inherently contained numerous thermal breaks at these fasteners. These thermal bridges can also contribute to condensation both within the roofing assembly and below. WJE found evidence of moisture around some fasteners, but did not attempt to analyze the source of the moisture. Instead, WJE attributed these issues to installation deficiencies. It is entirely possible that these localized patterns of moisture are related to condensation at or around the fasteners. The addition of insulation below the steel deck further reduces component temperatures above the steel deck, exacerbating condensation issues.

Wood Blocking

116. Another criticism of Layton by WJE is how the perimeter wood blocking was secured; however, the Project Specifications do not specify any specific type, frequency, spacing, or length for fasteners related to wood blocking. Nor did the specifications require submission of shop drawings related to attachment of wood blocking, or delegated design. In addition, the design drawings neither include notes regarding attachment of wood blocking nor graphically show any fasteners for such blocking.[56]

117. If needed to meet design intent, such attachment should have been specifically shown on the design documents.

118. Lack of any requirements for fastening of wood blocking notwithstanding, Global did provide ample fasteners to hold the wood blocking in place.

---

[56] *See generally*, Trial Exs. J0596-J0599 (Specifications); Trial Ex. 5524 (SGH Report. pp. 32, 52-53 (Appendix K)).

119. The design deficiency was addressed by the design team after termination of Layton as they completely modified the perimeter wood blocking attachment details to include a steel plate.[57]

120. To the extent any supplemental attachment of wood blocking was needed, fasteners can be added to the wood blocking without the need to remove any components. Such supplemental fastening is considered a betterment.

SlopeShield

121. WJE, SGH, and I all observed and noted widespread damage to the SlopeShield layer during the site visits starting on June 17, 2024.[58] Recall that the SlopeShield was the primary water barrier for the roofing system[59]. Observed damage include several large tears in the SlopeShield, and typical UV degradation. Damage to the SlopeShield can allow water to infiltrate the roofing system. Some examples of the damage observed to the SlopeShield during the June and July 2024 inspections are below and additional examples can be found in the expert reports of WJE, SGH, and my report.

---

[57] Trial Ex. D5515 (BTC Report, pp. 70-72).

[58] Specifically, in SGH's report it notes the following:

- Tears and abrasions in the SlopeShield Plus SA at each WJE sample area.
- There were severe tears and damage to the SlopeShield Plus SA at WJE Locations 1A, 1B, and 3.
- SharkSkin Ultra SA was used as the weather barrier at WJE locations DT 6 and DT 8.
- There was damage to the SlopeShield Plus SA along the ridge at SGH Location 1. There were tears and abrasions in the SlopeShield Plus SA at SGH Locations 2 and 3.

Trial Ex. D5524 (SGH Report, Appendix I p. 26).

[59] While shingles provide bulk water shedding functions, the SlopeShield is the material intended to make the system water tight.


SLOPESHIELD® PLUS
BY VAPROSHIELD
SLOPESHIELD®
SELF-ADHERED


HERED
of my kind"
SLOPESHIELD







Trial Ex. 5524 (SGH Expert Report (Appendix I) pp. 70-74).

122. During the course of construction, Layton's work was criticized due to reverse lapping of the SlopeShield roof underlayment and localized breaches in the underlayment. In addition, IBI indicated that "reverse lap is not acceptable" for this component.[60] These requirements were unfounded and prejudicial against Layton for the following reasons:

a. Installation of the roofing system required a sequence that necessitated installing the top underlayment (SlopeShield and/or Grace Ice and Water Shield) first, followed by detailing of the terminations that had not been constructed yet. This practice is common in most construction and will result in reverse lapping of the self-adhering rubberized asphalt underlayment in many instances. National Roofing Contractors Association (NRCA) recognizes this issue and addresses how reverse laps may be done in their published standard construction details.[61]

b. Backlapping or reverse lapping of the rubberized asphalt underlayment was addressed by the manufacturer of the underlayment and deemed acceptable as long as the reversed lapped seals were covered with a bead of sealant.[62]

c. Due to delays in finalizing the roof design, Layton was forced to delay installation of the shingles. In order to continue work on the roofs while the design was being finalized, Layton and Global proposed installing another layer of underlayment over the existing and starting shingle installation a few courses up from the eaves.[63] It is my understanding from project personnel that this proposal was rejected and Layton was told that any damage to the

[60] Trial Ex. D4919 (RFI 1881); Trial Ex. D9420 (RFI 1881R1); Trial Ex. D9068 (RFI 1592); Trial Ex. D9069 (RFI 1592R2).
[61] Trial Ex. D5515 (BTC Report, pp. 32-38 and Figs. 9-15).
[62] Trial Ex. D4604 (GCP letter dated August 8, 2023).
[63] Trial Ex. D4548 (Letter from Layton containing July 31, 2023 letter from Vaproshield).

underlayment (due to prolonged exposure to UV or physical damage) would have to be addressed by removing the underlayment and installing a new one, a very time-consuming and labor-intensive process.

123. Despite the Owner's refusal to allow reverse lapping or a second layer of underlayment to be installed over the first layer, during Alliance's roof work, the damaged underlayment installed by Alliance was overlaid with a second layer of underlayment as shown in the photo below. This too indicates that a difference level of scrutiny was applied to Layton versus SMC.




**Alliance in Process of Installing Second Layer of Underlayment over First Layer on Right Side of Photo**.

124. Despite Owner's refusal to allow limited reverse lapping of the SlopeShield layer to Layton, during my site visit on July 2, 2025, I observed numerous instances of reverse lapped

roof underlayment in Alliance's work after the entire roof had been torn off and reconstructed.




**Example of Reverse Lapping at Eave by Alliance on Replacement Roof (Fig. 15) p. 39 (BTC Report Trial Ex. D5515).**




**Example of Reverse Lap at Valley by Alliance on Replacement Roof (Fig. 16) p. 40 (BTC Report D5515).**

125. DDRM and IBI apparently recognized that reverse lapping of rubberized asphalt underlayments (e.g., SlopeShield or Grace Ice and Water Shield) at various project details was inevitable and acceptable, but not until after termination of Layton. Several details in Alliance's shop drawings showed reverse lapped rubberized asphalt underlayment. These included several underlayment details shown on shop drawing Sheet SD-9 for standing seam metal roofs.[64]

126. Similarly, Alliance's shop drawings for the shingled roofs also showed reverse lapped rubberized asphalt underlayment in several details.

[64] Trial Ex. D5454 (Alliance Submittal/Shop Drawings).

127. Neither I nor SGH identified any material issues with adhesion of the SlopeShield. Regardless, the waterproofing capability of the underlayment is not dependent on its adhesion to the substrate. The membrane is a waterproof membrane and maintains its ability to resist water penetration with or without adhesion to the substrate. Further, in this case the waterproofing underlayment is sandwiched by the shingles and the nailbase.

<u>Alleged Moisture and AOG in the Roofing System</u>

128. It was not until the Owner issued the expert report of WJE on August of 2025 that it alleged moisture and the presence of "apparent microbial growth" was a defect that existed in the roof or that it was a basis for replacement of the roof.

129. WJE's analysis did not include any investigation into the likely source or timing of the moisture penetration. Instead, WJE apparently assumed that the condition of the roof in June 2024 when it performed its investigation was the same as prior to Layton's termination. WJE further speculated that the source of moisture intrusion was the installation deficiencies it pointed out, but did not perform any further testing or analysis to examine this hypothesis.

130. There is no evidence, however, that the roof contained excessive moisture prior to Layton's termination. In fact, Layton's snow globe would have protected most of the roof areas from moisture intrusion. See below photo.



**Trial Ex. D5465 (Struction Site Photo of the Roof Taken Under the Snow Globe Dated 03.08.24, Area 1, Between Gridlines 2-3 and B-C looking toward Area 2).**

131. The removal of the snow globe after Layton's termination would have necessarily caused substantial damage to the underlayment. This removal also resulted in exposing an incomplete roof to the elements for a period of time.

132. While exact determination of the source and timing of the moisture intrusion is difficult, a rational and qualitative analysis can be performed. Such analysis shows that it is reasonable to conclude that at least some, if not most of the water intrusion occurred after Layton's termination. Such analysis also indicates that the source of moisture intrusion is more likely to be the extensive damage to the underlayment, not alleged installation deficiencies.

133. DDRM has provided no evidence of the condition of the roof underlayment and flashings at the time of termination.

134. Further, the WJE report implies that there were high moisture levels and biological growth throughout the roofs. In fact, many areas where WJE made exploratory openings did not exhibit high moisture levels or did not have indications of biological growth. This was despite the fact that the areas selected by WJE were typically at roof details where probability of moisture penetration at details is the highest.[65]

135. WJE did not perform any laboratory testing to determine the extent to which any layer of the roofing system was or was not infiltrated with moisture. Rather, it relied solely upon handheld moisture meters and water finding strips to identify the presence of moisture in any given component.

136. WJE did not retain an industrial hygienist or perform any testing to determine the nature of the alleged "microbial growth". As a result, it is not possible to determine if the alleged "microbial growth" that WJE has documented is dirt, staining, mold, or other organic growth. Nor has any testing or analysis been done to determine if the growth is toxigenic, non-toxigenic, or whether it had or ever could infiltrate into any occupied space within the building.

137. WJE personnel used a Tramex Model RWS and a Delmhorst Model Navigator moisture meters in the field to measure the moisture condition of the substrate materials. The Tramex RWS installation instructions indicate that "Readings from the RWS are qualitative, not quantitative, and should be used for comparative purposes only."[66] And that the readings are "not

---

[65] Trial Ex. D5524 (SGH Report, Appendix I).
[66] Trial Ex. D5515 (BTC Report, p. 23-24 referring to pages 16 and 23 of RWS User Manual - RWS USER GUIDE).

an indicator of percentage moisture content."[67] As a result, it is imperative that non-destructive moisture readings be correlated to gravimetric moisture measurements. WJE performed no such tests.

138. WJE has not performed any testing to correlate its field moisture measurements using various non-destructive test methods with actual moisture content of the insulation and engineered wood materials, or with the results of its infrared imagery. While WJE's moisture measurements in the field can provide general data, they are less reliable than SGH's data, which is verified through gravimetric laboratory testing.

139. The observations made through SGH's investigation related to moisture in the roofs were far more reliable because SGH's exploratory openings were made at representative locations, and included larger areas that could expose several insulation boards within the same opening. In addition, SGH correlated field moisture measurements with actual gravimetric analysis of samples in the laboratory. In comparison, WJE's exploratory openings were smaller and were typically made at problematic areas such as roof-wall interfaces, eaves, etc.

140. SGH's findings with respect to its destructive testing and observations are as follows:[68]

a. SGH's work began in early summer 2024, after weather protection erected by Layton for the roof had been removed and the incomplete roofing system left open to an additional three months of exposure to rain and snow.

[67] *Id.*

[68] A detailed summary of the field observations for the SGH and WJE samples, including the assessment of the SlopeShield, Sharkskin, insulation boards, and fastener location and engagement can be found at Trial Ex. D5524 (SGH Report, Appendix I). A detailed summary of the gravimetric laboratory testing performed by SGH can be found at Trial Ex. D5524 (SGH Report, Appendix J).

b. Widespread damage to the SlopeShield Plus SA underlayment was noted across the entirety of the roof.

c. SGH's (and my) inspection did not reveal substantive defects in either the plywood base layer or the SharkSkin underlayment. The plywood base layer was securely attached to the underlying structure, remained intact at all observed locations.

d. Field observations showed generally low moisture content (below 18%) of the plywood base layer, with the exception of two anomalies.[69] Gravimetric laboratory testing confirmed that the eight samples taken of the 3/4 in. plywood layer were well below industry accepted moisture limits.

e. Sharkskin was functioning as a viable air barrier/vapor retarder and protective covering over the plywood base layer.

f. Field observations showed that the only high moisture polyisocyanurate locations were along the eaves and some isolated perimeter locations. Laboratory moisture content testing of the polyisocyanurate insulation showed an acceptable moisture content range in the roof field, so it still provided the expected R-value. *See* photo of Insulation Board, below.

[69] In addition, at three locations high moisture content readings in the plywood base layer were noted at isolated fastener penetrations but not in the rest of the plywood and did not impair function.



**SGH Report., D5524, p. 205.**

g. Field observations and laboratory moisture content testing confirmed that there were no areas of high moisture content in the nailbase plywood layer, except at eave locations, some perimeter locations, and one location where Sharkskin was used as underlayment instead of SlopeShield.

h. The SGH and WJE field moisture meter readings indicate that the insulation has retained its R-value.

i. The field moisture meters used for testing, however, are not calibrated for polyisocyanurate insulation, meaning their readings cannot be considered exact moisture content values. Accurate determination of moisture content percentage requires laboratory calibration using specimens of known moisture content for comparison with field values.

j. The laboratory test results confirmed that the field readings overestimated actual moisture levels in the polyisocyanurate insulation.

141. Critically, WJE has made no cause-and-effect analysis that related the alleged installation deficiencies by Global to the observed pattern of moisture intrusion. In addition, WJE performed no testing that could establish the source and path of water infiltration. While WJE referenced observing deterioration and damage to the SlopeShield underlayment installed in 2023 by Global, its conclusions and discussions did not specifically address this issue, its impact on moisture in the roof, or provide any analysis as to who would be responsible for such damage.

142. Instead, WJE provided the following general opinion, which lays the blame for all moisture intrusion on Layton and its subcontractors:

> In general, the combination of improper material installation, inadequate installation at transitions, and failure to install a continuous air and moisture barrier has resulted in widespread water infiltration and organic growth within the originally installed roof assembly.

This statement is speculative and ignores the physical damage to the SlopeShield underlayment that was installed by Layton and Global in 2023 prior to its termination. The extensive damage observed by BTC and SGH approximately one year later was neither an installation issue nor a failure to ensure the material was installed in a continuous manner. The observed damage was due to exposure to UV and physical damage from traffic and work on the roof, including from the removal of the snow globe after Layton's termination.

143. WJE's own infrared thermographic survey of the roofs did not indicate moisture contamination of the insulation that could be reliably identified through the infrared survey. The only observable thermal anomalies were around dormers and other locations where such anomalies are normal and due to differences in thermal performance, not due to moisture. Furthermore,

WJE's infrared survey and field moisture measurements were not correlated by WJE and cannot be relied upon.

144. The roof remained unprotected and was subjected to over 7 inches of rain and snow from March through 30 July, based on weather data from that period.[70] As the roof was unprotected from weather exposure for several months during documented precipitation events in Jackson, moisture entering the roof assembly was expected. Any moisture accumulation analysis, however, must consider both the lack of adequate roof protection post termination and the resulting potential for water intrusion from the defects in the SlopeShield.

145. Further, WJE's and SGH's field investigations did not find more moisture entrapment in the roof in the areas that had not been covered by the Snow Globe. Had the alleged defects in the roof caused water intrusion, one would expect that the section of the roof not covered with the Snow Globe would have had significantly more entrapped moisture. Given that the moisture entrapment found by SGH and WJE were consistent in areas with or without the Snow Globe, the most reasonable conclusion is that at least some, if not most, of moisture intrusion occurred after removal of the Snow Globe and additional physical damage to the roof underlayment.

146. Therefore, WJE's assertion that the moisture in the roof is directly related to Layton's installation issues is flawed as it ignores available facts. From the time Layton was

[70] SGH reviewed relevant data and found that there were rain events in Jackson Hole from April through July 2024. The NOAA NOWData Online Weather Data5 and determine the rainfall amounts by month in 2024 between Layton' termination and the testing were as follows:

- March: 2.79 in.
- April: 1.23 in.
- May: 2.10 in.
- June: 1.35 in.
- July: 0.93 in.

Trial Ex. D5524 (SGH Appx. G).

terminated on March 11, 2024 to the date of the first destructive testing on June 17, 2024, substantial rain and snow storms occurred as shown through weather data and as noted in DAC meeting minutes.[71] Although DDRM seemed to recognize the urgency of performing roof repairs to address leaks, we did not observe any evidence of recent repairs to address extensive damage to the SlopeShield underlayment during our June, 2024 site visit. Such damage is well documented in the WJE and SGH reports.

147. SGH's investigation revealed that the excessive levels of moisture in the roofing system were concentrated in the insulation board layers down slope of the roofs (near eaves). Observed patterns of the moisture between various layers of the roof suggested bulk water infiltration and a downward flow pattern towards the eaves. This pattern was consistent in all roof openings, including areas of the roof where no dormers or other complicated roofing details such as roof-to-wall transitions were present. At such locations, **the only reasonable conclusion is that source of bulk water infiltration was damage to and breaches in the roof underlayment**. No other probable sources of moisture infiltration were identified.

148. Based on the available information, there is no correlation between the alleged installation deficiencies by WJE and moisture in the roof. Instead, an objective analysis of the data would reasonably suggest that the moisture intrusion occurred due to the damage in the SlopeShield underlayment, some, if not most of which, occurred after Layton was terminated. Even if one assumes that a substantial portion of the damage to the roof underlayment had occurred prior to Layton's termination, the Owner failed to mitigate the impact of water infiltration into the roof.

[71]Trial Exs. D5255; D5295 (DAC Minutes).

149. Further, the work being criticized by WJE was incomplete, in process work, that Layton and its subcontractors could not complete because of the existence of the unfounded stop work order issued by SafeBuilt. As a result, the items of alleged deficient work documented by WJE do not necessarily represent the final work that would have been part of the completed roofing system had Layton and its subcontractors been permitted to continue performing their work.

Disparate Treatment of Replacement Contractor

150. Alliance's reroofing work included many of the alleged roofing deficiencies cited for stop work notices against Layton. However, Alliance's work seems to have been approved by DDRM, IBI, and SafeBuilt.

151. The replacement roofing system installed by Alliance also suffered from physical damage and extensive UV degradation.[72] Based on presence of severely warped plywood, it is also reasonable to conclude that the replacement roofing system contains excessive moisture.[73] To our knowledge, these issues were not the subject of a stop work order from SafeBuilt and were allowed to be incorporated into the final construction of the roof.

152. IBI, SafeBuilt and DDRM's apparent acceptance of the roofing system installed by Alliance demonstrates prejudicial standards applied to Layton, or standards that were not appropriate.

153. WJE performed its investigation of the roofing system in mid-June, 2024. However, Alliance had issued its second revised roof replacement proposal which was later incorporated into

[72] Trial Ex. D5515 (BTC Report, pp. 47-51, Figs. 20-27).
[73] Trial Ex. D5515 (BTC Report, pp. 58-59, Figs. 39, 49).

its contract on May 22, 2024.[74] Therefore, it is evident that DDRM had decided that a full replacement was justified prior to receiving any meaningful analysis supporting such conclusion.

154. The roof replacement sequence and schedule of Alliance are also questionable. Alliance started the reroofing process in June of 2024. In July of 2025 when we were allowed a site visit to observe the roofs, Alliance was in the process of starting installation of a new underlayment and shingles on the upper main roof.[75] While some of the smaller shed roofs had been completed, no roofing work appeared to have been performed on the main roof sections for a while as evidenced by extensive deterioration and damage to the new underlayment that Alliance had installed in 2024.

155. During our July 2, 2025 site visit, we observed several features that raises questions regarding the quality of work that Alliance was held to versus Global/Layton. The new roof underlayment exhibited extensive deterioration, physical damage, wrinkles and tears.

---

[74] Trial Ex. D5270 (Alliance Letter of Intent May 30, 2024).
[75] Trial Ex. D5515 (BTC Report pp. 47).




**BTC Report (Trial Ex. D5515) p. 51 Torn Underlayment at Ridge by Alliance**




**BTC Report (Trial Ex. D5515) p. 51 Extensive Damage and Apparent Prior Repairs to the Underlayment by Alliance**

156. In general, it is apparent that the quality standards applied to Global and Layton were far stricter than those applied to Alliance and SMC. Many of the items that Global and Layton were criticized for were apparently accepted on a widespread basis for Alliance. Therefore, many of the alleged deficiencies used as a cause for termination or as justification for the stop work order were unfounded.

157. More significantly, we observed a substantial amount of apparently warped nailbase, which also indicates moisture intrusion into the new roof installed by Alliance.[76] See figure below. Damage, breaches and openings in the SlopeShield underlayment that had been exposed for approximately one year between July of 2024 and my observation in July of 2025, had likely allowed moisture to penetrate the roof and cause the same types of issues that were among WJE's basis for recommending complete removal and replacement of the roof. It is not clear why SMC and Alliance had opted to sequence and schedule the work in such a manner that the new underlayment had been exposed for such a long time. It appears, however, that SMC faced the same logistical issues and design delays that Layton faced.




**BTC Report (Trial Ex. D5515) p. 65, Fig. 49 – Warped and Distorted Nailbase with Punctures in Underlayment**

[76] Trial Ex. D5515 (BTC Report pp. 58-59, Fig. 39).

Repair Recommendations

158. Many of the alleged roofing deficiencies cited for Layton's termination were either of temporary nature or could have been addressed on a localized basis without a need for complete removal and replacement of the roof.

159. At the time Layton received a notice of termination, it was in the process of actively working on either addressing the alleged deficiencies, or demonstrating compliance with the Contract Documents and/or requirements imposed by Safebuilt.

160. Layton was not afforded a reasonable opportunity to complete corrective/verification work in light of the lack of input or direction provided from the Owner or SafeBuilt regarding what additional information was needed to progress the work in the face of Layton's evidence from testing companies and manufacturers showing that the work was conforming.

161. Had Layton been afforded the reasonable opportunity to remedy the items listed in the stop work order through the completion of the roof work, such work could have been completed in far less time than that required by Alliance to tear off the roof and replace all components. Layton could have completed the roof installation in 2024 (assuming the design was completed).

162. Further, based on WJE's own investigation and the investigation performed by SGH, many areas of the roof did not exhibit moisture entrapment. In addition, the Sharkskin layer intended to be a vapor retarder and air barrier was in good condition, well-adhered, and had very few breaches, which were limited to roof tie off penetrations. Such limited and localized areas could have been readily repaired by removing a small section of the roof and repairing the beaches around the penetrations, or by applying foam air barrier from below.

163. Even if WJE had performed its investigation prior to the decision to remove and replace the entire roofing system down to the steel deck, there was no justification to remove and replace the existing plywood and Sharkskin layer.

164. Our analysis reveals that the following scope of work would have addressed any issues in the roofing, regardless of who was responsible for them. **It should be noted, however, that the scope of repairs below would have been eliminated or at least substantially reduced had the roof been protected and the Snow Globe been maintained properly by SMC (or Layton) between March 11, 2024 and mid-June of 2024 when a complete tear off of the roof was commenced by Alliance**:

a. Perform a moisture survey of the insulation lower layer along the bottom 12 feet of the roof as follows:

i. On a 4-foot grid, drill small, 1/8-inch diameter holes.

ii. Insert insulated probes of a resistance type moisture meter five inches down from the nailbase surface.

iii. Designate areas that exhibit higher than acceptable moisture levels for removal.

b. Remove two to three rows (8 to 12 feet) of nailbase and insulation down to Sharkskin layer along the roof eaves.

c. Replace the insulation and nailbase. Where the two layers of insulation cannot be staggered, foam the unstaggered joints.

d. Where large gaps in the plywood nailbase are apparent along ridge lines, provide a 22-gauge galvanized steel closure plate over the ridge and secure at 12-inches on center using roofing nails or screws.

e. Add fasteners to perimeter wood blockings.

f. Apply a new layer of roof underlayment over the existing underlayment and new nailbase plywood.

g. Continue installation overlaying roof components including underlayment, flashings and shingles.

h. The gaps in the polyisocyanurate insulation observed along the roof ridges should be addressed by injection foam into the gap from the top. This repair does not require any removal of components previously installed.

The Design for the Roof was Incomplete and Remained Incomplete at Termination

165. While the design was sufficiently completed for Layton to proceed with the construction of the roofing system, it was not sufficiently to complete the roof. During construction of the Project, the design of the roof evolved based on some value engineering proposals and design decisions. At the time of Layton's termination several design aspects related to the roof remained unresolved, including the downspout placement materials for the gutters, and gutter attachment.[77] As a result of delays in finalizing roof accessory design, Layton could not complete the design of the snow melt and snow retention systems as they were dependent upon the placement of gutters and downspouts.[78] This led to the inability to start the installation of shingles, and the

[77] Trial Ex. D5515 (BTC Report, pp. 16); Trial Ex. D9301 (RFI 1781); Trial Ex. D9302 (RFI 1781R1); Trial Ex. D4379 (CCD 293 PR 16); Trial Ex. D4493 (CCD 376R1, PR 16.1); Trial Ex. D4433 (CCD 376 PR 16.2); Trial Ex. D4623 (CCD 376.2 PR 16.3).
[78] *Id.*; Pete Smith Deposition 105-107.

need to leave the roof underlayment exposed to elements and traffic for a long period of time. In fact, the roof design was not finalized at the time of Layton's termination. Based on information available to me, there is no reason why the design of the roof could not have been completed and finalized by the time Layton was terminated.

166. In addition, several components of the system were changed by DDRM and/or IBI. As an example, after termination of Layton, DDRM was requesting pricing for different finishes of chimney caps, and copper gutters. DDRM was also requesting a modified roof warranty which "… must be 100% , no carve outs."[79] In our experience, such warranties in the roofing industry are highly unusual. Such warranty was not part of the original Contract Documents.

**<u>Conclusion</u>**

167. It is my opinion that, as of the time of termination, and save for limited portions of work that Layton agreed to repair (such as completing flashings around chimneys and dormers and lapping of SharkSkin over facia at eaves, etc.) but was prevented from doing so, the roof Layton construction met all performance requirements of the code and plans and the Stop Work Order was not warranted. The design of the roofing system was incomplete as of the date of the stop work order and remained incomplete beyond the date of Layton's termination. Accordingly, even if the Stop Work Order had been lifted, Layton would have been unable to proceed due to lack of information. The weather protection in place at the time of termination was removed and the incomplete roof with its visibly damaged SlopeShield layer was left exposed for weeks to substantial snow and rainfall from the time of Layton's termination to the time of the destructive testing. This was likely done because the decision had already been made to remove and replace

[79] Trial Ex. D5245 (DDRM Email to SMC dated May 2, 2024); Trial Ex. D5270 (Alliance Letter of Intent May 30, 2024); Trial Ex. D5308 (OAR dated July 1, 2024).

the roof prior to any testing performed by WJE.  The cause of the moisture accumulation in the roof system is from defects in the SlopeShield underlayment and the absence of protection from rain and snow events.  Finally, even if Layton were responsible for the moisture intrusion into the roofing system, which has not been shown, there were localized repair options available that did not require the full removal and replacement of the roof.