Randall B. Reed (Wyo. Bar No. 5-2863)
Erika M. Nash (Wyo. Bar No. 6-3867)
Justin Daraie (Wyo. Bar No. 7-4690)
**LONG REIMER WINEGAR, LLP**
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001
307-635-0710
rreed@lrw-law.com
jdaraie@lrw-law.com
enash@lrw-law.com

Michael T. Hoppe (pre hac vice)
Bryan S. Johansen (pro hac vice)
Sara M. Nielson (pro hac vice)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
mhoppe@parrbrown.com
bjohansen@parrbrown.com
snielson@parrbrown.com

L. Tyrone Holt (pro hac vice)
**THE HOLT GROUP, LLC**
1675 Broadway, Suite 2100
Denver, Colorado 80202
tholt@holtllc.com

*Attorneys for Defendant Layton Construction Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff / Counterclaim Defendant,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant / Counterclaim Plaintiff. | Case No. 2:24-cv-00064-KHR<br><br>The Honorable Kelly H. Rankin<br><br>Magistrate Judge Stephanie Hambrick |
| LAYTON CONSTRUCTION CO., LLC,<br>Third Party Plaintiff,<br>v.<br><br>SPRAYFOAM SOUTHWEST, INC. DBA GLOBAL ROOFING GROUP, ET AL.<br><br>Third-Party Defendants | |

**WITNESS STATEMENT OF LAYTON CONSTRUCTION, LLC EXPERT WITNESS
KENNETH KLEIN**

**Introduction and Qualifications**

1. I, Kenneth Klein, am a Senior Principal at Simpson Gumpertz & Heger, Inc. ("SGH"), and a registered civil engineer and professional engineer. SGH is a consulting firm that designs, investigates, and rehabilitates structures and building enclosures.

2. I obtained my Bachelor of Science degree in Civil Engineering from the University of California, Berkeley in 1983.

3. I hold Professional Engineering registrations in the states of Colorado, Idaho, New Mexico, Oregon, Texas, and Wyoming.

4. I hold Civil Engineering registrations in the states of California, Minnesota, Nevada, Washington, and Wyoming.

5. I am a member of the National Council of Examiners for Engineering and Surveying (NCEES Record #39148).

6. I am the Technical Advisor for the Western States Roofing Contractors Association.

7. I am a member of the Construction Specifications Institute, the American Society of Civil Engineers, and the Sealant, Waterproofing, and Restoration Institute.

8. I have over forty (40) years of experience in designing and investigating commercial, institutional, and residential buildings, with a specific emphasis on building enclosure design and remediation on a wide range of structures, from residential and high-rise buildings to buildings of historic significance. I have consulted with architects, contractors, and building owners to analyze and repair water intrusion problems and construction defects on hundreds of projects.[1]

---

[1] My CV can be found at the end of the Rebuttal Expert Report of Kenneth Klien at Trial Ex. D5524.

**Scope of Retention**

9. Parr Brown Gee & Loveless, on behalf of Layton Construction (Layton), retained Simpson Gumpertz & Heger (SGH) in January 2024 to perform a thermal analysis of the as-built steepslope roof system to assess thermal performance of the roof on a building under construction located at 3355 West Cody Lane in Teton Village, Wyoming (the "Project"), which is also referred to as the Hoback Club. After Layton's termination in March 2024 from the Project, Holt Group LLC, on behalf of Layton, retained SGH to perform an investigation and testing of the as-built roof to respond to criticisms made by the Owner, Architect, and SafeBuilt regarding Layton's construction of the roof as set forth in the expert report of Owner's expert Robert Kerns of Wiss Janney Elstner Associates, Inc. ("WJE").

10. Cody Lane Development Company (the "Owner"), the owner of the Project, contracted with Layton Construction Company ("Layton") in May of 2021 to construct the Project. Layton retained Sprayfoam Southwest, Inc. dba Global Roofing ("Global") as its subcontractor to build the roof. The Owner retained DDRM Jackson, LLC and Martin J. Breen ("DDRM") as the Development Manager with authority to act on behalf of the Owner for the construction of the Project, Arcadis fka IBI Group as the architect for the Project ("Architect") and SafeBuilt, Inc. ("SafeBuilt" or "IOR") to act as the inspector on behalf of the Owner.

11. The Project is a four-story residential structure with primarily steep-slope roofs, some low-slope membrane roofs, and standing seam metal roofs. At the time of our investigation and analysis, the as-built roof system materials from the top to bottom included self-adhered roof underlayment (SlopeShield Plus SA), nailbase (a bonded plywood layer to polyisocyanurate

insulation), polyisocyanurate insulation, self-adhered air barrier/vapor retarder (SharkSkin Ultra SA), base plywood, and metal deck.

12. SGH was present for all destructive testing performed on the roof with WJE on June 17-19, 2024, July 7 and 9, 2024, and July 16 and 17, 2024.[2] Likewise, from early June through much of July 2024, SGH staff were continuously on site observing the roof assembly removal. SGH thoroughly documented the roof and testing, took physical samples and conducted laboratory testing of the samples taken from the roof. SGH also provided thermal modeling to establish the ability of the as-constructed roof to provide the thermal performance required by the Contract Documents and code. The results of SGH's analysis are contained within the expert report filed with the Court on September 26, 2025, which is incorporated herein by reference.[3]

13. In addition to the site investigations and laboratory testing, I and SGH personnel working at my direction met with Layton and Global project team members to obtain Project background. I and SGH personnel also coordinated and consulted with Kami Farahmandpour of Building Technology Group regarding observations, testing methodologies, and testing results.

**Summary of Opinions**

14. The thermal analysis performed by SGH establishes that nailbase and polyisocyanurate insulation boards do not require staggered joints to provide the code-compliant and construction document-mandated R-value.

15. The night seals at the non-staggered joints were compatible with the roof assembly.

16. The inspections confirmed that the base plywood layer remained dry and functional, and that the SharkSkin Ultra SA was properly installed and performing as intended.

---

[2] Trial Ex. D5524 (SGH Report p. 5).
[3] Trial Ex. D5524 (SGH Report).

17. From our observations the cause of the moisture accumulation in the roof system is from defects in the SlopeShield Plus SA and the absence of protection from weather events after Layton's termination.[4]

18. The investigations conducted months after Layton's termination show the primary moisture accumulation is limited to isolated locations at eaves and perimeters in the insulation board layers. For the balance of the roof assembly, moisture accumulation is within acceptable limits such that there is little to no effect on the roof assembly thermal insulation performance.

19. Based upon detailed testing and modeling, SGH found that the original roof fastening was determined to have sufficient capacity to accommodate wind uplift, dead loads, and snow loads despite some observed fastener installation anomalies.

20. A complete summary of SGH's findings and conclusions can be found in my Rebuttal Expert Report, filed with the Court on September 26, 2025 (Dkt. 271-6) and listed as trial exhibit number D5524.

**<u>The Roof</u>**

21. The shingled portion of the steep sloped roof consists of five layers. From bottom to top, the design of the roof consisted of (1) the fluted steel decking, (2) a plywood roof board to act as a substrate for the vapor retarder and air barrier, (3) the vapor retarder and air barrier

---

[4] Trial Ex. D5524 (SGH Report pp. 48, 55, Appendix I pp. 54-59). SGH reviewed relevant data and found that there were rain events in Jackson Hole from April through July 2024. The NOAA NOWData Online Weather Data5 and determine the rainfall amounts by month in 2024 between Layton' termination and the testing were as follows:

- March: 2.79 in.
- April: 1.23 in.
- May: 2.10 in.
- June: 1.35 in.
- July: 0.93 in.

Trial Ex. D5524 (SGH Appx. G).

consisting of a self-adhered underlayment (commonly referred to by its tradename "Sharkskin"), (4) a 4-inch-thick layer of rigid polyisocyanurate insulation board (commonly referred to herein as "polyiso"), (5) 5/8-inch thick plywood sheathing adhered to a layer of 2 3/8-inch thick polyisocyanurate insulation board (commonly referred to herein as "nailbase"), (6) a self-adhered rubberized underlayment (commonly referred to by its trade name "Slopeshield"), and (7) synthetic shingles (commonly referred to by its trade name "Brava"). The nailbase layer was to be mechanically fastened through all underlying layers to the steel deck using nine-inch steel fasteners, and the shingles were to be individually fastened to the nailbase.

22. At the time of Layton's termination, the completed portions of the roof consisted of the following layers down to the steel deck (e.g., shingles, gutter, and snow melt system not installed):




23. The applicable building code was the 2018 edition of the International Building Code (IBC), including Appendix J. The applicable energy code was the 2012 International Energy

Conservation Code (IECC).[5] The building is designed as non-separated mixed-use (IBC Section 508.3), with five stories of Type II-A construction.

**SGH Thermal Analysis**

24. SGH's Findings with respect to the thermal performance of the roof is as follows:[6]

25. The insulation designed to be used above the roof decks was to consist of two layers of polyisocyanurate (polyiso) insulation boards. The manufacturer of the insulation boards recommends, but does not require, that the insulation boards be installed in a staggered manner.[7]

26. The project specifications specified a minimum R-Value of R-35 while the drawings called for an R-Value of R-38.

27. The insulation installed by Global consisted of a 3-inch (total thickness) nailbase composite insulation consisting of 5/8-inch-thick layer of plywood and 2-3/8-inch-thick layer of polyiso insulation, and a 4-inch layer of polyisocyanurate insulation.

28. Pursuant to ASTM standard C1289 (Standard Specification for Faced Rigid Cellular Polyisocyanurate Thermal Insulation Board) Section 7.2, deference is to be made to the R-Value (its thermal resistance, e.g., the level of insulation provided) of a specific insulation, rather than by total thickness, as the total thickness is irrelevant to the performance. For example, if a two-inch piece of insulation provides more insulation value than a four-inch piece of insulation, the material consideration is the thermal performance rather than the thickness of insulation.

[5] Trial Ex. D5524 (Sheet AG003, SGH Report p. 9).
[6] A detailed summary of the thermal modeling analysis performed by SGH can be found in my rebuttal report (Trial Ex. D5524) on pages 33-36, 51-52.
[7] Trial Ex. D5524 (SGH Report, Appx. A and B).

29. Based upon information from the manufacturer's website, the total provided long term thermal resistance (LTTR) R-Value for the roof is R-38.6, which exceeds the R-38 requirement in the construction drawings

30. WJE noted unstaggered joints between the two layers of insulation boards and voids in certain areas such as roof ridges. SGH performed 2-dimensional thermal modeling to determine the impact non-staggered joints could have on the thermal performance of the roof. That analysis is based on calculating the U-Factor of the roof assembly, one of the three compliance paths allowed by the governing energy code.[8]

31. Our modeling established that the effective R-Value of the roof assembly is R-39.64 (U-Factor 0.025), even when it is assumed that unstaggered joints were present at every panel joint across the entirety of the roof. This is above the R-Value required by the code and Contract Documents.

32. It should be noted, however, that many insulation joints were in fact staggered, while some were not. SGH's analysis assumed the worst-case scenario with all joints not staggered. Despite this assumption, the analysis indicated that the as-installed assembly exceeds energy code requirements and the higher value specified in the Contract Documents.

**SGH Destructive Testing and Observation Methodology**

33. The SGH field documentation process included the following specific steps:

a. Perform an initial survey of the SlopeShield underlayment conditions and assess underlayment adhesion.

[8] 2012 International Energy Code.

b. Record fastener spacing, engagement, and installation at the H-Shield NB nailbase board and 3/4 in. plywood layer levels.

c. Document the moisture content levels:

- On the nailbase plywood using a moisture scanner placed over the roof underlayment.
- On the nailbase plywood at a selected 4 ft x 8 ft sheet using a moisture meter with non-insulated pins taking readings at 2 ft on center on the top surfaces and the underside.
- On the loose-laid polyisocyanurate insulation at a selected 4 ft x 8 ft panel using a moisture meter with insulated pins taking readings at 2 ft on center.
- On the base plywood using a moisture meter with non-insulated pins.
- Observe and document staining on the top and bottom of the polyisocyanurate facer.
- Note the condition of the SharkSkin Ultra SA underlayment and the adhesion to the plywood base layer.
- Assess the condition of the plywood base layer.
- Retain representative samples of the nailbase, polyisocyanurate, and plywood base layer; double-wrap the samples in a polyethylene bag sealed with polyethylene tape; and ship the samples to the SGH laboratory in Waltham, Massachusetts, for gravimetric testing.

34. SGH's findings with respect to its destructive testing and observations are as follows:[9]

a. SGH's work began in early summer 2024, after weather protection erected by Layton for the roof had been removed and the incomplete roofing system left open to an additional three months of exposure to rain and snow.

b. Widespread damage to the SlopeShield Plus SA underlayment was noted across the entirety of the roof.

c. Our field inspection did not reveal substantive defects in either the plywood base layer or the SharkSkin underlayment. The plywood base layer was securely attached to the underlying structure and remained intact at all observed locations.

d. Field observations showed generally low moisture content (below 18%) of the plywood base layer, with the exception of two anomalies.[10] Gravimetric laboratory testing confirmed that the eight samples taken of the 3/4 in. plywood layer were well below industry accepted moisture limits.

e. Sharkskin was functioning as a viable air barrier/vapor retarder and protective covering over the plywood base layer.

f. Field observations showed that the only high moisture polyisocyanurate locations were along the eaves and some isolated perimeter locations. Laboratory moisture content

---

[9] A detailed summary of the field observations for the SGH and WJE samples, including the assessment of the SlopeShield, Sharkskin, insulation boards, and fastener location and engagement can be found at Trial Ex. D5524 (SGH Appendix I). A detailed summary of the gravimetric laboratory testing performed by SGH can be found at Trial Ex. D5524 (SGH Appendix J).

[10] In addition, at three locations high moisture content readings in the plywood base layer were noted at isolated fastener penetrations but not in the rest of the plywood and did not impair function.

testing of the polyisocyanurate insulation showed an acceptable moisture content range in the roof field, so it still provided the expected R-value. *See* photo of Insulation Board, below.



**Trial Ex. D5524 (SGH Report, Appendix I, p. 91).**

g. Field observations and laboratory moisture content testing confirmed that there were no areas of high moisture content in the nailbase plywood layer, except at eave locations, some perimeter locations, and one location where Sharkskin was used as underlayment instead of SlopeShield.[11]

h. The SGH and WJE field moisture meter readings indicate that the insulation has retained its R-value.

i. The field moisture meters used for testing are not calibrated for polyisocyanurate insulation, meaning their readings cannot be considered exact moisture content

[11] Trial Ex. D5524 (SGH Report, Appendix I).

values. Accurate determination of moisture content percentage requires laboratory calibration using specimens of known moisture content for comparison with field values.

j. The laboratory test results confirmed that the field readings overestimated actual moisture levels in the polyisocyanurate insulation.[12]

**SGH's Fastener Capacity Analysis**

35. WJE also criticized the fastening of the nailbase plywood to the substrate, citing over-driven, under-driven and missing fasteners.

36. In response, SGH performed a detailed analysis of the attachment of the nailbase to the substrate. This analysis was performed based on observations and data obtained in the field and testing of various fastener capacities.

37. The original roof fastening was determined to have sufficient capacity to accommodate wind uplift, dead loads, and snow loads despite some observed fastener installation anomalies.[13]

**Conclusion**

38. SGH's field observations, modeling, and laboratory testing of roofing materials established that the roof as installed by Layton's subcontractor Global (1) met and exceeded the thermal requirements of the Contract Documents and Code, (2) that the plywood and Sharkskin layers of the roofing assembly were dry, well adhered and performed as required, (3) that there was excessive moisture found in the insulation layers located at the eaves of the roof caused by water getting into the incomplete and unprotected roofing system through damaged SlopeShield

---

[12] Trial Ex. D5524 (SGH Report, Appendices I, J).

[13] A detailed analysis of the tests and modeling performed by SGH on the fasteners can be found in Appendix L to the SGH report. Trial Ex. D5524.

Plus SA underlayment, (4) that the fastening of the roofing system was more than adequate to perform as required despite common construction anomalies of over driven, under driven, or misplaced fasteners, and (5) repair of the eave areas with excessive moisture would not necessitate the full removal and replacement of the roof.