Randall B. Reed (Wyo. Bar No. 5-2863)
Erika M. Nash (Wyo. Bar No. 6-3867)
Justin Daraie (Wyo. Bar No. 7-4690)
**LONG REIMER WINEGAR, LLP**
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001
Telephone: 307-635-0710
rreed@lrw-law.com
jdaraie@lrw-law.com
enash@lrw-law.com

Michael T. Hoppe (pre hac vice)
Bryan S. Johansen (pro hac vice)
Sara Meg Nielson (pro hac vice)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
mhoppe@parrbrown.com
bjohansen@parrbrown.com
snielson@parrbrown.com

L. Tyrone Holt (pro hac vice)
**THE HOLT GROUP, LLC**
1675 Broadway, Suite 2100
Denver, Colorado 80202
tholt@holtllc.com

*Attorneys for Defendant Layton Construction Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff / Counterclaim Defendant,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant / Counterclaim Plaintiff. | Case No. 2:24-cv-00064-KHR<br><br>The Honorable Kelly H. Rankin<br><br>Magistrate Judge Stephanie Hambrick |
| LAYTON CONSTRUCTION CO., LLC,<br><br>Third Party Plaintiff,<br><br>v.<br><br>SPRAYFOAM SOUTHWEST, INC. DBA GLOBAL ROOFING GROUP, ET AL.<br><br>Third-Party Defendants | |

## WITNESS STATEMENT OF TERRY WRIGHT

Pursuant to the Court's Amended Initial Pretrial Order (ECF 119), as amended by the Court's December 31, 2025 Order (ECF 363), Defendant Layton Construction Company, LLC hereby submits the following Witness Statement of Terry Wright.

### QUALIFICATIONS

Education:

- M.S. Degree 1981 – Civil Engineering / Construction Management (University of Missouri-Columbia)
- B.S. Degree 1980 – Civil Engineering (Brigham Young University)

Licensing:

- Contractor Licensing: Currently has a B-100 in the State of Utah; Was the qualifying party for Jacobsen Construction Company in the following states requiring contractor licenses including Utah, Neveda (both Commercial and Industrial), California, Idaho (Construction Management & Public Works), Arizona, Tennessee, Florida, plus others.
- Structural Engineering – State of Utah

Work History:

- DTW Engineering & Construction – since 2020 – Owner/Principal
- Jacobsen Construction Company – 1982 – 2020 (retirement) (Large Commercial and Industrial Contractor in the Intermountain region) Projects included the following types of work – Large Commercial type of projects like Hospitality projects, Mountain resorts (Wyoming, Utah, Idaho, Colorado, and Nevada), Hospitals, High-rise office, Higher Education, Retail facilities, Condominiums, Public Works types of Buildings, Manufacturing facilities, Industrial types of projects, Mining related projects, Large seismic renovation projects. Project sizes from $500,000 to over $1,500,000,000. Roles

included Project Engineer, Project Superintendent, Project Manager, Estimator, Estimator Manager, Project Executive, Owner (1 of 5 partners).

- Adjunct Professor – Brigham Young University – Construction Management 2018-2021

## BRIEF DESCRIPTION OF PROJECT AND SCOPE OF WORK

1. The Owner, Cody Lane Development Corporation ("Owner or "Cody Lane") and Layton Construction Company, LLC, ("Layton"), entered into that certain Standard Form of Agreement Between Owner and Construction Manager as Constructor, consisting of both AIA A133 and A201 modified form contracts), as of May 28, 2021, (the "Construction Contract"), for the construction of the Hoback Club Project ("Project").

2. The Project is approximately $250 million, 241,496 square foot, multi-level, high-end residential construction project located near the Jackson Hole Ski Resort. The Project was designed by IBI Group/Arcadis, (referred to herein as the "Architect", "IBI", or "Arcadis"). The Owner engaged the Architect to provide Layton with a reasonably complete, properly coordinated, and constructible set of design drawing, specifications, and related information for Layton to construct the Project. The Architect engaged various subconsultants to assist it in developing and issuing the design drawings, specifications, and other related information and materials.

3. Cody Lane retained DDRM Jackson, LLC, as the Development Manager and Owner's Representative for the Project (referred to herein as "DDRM" or "Development Manager").

4. The Owner terminated Layton from the Project by letter dated March 4, 2024.

5. I was engaged by The Holt Group LLC, counsel for Layton, to evaluate the circumstances leading up to Cody Lane's termination of Layton as the General Contractor for the

Project, and to determine whether, in my opinion as a construction industry professional, Cody Lane failed to meet its obligations of the Contract with Layton based upon its terms and the prevailing business and construction practices and procedures in the industry.

6. My opinions are based on my long experience in the industry, my knowledge of the prevailing business and construction practices and procedures in the industry, and my careful and extensive review of the following categories of documents:

a. Legal Claim Documents
b. Expert Reports/Disclosures
c. Depositions
d. Project Correspondence
e. Project Documents
    i. Project Agreement and Amendments
    ii. Drawings, Specifications, ASIs and Addenda
    iii. Construction Change Directives (CCDs)
    iv. Owner Change Orders (OCOs)
    v. Proposed Change Orders (PCOs)
    vi. Project Payment Applications
    vii. Capital Consultants Review of Pay Application Reports
    viii. Construction Schedules
    ix. Requests for Information (RFIs)
    x. Meeting Minutes
    xi. Submittals
    xii. Schedules
    xiii. Notice of Claim, Delay
    xiv. Observation, Inspection Reports, Non-Conformance Work Log
    xv. List of Layton's subcontractors and suppliers for the Project
    xvi. Other miscellaneous documents
f. Cumming Group information
    i. Daily Progress Reports
    ii. Monthly Reports Dec 18, 2023 – Feb 26, 2024 – PCO Responses
    iii. Monthly Responses Jan 24, 2023 – Nov 27, 2023
    iv. Monthly Responses Jul 6, 2021 – Nov 21, 2022

## **SUMMARY OF OPINIONS**

7. Based upon my careful analysis of the factual and documentary evidence, it is my professional opinion that prior to March 4, 2025, Cody Lane materially failed to meet its obligations pursuant to the Construction Contract in at least the following ways:

a. Failing to provide complete, properly coordinated, and constructible design documents to allow Layton to construct the Project within the contractually established GMP and Rebaselined Schedule;

b. Changing the design through the improper use of the RFI and submittal process;

c. Changing the design through the improper use of the CCD process;

d. Failing to provide timely and complete answers to RFIs, which caused critical path schedule delays and inefficiencies;

e. Failing to timely review submittal packages;

f. Failing to timely acknowledge and approve legitimate and appropriate changes in the work;

g. Making material design changes, which increased the work scope, delayed progress of the work, increased the cost of the work, and failed to afford Layton commensurate time and cost to complete the new scope of work;

h. Improperly and materially interrupted the Contractor progression of the Work by intentionally abusing the processing of change orders;

i. Failing to timely inspect and approve compliant work so following work could proceed;

j. Refusing to pay for completed original work scope and changed work scope;

k. Failing to make timely and complete payments; and

l. Terminating the Contract on March 4, 2024, without proper grounds.

A copy of Mr. Wright's Expert Report is provided as Exhibit D5511. The Exprt Report includes Mr. Wright's complete CV. A copy of Mr. Wright's Rebuttal Expert Report is provided as Exhibit D5512. Mr. Wright will testify consistent with those Reports and his deposition.

## OPINIONS

### I. THE OWNER FAILED TO DELIVER A REASONABLY COMPLETE, PROPERLY COORDINATED, AND CONSTRUCTIBLE DESIGN.

8. The following items are needed to allow any construction activity to move forward: 1) Complete Information (Contract Documents, RFI responses, CO, Submittal, etc.); 2) Sufficient and Skilled Manpower (includes subcontractors); 3) Materials (delivered and on-site); 4) Appropriate Tools/Equipment; 5) Pre-requisite work complete; 6) Appropriate Environmental Conditions; and 7) Safe space. If any ***one*** of these items is not ready, the activity cannot move forward. Of the above, the first that is required so that the Project may progress is "complete information." Information affects all the other criteria. The crux of the Project's constructability is whether the information provided by the Owner (and its design team and representatives) was complete, timely, and credible.

#### A. The Owner was Responsible for the Design, Not Layton.

9. The contractual obligations of the Owner as outlined in Article 3 of the modified AIA A133-2009 include the following:

a. Section 3.1.1, 3.1.4.4 - Information and Services Required of the Owner - "During the Construction Phase, the Owner shall provide information or services required of the Owner by the Contract Documents with reasonable promptness." The Owner is responsible for the timeliness of information flow between itself and others.[1]

b. Section 3.3 - Architect – Owner shall retain an Architect to provide the architectural services per AIA Document B101 Standard Form of Agreement Between Owner and Architect. The Owner is responsible for the design of the Project through its agreement with the Architect.[2]

10. The contractual obligations of the Owner as outlined in the modified AIA Document A201-2017 General Conditions include the following:

---

[1] See J0004 (LCC-WYUSDC00000546, AIA A133-2009)
[2] See J0004 (LCC-WYUSDC00000546, AIA A133-2009)

a. Section 2.3.2 – The Owner shall retain an architect to perform the design of the Project.[3]

b. Section 2.3.4, 2.3.5 – the Owner shall furnish information and services with reasonable promptness. The Contractor [Layton] is entitled to rely on the accuracy of the information furnished by the Owner, Architect, and Owner's Development Manager [DDRM].[4]

c. Section 1.2.1 The intent of the Contract Documents [Drawings and Specifications] is to include all items necessary for the proper execution and completion of the work by the Contractor [Layton].[5]

11. Based upon the Construction Contract, the Owner is responsible for the Project design. Under the terms of the Construction Contract as I understand them based on the prevailing business and construction practices and procedures in the construction industry, the Owner has the responsibility to timely provide reasonably complete, properly coordinated, and constructible design documents to Layton.

12. "Complete design" refers to the entire work scope that can be identified and all the associated details needed for the Project. Every detail needed to convey the design intent and how the work scope needs to be constructed must be accounted for within the design.

13. "Properly coordinated" refers to the input from the other design disciplines to ensure that all the different elements are brought together to ensure efficiency and harmony in the design. For example, the design must include information on how electrical power is to be provided and the appropriate load if a design element needs power, such as a light fixture or appliance.

---

[3] See J0005 (LCC-WYUSDC00000664, AIA A201)
[4] See J0005 (LCC-WYUSDC00000664, AIA A201)
[5] See J0005 (LCC-WYUSDC00000664, AIA A201)

14. "Constructible design" refers to something that can be physically built or created, with a tangible form or shape. It is important for a project or design to be constructible, meaning that it can be successfully executed and built to the intended plan.

15. Layton had no responsibility to design the Project or its components *except* for those items which were expressly designated as delegated design elements.[6]

## B. The Deficient Design Led to Extensive Design Issuances and High Numbers of CCDs, RFIs, and PCOs.

16. In my opinion, the quality and completeness of the design documents has an enormous impact on how well a project will progress to completion. The high numbers of CCDs, RFIs, and PCOs, and extensive design revisions issued on the Project are evidence of a deficient design and evidence of the impact on the Project of that incomplete design.

***<u>High Number of CCDs</u>***

17. A CCD is a directive issued by the Owner which requires Layton to proceed immediately with the change of work scope but promises to pay Layton for any incurred impacts. CCDs were used on this project to correct the incomplete design, change the design intent for the Project, or to direct Layton to implement responses to RFIs fixing design errors or omissions.

18. As of March 11, 2024, the Owner had issued 922 Construction Change Directives (CCDs) plus numerous revisions, to Layton implementing the Project design.

[6] Under Layton's contract with the Owner, the delegated design elements are limited solely to the following: exterior cold-formed framing, metal fabrications (ladders, metal pan stairs, deco metal railing), architectural wood casework – seismic anchorage, metal roof panels, fireproofing, glazing for frameless glass reliefs, seismic anchorage, fire suppression sprinkler system, mechanical hangers, hydronic piping, HVAC metal ductwork, air terminal units, and heat exchangers.




| DATE | CCD Count |
|---|---|
| May-21 | 0 |
| Jun-21 | 1 |
| Jul-21 | 1 |
| Aug-21 | 3 |
| Sep-21 | 2 |
| Oct-21 | 3 |
| Nov-21 | 2 |
| Dec-21 | 5 |
| Jan-22 | 4 |
| Feb-22 | 5 |
| Mar-22 | 7 |
| Apr-22 | 10 |
| May-22 | 7 |
| Jun-22 | 9 |
| Jul-22 | 7 |
| Aug-22 | 13 |
| Sep-22 | 32 |
| Oct-22 | 42 |
| Nov-22 | 56 |
| Dec-22 | 41 |
| Jan-23 | 47 |
| Feb-23 | 79 |
| Mar-23 | 58 |
| Apr-23 | 35 |
| May-23 | 38 |
| Jun-23 | 51 |
| Jul-23 | 54 |
| Aug-23 | 86 |
| Sep-23 | 58 |
| Oct-23 | 39 |
| Nov-23 | 42 |
| Dec-23 | 23 |
| Jan-24 | 30 |
| Feb-24 | 24 |
| Mar-24 | 8 |
| Total | 922 |

*Figure 1: Teton Hoback Club Project - Quantity of CCDs by month.*[7]

19. As shown in the above figure, the rate of CCDs in the early part of the Project (prior to August 2022) appears to be reasonable but leaning to be on the high side. During the latter part of the Project (after August 2022) the volume and severity of CCDs issued far exceeded any amount a contractor could expect to occur on a Project.

---

[7] D5115 (LCC-WYUSDC01509101).

20. In comparison, a recent project constructed in 2021 through 2024, for which I had some oversight responsibility was able to be built with 1,328 RFIs (many of the RFIs had to deal with the interface between the different design packages) and 145 ASI/CCDs. This other project was generally comparable to the Hoback Project, being a high-end condo and hotel mix, with similar size and floors, a similar cost/budget, and was located in a mountainous area. However, it had more complexity (the design was done in multiple packages as opposed to one design package), was in a congested location, and was constructed under a CM as Constructor basis.

***<u>High Number of RFIs</u>***

21. An RFI is a "request for information" issued by Layton/its Subcontractors to the project architect asking the architect to clarify or provide information about its design. Because of the lack of a reasonably complete, coordinated, or constructible design, Layton was required to issue an extremely large number (2,659) of RFIs. These RFIs were needed to obtain missing information or clarification of the design documents, etc.

# RFI's Count by Month

**Teton HI Hoback Club**

| DATE | RFI Count |
|---|---|
| May-21 | 12 |
| Jun-21 | 42 |
| Jul-21 | 36 |
| Aug-21 | 68 |
| Sep-21 | 48 |
| Oct-21 | 58 |
| Nov-21 | 44 |
| Dec-21 | 35 |
| Jan-22 | 59 |
| Feb-22 | 65 |
| Mar-22 | 72 |
| Apr-22 | 45 |
| May-22 | 71 |
| Jun-22 | 66 |
| Jul-22 | 56 |
| Aug-22 | 79 |
| Sep-22 | 66 |
| Oct-22 | 92 |
| Nov-22 | 53 |
| Dec-22 | 55 |
| Jan-23 | 133 |
| Feb-23 | 100 |
| Mar-23 | 88 |
| Apr-23 | 98 |
| May-23 | 111 |
| Jun-23 | 110 |
| Jul-23 | 106 |
| Aug-23 | 112 |
| Sep-23 | 85 |
| Oct-23 | 138 |
| Nov-23 | 105 |
| Dec-23 | 78 |
| Jan-24 | 162 |
| Feb-24 | 65 |
| Mar-24 | 46 |
| Total | 2659 |




*Figure 2: Teton Hoback Club - Issuance of RFI by the Month*[8]

As can be seen in Figure 2, there was an excessive amount of RFIs being generated throughout the entire project but with significantly more occurring during the later phase. The entire design appears to remain incomplete throughout the course of the Project.

***<u>High Number of PCOs</u>***

22. A PCO is a potential change order presented to the Owner by Layton to address a change in Layton's scope of work, including changes that have a cost or schedule impact. At the time of termination by the Owner Layton had submitted approximately 1400 PCOs to the

[8] D5115 (LCC-WYUSDC01509101).

Owner[9], most of which were based on CCDs issued by the Owner that would have increased the costs of the Project by approximately $46 million. Of the $46 million, only approximately $13.5 million was approved by the Owner and authorized by the Owner to bill in Pay Applications, meaning that Layton and its subcontractors were not able to bill and be paid for the remaining amount. At the time of termination, there appears to have been at least 246 PCOs worth approximately $31 million outstanding that had not been processed by the Owner.

23. The total value of changes and potential changes based on CCDs issued by the Owner amounts to over **19%** of the original contract amount. The significant number of changes indicates that the design documents were inadequate and not sufficiently complete to satisfy the Owner's obligations to the Contractor under the terms of the Agreement. The extent of the design changes required Layton to modify its approach to the project, including changes to workflow, sequencing, and overall schedule.

***Extensive Design Issuances***

24. Extensive design issuances were the cause of the large numbers of PCOs and CCDs and/or evidence of deficient design documents.

25. For example, in addition to the large numbers of RFIs, Layton received 26 Addenda to the Construction Contract that revised the design documents – seven (7) addenda of which were received prior to setting the GMP, and eighteen (18) addenda which were received afterwards.

26. The Owner's attempt to provide Layton with constructible conformance sets of design documents is further evidence of a deficient design. Typically, a conformance set is a set of design documents that captures and incorporates all changes that had occurred in the design

[9] D5282 (LCC-WYUSDC01509103).

up to the point of the issuance of the conformance set. Layton received a 100% Construction set (also known as a Conformance Set (#1)) of Contract Documents on October 19, 2021. The design team delivered that Conformance Set to DDRM on September 29, 2021. This set was issued to Layton via CCD 9/Addendum 22 and was to include design changes issued in responses to RFIs 1-200 and ASIs 2-5. It was later learned that there was missing and incomplete information in this set of documents.

27. The Owner had the Design Team prepare Conformance Set (#2) of contract documents, which were issued to DDRM in December 2022. This set of documents was supposed to be issued to the contractor as part of CDD 263 / ASI 218. After a more than five-month struggle by the design team to deal with missing information, changes that had not been released, and other issues, the Owner elected not to release this conformance set to Layton.

28. Layton received an additional Conformance Set (#3) of Contract Documents dated June 6, 2023 on August 15, 2023 with Addendum #26/CCD 601. In this CCD, the Owner directed Layton to proceed with all of the changes to the design implemented in Conformance Set #3 but indicated that it would not add any costs or agree to any days to the schedule even though Conformance Set #3 included approximately 548 CCD items and an undetermined number of design changes issued in responses to RFIs. In addition, this set of documents appears to have several additional "unclouded" (i.e., unidentified) changes.

29. By letter Layton dated August 31, 2023, Layton notified the Owner and Design Team of substantial deficiencies with the Conformance Set #3, including both information from previous design issuances which was now missing and unapproved changed information.[10] As a result, Layton informed the Owner that Layton would not use Conformance Set #3 unless

[10] D4641 (LCC-WYUSDC01261659 & 1660).

specifically directed to do so by the Owner due to the confusion it would cause on the Project. The Owner never gave Layton further direction to use Conformance Set #3. On numerous occasions, the Owner requested an explanation from the Design Team regarding why Conformance Set #3 was missing information and contained unapproved changes or to otherwise defend itself from Layton's criticisms of Conformance Set #3.[11] As of Layton's termination, however, the Owner had not received a substantive response from the Design Team.[12]

30. It appears that from June 2023 through the remainder of the Project, in lieu of updating its Construction Documents and issuing a complete and coordinated set of Construction Documents, the Architect issued ASI sketches to address the RFIs, CCDs, and other modifications. The Construction Documents were no longer being coordinated by the Design Team, which may have increased the likelihood of additional errors and Requests for Information (RFIs).

31. The design revisions made necessary by the incomplete, uncoordinated, and unbuildable design provided by the Owner had a significant impact on the Project.

32. In two separate communications from the Owner to the Architect, one dated April 7, 2023,[13] and the other dated December 6, 2023,[14] the Owner gave notice to the Design Team regarding the inadequacy of the design due to the volume of requests for supplemental design information. The letter of December 6, 2023 from the Owner and Architect includes a three (3) page exhibit that identifies on a plan sheet the number of RFIs and CCDs that had impacted the Project to date by indicating within the units the CCDs/RFIs that made design changes within the

[11] D4865 (CL_DDRM00091319); D5140 (Depo. Ex. 444).
[12] D5140 (Depo. Ex. 444).
[13] D4442 (DDRM00288005 & 8006).
[14] D4915 (Depo. Ex. 1000).

units. As is illustrated in this marked up map of units on three levels, nearly every unit and room had been impacted by RFIs requesting additional design information or by CCDs making a design change (some of which are associated with RFIs).




*Figure 3: Hoback Club - Level 1 RFIs and CCDs*[15]

[15] D6905 (LCC-WYUSDC01398285).




*Figure 4: Hoback Club - Level 2 RFIs and CCDs*[16]

[16] D6905 (LCC-WYUSDC01398285).




*Figure 5: Hoback Club - Level 3 RFIs and CCDs*[17]

33. The above figures demonstrate how widespread RFIs and CCDs were on the Project. The Project design issues were not isolated to one area or one discipline but to multiple areas and disciplines.

34. Incomplete design - As of October 25, 2022 (see Amendment #3, Exhibit H and Exhibit L.1) the following were open design issues with no projected dates for completion.

[17] D6905 (LCC-WYUSDC01398285).

a. ASI 34 r2 – Access Control and Door Clarifications

b. ASI 59 – Ski Lockers

c. ASI 60 – Specifications Update: AV Subscriptions, 3rd Party Testing

d. ASI 62 – Elevator Access Control into Founder's Unit

e. ASI 63 – Spa update: equipment, Himalayan salt room

f. ASI 76 – L2 Deck Fire Feature

g. ASI 139 – Public Wine Storage

h. ASI 177 – Signage Package Update[18]

35. Other incomplete design issues include the following:

a. Internal Downspout & Snowmelt & Gutter system – An early design concept had been developed in response to Price Request (PR) 16. PR16 was submitted to the Owner but never accepted. As of the date of termination, no updated design had been approved by the Owner to be released for construction.[19] The snowmelt system is integral with the roofing (shingles) system. Without the complete and approved design of the downspout and gutter system, the snowmelt system could not be fabricated or installed. Without the snowmelt system installed, the roofing system cannot be started or completed. There was a proposed solution for reverse shingling the lower portion of the roof, but this option was rejected by the Owner.[20]

b. Fire Alarm System – After the termination date, SMC had the Fire Alarm System reviewed by a Fire Protection Engineer (FPE). Upon the conclusion of the review, it was determined that current design was deficient.[21]

36. To efficiently manage a project, it is important to be able have a workflow which allows for areas to be completed and then "locked off". This promotes momentum on a project and limits the amount of damage to finish units. When units cannot be completed due to

[18] Ex. J0008 (LCC-WYUSDC00000087).
[19] Ex. D6316 (LCC-WYUSDC00101726 (PR 16)); Ex. D4493 (DDRM00008659 & 8660 (PR 16.1)); Ex. D4432 (LCC-WYUSDC00789990 & 9993 (PR 16.2); Ex. D4623 (LCC-WYUSDC01249409 & 9410 (PR 16.3)).
[20] Ex. D5007 (LCC-WYUSDC00950247 & 0249).
[21] Ex. D5199 (SMC00035961).

outstanding information or direction, however, the momentum ceases and the additional amount of trade damage within an otherwise finished unit will increase due to open access. Outstanding unanswered RFIs or waiting for direction in the form of a CCD, ASIs, etc. will prolong the Project, increase costs, and delay the overall completion of the Project.

37. It is quite apparent from the information noted above that the design documents for this project were never sufficiently complete, coordinated, or constructible for the Project to move forward in a consistent and efficient manner. The insufficient and inadequate design information plagued the Project, interfered with, and materially disrupted the ability of Layton to effectively manage its construction.

38. The Owner itself acknowledged the impact of the deficient design documents, as illustrated in the following communication:

a. May 2-22, 2023 email chain between Rob DesLauriers (Hoback Club and Terra Asset Group) and Dave Saunders regarding expected delay in substantial completion. The Owner was aware of the "terrible construction documents" and was expecting to make claim on IBIs Professional Liability Insurance Policy. The substantial completion date will slide due to design-related problems. The Owner was expecting that Layton, and its subcontractors were experiencing concurrent delays that line up with IBI's mistakes.[22]

b. September 8, 2022 letter from DDRM to IBI regarding insufficient Design staff to support Project – DDRM gave "Notice" to IBI that its staffing was insufficient for the Project and was failing to respond to the RFIs and provide the supplemental information to answer the questions. The supplemental design documents and information was often generating claims for time and costs and is increasing risk to the Owner. DDRM demanded of IBI to buttress the construction administrative staffing to be able to provide the "reasonable promptness" support to the Project.[23]

## C. Layton Responded Appropriately to the Owner's Deficient Design.

[22] Ex. D4491 (CL0123964).
[23] Ex. D4276 (Depo. Ex. 467.

39. The insufficient design required Layton to add project staff members to deal with the influx of RFIs, CCDs, PCOs, and ASIs. The impact of adding staff will occur throughout the entire project, including the possible addition of assistant project managers, area superintendents, project engineers, and other supporting staff.

40. As the design deficiencies multiplied, Layton requested additional funding from the Owner to be able to staff the Project appropriately to deal with the design deficiencies and associated administrative issues. Those requests include the following:

a. PCO 596 – Proposed expanded staff by adding seven additional staff members to deal with the quantity of RFIs, CCDs, PCOs, and ASIs. This PCO was **not** approved by the Owner.[24]

b. PCO 596.1 – Extension of the expanded staff thru to 20 August 2023. This PCO was voided by the Owner.[25]

c. PCO 596.1R – Extension of the expanded staff thru to 31 Dec 2023. This PCO was Pending-Proceed but rejected by the Owner after the time of termination.[26]

d. PCO 596.2 – Extension of the expanded general conditions staff beyond 31 Dec 2023. This PCO was rejected by the Owner after the time of termination.[27]

e. PCO 855 - Amendment #4 for extended General Conditions Staffing & General Requirements. This PCO was approved by the Owner for $0 but did allow for money to be transferred from contingency which was done.[28]

f. PCO 855.2 – Proposal of Extended & Expanded General Conditions staffing and extended General Conditions. This PCO is part of the dispute with the Owner.[29]

While Layton appears to have responded appropriately by adding additional staff to deal with the influx of deficient design related issues in the forms of RFIs, CCDs, PCOs, and ASIs to mitigate schedule related issues, the Owner improperly refused to pay for them. It is my opinion that

[24] Ex. D6721. (LCC-WYUSDC-00785141-144)
[25] Ex. D6721.
[26] Ex. D6722; Ex. D4995 (LCC-WYUSDC-00944586).
[27] Ex. D6723. (LCC-WYUSDC-00910761-830).
[28] Ex. D6764. (LCC-WYUSDC-00546908-546922)
[29] Ex. D5063. (LCC-WYUSDC-00972644-972701).

Layton is entitled to recover all the Cost of the Work that it incurred in complying with the Construction Change Directives. Moreover, the Owner's consistent refusal to pay for extended General Conditions and increased costs associated with the unexpectedly large quantity of RFIs, CCDs, PCOs, and ASIs was wrongful and not in compliance with its contractual obligations.

41. Moreover, based on the opinions expressed by Tom Caruso, Layton was entitled to time extensions due to delay caused by the large quantity of RFIs, CCDs, PCOs, and ASIs that extended the durations required for Layton to complete the Work due to the added time needed to process the documentation, handling any new submittals, getting new materials procured and shipped to the jobsite, re-aligning crews, and to schedule the altered work back into the workflow for the Project.

## II. THE OWNER FAILED TO ANSWER RFIS IN A TIMELY, COMPLETE, AND COORDINATED FASHION.

42. *Reasonable expectations of GC in submitting RFI requests (on its own behalf or from subs), timing, detail, and anticipated response* – Per the Project Management and Coordination Section 01 3100 of the Project Specifications, Paragraph 1.5 C,[30] the Architect had ten (10) working days to respond to an RFI.[31] In essence, ten (10) working days are equated to fourteen (14) calendar days.

43. In review of the RFI log and evaluating the average time it took to answer the closed RFIs (2,504 RFIs of the 2,659 total RFIs had been answered and closed), the average time from the date of submission of the RFI to when the response was given and the issued closed was

---

[30] My opinion originally relied on an old version of the specification that contained a different response time for RFIs. I have adjusted my opinion here to reference the correct specification and the correct RFI response time.

[31] Ex. D0591 (LCC-WYUSDC00481518).

**19** calendar days.[32] The additional five (5) days to respond to the RFIs severely impacted the ability of Layton and its subcontractors to prosecute the work efficiently and effectively. The extra five (5) days impacted the overall project schedule by pushing more activities to later periods which would necessitate more of an unleveled craft work force, because the workload became imbalanced, which in a remote location like Jackson, Wyoming creates a labor issue. In remote locations like Jackson, it is better to maintain an even crew size rather than adjusting up and down like what can be done in a more metropolitan environment. Trying to attract a work force on an "on and off" basis in a remote location is difficult at best. The real culprit to the extended time schedule is the "lack of timely information" not a man-power issue. *Tom Caruso will provide opinions about delays on the Project based on his delay analysis.*

---

[32] Ex. D5179 (LCC-WYUSDC00190664). For example, based on the Architect's log (first date of information available was July 11, 2023) the following trend was seen (the dates were randomly chosen about 30 days apart):

1. As of July 11, 2023, there were 84 open RFIs with 33 being open longer than 21 days, 19 open between 11-20 days, 13 open between 6-10 days, and 19 being open between 1-5 days.
2. As of Aug. 9, 2023, there were 72 open RFIs with 17 being open longer than 21 days, 20 open between 11-20 days, 10 open between 6-10 days, and 24 being open between 1-5 days.
3. As of Sept. 20, 2023, there were 61 open RFIs with 18 being open longer than 21 days, 14 open between 11-20 days, 13 open between 6-10 days, and 16 being open between 1-5 days.
4. As of Oct. 13, 2023, there were 78 open RFIs with 10 being open longer than 21 days, 21 open between 11-20 days, 11 open between 6-10 days, and 33 being open between 1-5 days.
5. As of Nov. 10, 2023, there were 78 open RFIs with 17 being open longer than 21 days, 18 open between 11-20 days, 11 open between 6-10 days, and 32 being open between 1-5 days.
6. As of Dec. 13, 2023, there were 85 open RFIs with 24 being open longer than 21 days, 14 open between 11-20 days, 28 open between 6-10 days, and 19 being open between 1-5 days.
7. As of Jan. 10, 2024, there were 68 open RFIs with 40 being open longer than 21 days, 11 open between 11-20 days, 6 open between 6-10 days, and 11 being open between 1-5 days.
8. As of Feb. 14, 2024, there were 145 open RFIs with 38 being open longer than 21 days, 80 being open between 11 - 20 days, 13 being open between 6-10 days, and 14 being open between 1-5 days.

Over this period, on average, there were 82 open RFIs with 26 being open longer than 21 days, 23 being open between 11 - 20 days, 20 being open between 6-10 days, and 20 being open between 1-5 days. At this stage of the Project, there are areas within the building which have been delayed from moving forward for over one month (by the time an RFI is submitted to the time when the RFI is addressed, and the trade contractor can remobilize back to the area and complete its work).

44. The “lack of timely information” is due to the incomplete design documents furnished by the Design Team which is the responsibility of the Owner. Due to the large quantity of RFIs the delayed response time had a severe impact on Layton’s ability to perform its work. In addition, it prolongs the overall project schedule and requires an increase in the project supervision to address the unbalanced workload.

45. Based on my understanding of Layton’s practice on the Project an RFI was issued once an issue is recognized and insufficient information is available to move the activity forward. Layton and subcontractors were looking ahead for 2-plus weeks to plan their work and to efficiently utilize its crew. An RFI response time of 10 calendar days is within the period that the work activity can continue forward without an overall delay. An average RFI response time of nineteen (19) calendar days, however, disrupted the flow of the Project, and Layton and subcontractors were not able to plan their work efficiently and effectively.

46. Because the Owner is in control of the process to respond to RFIs and the issuance of CCDs, the Owner is ultimately responsible for the slow response time and the associated delays and costs. In this case, it had such a fundamentally detrimental impact on Layton as to constitute material breach of the Contract and the covenant of good faith and fair dealing.

47. *Impact on Layton from failure to timely receive responses to RFIs.* As mentioned above the failure to provide timely responses to RFIs impacted Layton and its subcontractors by 1) severely impacting their ability to prosecute the work efficiently and effectively; 2) creating a labor issue by unbalancing the crew sizes to respond to the available work; and 3) impacting the quantity and duration of the supervisory personal of both Layton and subcontractors to deal with the unbalanced work load.

## III. THE OWNER FAILED TO RESPOND TO AND REVIEW SUBMITTAL PACKAGES IN A TIMELY MANNER AND MADE DESIGN CHANGES DURING THE SUBMITTAL PROCESS.

48. A submittal is information or data supplied by a contractor to the architect for approval that, for example, explains what material will be used for specific work, provides testing or compliance data for materials, or explains how specific components will be assembled and installed. In my opinion, it is reasonable for a general contractor to expect a reasonably complete and coordinated design before it completes submittals.

49. The design documents must be sufficiently complete for the contractor/ subcontractors/suppliers to be able to ascertain the appropriate work scope. For instance, before Layton could prepare a submittal for the Ski Lockers on the Project, the contractor/supplier had to have a conference with the design team to understand the design intent for the Project. Only after the conference with the design team was the supplier able to begin the submittal process. The purpose of the submittal process is for the contractor/subcontractor/supplier to convey to the design team what their understanding is of the work scope within the design documents. The submittal process is not for the design team to complete the design intent or to amend the published design. The design team on the Project used the submittal process to change the design of various elements of the Project. For example, during the submittal process for the Ski Lockers, there were multiple "revise and resubmit" cycles to address revisions to the design from the design team. When the submittal process is used to complete or change the design there will be delays and over-burdening of personnel due to the additional "revise and resubmit" cycles required to get to a clear understanding of the design intent.

50. This type of modified design process consumes project supervision resources and delays implementation of the work. Using the ski locker example had the design for the ski

lockers been complete as required by the Construction Contract, this added process would not have been needed.

51. *Propriety of submittals provided by Layton*. Based on my review of Layton's submittals, when Layton and its subcontractors were provided adequate and sufficient design information Layton and its subcontractors and suppliers were able to provide complete submittal information for a quick and efficient review by the design team.

52. *Impact on Layton from failure to timely receive approval of submittals*. When Layton was required to perform a "design charette" or pre-submittal review conference with the design team to gather sufficient information, all of which should have already been in the Contract Documents to begin with, it created additional "pre-submittal" steps, revisions, and re-submittal cycles. This expanded process delayed implementation of the work, required additional supervisory staff and costs to manage, and extended the time in which the supervisory personnel must perform their duties on a Project.

53. The Owner's/Architect's practice of making design changes through the submittal process also had the practical effect of imposing design assist obligations on Layton, which Mr. Breen of DDRM recognized, as illustrated in the following communication:

a. October, 1-12, 2022 email chain between IBI and DDRM involving a discussion about providing an ASI for the door hardware revisions provided with Door Submittal while keeping this work scope as a "design assist" work scope. Marty of DDRM is concerned about maintaining a claim defense strategy.[33]

## IV. THE OWNER INSERTED ITSELF INTO THE DESIGN PROCESS, CAUSING FURTHER PROBLEMS.

55. The Owner failed to meet its obligations under the Construction Contract by disrupting the Design Document Control process Disruptions were caused by the Owner

[33] Ex. D4305 (ARCADIS00593913).

inserting itself into the release of RFI and CCD information process which caused confusion with the Project construction team regarding the intended work scope of the Project

56. The Owner, typically through DDRM, impacted the design process in the following ways:

a. Reducing the design schedule by three months. This lessened the ability of the key design team members to analyze issues, develop appropriate responses, and coordinate and review with all team members.

b. Being unable to provide the required input or attend design-related meetings due to other DDRM issues.

c. Performing limited operations review input of the design. Suggested changes came late into the design process causing disruption in the design process.

d. Buyer changes distracted the design team as they reviewed alternative options instead of completing the design.

e. This evaluation of alternatives schemes after the completion of the 95% design documents was done while keeping the information away from the Contractor. This required the design team to manager multiple design models to try and avoid having potential changes from leaking into the actual design model.[34]

57. Perhaps most significantly, however, the Owner impacted the design process by inserting itself directly into that process and requiring that DDRM review and approve all design changes. This had the practical effect of creating confusion and delay for Layton and its subcontractors due to design document control failures.

58. Design document control refers to the Architect's ability to adequately illustrate, track, and disseminate design changes on the project. In this Project, the Architect was not able to properly deal with the number and the frequency of the design changes, which caused confusion on the Project in a number of ways, including unclouded design changes, design elements being included in one set of drawings then omitted in subsequent versions, and design

[34] Ex. 4196 (ARCADIS00447709, Response to DDRM letter dated April 2022 by IBI).

changes issued in RFI responses not being noted in other related documents. The following are documents that illustrate the document control problems that stem from the deficient design:

a. Design Document Control process disrupted due to non-coordinated design documents – See Oct. 21-23, 2022 email chain – IBI and DDRM – Discussion regarding document control issue. The document control issue appears to be an internal design issue.[35]

b. Layton & Subcontractor Confusion – See Nov. 21-22, 2022 email chain – IBI and DDRM – DDRM is troubled with the problem of document control clarifications. The problem persists and affects the pricing of the PRs, and the subcontractors are not sure how to proceed with the work. Layton has bonafide complaints that are affecting the administration of the Project and is putting the Ownership in an indefensible position and heighted risk. [36]

59. The Owner made the document control problems worse when DDRM inserted itself into the design process by requiring that it approve all design changes. DDRM sometimes was delayed in approving the issuance of RFIs or ASIs, and the Architect was not aware of such delay and issued other design documents implementing or referring to the change set out in an unissued RFI/ASI. This meant that Layton received conflicting or confusing information about design changes and the design generally.[37] The following are communications that illustrate this issue.

a. Owner disruption of the Design Document Control process - See Oct. 24, 2022 email chain – IBI and DDRM – Discussion regarding issuing plans with partial narratives and randomly clouded revisions by IBI. Part of this issue is the way in which DDRM has inserted itself into the reply process for RFIs and CCDs. DDRM will release some RFIs and CCDs before others. IBI does not effectively know when DDRM will be releasing the RFIs and CCDs to the Contractor. Invariably, IBI will release an answer to an RFI and CCD which has other RFI and CCD information contained on the design document. This process will cause confusion with the contracting team as what the real work scope is supposed to be. The Owner appears to want to get a benefit of additional work scope without the appropriate adjustment in cost or time. Appears IBI will be forced to use

---

[35] Ex. D4325 (ARCADIS00605456).
[36] Ex. D4349 (ARCADIS00635989).
[37] Ex. D5062 (DDRM_00054230).

ASKs (sketches) to be able to answer RFIs and issue CCD which makes documentation worse.[38]

b. Owner disruption of the Design Document Control process **-** See Jan. 3-5, 2023 email chain – IBI communication with consultants – Air transfer duct going through a fire rated wall was missed but corrected in RFI-849. The conformance set [#2] did not have this change since DDRM had not released the RFI.[39]

## V. THE OWNER INAPPROPRIATELY AND IMPROPERLY CHANGED THE DESIGN THROUGH THE RFI PROCESS.

60. In my opinion, the following are within a contractor's reasonable expectations for RFI (submitted on their own behalf or from subs) in terms of timing, detail, and anticipated response.

a. An RFI request is generally the result of conflicting or insufficient design information, which needs some clarification to implement the design intent. RFIs usually deal with a discrete design issue in a specific location.

b. Layton's expectation of submitting an RFI is to receive a timely response which is in harmony with the original design intent shown on the contract documents.

c. What is not expected by the Contractor is a new or "improved" design intent when receiving a response to an RFI.

61. *Propriety of RFI's submitted by Layton*. Based on my review of a sample of RFIs, it appears that Layton's RFIs generally were submitted due to a lack of design information or a need to understand precedence of conflicting design information. These are proper uses of the RFI process.

62. *Impact on Layton from receiving RFI responses with additional scope/design changes.* Some of the RFI responses Layton received from the owner/architect changed the design intent considerably, which required additional resources to be able to implement the new

---

[38] Ex. D4326 (ARCADIS00606900).
[39] Ex. D4369 (ARCADIS00664544).

or improved design intent. When the design intent is "new or improved" it takes additional time and resources to implement the design throughout the Project.

63. It is not appropriate for the Owner to make design changes through the RFI process. The appropriate way to introduce a design change is through the Change Order Request process, or ASIs, or CCDs, not through RFI of submittal responses.

## VI. THE OWNER FAILED TO TIMELY ACKNOWLEDGE AND APPROVE LEGITIMATE AND APPROPRIATE CHANGES IN THE WORK.

64. The Owner had a contractual obligation to approve or give other direction regarding Layton's potential change orders (added or modified work scope) in a timely manner. Per the Construction Contract the Owner is required to respond to a potential change order requested by Layton within fifteen (15) days of receipt.[40]

65. *Layton's practices in submitting and supporting requested changes in work*. Based on my review of a random selection of PCOs, it is my opinion that the PCOs submitted by Layton had the appropriate supporting documentation for the PCO to be reviewed and approved by the Owner.

66. *Status of direction regarding PCOs and other change directives*. By March 2024 Layton had submitted over 1,400 PCOs (including those resulting from ASIs and CCDs issued to rectify design errors and omissions) to the Owner.[41] Many of the PCOs had cost and time impacts. The total value of the submitted PCOs was approximately $44.5 million. By March 2024, the Owner had approved only approximately $13.5 million worth of PCOs. By March 2024 there were 246 unapproved PCOs in the Owner's court worth approximately $31 million.[42]

---

[40] Ex. Jooo5 (LCC-WYUSDC00000664, AIA A201 Section 7.2.2).
[41] Ex. D5282 (LCC-WYUSDC-01509103)
[42] Ex. D5282 (LCC-WYUSDC-01509103)

67. Based upon the number and cost amount of outstanding PCOs, the Owner was unreasonably slow in reviewing and approving PCOs and then incorporating them into signed OCOs. Without authorization to receive payments for work previously authorized, trade contractors were strapped for cash flow and inhibited from being able to pay workers or to buy material for the Project. A slow approval process for change orders significantly delays a project by affecting the ability of trade contractors and the construction manager to coordinate and schedule the work efficiently. As expected, this disparity in authorizing payment affects the subcontracting community and Layton's ability to be able to effectively manage the Project.

68. The "slowness" of the process primarily appears to be related to the overwhelming quantity of CCDs /PCOs which needed to be submitted by Layton and acted upon by the Owner. Due to the quantity of changes in the Project due to the deficient design, the Owner did not have sufficient administrative staff to timely manage and complete the review and processing of all the design revisions and attendant changes in time and cost to the Project.

69. Of the approximately 1400 PCOs in process between the Owner and Layton, there were 605 PCOs that had submitted, reviewed, responded to, and finalized at the time of Layton's termination. Based upon the dates when PCOs was submitted and the date DDRM responded, it took an average of 65 days for DDRM to review and respond to PCOs.[43] This far exceeded the 15 days allowed by contract. The Owner was *delinquent an average of 50 days* to respond to the PCOs submitted. In turn, the payment for the services rendered was likewise delayed.

a. The time it took to get a potential change order approved by the Owner, Layton, subcontractors, and the Project was impacted by the extreme delay in the PCO review process.

b. As noted earlier, the Owner informed IBI that due to the number of design deficiencies and changes the Owner's support staff was being overwhelmed with

[43] Ex. D5282 (LCC-WYUSDC-01509103)

the administration effort needed to process the changes, both in issuing the CCDs and performing the PCO reviews.

c. The Owner failed to meet its obligation of the Contract with Layton with regards to responding timely to a submitted PCO due to the CCD (Change Order)/PCO (Potential Change Order) process.

70. *Impact on Layton (project as a whole) on not receiving timely approval of changes in work/scope.* The delay in not receiving timely approval of work scope changes is like the delay in receiving responses to RFIs. Layton and its subcontractors were 1) severely impacted by their ability to prosecute the work efficiently and effectively; 2) impacted by the unbalancing of crew sizes to respond to the available work; 3) impacted by the quantity and duration of the supervisory personal of both Layton and subcontractors to deal with the unbalanced work load; 4) impacted by creating material procurement issues - especially on long-lead time items; and 5) forced to provide interim financing for the Owner to construct the Project without receiving compensation for their work.

71. It is my opinion that the Owner materially breached the Construction Contract by failing to respond to PCOs timely.

72. Additionally, per the Construction Contract, once Layton signed a CCD, the work scope modification (along with costs and time impacts) become effective immediately and is to be recorded as a CO.[44] Requiring Layton to process additional documents (an Owner Change Order (OCO) document, etc.) before the CCD becomes an approved change order is outside of the process/procedure outlined within the Construction Contract. In my opinion, this additional requirement requested /demanded by the Owner was a material breach of the Construction Contract.

---

[44] Ex. J0005 (LCC-WYUSDC00000664 (AIA A201 Section 7.3.7).

## VII. THE OWNER FAILED TO MAKE TIMELY AND COMPLETE PAYMENTS WHEN DUE.

73. A summary of applicable provisions within the agreement executed regarding payments are listed below.

a. A133 -2009 Document – Section 7 Payments for Construction Phase Services[45]

b. A201 - 2017 General Conditions for the Contract for Construction: Article 7 – Changes in the Work and Article 9 – Payments and Completion[46]

74. Costs associated with CCDs may be submitted in Pay Applications prior to the CCDs being converted into Change Orders (see AIA 201 articles 7.3.9, 9.3.1.1, and 9.7[47]). This issue was disputed by the Owner who wanted costs of change work to be included in Pay Applications only if those costs were in approved CCDs that had been incorporated into an executed OCOs (Owner Change Orders). A letter from DDRM to Layton dated September 6, 2023 outlines the Owner's position regarding billing for CCD work that does not have a final cost agreement with the Owner.[48] The Owner finally relented and allowed for some non-OCO CCDs costs to be included in Pay Applications #36 and #37. This issue impacted Layton and its subcontractors' ability to perform the work because of the cash flow restriction this placed on the Project. The subcontractors needed to be able to perform sufficient "payable" contract work to finance the Project to perform the "slow-pay" CCD work. The slow-pay for ongoing CCD work plagued the Project for over 30 months with the slow process of review and approval of OCOs before Layton and subcontractors received only partial payments. Due to the large volume of CCD work on this Project, the Owner took unreasonable advantage of its position to disallow payment for non-OCO CCD work, which required Layton and the subcontractors to provide

[45] Ex. J0004 (LCC-WYUSDC00000348).
[46] Ex. J0005 (LCC-WYUSDC00000664).
[47] Ex. J0005 (LCC-WYUSDC00000664).
[48] Ex. D4653 (LCC-WYUSDC01267207 & 7208).

interim financing for the Project for the sole benefit of the Owner. This is contrary to the terms of the Construction Contract and is a material breach. In addition, it is contrary to standards in the construction industry and the duty of good faith and fair dealing between the parties.

75. Layton provided "notice" to the Owner and Architect regarding the contractual right to bill for work on CCDs when the total costs have not been agreed to by the parties:.

a. Letter dated September 1, 2023 - From Layton to DDRM and Arcadis.[49]
b. Letter dated November 14, 2023 - From Layton to DDRM and Arcadis.[50]
c. Letter dated November 28, 2023 – From Layton to DDRM and Arcadis.[51]
d. Letter dated January 22, 2024 – From Layton to DDRM and Arcadis,[52]

76. In those instances, the Architect is to make a reasonable determination of the costs and certify the amount for the CCD within the Pay Application. The Architect has seven (7) days to certify a Pay Application for the amount submitted or an amount that it can certify or withhold certification per section 9.4.1 of the AIA 201.[53]

77. After Certification by Architect, the Owner is required to make payment within 30 days after submission of the Pay Application.[54]

78. If Pay Application Certification is not made or Owner Payment is not made within 7 days after the date established by the Agreement Layton (Contractor) may stop the work until payment is received from Owner. Any delays in either the Architect's certification or the Owner's payment, thereafter, may have delayed the schedule and increased the GMP entitling Layton to a Change Order to recover the damage incurred (see AIA 201 section 9.7).[55]

---

[49] Ex. D4645 (LCC-WYUSDC01264795 & 4796).
[50] Ex. D4858 (LCC-WYUSDC01346141 & 6142).
[51] Ex. D4888 (LCC-WYUSDC01396953 & 6954).
[52] Ex. D4996 (LCC-WYUSDC00944392 & 4393).
[53] Ex. J0005 (LCC-WYUSDC00000664).
[54] Ex. J0004 AIA A133 Agreement clause 7.1.3.
[55] Ex. J0005 (LCC-WYUSDC00000664).

79. The actual payment process during the duration of the Project is shown in the following table entitled "Layton-Hoback Project – Pay Application Process".

## Layton-Hoback Project

## Pay Application Process

19-Jun-25

| Pay App # | Pay Period | Payment Amount (Net after Retention withheld) | Date Pay Application Submitted | Date Certified or Decision to withhold Certification | Days between Submission and Certification - 7 days by Agreement | Payment Amount | Payment date due (30 days from submission) plus 7 day cure period | Actual Payment Date Received | Days between Submission and Payment - NGT 30 days | Days over payment due date plus 7 (cure period) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Jun-21 | $ 4,225,070.39 | 9-Jul-21 | 13-Jul-21 | 4 | $ 4,225,070.39 | 15-Aug-21 | 16-Jul-21 | 7 | -30 | |
| 5 | Jul-21 | $ 2,321,655.63 | 6-Aug-21 | 6-Aug-21 | - | $ 2,321,655.63 | 12-Sep-21 | 20-Aug-21 | 14 | -23 | |
| 6 | Aug-21 | $ 2,979,749.30 | 26-Aug-21 | 7-Sep-21 | 12 | $ 2,979,749.30 | 2-Oct-21 | 27-Sep-21 | 32 | -5 | |
| 7R1 | Sep-21 | $ 3,569,984.74 | 24-Sep-21 | 25-Oct-21 | 31 | $ 3,033,584.74 | 31-Oct-21 | 2-Nov-21 | 39 | 2 | 7 R1 - Partial Payment; Late payment beyond the cure period; |
| 7R1 | Sep-21 | See Above | 24-Sep-21 | 25-Oct-21 | | $ 536,400.00 | 31-Oct-21 | 23-Dec-21 | 90 | 53 | 7 R1 - Partial Payment; Late payment beyond the cure period; |
| 8 | Oct-21 | $ 6,143,630.66 | 3-Nov-21 | 12-Nov-21 | 9 | $ 6,143,630.66 | 10-Dec-21 | 23-Nov-21 | 20 | -17 | |
| 9R2 | Nov-21 | $ 5,091,810.76 | 14-Dec-21 | 16-Dec-21 | 2 | $ 5,091,810.76 | 20-Jan-22 | 7-Jan-22 | 24 | -13 | |
| 10R4 | Dec-21 | $ 3,639,089.82 | 14-Jan-22 | 19-Jan-22 | 5 | $ 3,639,089.82 | 20-Feb-22 | 27-Jan-22 | 13 | -24 | |
| 11 | Jan-22 | $ 3,294,778.80 | 27-Jan-22 | 15-Feb-22 | 19 | $ 3,294,778.80 | 5-Mar-22 | 25-Feb-22 | 29 | -8 | |
| 12R1 | Feb-22 | $ 4,261,601.70 | 9-Mar-22 | 14-Mar-22 | 5 | $ 4,261,601.70 | 15-Apr-22 | 24-Mar-22 | 15 | -22 | |
| 13R2 | Mar-22 | $ 5,317,551.96 | 13-Apr-22 | 14-Apr-22 | 1 | $ 5,317,551.96 | 20-May-22 | 28-Apr-22 | 15 | -22 | |
| 14 | Apr-22 | $ 7,789,347.57 | 5-May-22 | 9-May-22 | 4 | $ 7,789,347.57 | 11-Jun-22 | 24-May-22 | 19 | -18 | |
| 15 | May-22 | $ 8,095,576.24 | 2-Jun-22 | 3-Jun-22 | 1 | $ 8,095,576.24 | 9-Jul-22 | 24-Jun-22 | 22 | -15 | |
| 16R1 | Jun-22 | $ 7,462,477.56 | 14-Jul-22 | 18-Jul-22 | 4 | $ 7,462,477.56 | 20-Aug-22 | 27-Jul-22 | 13 | -24 | |
| 17R2 | Jul-22 | $ 6,052,703.44 | 15-Aug-22 | 15-Aug-22 | - | $ 6,052,703.44 | 21-Sep-22 | 29-Aug-22 | 14 | -23 | |
| 18R3 | Aug-22 | $ 9,058,263.46 | 5-Oct-22 | 5-Oct-22 | - | $ 9,058,263.46 | 11-Nov-22 | 13-Oct-22 | 8 | -29 | |
| 19 | Sep-22 | $ 8,601,078.50 | 20-Oct-22 | 21-Oct-22 | 1 | $ 8,601,078.50 | 26-Nov-22 | 3-Nov-22 | 14 | -23 | |
| 20 | Oct-22 | $11,289,687.94 | 18-Nov-22 | 23-Nov-22 | 5 | $11,289,687.94 | 25-Dec-22 | 14-Dec-22 | 26 | -11 | |
| 21R1 | Nov-22 | $ 6,065,512.49 | 16-Dec-22 | 21-Dec-22 | 5 | $ 6,065,512.49 | 22-Jan-23 | 20-Jan-23 | 35 | -2 | |
| 22 | Dec-22 | $ 6,346,461.49 | 13-Jan-23 | 30-Jan-23 | 17 | $ 6,346,461.49 | 19-Feb-23 | 14-Feb-23 | 32 | -5 | |
| 23R2 | Jan-23 | $ 6,972,881.01 | 23-Feb-23 | 27-Feb-23 | 4 | $ 6,972,881.01 | 1-Apr-23 | 3-Mar-23 | 8 | -29 | |
| 24R2 | Feb-23 | $ 5,616,123.28 | 28-Mar-23 | 28-Mar-23 | - | $ 5,616,123.28 | 4-May-23 | 11-Apr-23 | 14 | -23 | |
| 25R1 | Mar-23 | $ 5,354,692.13 | 12-Apr-23 | 18-Apr-23 | 6 | $ 5,354,692.13 | 19-May-23 | 22-May-23 | 40 | 3 | Late payment beyond Cure Period; |
| 26 | Mar-23 | $ 2,748,251.22 | 7-Sep-23 | 18-Sep-23 | 11 | $ 2,748,251.22 | 14-Oct-23 | 12-Oct-23 | 35 | -2 | Partial Release of Retainage up to 31 March 2023; |
| 27 | Apr-23 | $ 4,838,250.61 | 10-May-23 | 10-May-23 | - | $ 131,404.57 | 16-Jun-23 | 28-Apr-23 | -12 | -49 | Partial Payment for Pay App #27 |
| 27 | Apr-23 | See Above | 10-May-23 | 10-May-23 | - | $ 4,706,846.04 | 16-Jun-23 | 20-Jun-23 | 41 | 4 | Partial Payment for Pay App #27; Late payment beyond Cure Period; |
| 28 | May-23 | $ 7,375,799.32 | 30-Jun-23 | 6-Jul-23 | 6 | $ 7,375,799.32 | 6-Aug-23 | 10-Jul-23 | 10 | -27 | |
| 29 | Jun-23 | $ 6,573,316.33 | 31-Jul-23 | 1-Aug-23 | 1 | $ 6,386,023.05 | 6-Sep-23 | 16-Aug-23 | 16 | -21 | Partial Payment for Pay App #29 |
| 29 | Jun-23 | See Above | 31-Jul-23 | 1-Aug-23 | 1 | $ 96,050.47 | 6-Sep-23 | 5-Dec-23 | 127 | 90 | Partial Payment for Pay App #29; Late payment beyond Cure Period; |
| 29 | Jun-23 | See Above | 31-Jul-23 | 1-Aug-23 | 1 | $ 7,567.11 | 6-Sep-23 | 22-Nov-23 | 114 | 77 | Partial Payment for Pay App #29; Late payment beyond Cure Period; |
| 29 | Jun-23 | See Above | 31-Jul-23 | 1-Aug-23 | 1 | $ 24,678.00 | 6-Sep-23 | 23-Oct-23 | 84 | 47 | Partial Payment for Pay App #29; Late payment beyond Cure Period; |
| 30R1 | Jul-23 | $ 4,656,495.73 | 30-Aug-23 | 1-Sep-23 | 2 | $ 4,211,998.45 | 6-Oct-23 | 18-Sep-23 | 19 | -18 | Partial Payment for Pay App #30R1 |
| 30R1 | Jul-23 | See Above | 30-Aug-23 | 1-Sep-23 | 2 | $ 73,081.00 | 6-Oct-23 | 13-Oct-23 | 44 | 7 | Partial Payment for Pay App #30R1; Late payment beyond Cure Period; |
| 30R1 | Jul-23 | See Above | 30-Aug-23 | 1-Sep-23 | 2 | $ 5,041.95 | 6-Oct-23 | 5-Dec-23 | 97 | 60 | Partial Payment for Pay App #30R1; Late payment beyond Cure Period; |
| 30R1 | Jul-23 | See Above | 30-Aug-23 | 1-Sep-23 | 2 | $ 155,584.35 | 6-Oct-23 | 22-Nov-23 | 84 | 47 | Partial Payment for Pay App #30R1; Late payment beyond Cure Period; |
| 30R1 | Jul-23 | See Above | 30-Aug-23 | 1-Sep-23 | 2 | $ 159,544.00 | 6-Oct-23 | 17-Jan-24 | 140 | 103 | Partial Payment for Pay App #30R1; Late payment beyond Cure Period; |
| 31 | Not Used | | | | - | Not Used | | | | | Not Used |
| 32R2 | Aug-23 | $ 5,176,570.45 | 5-Sep-23 | 26-Sep-23 | 21 | $ 376,889.00 | 12-Oct-23 | 13-Oct-23 | 38 | 1 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 47,848.58 | 12-Oct-23 | 5-Dec-23 | 91 | 54 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 80,447.08 | 12-Oct-23 | 22-Nov-23 | 78 | 41 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 2,511,537.93 | 12-Oct-23 | 12-Oct-23 | 37 | 0 | Partial Payment for Pay App #32R2 |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 1,260,229.78 | 12-Oct-23 | 23-Oct-23 | 48 | 11 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 162,072.00 | 12-Oct-23 | 30-Oct-23 | 55 | 18 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 187,293.28 | 12-Oct-23 | 4-Jan-24 | 121 | 84 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 294,893.47 | 12-Oct-23 | 4-Jan-24 | 121 | 84 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 44,842.72 | 12-Oct-23 | 26-Dec-23 | 112 | 75 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |
| 32R2 | Aug-23 | See Above | 5-Sep-23 | 26-Sep-23 | 21 | $ 210,516.61 | 12-Oct-23 | 26-Dec-23 | 112 | 75 | Partial Payment for Pay App #32R2; Late payment beyond Cure Period; |

**Layton-Hoback Project**

**Pay Application Process**

19-Jun-25

| Pay App # | Pay Period | Payment Amount (Net after Retention withheld) | Date Pay Application Submitted | Date Certified or Decision to withhold Certification | Days between Submission and Certification - 7 days by Agreement | Payment Amount | Payment date due (30 days from submission) plus 7 day cure period | Actual Payment Date Received | Days between Submission and Payment - NGT 30 days | Days over payment due date plus 7 (cure period) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 33R1.1 | Sep-23 | $ 4,210,731.86 | 20-Oct-23 | 31-Oct-23 | 11 | $ 3,668,648.50 | 26-Nov-23 | 10-Nov-23 | 21 | -16 | Partial Payment for Pay App #33R1.1 |
| 33R1.1 | Sep-23 | See Above | 20-Oct-23 | 31-Oct-23 | 11 | $ 125,855.40 | 26-Nov-23 | 4-Jan-24 | 76 | 39 | Partial Payment for Pay App #33R1.1; Late payment beyond Cure Period; |
| 33R1.1 | Sep-23 | See Above | 20-Oct-23 | 31-Oct-23 | 11 | $ 416,227.96 | 26-Nov-23 | 26-Dec-23 | 67 | 30 | Partial Payment for Pay App #33R1.1; Late payment beyond Cure Period; |
| 34 | Sep-23 | $ 3,487,236.29 | 13-Nov-23 | 20-Nov-23 | 7 | $ 3,487,236.29 | 20-Dec-23 | 28-Nov-23 | 15 | -22 | |
| 35 | Oct-23 | $ 4,759,362.53 | 13-Nov-23 | 20-Nov-23 | 7 | $ 105,755.52 | 20-Dec-23 | 9-Jan-24 | 57 | 20 | Partial Payment for Pay App #35; Late payment beyond Cure Period; |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 3,116,462.43 | 20-Dec-23 | 5-Dec-23 | 22 | -15 | Partial Payment for Pay App #35 |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 104,701.00 | 20-Dec-23 | 15-Dec-23 | 32 | -5 | Partial Payment for Pay App #35 |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 110,603.07 | 20-Dec-23 | 4-Jan-24 | 52 | 15 | Partial Payment for Pay App #35; Late payment beyond Cure Period; |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 23,748.41 | 20-Dec-23 | 4-Jan-24 | 52 | 15 | Partial Payment for Pay App #35; Late payment beyond Cure Period; |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 1,262,509.43 | 20-Dec-23 | 26-Dec-23 | 43 | 6 | Partial Payment for Pay App #35; Late payment beyond Cure Period; |
| 35 | Oct-23 | See Above | 13-Nov-23 | 20-Nov-23 | 7 | $ 35,582.57 | 20-Dec-23 | 26-Dec-23 | 43 | 6 | Partial Payment for Pay App #35; Late payment beyond Cure Period; |
| 36 | Nov-23 | $ 3,491,016.30 | 28-Nov-23 | 5-Dec-23 | 7 | $ 3,491,016.30 | 4-Jan-24 | 22-Dec-23 | 24 | -13 | |
| 37 | Dec-23 | $ 3,842,537.13 | 24-Jan-24 | 14-Feb-24 | 21 | $ 673,606.02 | 1-Mar-24 | 7-Mar-24 | 43 | 6 | Partial Payment for Pay App #37; Late payment beyond Cure Period; |
| 37 | Dec-23 | See Above | 24-Jan-24 | 14-Feb-24 | 21 | $ 2,845,102.15 | 1-Mar-24 | 21-Feb-24 | 28 | -9 | Partial Payment for Pay App #37 |
| 37 | Dec-23 | See Above | 24-Jan-24 | 14-Feb-24 | 21 | $ 26,523.46 | 1-Mar-24 | 4-Mar-24 | 40 | 3 | Partial Payment for Pay App #37; Late payment beyond Cure Period; |
| 37 | Dec-23 | See Above | 24-Jan-24 | 14-Feb-24 | 21 | $ 297,305.50 | 1-Mar-24 | 12-Dec-23 | -43 | -80 | Partial Payment for Pay App #37; amount paid before Pay application was submitted; Seems odd for payment to occur before Pay App is submitted; |
| 38 | Feb-24 | $10,816,168.84 | 22-Mar-24 | Not Certified | | No Payment | 28-Apr-24 | | | | Rejected - 12 March 2024; Rejected before Pay Appication was submitted |
| 39 | Apr-24 | $21,999,568.84 | 15-Apr-24 | Not Certified | | No Payment | 22-May-24 | | | | Contains signed OCO #30; Contains proposed OCOs #31, #32, #32.1, and #33. These proposed OCOs contain CCDs authorized by the Owner. **Rejected -** |

*Figure 6: Hoback Project Pay Application Process*[56]

80. In the construction industry, failure to pay the full amount due in a timely manner is a material breach of contract. This is true in the Construction Contract as well since Layton has the right to "terminate the Contract" if "[t]he Owner has not made a require payment within the time stated in the Contract Documents.[57]

[56] Table prepared based upon Payment Applications, including Payment Application 7R1 contained in J0521, and Exs. J0543 through J0588; *see also* Ex. D5545 Payment Application Summary demonstrative exhibit.
[57] Ex. J0005 ((LCC-WYUSDC00000664, AIA A201, Section 14.1.1.3).

81. There were multiple instances where the Pay Application Certification process duration exceeded seven (7) days plus a cure period of seven (7) days (for a total of 14 days), for which Layton was entitled to stop work. Each of these incidents would constitute a breach of the Construction Contract. Because the Owner is responsible for the Architect, the Architect's failure to conform to the contract terms becomes an Owner's material breach with respect to Layton. The earliest breach occurred as of Oct. 1, 2021, and the latest pay application certification breach occurred on Jan. 31, 2024.

82. There were multiple instances where the Owner's timing for payment of amounts certified in a pay application exceeded the thirty (30) days plus a cure period of seven (7) days, for which Layton could have stopped work. Each of these incidents would constitute a breach of the Construction Contract. The following shows the length of time after the breach occurred for Layton to receive full payment for each payment application.

a. Pay Application 7R1 – Full payment was received 53 days after the cure period.

b. Pay Application 25R1 - Full payment was received 3 days after the cure period.

c. Pay Application 27 - Full payment was received 4 days after the cure period.

d. Payment Application 32R2 - Full payment was received 84 days after the cure period.

e. Payment Application 33R1.1 - Full payment was received 39 days after the cure period.

f. Payment Application 35 - Full payment was received 20 days after the cure period.

g. Payment Application 37 - Full payment was received 6 days after the cure period.[58]

[58] Ex. D5491 (LCC-WYUSDC01623585).

During the early stage of the Project (June 2021 through February 2023, encompassing 21 Pay Applications), the Owner made timely payments 20 out of the 21 Pay Applications. In fact, it appears the Owner paid on average 18 days earlier than contractually required during his period. During the later stage of the Project (March 2023 through March 2024), however, the Owner was late making payment on the majority of payment applications. Overall, the Owner was late by an average of 13 days for providing **full** payment for the Payment Applications for the latter part of the Project; giving rise to Layton's right to stop work and terminate the Construction Contract.

83. Owner also short-paid Layton without justification.

a. In a letter dated January 3, 2024 Layton identified the failure to pay certified work dating back to Pay Application #29 (June 2023) amounting to $841,264.00 without any justification for the non-payment.[59] Non-payment of certified amounts without any justification is a material breach of the Construction Contract.

b. In response, DDRM alleged that the non-payments of certified amounts were due to missing unconditional and conditional lien waivers;[60] however, the amount withheld for the waiver issue was only $269,878.68; leaving nearly $500,000 unpaid.

c. In addition, in a letter dated January 17, 2024, Layton notified the Owner that the October 2023 certified pay application had been short paid by approximately $1.5 million without any explanation. Layton also stated the missing waivers were either submitted to the Owner or that, with respect to waivers allegedly missing from two subcontractors, there could be no missing conditional waivers because the subcontractors had not submitted an invoice. When questioned concerning the short pay the Owner did wire (in four separate wires) a total of $1,969,679.19 of additional funding but without an explanation regarding which pay applications the money was for nor how the $1.5 million was to be reconciled.[61]

84. Late payments from the Owner ripple down to the subcontractor/suppliers. Layton has a contractual obligation to make payments to the subcontractors within 7 days of receiving

---

[59] Ex. D4933 (CL_DDRM00552101).
[60] Ex. D4954 (LCC-WYUSDC00910905 & 0907); Ex. D4964 (LCC-WYUSDC00932849 & 2852).
[61] Ex. D4976 (CL00156137).

payment from the Owner.[62] When the Owner payment is late this affects the ability of the subcontractors to make payroll, buy materials, rent equipment, etc. to be able to support the Project.

85. Consistently being late with payment causes the subcontractors to allocate their resources to projects which pay timely.

86. Consistently being late with payment causes the suppliers to modify payment terms before materials are shipped to the Project. This has a negative impact on a project and interferes with Layton's ability to progress the work.

## VIII. THE OWNER FAILED TO TIMELY APPROVE COMPLIANT WORK, WHICH IMPAIRED LAYTON'S ABILITY TO PROPERLY COORDINATE THE WORK AND PERFORM IT IN A TIMELY MANNER.

87. Layton has an obligation to construct the Project at the quality level specified in the plans and specifications. During the Project, Layton's quality assurance program was reviewed and Layton ensured that any work which was non-conforming was corrected. To be classified as non-conforming work, however, the item being reviewed needs to be at the completion level to be tested or for the next trade to perform work on it. Work products that are not ready for such reviews are classified as work-in-progress, not non-conforming. As part of the its responsibilities, the design team is to conduct Project visits and make observation reports to ascertain if the work being installed is per the design intent. Most observation reports are looking at work in progress but in limited circumstances the observation report will deal with a completed work item. When an item is classified as a non-conformance item, that item is documented, and special action is taken to correct the work. But, when "work-in-progress" is

[62] Ex. J0005 (LCC-WYUSDC00000664 (AIA A201 Section 9.6.2).

classified as non-conformance work, the whole process of correcting work becomes convoluted and begins to disrupt the overall workflow on a project.

88. Layton used a program called BIM 360 to document non-conforming work and to track comments from inspection/observation reports for the Project.[63] For true non-conforming work items, each item needing correction would be noted on the log along with a description of the non-conforming work, photos, details, etc.

89. As part of the sign-off process for true non-conforming work, the subcontractor, contractor, and the applicable design team member/testing agency/or owner representative need to sign off that the work has been corrected and that part of the work can move forward. To have a good flowing project it is important that the overall project team work together and review and sign-off the corrected non-conforming work.

90. In my review of a sample of items on the BIM 360 log, there were a number of items that were reported to be ready for review or had been corrected but could not be closed because all the items on an observation report were not completed and signed-off so none of the items could be signed-off.[64] The logic of this sign-off process established by the Owner is convoluted and artificially inflates the number of alleged non-conforming work items. In addition, the non-conformance list included items that were merely comments or suggestions from the observer that should not have been on the list in the first place. For instance, a Morrison-Hershfield observer suggested using a wet film thickness gauge to confirm the mil thickness of a liquid applied membrane.[65] This type of item is not a non-conformance but just a suggestion for the installation contractor, yet this issue could not be signed off the non-

[63] Ex. D5139 (LCC-WYUSDC00085175).
[64] Ex. D5139 (LCC-WYUSDC00085175).
[65] Ex. D5139 (LCC-WYUSDC00085175 at pg. 1,262.)

conformance list. Overall, it appears the non-conforming work log was artificially inflated with items waiting to be signed off or that should not have been on the list in the first place.

91. There is a negative impact on Layton and workflow from the lack of timely approval of items ready to be removed from a non-conforming worklog. The project will 'bog' down when there is ***no*** timely sign-off of corrected non-conforming work. The following trades cannot move forward until the non-conforming work is acknowledged to have been corrected so they can build upon the alleged non-conforming work area. The project schedule begins to be impacted as more areas become unworkable.

92. Ultimately, it was improper for the Owner to terminate the Construction Contract based on the alleged quantity of non-conforming work items. The non-conforming work list is a misnomer. Many of the items on the list were either simple observations, work in progress, or work that had already been completed rather than actual non-conforming work. It appears that Layton was performing its duty to correct non-conforming work items as appropriate.

## IX. VARIOUS OF THE OWNER'S OTHER ACTIONS WERE IMPROPER AND A BREACH OF THE CONSTRUCTION CONTRACT.

93. It was improper for the Owner to terminate the Construction Contract based upon the alleged failure of Layton to produce a "recovery schedule." Owner failed to acknowledge the impact the incomplete, uncoordinated, and non-constructible design had on the Project. As shown through Layton's schedule, this root deficiency by the Owner led to the schedule delays. As a result, Layton did not owe a recovery schedule to Owner.

94. It was improper for the Owner to terminate the Construction Contract based on Layton's alleged failure to submit Payment Applications prior to the 25th day of the month. The Construction Contract is clear that the remedy to the Owner if a Pay Application is submitted

later than the 25th of the month is to pay 30 days after the submission of the Payment Application.[66]

95. It was improper for the Owner to Terminate the Construction Contract based on Layton's alleged failure to supply sufficient skilled workers to progress the work without considering the disruption caused by, non-payment, slow payment, unanswered RFIs, and continual scope changes on the Project. As mentioned, the remote location of the Project in Jackson, Wyoming creates a unique challenge to project management of trying to maintain a constant level of a work force without the ability to be able to transfer labor between other projects to deal with the ebb and flow of a project's needs. Any disruption of the leveling of the work force is related to the unanswered RFIs and issuance of CCD changes that constantly resulted in changes to subcontractor scopes of work, all of which to the Owner's failure to deliver reasonably complete, properly coordinated, and constructible design.

## X. LAYTON SUBSTANTIALLY PERFORMED UNDER THE CONSTRUCTION CONTRACT DESPITE THE OWNER'S BREACHES OF THE CONSTRUCTION CONTRACT.

96. Layton continued to provide supervisory, labor, material, and other resources to the Project with the intent to complete the construction despite the numerous challenges.

97. Layton continued to address the inadequate design documents by requesting information from the design team. Layton planned work activities to complete portions of the Project once the design information became available. Layton provided additional supervisory personnel for the Project to deal with the lack of information.

[66] Ex. J0004 (LCC-WYUSDC00000546 (AIA, A133 Section 7.1.3).

98. Layton continued to be tolerant of the Owner despite the slowness of payments for performed and certified work. Layton continued to make timely payments to the subcontractors and suppliers via the Construction Contract.

99. Layton continued to be tolerant of the Owner despite the exorbitant amount of design changes occurring on the Project. Layton provided additional supervisory personnel for the Project to deal with the abundant number of design changes.

## XI. SUMMARY OF CONCLUSIONS

100. In summary, based on the discussion noted above, the following are my conclusions and findings:

101. The Owner failed to meet the obligation of the Construction Contract with Layton due to its failure to timely deliver to Layton a reasonably complete, properly coordinated, and constructible set of design documents. The excessive number of RFIs (Request for Information – (2,659RFIs), CCDs (922 CCDs as of March 2024), ASIs, and PCOs clearly demonstrates the total lack of a complete and coordinated design for Project.

102. The Owner failed to meet its obligations under the Construction Contract by unilaterally and improperly modifying Layton’s work scope to a Design Assist role during the submittal process.

103. The Owner failed to meet its obligations under the Construction Contract by disrupting the Design Document Control process by inserting itself into the release of RFI and CCD information process causing confusion with the Project construction team regarding its understanding of what the intended work scope was supposed to be on the Project.

104. The Owner acted contrary to its obligations under the Construction Contract by materially and repeatedly interfering with Layton's ability to manage and timely progress the Work due to the number and material nature of design changes throughout the Project.

105. The Owner failed to meet its obligations to Layton under the Construction Contract regarding Pay Application review and timely payment. The late payments and partial payments disrupted Layton's ability to manage the Project and its subcontractors. The abusive use of the CCD process improperly slowed down the payment process to Layton and subcontractors for work properly performed.

106. The Owner failed to meet its obligations under the Construction Contract with regards to the Project schedule through its abuse of the CCD process and failure to comply with its contractual obligations for PCOs (. Despite being required to respond to a PCO within 15 days, the Owner was delinquent for an average of 50 days. This delay 1) severely hindered Layton's ability to prosecute the work efficiently and effectively; 2) created a labor issue by unbalancing the crew sizes to respond to the available work; 3) impacted the quantity and duration of the supervisory personal of both Layton and subcontractors to deal with the unbalanced work load; 4) created a potential material procurement issue and 5) required Layton and Subcontractors to effectively provide interim financing for the Owner to construct the Project without receiving payment for their work. *See also* the Witness Statement of Tom Caruso.

107. The Owner failed to meet its obligations under the Construction Contract through the abusive use of the CCD process. The Owner utilized the CCD process to remedy the deficiencies in the design without agreeing to provide Layton the increased compensation and contract time required to perform the additional work.

108. The Owner failed to act in good faith and to deal fairly with the Contractor in the following ways:

a. The Owner was fully aware that design documents were inadequate for the Project but continued to maintain a claims defense posture with respect to Layton.

b. The Owner's process of review and approval of RFIs caused untimely and incomplete answers to RFIs, causing critical path schedule delays and inefficiencies.

c. The Owner's process of review and approval of CCDs caused inefficiencies and disrupted the Contractor's ability to properly plan and execute its Work on the Project.

d. The Owner's failure to acknowledge and approve legitimate and appropriate changes in the Work 1) disrupted the workflow on the Project; 2) affected the managing and planning for the Project; and 3) affected the cash flow of Layton and its subcontractors on the Project.

e. The Owner's refusal to accept responsibility for the design changes that materially altered the design and increased the scope, delayed progress of the Work, and increased the cost of the Work.

f. The Owner's slowing and eventually stopping the processing of change orders disrupted the workflow on the Project, negatively affected the Contractor's ability to manage and plan for the Project, and negatively affected the cash flow of Layton and its subcontractors on the Project.

g. The Owner failed to timely inspect and approve compliant work so that the following Work could proceed.

h. The Owner's failure to make timely and complete payments affected managing and planning for the Project and affected the cash flow of Layton and its subcontractors on the Project.

i. Inappropriately terminating the Construction Contract.

109. Despite the Owner's repeated failures to meet its contractual obligations, Layton attempted in good faith to collaborate with the Owner to progress the Project, but Layton did not waive its rights with respect to the Owner's various failures to comply with the letter and spirit of Construction Contract.

## REBUTTAL

## I. REBUTTAL TO OPINIONS POTENTIALLY OFFERED BY OWNER'S EXPERT WITNESSES WILLIAM IBBS, AND SCOTT MALONEY

### A. Rebuttal to Opinions Related to Alleged Insufficient Skilled Workers.

***Layton did Not have High Personnel Turnover and did Not Exacerbate Delays and Non-Conforming Work Due to such Turnover.***

110. Mr. Ibbs has opined that Layton's high personnel turnover exacerbated delays and non-conforming work. Mr. Ibbs provided no evidence to support this assertion.

111. It is widely understood that on any project of this size it is expected there will be a certain amount of supervisory turnover that may occur. While excessive and unmanaged turnover may have an adverse effect on a project, there are many instances where turnover has a positive impact or no impact. The industry also understands the importance of transitioning a project through turn-over if it does occur. In addition, there are some supervisory and administration roles that will not affect the Project if turn-over does occur. Based upon my review of the Project records, Layton properly addressed the naturally occurring turnover on this Project quickly and appropriately to address each specific issue or need on the Project as it progressed.

112. How a supervisor's turnover occurs determines the overall effect on the teamwork and progress of the Project. If there is sufficient overlap between the supervisors (one leaving and one coming) there will be minimal, if any, effect on the Project.

113. In addition, the supervision requirements for a large complex project will change as the project evolves. For example, a project may start with a portion of the planned overall team and as more seasoned supervisors become available, they are added to the project. For instance, during the beginning of a project the superintendent assigned to the project may have

strength in the structural aspects of the project and another superintendent may have strength in finishes, etc. It is expected that staff will change as the needs of the project change.

114. Sometimes, there may be personality conflicts between a contractor's supervisory personnel and the Owner's personnel and the Owner will require that the contractor's personnel be replaced. The owner-requested change may have nothing to do with the technical and experiential qualifications of the supervisory personnel. While the Owner has the contractual right to require such changes, the Owner takes responsibility for the impact to the Project since they were caused by the Owner's interference.

115. In reviewing the staffing for the Project, most transitions that occurred before Amendment 4 included staffing overlaps during the transition. After Amendment 4, there were months of overlap during transitions. When there is sufficient overlap during a transition, the issues alleged to exist by Mr. Ibbs will have minimal impact on a project.

116. Based on what occurred after Amendment 4, the concept of High Personnel Turnover is a minimal issue, if an issue at all, and does not rise to the level of a breach in the Construction Contract.

117. The staff increases and influx on this Project were somewhat dynamic due to a few issues, but a huge issue was the added staff needed to deal with the changed work scope and CCD process resulting from the Owner's deficient design documents. The following outlines what staff was modified and the reason for the change:

a. Project Executive Role (2 each) – The first project executive was asked to be replaced by the Owner. It appears that this was related to personality conflicts rather than the substantive background, experience and training of the executive. Thereafter, there was no turnover in this role. This role experienced no changes after Amendment 4.

b. Construction Manager (2 each) – The additional Construction Manager was added to deal with the influx of design and contract issues. The added staff was later

reduced once the structure was completed. This role experienced no changes after Amendment 4.

c. Senior Project Manager (2 each) – the first Senior Project Manager was replaced due to the request of the Owner. Thereafter, there was no turnover in this role. This role experienced no changes after Amendment 4.

d. Project Managers and Assistant Project Managers (7 each) – Much of this staff was added to deal with the influx of the volume of CCDs, pay application support, and proposal request assistant. This role experienced no changes after Amendment 4.

e. Project Engineers (8 each) – The added project engineer staff was due to the volume of CCDs and changes which were occurring. The three Project Engineers who left the Project resigned to work for other contractors in different positions. The project engineer role, which typically processes paper, usually has a minimal impact on the Project when there is a transition.

f. Senior Superintendent (5 each) – One Senior Superintendent was replaced at the demand of the Owner. Another Senior Superintendent resigned because he preferred not to work for this owner; threatening to leave the company if he was not allowed to change projects. A structural senior superintendent left the Project because the structure was completed. One of the other senior superintendents had a planned retirement and wished to move on with his retirement after realizing the Project was being delayed due to bad design. The replacement of senior superintendent is a critical element on a project. In review of the staffing chart there was consideration given to overlap personnel for the transition from the structural work and the finish work, as well as for the retirement issue. Based on the overlap of the personnel making the transition, the impact on the Project was minimized. Only one of these transitions, a retirement, occurred after Amendment 4 was executed.

g. Area Superintendents/Field Engineers (16 each) – These individuals had specific responsibility over specific areas of the Project. While the area superintendent for exteriors changed after Amendment 4, there was sufficient overlap between the existing and the replacement to avoid any impact on the Project. The area superintendents were otherwise stable throughout the Project. There were additional supervisors added to deal with the influx of the CDDs and other changes which occurred on this project. If the increased scope that required their assignment to the Project had been completed, they would have been reassigned to other projects.

h. Project administration assistants (4 each) – these individuals provide support to the in-line supervisors and do not affect operations. These roles are administrative/clerical in nature, and this position experienced no changes after Amendment 4.

i. Scheduling / BIM / VDC personnel (7 each) - The scheduling manager was constant throughout the Project. Most of these staff were added due to the volume of CCDs, and other change work. Once their work scope was completed, they would have been reassigned to other projects. These transitions had no adverse impact on the Project.

j. Safety Managers (5 each) – One of the safety personnel got cancer and needed to relocate for cancer treatment. There was some early turnover in this position, but safety is a support role and usually does not affect operations negatively when there is turnover on a project.

Except for the Owner requested personal changes, the other staffing changes seem to be within a normal range of what is to be expected on a large project of this location, size and complexity. There will be retirements and there will be sickness or issues that need to be addressed, including staff who will leave for a perceived better opportunity, staff who come and go on a project due to the project's need, and staff who are on a project on a temporary basis while waiting for more permanent personnel to arrive.

118. It appears that Mr. Ibbs made a general statement about supervisory turnover and did not actually review the pertinent project data. There does not appear to be any substantive support for this aspect of his opinion.

119. Similar to Mr. Ibb's incorrect opinion, Mr. Maloney has opined that Layton provided insufficient project personnel and had high project personnel turnover. Mr. Maloney makes this statement without giving consideration to or indication of which supervisory personnel turnover caused the issues he alludes to. In fact, Mr. Maloney appears to have performed no factual review at all.

120. Layton and the Owner worked closely together to develop a project staffing plan that would fit into the Project budget based on the Owner's obligation to provide design documents that are reasonably complete, coordinated, and constructable. When it was determined that there was a major problem with the design documents, Layton did add personnel

to be able to deal with the increased administrative burden posed by the numerous design-related issues. The fundamental issue Mr. Maloney and the Owner's other experts fail to address is that the Owner failed to provide a reasonably complete, coordinate, and constructible design, which negatively impacted each phase of the Project. The "design issues" never got any better but continued impacting the Contractor's performance from one phase of the Project to the next phase.

121. Contrary to Mr. Maloney's opinion, I disagree that overall project personnel turnover causes:

a. Exuberant amounts of requests (RFIs) to the Design Team;
b. Lack of enforcement of previously made commitments;
c. Inconsistent enforcement of standards;
d. Incomplete or undocumented field corrections; or
e. Decisions being made without owner or architect approval.

122. Certain supervisory personnel will have more influence on the issues than other personnel. For example, the Area Superintendents/Field Engineers would be at the "front lines" dealing with the upcoming work items and would be involved with all the above-mentioned issues noted above. While there was limited turnover in the Area Superintendent over exteriors after Amendment 4, there was sufficient overlap between the original and the replacement employee to avoid negative impacts of the change.

123. To suggest that more RFIs were generated because the superintendents did not understand the design documents and were too lazy to do their own research is a stretch in imagination and only points back to the real issue — the incomplete and uncoordinated design. Saying that someone else should have caught the design errors does not change the fact that the errors originated with the design; it only blames others for the Owner's liability.

**124.** A supposed lack of enforcement of commitments or inconsistent enforcement of standards cannot be tied to the turnover of area superintendents. Area Superintendents do not

make design decisions; they implement the approved design. The Construction Contract is clear that the Contractor's reviews of the documents "are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents and the Contractor does not thereby assume responsibility for any errors, inconsistencies, or omissions in the Contract Documents."[67] The liability for the design lies with the Owner.

***Layton did Not Provide an Inadequate Workforce that Exacerbated Delays and Non-Conforming Work***

125. It is my opinion that the Project was staffed appropriately with the skilled workers needed as adjudged by the subcontractors and Layton. Mr. Ibbs's contrary opinion that inadequate labor numbers exacerbated delay (by slowing down the work) and non-conforming work is unfounded with no verified back-up evidence. For instance, Mr. Ibbs relies on the inflated quantity of non-conforming work items already described in my opinions without reviewing and questioning what that number contains. For instance, the Owner insists that at the time of termination there were 2,804 outstanding nonconformance items that need to be corrected. While in fact, Layton's records establish that 2,655 of those allegedly non-conforming items had been corrected and that Layton was awaiting inspection by the Owner and its representatives to confirm the removal of these items off the alleged "nonconformance" list.[68] It appears that there were only 149 outstanding "nonconformance" issues on the Project at the time of termination, some of which were mere observations and work in progress.[69] In light of the size, complexity and ever-changing designs on the Project, this is well within an expected range at any given time.

---

[67] Ex. J0005 (LCC-WYUSDC00000664, AIA A201, Section 3.2.2).
[68] Ex. D5466 (LCC-WYUSDC-00414331-4434).
[69] Ex. D5466 (LCC-WYUSDC-00414331-4434).

126. While I agree that inadequate number of skilled employees could cause project delays, I have seen no evidence that this happened on the Project. And it is also my opinion that the workforce needs to be balanced with the available workload. Work that is held up waiting for information or clarification of design changes to be issued is not part of an "available workload". It appears that Mr. Ibbs includes "held up" work as part what he deems to be available workload for purposes of his opinion on this issue. This is incorrect, since to be able to move forward the missing information needs to be provided to the contractor. The lack of timely delivery of a complete and properly coordinated design interfered with Layton's staffing because work that should be available was not available. This disrupted Layton's ability to plan and manage the workforce.

127. A steady and constant workforce will be more beneficial to a project schedule as opposed to a fluctuating work force due to slowdown within the crew dynamics. The fluctuating amount of CDD work due to design changes resulting in fluctuating work force needs, which is detrimental to the Project.

128. A steady workforce is better to maintain the quality of the project since the workforce understands the quality standards of the project. A fluctuating workforce will be detrimental to the quality of the project due to additional oversight and training needed for the workforce. With the attention of the crew foreman focused on training and oversight of the new crew members, other issues are impacted.

129. Layton has the responsibility to control the construction sequencing, means, techniques and methods of its work. It likewise has the obligation to exercise its judgment in how best to use those means and methods and sequencing to build the Project. It is apparent that the Owner believed Layton was required to prioritize CCD work over the base contract work. There is no basis for this in the Construction Contract or as a standard in the industry. While the

Owner can direct changes in work through a CCD and Layton has an obligation to proceed with that work regardless of an agreement on time or cost impact, Layton has the right to control how and when those changes are implemented in the field to most efficiently and effectively accomplish all of the work required under the Construction Contract. The Owner has failed to acknowledge the massive impact its abuse of the CCD process had on Layton's ability to efficiently construct the Project considering the constant and voluminous changes to the scope of the work as reflected in the over 900 CCDs issued to Layton.

### B. Rebuttal to Opinions Relating to Supposed Failure to progress the Work in accordance with the approved Construction Schedule.

***Layton did Not Fail to Meet a Standard of Care in Administration, Information Processing and Coordination; the CCD Volume was Unreasonable but was a Consequence of the Owner's Poor Design, Not any Failure by Layton.***

130. Mr. Maloney has opined that Layton failed to maintain a baseline standard of care in project management and cites the CCD volume as evidence of Layton's failure. It appears that Mr. Maloney made this statement without reviewing the evidence regarding the CCD process. He opines that "Layton repeatedly pressed for the issuance of CCDs" without providing any examples. This is not supported by the evidence. According to the Project record, the Owner mandated the use of the CCD process as a standard way of proceeding with change work without having to wait for an agreement on the cost or time impact of a change. In this way, the Owner used the CCD process as a controlling mechanism to try and control schedule and the flow of information on the Project. In fact, the Owner used the first CCD on the Project to issue the first changes of the Project associated with Addenda 8 through 12, and 15 through 19.[70] In this manner, the Owner believed the delay arising from the design changes would be minimized as

[70] Ex. D6023 (LCC-WYUSDC00097072).

opposed to waiting for pricing and then issuing a Change Order. The CCD process requires the contractor to proceed with the change immediately. From the beginning it was the Owner who dictated the use of the CCD process as the way in which changes would be made.

131. A CCD is a formal document issued by the Owner to direct Layton to proceed with a change prior to agreement on cost or schedule impact. I agree that the CCD process is usually used as an exception on a project. But the significant use of the CCD process on this Project was the Owner's decision, not Layton's. Only the Owner can issue CCDs, not Layton. Once the Owner decided how the flow of information was to be managed, Layton followed the contractual provisions associated with the process by refusing to proceed with change work until it received a CCD.

132. Layton is not responsible for design errors and omissions under the Construction Contract.[71] There are many examples of RFI responses and Submittal reviews that referenced a forthcoming ASI that had not been issued by the Owner/Architect, meaning Layton could not evaluate the response/review until it received the ASI. At other times, Layton would not receive any relevant information in an RFI or Submittal response regarding how to proceed with the work and would need to communicate with the Owner to understand when the information would become available. Some examples of responses from the Owner/Design Team without relevant information would include RFI 2010[72], RFI 2093[73], RFI 1992[74], RFI 2263[75], and Submittals 031000.05[76], and 062023.28R2[77].

[71] Ex. J0005 (LCC-WYUSDC00000664 (AIA A201 Section 3.2.2).
[72] Ex. D9581 (LCC-WYUSDC00218699).
[73] Ex. D4292 (LCC-WYUSDC00909880).
[74] Ex. D5961 (LCC-WYUSDC00218088).
[75] Ex. D9873; D9874 (LCC-WYUSDC01170085; 1175501).
[76] Ex. D4902 (LCC-WYUSDC00229795).
[77] Ex. D4974 (LCC-WYUSDC00240406.)

133. I agree with the statement made by Mr. Maloney that the volume of CCDs on the Project is well beyond what is reasonable for a project of this nature and reflects poor management and inadequate coordination of the change process resulting from design errors, omissions, or coordination that contributed to inefficiency and avoidable administrative burden. But the poor management and inadequate coordination of the change process was the creation of the Owner and its Architect, not Layton.

134. Usually, a CCD will deal with one issue, but the Owner sometimes included multiple design changes in one CCD, which results in CCDs becoming more like a design Addendum. One example is CCD 054 dated June 9, 2022.[78] In this one CCD, the Owner issued changes to a minimum of twenty-six different issues and required the use of Section 7.3.3.3 and Section 7.4 pricing adjustments. This kind of CCD issuance creates havoc for a project team trying to keep track of each separate design change. Some of the separate issues addressed in this CCD included changes to Structural – P.T. Cabling, Window system, Plumbing, Electrical, HVAC, Drywall Systems, and Lighting. The CCD also changed the Window System details requiring a resubmittal of the window system. The Owner claims it is just one CCD, when there are more like twenty-six (26) CCDs packaged into one. This example is not an isolated case but occurred multiple times during the Project. The Owner convoluted and abused the normal change order process as outlined in the Construction Contract.

135. The only way to proceed with a change on this project as outlined in the Construction Contract was with a written directive from the Owner. Based on some early interactions with the Owner's representative, Layton required written authorization to proceed with change work as per the contract documents (because the Owner "burned" Layton by

[78] Ex. D6046 (LCC-WYUSDC00689776.

requesting that Layton perform some change and deciding not to pay for the changed worked because the change was not in writing).

136. Whether design changes were directed through the typical change order process (PCOs) included in executed OCOs or through CCDs as the Owner directed, the amount of time and staff needed to administer the changes and design information would be similar for 1,000 PCOs as it would for 1,000 CCDs. What does matter is why there were so many design errors, omissions, or coordination issues. The poor design management by the Owner/Architect during the design and later into construction was the cause for the magnitude of the changes.

137. The abusive use of the CCD process, dictated by the Owner, slowed down the payment process to Layton and subcontractors. In the early stage of the Project, the Owner insisted that a CCD had to be incorporated into a Change Order before any of the costs of the CCD could be incorporated into a pay application and the subsequent payment made. This non-contractual requirement essentially allowed the Owner to have a "free loan" until the Change Order was executed and could be billed, all at the expense of Layton and Subcontractors. Once again, the slow CCD payment process hindered Layton's ability to manage the Project with the subcontractors since the Owner's directed process took away Layton's ability to bill and be paid.

138. Layton submitted 800 pre-construction RFIs to the Design Team prior to issuance of the 95% Construction Documents These RFIs outlined items that needed to be clarified in the design.[79] In addition, there were further incomplete design items outlined in Exhibit H of the GMP Amendment to the Construction Contract that still needed to be designed after construction began.[80] The poor design management by the Owner/Architect during the design phase and later

---

[79] Ex. D4084 (ARCADIS00300717 & 0718).
[80] Ex. J0006 (LCC-WYUSDC0000348).

into construction was the cause of the poor design information which was the cause for the magnitude of the changes.

139. The large number of additional RFIs and CCDs is evidence that the Owner/Architect neglected their duty to provide the Contractor with a completed and coordinated set of construction documents. The results of not having a complete and coordinated set of construction documents caused disruption in the field by not allowing clear direction, creating come-back work, start and stop work, and an inability to maintain crew size, etc.

140. The only ways in which the Contract Documents can be modified would be through a change instrument such as a Change Order, CCD, or other similar documents issued by the Owner/Architect. An answer to an RFI does not change the Contract Documents. If the answer to an RFI would change or clarify the Contract Documents, then the answer needs to be in a form which can change the Contract Document by using one of the contractually recognized change documents. If not, the work performed by the Contractor following the answer on an RFI would be classified as non-conforming work.

141. The incomplete construction documents resulted in an increased burden on both Layton and Owner/Architect, but the cause of the over-burden is due to the fault of the Owner/Architect not having a coordinated and reasonably complete set of design documents as required by the Contract Documents. In internal email correspondence dated September 2, 2022, between Marty Breen and Alan Mullin of DDRM, Marty Breen outlines:

> "The fact is that the quality of the IBI Contract Documents were very poor initially (GMP set) as well as subsequently (Post GMP Addendums and ASIs) which have caused too many Bonafide RFIs, Coordination and Design Assist Meetings, Addendums and ASIs, revs to Addendums & ASIs and CCDs to resolve the conflicts or omissions in the documents and to implement the fixes. These then turn into Claims for cost and time, more CCDs, Sub claims, Risk Reporting and

Management, PCOs, interface with Legal on Claim Management, Negotiation Meetings, and finally Change Orders."[81]

142. During the same email chain correspondence between Mr. Breen and Mr. Mullin, Mr. Mullin estimates the impact on the DDRM team from dealing with design-related issues and corresponding changes is 56 hours weekly (approximately a minimum of 22% of the staff's time).

143. It is interesting that DDRM apparently recognized the adverse impact the "poor design" was having on DDRM but refused to acknowledge that Layton was also severely impacted. In Response to Layton's Notice of Claim PCO 596.1 Expanded General Conditions Staff dated November 16, 2023, DDRM states "The Contract does not establish a limit for volume of CCDs that may be issued."[82] DDRM rejected the concept that Layton staff have been negatively impacted by the "poor design".

144. In the same email correspondence, DDRM proves that it was aware of the impact the "poor" design documents were projected to have on the development team's costs.

145. While the Owner recognized the costs of the deficient design on DDRM, it ignored the way those costs were impacting Layton and its subcontractors. As already explained, the Owner's failure to timely review and approve PCOs resulting from the large number of CCDs needed due to the deficient design improperly shifted the costs of change work onto Layton and its subcontractors.

146. Indeed, the Owner was very much aware of the incomplete and uncoordinated set of documents and the administrative burden placed on both the Owner and Layton and how it

[81] Ex. D4275 (DDRM_00534508).
[82] Ex. D4870 (LCC-WYUSDC01386355 & 6356).

was disrupting the Project, but it failed to acknowledge the impacts to Layton in terms of cost and time.

147. In reviewing the email correspondence of the Owner and Design Team, both parties were aware of the deficient status of the design documents and were attempting to correct the situation. In addition, the correspondence also outlines the poor management and inadequate coordination of the change process by both the Owner and Design Team. The following is a sample of that correspondence:

a. Feb. 8, 2021 – Letter from JAWA design to DDRM – JAWA Design had been contracted by DDRM to review the 95% set of CD documents and provide an evaluation of the set of documents. JAWA determined that:

    i. The average completion of the design package was approximately 75%;
    ii. Significant coordination between MEP and Interior Design was needed;
    iii. Finish detailing had not considered minimizing maintenance and on-going capital expenditure;
    iv. If the above items are not rectified, there will be a significant RFI count which would lead to delays and increased costs; and
    v. Operations considerations were severely lacking.

    Overall, JAWA determined that the design documents were severely lacking and the lacking operation considerations is a huge concern because of the redesign that is usually required to get these spaces correct.

    To obtain a building permit so construction could begin in May the Owner would need to submit the Design Documents to Teton County around the first part of March. There would be insufficient time (approximately 3 weeks) for the Design Team to be able to correct, complete, and coordinate that much design work to have the Design Document submission at 95% or better. It would appear the Owner provided less than 95% Design Documents to Layton for construction purposes. This would be contrary to the requirements of the Construction Contract between the Owner and Layton.[83]

b. Sept. 28, 2021 – Correspondence from lighting consultant concerning its ability to provide an updated conformance set as requested, since they had not done any update since late 2020. Also, the consultant did not understand what changes had been made in the last year.[84]

[83] Ex. D4072 (DDRM00569427).
[84] Ex. D4117 (ARCADIS00337220).

c. Nov. 1, 2021 – Zach Moseman [Layton] notifies IBI about additional missing information (separate from the five (5) missing RFI responses) in the Conformance Set [#1] of documents.[85]

d. March 4-15, 2022 email chain – Primarily an IBI internal communication between Peter Pillman & Craig Rothenburger. Discussion regarding the background of DDRM and why they may be part of the management group for the Owner. Discussion regarding the memo from the Owner concerning the design documents, changes being made without the Owner being aware of the changes, changes occurring without clouding them in the drawings, the documents have not been coordinated, etc. The tone of the memo was severe enough for IBI to tender it to their legal and insurance representatives. IBI also implemented a training seminar with its employees concerning document control and retention.[86]

e. March 31, 2022 – IBI internal communication concerning Marty Breen comments - From Marty (DDRM) - "No Colby. Craig has general industry knowledge but is not intimately knowledgeable 100% about this design, still helpful. Joe joined but also does not totally own the design. More questions than answers. Constructability was supposed to be addressed in all the work sessions, but constructability questions are still open. My prior review comments have not been captured. Rather than presenting a complete design we are having another work session with Layton. Some changes appear unclouded, Window fabrication on hold. Very serious schedule implications. I am very concerned we are kicking the can again down the road. Death by a thousand cuts."[87]

   The Owner is concerned about the constructability of the design documents, how the change information is being communicated (or not being communicated), continued delay in achieving a constructable set of design documents, and the implications to the Project schedule.

f. March 13 – April 8, 2022 email chain – primarily DDRM and other Owner related parties re Notice of Claim from Layton for CCD-028. Owner needs to prepare a response within 10 days. Question regarding why it took 8 months from the RFI response to issue the CCD. Discussion about defending the notice claim by putting Layton in a position that they should have known there were cost and time impacts even if they did not have the revised documents. The design information was not issued in the Conformance Set [#1] of drawings. The Owner changed from a defense position and decided to treat the issue as a claim and see if it has merit. Email to IBI concerning the amount of time it took to address the "grease line risk" and for putting the ownership in a heightened risk for claim, claim costs, and potential time extensions.[88]

---

[85] Ex. D4128 (ARCADIS00347886).
[86] Ex. D4159 (AARCADIS00412424).
[87] Ex. D4178 (ARCADIS00424686).
[88] Ex. D4183 (ARCADIS00431444).

g. April 18-19, 2022 – correspondence between BNA and IBI – BNA is unable to get the latest set of design documents (Architectural, Mechanical, Plumbing, and Interiors) to be able to perform the latest review request.[89]

h. May 3, 2022 – IBI and DDRM communication concerning example of incomplete work - ASI 19 was issued to plug 'holes' in the Addendum 22 Conformance Set [#1] of drawings but ASI 19 took over six (6) months to complete leaving the Owner open for claims from the contractor.[90]

i. Oct. 1-12, 2022 email chain – IBI and DDRM – Discussion about providing an ASI for the door hardware revisions provided with Door Submittal while keeping this work scope as a "design assist" work scope. Marty Breen of DDRM is concerned about maintaining a claim defense strategy.[91]

j. Nov. 21 – 22, 2022 – IBI and DDRM – DDRM is troubled with the problem of document control clarifications. The problem persists and affects the pricing of the PRs, and the subcontractors are not sure how to proceed with the work. Layton has bonafide complaints which is affecting the administration of the Project and is putting the Ownership in an indefensible position and heighted risk.[92]

k. Jan. 3-5, 2023 email chain – IBI communication with consultants – Air transfer duct going through a fire rated wall was missed but corrected in RFI-849. The Conformance sSet [#2] did not have this change since DDRM had not released the RFI.[93]

l. April 7, 2023 email and attached letter – DDRM to IBI – Letter "notice" to IBI from DDRM making a professional liability claim due to IBI's failed performance. Some of the issues relating to the failed performance include[94]:

   i. Untimely delivery of supplemental documents.
   ii. Untimely delivery of RFI responses required to resolve errors and omissions.
   iii. Deficient documents
   iv. Extraordinary volume of ASIs

m. May 2 – 22, 2023 – email chain between Rob DesLauriers (Hoback Club and Terra Asset Group) and Dave Saunders. The Owner is aware of the "terrible construction documents" and is expecting to make claim on IBIs Professional Liability Insurance Policy. The substantial completion date will slide due to

---

[89] Ex. D4190 (ARCADIS00440902)
[90] Ex. D4199 (ARCADIS00451187).
[91] Ex. D4305 (ARCADIS00593913).
[92] Ex. D4349 (ARCADIS00635989).
[93] Ex. D4369 (ARCADIS00664544).
[94] Ex. D4442 (DDRM00288005 & 8006).

design-related problems. The Owner is expecting that Layton, and its subcontractors are experiencing concurrent delays that line up with IBI's mistakes.[95]

n. July 10, 2023 – Arcadis – Arcadis uploaded the Conformance Set [#3] (dated 6 June 2023) to Teton County.[96]

o. Aug. 31, 2023 – Layon, DDRM, Arcadis – Layton gives notice to DDRM concerning use of CCD 601 Addendum #26 – Conformance Set [#3]. DDRM requests Arcadis to review and respond to the notice. The Layton notice gives listing of the missing design sheets, inclusion of design documents which have not been issued as changes to date, and exclusion of 128 CCDs issuance with the last referenced CCD dated 6 July 2023. The Layton notice is a letter dated August 31, 2023 from Robert Minhondo [Layton] to Marty Breen [DDRM] outlining the issues with the Conformance Set [#3] as noted above.[97]

p. Dec. 27, 2023 - DDRM to Arcadis – Outlines the CCDs issued to Layton since the last DAC meeting. This is an email chain listing every CCD issued to Layton since November 2, 2022. The flow of CCDs released to Layton is constant.[98]

q. March 8, 2024 - DDRM to Arcadis – Outlines the CCDs issued to Layton since the last DAC meeting. This is an email chain listing every CCD issued to Layton since November 2, 2022. The flow of CCDs released to Layton is constant.[99]

r. April 10, 2024 – DDRM internal – Fire alarm system was peered reviewed, and a few design deficiencies were noted. SMC met with Alarmlogix to see if they could take over a design-build of the fire alarm system with oversight by the FPE (Fire Protection Engineer).[100]

s. April 17, 2024 – Arcadis internal – the new Conformance Set (#4) will take a month to prepare due to the conformance can only include the CCDs which have already been issued to Layton. There are 30-40 ASIs which were sent to DDRM but were not issued to Layton. These 30-40 ASIs need to be excluded from the Conformance Set (#4). All these 30-40 ASIs were created on different days, some of which are back in the Sept-Oct 2023 period. So, all these changes need to be drawn back to make the conformance set correct.[101]

t. August 23, 2024 – Arcadis and DDRM – Conformance Set (#4) is not being issued by Arcadis. Geroux Architects is assembling the document to assist SMC. Arcadis is assisting in expediting the process so SMC and subcontractors can

---

[95] Ex. D4491 (CL0123964).
[96] Ex. D4563 (SFBT00015006).
[97] Ex. D4641 (LCCWYUSDC01261659 & 1660).
[98] Ex. D4923 (ARCADIS01137243).
[99] Ex. D5113 (ARCADIS01220222).
[100] Ex. D5199 (SMC00035961).
[101] Ex. D5216 (ARCADIS01261118).

continue to move forward. This document will not be a contract document or official conformance set issued by the Architect of Record.[102]

*u.* January 8, 2025 – February 5, 2025 - email chain – DDRM and Arcadis - Outlines the CCDs issued to SMC/Layton since the last DAC meeting. This is an email chain listing every CCD issued to SMC/Layton since 2 November 2022. The flow of CCDs released to SMC is decreasing. A total of 9 CCDs has been issued in this period.[103]

v. *See also* Correspondence listed in other sections of this statement.

148. While I agree with Mr. Maloney that the volume of CCDs on this project was well beyond what was reasonable, it is my opinion that the poor management and inadequate coordination of the change process was a failing by the Owner, not Layton.

### C. Rebuttal to Opinions relating to Alleged Non-Conforming Work.

***Layton did Not use Less than Industry Standard Site Protection Practices***

149. Mr. Ibbs has opined that Layton's substandard site protection measures exacerbated delays and non-conforming work. I disagree. The only alleged failure in site protection identified by any of the Owner's experts relates to protection of DensGlass sheathing on the exterior of the building.

150. As noted below, Layton protected the exterior of the building by wrapping the outside of the scaffolding surrounding the building with reinforced plastic sheathing. This type of protection is typical on a project located in a mountainous area subjected to heavy snowfall. In addition, during the winter of 2023-2024, Layton installed a temporary "dome" over most of the building. This added to the overall protection of the exterior envelope of the building and is beyond the measures typically taken by a contractor to protect the work.

---

[102] Ex. D5343 (ARCADIS01384659).
[103] Ex. D5430 (ARCADIS01524842).

151. As noted in this statement, DensGlass protection was given unwarranted consideration because the Owner's QA/QC manager, SAFEbuilt, used an incorrect, self-created standard to determine that DensGlass had been damaged by water. He required the incorrect use of a hand-held moisture meter to test for moisture within DensGlass and required DensGlass be replaced if it did not meet his arbitrary standard for moisture content. This alleged non-conforming work issue was Owner-caused.

152. As illustrated by the agreement between SAFEbuilt and the Owner and by SAFEbuilt's conduct on the Project, SAFEbuilt was neither an independent nor an unassociated third-party that was performing inspections on behalf of Teton County. Rather, SAFEbuilt performed inspections for the County but was also retained by the Owner to perform quality assurance inspections on behalf of the Owner. These two project roles were performed by the same individual. Obviously, there was a built-in conflict of interest created by this arrangement. The Owner was aware of this conflict when it hired SAFEbuilt to perform both services.

153. SAFEbuilt's reliance on moisture content to identify damage to the DensGlass not only prevented them from correctly identifying damage, but also resulted in them falsely identifying damage, because: 1) they failed to follow industry standards; 2) they used a 2-pin hand-held moisture meter; 3) they improperly used a 2-pin hand-held moisture meter; 4) they relied upon an unapproved moisture content criterion; and/or, 5) they relied upon an unapproved maximum dry out period. With respect to the third issue, SAFEbuilt did not get a formal lab test performed to actually determine if the readings of the moisture meter were correct based on how the meters were being used on this type of material. Without the actual lab test needed for verification, the meter readings would give a number without a real gauge to determine the real moisture content.

154. In essence, it appears that much of the alleged DensGlass non-conforming work, which is what drove the Owner's concern about protection of DensGlass, was falsely identified as being non-conforming by an entity that was not an independent agency, that made up its own standards, and that was working for the Owner. This caused not only monetary waste for the Project but also disruption to the progress of the Project.

***Allegations about Unapproved Material Substitutions and Deviations from Approved Drawings on the Roof are a Red Herring***

155. Mr. Maloney has opined about alleged non-conforming work executed by Layton on the roof and describes that non-conforming work as including, among other things, unapproved material substitutions and deviations from approved drawings. Yet, Mr. Maloney fails to acknowledge that the subcontractor that performed work on the roof after Layton's termination, Alliance Roofing, was allowed to ignore the design documents that Mr. Maloney alleges Layton did not follow.

156. Based on my review of Alliance Roofing's contract for the Project, Alliance Roofing was not required to comply with the Project design documents and was allowed to rebuild the roof using unapproved substitutions and/or deviations from the approved drawings. The portions of that contract that are of interest are as follows:

a. Paragraph 1.1, stating that "exhibits A thru N constitute an integral part of this Agreement and are incorporated herein by reference."[104]

   i. Exhibit A - Scope of Work
   ii. Exhibit B – Contract Documents
   iii. Exhibit C – Contract Schedule
   iv. Exhibits D through N pertain to items procedurally needed for the Project.

b. Paragraph 3.2[105]

[104] Ex. D5333 (ALLIANCE00009869 (Depo Ex. 152)).
[105] Ex. D5333 (ALLIANCE00009869 (Depo Ex. 152)).

i. Exhibit A - Work Scope becomes the SMC PCO-4008, which includes Alliance Roofing proposal with proposed deviations from the design documents.
ii. Exhibit B – Contract Documents is *deleted in its entirety* and relies on the Alliance Roofing proposal as the Contract Documents.
iii. Exhibit C – Contract Schedule is *deleted in its entirety* and relies on the Alliance Roofing proposal that the roof installation will be done *within a reasonable time*.

c. Unapproved material substitutions and deviations from original design documents included in Alliance Roofing plan for constructing the roof included the following:

i. Slope Shield: The slip sheet was supposed to be Vapro Shield's Slope Shield Plus instead of the Grace Ice and water shield proposed by Alliance Roofing. The use of the Slope Shield Plus material is a proposed add to their scope of work.
ii. Snow Fence: The snow fence proposed by Alliance Roofing for both the shingle roof and metal roof is different and in conflict with the original design documents.
iii. Screws: The 5/8" plywood sheathing was supposed to be anchored using thirty-five (35) #14 screws, but Alliance Roofing's scope required them to anchor the 5/8" plywood with just six (6) #14 screws.
iv. Free Reign: Alliance Roofing's contract gave them incredible leeway. It states that SMC will use Alliance Roofing's advice on how to construct the roofs (see page 5 of Alliance Roofing proposal). The Contract Documents and Scope of Work are replaced by "**Alliance Roofing best advice.**"[106]

d. To my knowledge, these design changes were not reviewed or accepted by the Teton County Building department regarding the permit set of contract documents.

e. The Owner signed PCO 4008 that incorporated Alliance Roofing's scope of work into the contract and gave direction to SMC to proceed.[107]

157. The Owner does not seem to mind when others provide non-conforming work and deviate from approved design documents when it suits the Owner's purpose. There appears to be double standards when it comes to the definition of non-conforming work with respect to the roof.

---

[106] Ex. D5333 (ALLIANCE00009869 (Depo Ex. 152)).
[107] Ex. D5429 (CL00062298).

***<u>Layton Did Not Perform Unauthorized Changes and Deviations from Contract Documents</u>***

158. Mr. Maloney has opined that Layton allowed field substitutions, undocumented changes, and deviations without submitting proper change documentation or obtaining Architect approval, that several such deviations were found during the Project, and that such was in violation of the Construction Contract. This opinion, however, is not supported by any documentation or even reference to specific circumstances. Instead, it is merely a conclusory statement reiterating the Owner's baseless claim.

159. While it is possible that some "non-conforming" work items could be described as unauthorized changes or deviations from the Contract Documents, without any specific examples we can only guess at what Mr. Maloney means. It is possible that what Mr. Maloney believes are "non-conformance work items" may simply be design change work that was issued after the base scope work had already been installed, which would not be non-conforming work at all.

160. Any unauthorized changes and deviations from Contract Documents noticed by Layton, the Design Team, or Owner would be documented in the non-conforming work log and then assigned to the appropriate subcontractor to correct the issue.

161. As already discussed, most of the alleged non-conforming work items at the time of termination were not actual non-conforming work but were 1) corrected and waiting for review by the responsible design team member; 2) completed and signed off by the responsible design team member but awaiting all other items associated items on the original list to be signed off so the issue could be closed (this was an Owner requirement); 3) observation statements instead of actual non-conforming work; and 4) work in progress.

162. Based on the deposition testimony of replacement contractor, SMC, after SMC vetted the alleged non-conforming work item list, over 75% of them were deemed to be "not

real."[108] And as shown by Layton's project records, there were only 19 issues on that list that required one or more subcontractors to address, none of which were impacting schedule or causing critical path delays on the Project.[109] Mr. Maloney's opinion about the prevalence of non-conforming work is not supported by the actual documentation which existed. On the contrary, it is apparent that the "non-conformance list" was improperly inflated as a pretext to terminate Layton from the Project.

***<u>Layton did Not Fail to Correct Known Deficiencies Identified in Observation Reports or Leave Them Unaddressed for Extended Periods</u>***

163. Mr. Maloney has opined that non-conforming work identified in punch lists or observation reports was left unaddressed for extended periods. This opinion is not supported by any documentation but is merely a statement reiterating the Owner's baseless claim.

164. As already explained, the Owner instituted a process that artificially prevented items on Layton's BIM 360 log (i.e., "non-conformance" items) from being closed out. By doing so, the Owner artificially inflated the number of alleged "nonconformances" on the Project. In addition, the vast majority of the items on the list were misrepresented as being non-conformance items to begin with.

***<u>Layton did Not Install Damaged or Incomplete Components</u>***

165. Mr. Maloney has opined that Layton allowed materials known to be damaged or incomplete to be installed. This opinion is not supported by any documentation but is merely a statement reiterating the Owner's baseless claim.

166. There was "in-progress work" which did not have all the components installed because they were work "in-progress" and not completed assemblies for review.

---

[108] 2025.07.24 Pete Smith Depo. Tr., 80:6-81:8, 90:5-16.
[109] Ex. D5466 (LCC-WYUSDC-00414331-4434).

***<u>Layton did Not Fail to Provide Reasonable Protection for DensGlass during the Winter Season</u>***

167. Mr. Ibbs has opined that Layton failed to protect DensGlass during the winter season requiring removal and replacement of up to 80% of the DensGlass. This statement was a reiteration of the Owner's claim. The 2022-2023 snow year was one of the biggest on record for the area.[110] As a result, despite industry standard scaffolding and plastic weather protection in place, certain external areas could not be practically protected from the substantial build-up of snow and ice during this unprecedented season. In those areas there was physical damage to DensGlass such as delamination that required its removal and replacement. Layton accomplished this work.[111] SAFEbuilt, an entity retained by the Owner to perform certain inspections on behalf of Teton County and as the Owner's separate QA/QC manager, however, claimed that vast sections of DensGlass also had to be replaced in reliance on an unsupported moisture content standard despite not having any delamination or physical deterioration. It is my understanding that Dean Vlahos has offered detailed opinions on this issue.

168. In my opinion, Layton did not fail to take reasonable measures to protect the DensGlass sheathing material. Layton wrapped the outside of the scaffolding surrounding the building with reinforced plastic sheathing. This type of protection is typical on a project located in a mountainous area subjected to heavy snowfall. In addition, in the winter of 2023-2024, Layton installed a temporary "dome" over most of the building, which is above the normal industry standard protection requirements. This added to the overall protection of the exterior envelope of the building. As mentioned in other documentation, there were isolated areas where

---

[110] See Historical Weather Reports from the Teton-Bridger Avalanche Center (https://jhavalanche.org/historicalData.php) and On the Snow (https://www.onthesnow.com/wyoming/jackson-hole/historical-snowfall)
[111] Ex. D6497.PCO-1113.1

the snow breached the temporary protection system, but **not** 80% of the exterior sheathing area. As agreed by Layton, there were some areas which had been damaged by ice and snow build up during an unprecedented snow fall that occurred during the winter of 2022-2023. Those areas damaged by the extreme conditions (snowfall levels far above the 10-year average in a 30-day period) were submitted as a claim to the Builders' Risk Insurance carrier.[112]

169. The Owner provided the Builders' Risk Insurance Policy for the Project. The Owner refused to submit the replacement of the DensGlass to the insurance carrier as a claim, which required Layton to submit the DensGlass replacement claim to the insurance company after all the corrective work was completed (approximately one year after the occurrence). The insurance carrier rejected the claim, and one of the major reasons for the rejection was that the insurance company did not have an opportunity to conduct a site inspection or perform a condition survey prior to the remediation work occurring due to the Owner's refusal to make the claim. This inaction by the Owner severely restricted and prejudiced the Contractor's insurance recovery on this issue.

***<u>Layton did Not Provide Insufficient Oversight of Work Quality and Sub Coordination</u>***

170. Mr. Maloney has opined that Layton did not properly ensure that subcontractor work conformed to the Contract Documents or that their work met industry standards and cites as evidence the "nonconformance" log.

171. This opinion is not supported by any documentation but is a statement reiterating the Owner's baseless claim. The existence of items on a "non-conformance" log is not proof of an oversight on the part of Layton, particularly here where the "nonconformance" log contained work in progress and mere observations of consultants rather than true nonconformance issues.

---

[112] Ex. D6794; D6795; D6796.

Layton used its BIM 360 quality assurance tool to reduce quality assurance issues and reviewed the lists with each subcontractor in the weekly Subcontractor Coordination Meeting and daily morning meetings with subcontractors (called daily huddles). Each subcontractor would get the updated work lists which had the issues to be corrected. Layton area superintendents would follow up on the status of the lists daily. In addition, during meetings with subcontractors Layton reviewed design changes (CCDs) with subcontractors and direction.

172. While Mr. Maloney's opinion specifically mentioned supposed failures by Layton to coordinate MEP systems, Mr. Maloney failed to address the incomplete design and uncoordinated set of design documents. Many of the issues observed by the Architect as being "nonconformances" were design related items (as previously been discussed) that finally got corrected through the RFI and CCD process.

173. There is no support for the opinion that there was insufficient oversight of Work Quality. Further, to the extent there was insufficient oversight, it was a function of the Owner and Design Team not being able to provide a reasonably complete and coordinated set of design documents in a timely manner.

### ***D.*** **Rebuttal Opinions Related to Alleged Failure to Cooperate with the Architect and Exercise Skills and Judgement in Furthering the Owner's Interests, to Furnish Efficient Construction Administration and Management Services, and to Perform Work in an Expeditious and Economical Manner.**

***Layton did not fail to coordinate and integrate with the architect; Layton did not provide insufficient early input***

174. Mr. Maloney has opined that Layton's RFIs were reactive rather than proactive due to Layton's failure to provide insufficient early input on design problems. Mr. Maloney's opinion ignores the evidence of the amount of input provided by Layton to the Architect regarding items that needed to be clarified or otherwise addressed in the design documents.

175. During the preconstruction process Layton submitted more than eight hundred (800) preconstruction RFIs (see Pre-Con RFI Log)[113] of items that needed further design information. DDRM (Owner), IBI (Design Team), and Cummings (Owner's Cost & Schedule Consultant) analyzed those items and decided how to implement needed changes into the design documents. They made decisions regarding how the information would be released either directly into the CD set or by Addenda or the CCD process.

176. The numerous preconstruction RFIs are all "proactive" to get the design reasonably complete and coordinated before being released for construction. It was the Owner's and Design Team's decisions that controlled whether or not to make corrections with the design documents, not Layton.

177. The preconstruction RFIs were submitted to the Design Team and Owner during the Conceptual Design phase, Schematic Design (SD) phase, Design Development (DD) phase, 50% Construction Document (CD) phase, and 95% Construction Document (CD) phase. The design team was given plenty of input regarding items which were **not** coordinated, vague, or incomplete. Even with all the input provided to the design team, there were numerous items that were not addressed by the Owner or Design Team.

178. Exhibit E to the GMP Amendment to the Construction Agreement identified 47 design clarifications that still needed to be address by the Design Team at the time of 95% CDs.[114]

179. Exhibit H to the GMP Amendment identified an additional 139 allowance items that still needed to be addressed by the Design Team.[115]

[113] Ex. D4084 (ARCADIS00300717 & 0718).
[114] Ex. J0006 (LCC-WYUSDC00000348).
[115] Ex. J0006 (LCC-WYUSDC00000348).

180. Exhibit J to the GMP Amendment identified 13 value engineering items that had not been incorporated into the CD set of drawings.[116]

181. Exhibit K to the GMP Amendment identified an additional 62 potential value engineering items on which the Owner needed to provide direction regarding acceptance and incorporation into the CD set of documents.[117]

182. From the beginning of construction, it became apparent there were more design issues with the documents. In the 95 % CD and Conformance set of drawings there were missing as well as uncoordinated items. Both the Owner and Design Team were aware of the problem even without Layton submitting RFIs. The following emails provide evidence of the poor design management of the design team and how the Owner was convoluting the change process:

a. Sept. 23, 2021 – Steve Jones (IBI) email to design team members – thanking folks for getting the Addendum 20 drawings and the upcoming issuance of the Conformance Set [#1] by the following Wednesday [September 29, 2021]. He outlines the design scope which is to be included in the conformance set. He emphasis to make sure not to include any additional scope or design after September 23, 2021.[118]

b. Oct. 20, 2021 – Eman Siddiqui [IBI] notifies DDRM (Owner Representative) and other IBI management that there are Five (5) RFIs which are still open, so the Conformance Set [#1] is inaccurate.[119]

c. Emails identified in other sections of this statement.

183. Similar types of communication occurred between DDRM and IBI, internally within IBI, and between IBI and its consultants throughout the Project up to the time of termination of the Project. Even though Layton had provided proactive information for the

---

[116] Ex. J0006 (LCC-WYUSDC00000348).
[117] Ex. J0006 (LCC-WYUSDC00000348).
[118] Ex. D4119 (ARCADIS00336386).
[119] Ex. D4125 (ARCADIS00343164).

Owner and Design Team to address during the design process, the Owner and Design Team was simply unable to coordinate and complete the design.

***Layton did Not Provide Inadequate Preconstruction Cost Input and Budget Control***

184. Mr. Maloney has opined that Layton provided inadequate preconstruction cost input and budget control. This opinion ignores the evidence of the amount of input provided by Layton to the Design Team regarding cost items and cost estimates during the differing stages of design.

185. Layton provided a total of seven (7) cost estimates of the Project during the many design phases including at 1) Programming phase; 2) Conceptual Design phase; 3) Schematic Design (SD) phase; 4) Design Development (DD) phase; 5) Founders Design phase; 6) 50% Construction Design (CD) phase; and at 7) GMP Construction Design phase.[120] Each of the cost estimates were broken down by DDRM's specific request to present the information in a format DDRM was accustomed to using. The Design Team was aware of all the cost information for the Project during each phase of the design process.

186. The cost budgeting process included comparison costs from the last version of the design to show how the costs had fluctuated based on the updated design. The following is an example of the budget cost comparison presented in the cost estimates:

[120] Ex. D4028 (LCC-WYUSDC-00417827-417973) (December 11, 2019); Ex. D4030 (LCC-WYUSDC-00273089-273237) (January 17, 2020); Ex. D4054 (LCC-WYUSDC-00273239-273369) (September 11, 2020); Ex. D4056 (LCC-WYUSDC-00422225-422373 (September 18, 2020); Ex. D4062 (LCC-WYUSDC-00292243-292399); Ex. D4098 (LCC-WYUSDC-00378617) (June 17, 2021).

**Teton Village H1**
**DDRM Partners**

**DD Update - Founders' Units**
**10/23/2020**

| System Description | DD 9/18/20 | FU 10/23/20 | Delta FU-DD |
|---|---|---|---|
| A10 Foundations | 4,482,478 | 4,482,478 | - |
| B10 Superstructure | 22,409,982 | 22,409,982 | - |
| B20 Exterior Enclosure | 14,479,962 | 14,479,962 | (0) |
| B30 Roofing | 3,873,134 | 3,873,134 | - |
| C10 Interior Construction | 19,441,987 | 19,957,016 | 515,029 |
| C20 Stairs | 1,075,861 | 1,075,861 | - |
| C30 Interior Finishes | 21,954,829 | 24,028,106 | 2,073,276 |
| D10 Conveying | 3,565,845 | 3,565,845 | - |
| D20 Plumbing | 8,597,975 | 8,597,975 | (0) |
| D30 HVAC | 19,521,787 | 19,521,787 | - |
| D40 Fire Protection | 1,239,283 | 1,239,283 | - |
| D50 Electrical | 15,012,667 | 15,312,150 | 299,483 |
| E10 Equipment | 2,917,542 | 2,929,906 | 12,364 |
| E20 Furnishings | 820,778 | 812,363 | (8,415) |
| F10 Special Construction | 2,100,033 | 2,100,033 | (0) |
| G10 Site Preparation | 6,560,979 | 6,560,979 | - |
| G20 Site Improvements | 5,606,440 | 5,606,440 | - |
| G30 Site Mechanical Utilities | 1,193,280 | 1,193,280 | - |
| G40 Site Electrical Utilities | 1,016,979 | 1,016,979 | - |
| H30 Hoisting and Access | 7,594,750 | 7,594,750 | - |
| **Subtotal** | $ 163,466,570 | **$ 166,358,308** | **$ 2,891,738** |
| General Conditions | 10,092,576 | 10,092,576 | - |
| General Requirements | 4,164,035 | 4,164,035 | - |
| Weather Conditions Allowance | 2,535,000 | 2,535,000 | - |
| Time Extension Allowance | 1,000,000 | 1,000,000 | - |
| Housing Costs for Trades | 4,000,000 | 4,000,000 | - |
| Third-Party Photos & Documentation | 130,000 | 130,000 | - |
| Third-Party Home Warranties | 125,000 | 125,000 | - |
| **Subtotal** | $ 185,513,181 | **$ 188,404,919** | **$ 2,891,738** |
| Safety, Scheduling, BIM, Textura | 1,269,689 | 1,289,504 | 19,815 |
| Liability Insurance Workers Comp & Gap | 766,192 | 778,149 | 11,957 |
| Payment & Performance Bond | 1,269,689 | 1,289,504 | 19,815 |
| Subcontractor Default Insurance | 1,634,666 | 1,663,583 | 28,917 |
| Contractor Fee | 10,945,599 | 11,116,417 | 170,819 |
| Contractor Contingency | 6,567,359 | 6,669,850 | 102,491 |
| Design Contingency | 10,945,599 | 11,116,417 | 170,819 |
| Escalation & Market Conditions Contingency | - | - | - |
| **Construction Total** | $ 218,911,974 | **$ 222,328,345** | **$ 3,416,371** |

*Figure 7: Project cost budget comparison between different design phases.*[121]

187. In addition, Layton provided the Owner/Architect an overall tracking of the cost budgets for the Project during the design process[122]:

---

[121] Ex. D4059 (LCC-WYUSDC00422662 & 2663).
[122] Ex. D4098




*Figure 8: Project cost budget over the differing stages of design.*

***<u>Layton did Not Manage Submittals Poorly or Submit them Out of Sequence Due to any Layton Failure</u>***

188. Mr. Maloney has opined – merely repeats the Owner's baseless claim claim – that submittals were routinely submitted out of sequence, incomplete or with insufficient time for proper architectural review. Mr. Maloney has not provided any evidence supporting the claim.

189. Moreover, Mr. Maloney fails to acknowledge that the constant changes to the design through the submittal, RFI, and CCD process led to submittals being out of sequence. Certain design issues that impacted the submittal schedule include the following:

a. Design changes that occurred regularly would require different materials or systems, which would require that Layton and its Subcontractors completely restart the submittal process or to be updated prior submittals already submitted.

b. The extensive CCDs issued by the Owner to correct its deficient design impacted the submittal flow, causing out of sequence submittals.

c. Some design changes required new equipment to be submitted after the original submittal package had been reviewed and approved. For example, after the original electrical submittal package had been submitted, approved, and material procured, a change required new electrical sub-panels in the lock-off units to be submitted late in the Project. This design change occurred after the drywall in the lock-off units had been hung and finished.[123]

190. Mr. Maloney also ignores the Owner and its Design Team's practice of using the submittal process to understand what was available, which amounted to using the submittal review process to force a Design Assist role onto Layton.

191. The "design assist" role the Owner pushed onto Layton was a way to gain information for the designers to be able to understand what products were available for this type of project. This design work was supposed to have taken place and completed before the 95% CD documents were released for construction.

192. Addressing design changes being made during the submittal review process caused the submittal process to be disrupted and, in some cases, to be redone.

a. RFI 0360 – requested clarification regarding the changing of beam sizes and the modification of beam connection plates and number of bolts required during the structural steel submittal process.[124]

b. RFI 0692 – In submittal 211002-0406, the Roll-out Cabinets were marked as "Revise and Resubmit" due to the specifications needing to be revised. The new specification section would be issued in an upcoming ASI.[125] This submittal became out of sequence due to design issues.

c. RFI 0699 – In submittal 211002-0455, the design team marked the submittal "revise and resubmit" because the design team wanted to add a "microbevel" on the wood planks. The "micro-bevel" requirement was not part of the design documents. When questioned about the additional requirement for the wood plank, the design team changed the submittal to not require the "micro-bevel".[126] In the meantime, this submittal had become late being released back to the manufacturer.

---

[123] Ex. J038 (LCC-WYUSDC-00105033)
[124] Ex. D4141 (LCC-WYUSDC00580241 & 0242).
[125] Ex. D4243 (LCC-WYUSDC00710343 & 0344).
[126] Ex. D4236 (LCC-WYUSDC00703995 & 3996).

d. Submittal 211002-0650 – During the submittal review process a note was added to the shop drawing indicating the floor in P232 was changing from wood to stone and indicating that Layton should submit an RFI regarding this issue and an updated drawing will be issued. The submittal was stamped as a "revise and resubmit".[127] This submittal became out of sequence due to design changes being made during the submittal process.

The above examples are not isolated cases for this project but occurred numerous times. The submittal process became overburdened with the design related "revise and resubmit" process. In addition, many items became out of sequence and ended up being released later than expected due to waiting for a CCD/ASI authorizing the design change.

193. There were times when a CCD would be issued to change items within a submittal. For example:

a. CCD 054 – modified submittal 085113.02.R4 by referencing ASI-036 and identifying the insulation to be Rockwool Comfort Board 110.[128]

b. The answer to RFI 0661 addressed submittal 087100.02 and required that ASI-034 be revised. The submittal was on hold until the Owner released the revised ASI or a CCD.[129]

c. Submittal 033300.17 was returned with markup of revised wall layouts per ASI 435. ASI 435 had been submitted by the architect to the Owner but has not yet been approved and given to Layton for implementation.[130]

*d.* Submittal 064100.68 had a note attached that the finish of WC-17 was to change and would be contained in ASI 535.[131] ASI 535 would need to be reviewed by the Owner and then given to Layton to implement.

The above examples are not isolated cases for this project but occurred numerous times. The submittal process became overburdened with the design changes and the resulting need to wait for the change to be reviewed and approved by the Owner. In addition, many items became out

---

[127] Ex. D4270 (LCC-WYUSDC00747460 & 7461).
[128] Ex. D4363 (LCC-WYUSDC00105794).
[129] Ex. D8025 (LCC-WYUSDC00196505).
[130] Ex. D4474 (LCC-WYUSDC00824039 & 4041).
[131] Ex. D4482 (LCC-WYUSDC00828644 & 8645).

of sequence and ended up being released later than expected due to waiting for a CCD authorizing the design change.

194. Design changes in the submittal process disrupted the administration staffing needed by Layton. The construction staff would need to spend more time performing "revise and resubmit" type of work instead of being able to process other needed submittals.

195. In my review of the submittals that were returned by the Architect as "revise and resubmit" mostly due to design modifications, these submittals took an additional 13 calendar days (8 workdays) on average to process and receive approval to proceed.[132] This additional amount of time impacted the efficiency of Layton's staff handling submittals.

196. Any suggestion that Layton's managed the submittal process poorly would have to consider the root cause of out of sequence submittals. A major cause of the issue was the lack of a reasonably complete and coordinated set of design documents. If the design is deficient, then it is likely that the Design Team will try to complete and coordinate the design during the submittal and RFI processes, which is what occurred on this project.

***Layton did Not use Contractor Contingency Improperly***

197. Mr. Maloney has opined that Layton used Contractor Contingency improperly. The claim of improper use of contractor contingency is without merit. Layton used contingency to deal with gaps between subcontractor's work scope, to deal with repairing and correcting damaged or non-conforming work, and other matters pertaining to the work, all of which are proper uses for Contractor Contingency.[133]

[132] Ex. D5468 (LCC-WYUSDC00229585 (Submittal Log)).
[133] Ex. J0004 (LCC-WYUSDC-00000546, AIA A133, Section 2.2.4; Article 6).

198. “Costs of repairing or correcting damaged, defective, or non-conforming Work” is a Cost of Work and is billable under the Construction Contract.[134]

199. Under the Construction Contract, however, it is improper for the Owner to make Layton use Contractor Contingency to cover design changes that are the Owner’s responsibility or a result of architect design errors.[135]

200. There were many instances where the Owner tried to require Layton to use Contractor Contingency to cover design changes that the Owner alleged were “inferred scope” that Layton should have included in its bid and the final GMP. Layton often disagreed that design changes involved “inferred scope” and asserted that the change resulted from a design error. Mr. Maloney suggests that Layton should have used its contingency to cover the cost of these changes until the dispute was resolved. This opinion ignores the Owner’s actual behavior on the Project. For example, in its response to PCO 667, the Owner alleged that changes made in CCD 407 were reasonably inferable in Layton’s original scope and that Layton should use contractor contingency.[136] The Owner then stated in its approval of the use of contractor contingency that "Contractor and Owner agree this Change Order constitutes full resolution and compensation to the contractor for all costs,"[137] which if agreed to, does not give Layton the right to later resolve the dispute and regain any contingency used. Additionally, if the costs included in PCO 667 were in fact due to design changes that were **not** inferred scope, then it would be improper for the Owner to ask Layton to pay for them out of Contractor Contingency.

[134] Ex. J0004 (LCC-WYUSDC-00000546, AIA A133, Section 6.7.3).
[135] Ex. J0004 (LCC-WYUSDC-00000546, AIA A133, Section 2.2.4.1).
[136] Ex. D6740 (LCC-WYUSDC01472123).
[137] Ex. D4709 (LCC-WYUSDC01472123).