Randall B. Reed (Wyo. Bar No. 5-2863)
Erika M. Nash (Wyo. Bar No. 6-3867)
Justin Daraie (Wyo. Bar No. 7-4690)
LONG REIMER WINEGAR LLP
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001
307-635-0710
rreed@lrw-law.com
jdaraie@lrw-law.com
enash@lrw-law.com

Michael T. Hoppe (pro hac vice)
Bryan S. Johansen (pro hac vice)
Sara Meg Nielsen (pro hac vice)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
mhoppe@parrbrown.com
bjohansen@parrbrown.com
snielson@parrbrown.com

L. Tyrone Holt (pro hac vice)
THE HOLT GROUP, LLC
1675 Broadway, Suite 2100
Denver, Colorado 80202
tholt@holtllc.com

*Attorneys for Defendant Layton Construction Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CODY LANE DEVELOPMENT CORP.,<br><br>Plaintiff / Counterclaim Defendant,<br>v.<br><br>LAYTON CONSTRUCTION COMPANY, LLC,<br><br>Defendant / Counterclaim Plaintiff. | Case No. 2:24-cv-00064-KHR<br><br>The Honorable Kelly H. Rankin |
| Layton Construction Co., LLC,<br><br>Third-Party Plaintiff,<br>v.<br><br>Sprayfoam Southwest, Inc. dba Global Roofing Group, et al.<br><br>Third-Party Defendants. | |

**WITNESS STATEMENT OF DEAN VLAHOS, FAIA**

Defendant, Counterclaim Plaintiff and Third-Party Plaintiff Layton Construction Co., LLC ("Layton"), pursuant to the Court's Amended Initial Pretrial Order of October 23, 2024 (ECF No. 119), Order Ruling on Plaintiff Cody Lane's Motion to Continue Trial, Expand Trial Time Allotted, & Reset Pretrial Deadlines of December 31, 2025 (ECF No. 363), and Local Rule 16.2(b)(1), provides the following Witness Statement of Dean Vlahos, FAIA, NCARB, CDT, CCCA.

## QUALIFICATIONS

Mr. Vlahos is architectural expert with over 47 years of experience in architectural practice. He is the Founding Chair of the High-Performance Building Envelopes Committee for the Los Angeles American Institute of Architects. In 2010, he was elected to the American Institute of Architects (AIA) College of Fellows (FAIA), one of the highest honors the profession bestows on its colleagues, because of notable contributions to the advancement of the architectural profession and technical contributions in the fields of both design-and-construction and forensics. Only approximately 2% of architects receive this honor. He is a certified Construction Document Technologist (CDT), following a written examination and demonstrating "the required experience, knowledge and ability in the preparation and evaluation of construction documents as prescribed by the Construction Specification Institute." He is also a Certified Construction Contract Administrator (CCCA), following a written examination and demonstrating "the required experience, knowledge and ability in the preparation and evaluation of construction contracts and the Administration of construction projects as prescribed by the Construction Specification Institute." He is a Registered Post Disaster Safety Assessment Program Evaluator Trainer in the state of California, responsible for training architects who evaluate affected buildings in the wake of natural disasters such as earthquakes. A complete copy of Mr. Vlahos's current curriculum vitae is located at **Exhibit D5509.**

Mr. Vlahos's background, experience, and training include all phases of architectural design practice, including programming, preconstruction, development of design documents, and contract administration for AIA design/construction documents, including architectural design and construction administration, conceptual design drawings, observations by design professionals, issuance and processing of submittals, shop drawings, requests for information ("RFIs"), construction change directives ("CCDs"), and bulletins to design drawings and specifications. Mr. Vlahos has been accredited by the National Council of Architectural Registration Board (NCARB) since 1986, which permits him to become licensed in any jurisdiction in the United States. He is currently licensed to practice in eleven states: Wyoming, California, Hawaii, Utah, Nevada, Florida, Alabama, Texas, Colorado, Georgia, and North Dakota. In his career as a design architect, he has been responsible for over 18 million square feet of architectural projects in all project phases, including design, project management, construction administration services, and quality document review and peer review for a wide range of building projects, including hospitality, condominiums, high-end residential, single- and multi-family homes, state and federal correctional facilities, hospitals, laboratories, commercial, sports, and educational, at an approximate construction value of over $26 billion. He remains active in the design and construction profession today, having most recently submitted architectural drawings for permitting in 2025, which are currently being used for construction. Mr. Vlahos has also served as a forensic architect since 1999. He has performed forensic evaluations of projects including hospitality, residential, hospitals, commercial, correctional, and educational, and has engaged in peer review of dozens of construction projects.

A full list of the projects on which Mr. Vlahos has provided professional services is found on his curriculum vitae, **Exhibit D5509**. During his career, he has testified at trial or arbitration in twenty cases since 2012. He has been qualified as an expert witness in the areas of architecture, contract administration and the quality of design services provided by other design professionals. A full list of his experience as a testifying witness over the past ten years is located at **Exhibit D5509**.

## SUMMARY OF OPINIONS

Mr. Vlahos is offered to testify in this case as an expert witness under Fed. R. Evid. 702, regarding his professional opinions on the contractual duties of the Project's Architect, as the Owner's contractor and design consultant for the purposes of satisfying the Owner's obligations to Layton, the Contractor, to provide complete, coordinated, and constructible Construction Documents for the Project. His testimony will focus on Cody Lane Development Corp.'s ("Cody Lane"), the Owner of the Hoback Club project (the "Project"), engagement of Arcadis, A California Partnership f/k/a IBI Group, A California Partnership ("Arcadis"), the Project Architect, to satisfy the Owner's contractual obligations, beginning with Cody Lane's duty to provide Layton with a reasonably complete, coordinated, and constructible set of construction documents, in a timely manner. Cody Lane and Arcadis were also contractually obligated to timely update and supplement Construction Documents they issued so as to allow Layton to progress and complete the construction of the Project in accordance with the schedule referenced in the A133 Contract, as amended by Amendments 1-4. Mr. Vlahos will opine that Cody Lane, relying on Arcadis as the Project Architect, further failed to timely update and coordinate the Construction Documents and correct the myriad design errors and omissions contained therein. Cody Lane failed to satisfy this contractual obligation despite the endless cascade of revisions throughout the course of the Project.

He will also opine that Arcadis, as a contracted consultant of Cody Lane, and Cody Lane failed to meet their respective contractual duties to timely and efficiently evaluate, process, and respond to Layton's RFIs, he will opine that Cody Lane's and Arcadis's failures on these fronts were responsible for many delays and other issues which occurred on the Project and negatively affected Layton's ability to complete the Project timely and within the Guaranteed Maximum Price.

A copy of Mr. Vlahos' Expert Report, dated August 15, 2025 (the "Vlahos Report"), may be found as **Exhibit D5507**. A copy of Mr. Vlahos's Rebuttal Expert Report, dated September 26, 2025 (the "Vlahos Rebuttal"), is attached hereto as **Exhibit D5508**. He will testify consistent with those Reports and his deposition of December 12, 2025.

## AFFIRMATIVE OPINIONS AND FACTUAL BASIS

### A. Cody Lane Had a Contractual Obligation to Provide Adequate Construction Documents.

As referenced in Section 1.2.1 of the A201, Cody Lane and Arcadis entered into a contract on the Project on or about October 1, 2019, using a modified AIA B101-2017 form (the "Arcadis Contract") (**Exhibit J0001**). The Arcadis Contract was amended once, on January 31, 2024, following Arcadis's acquisition in whole of IBI Group, Arcadis's predecessor in interest under the Arcadis Contract, and updated Exhibit E to the Arcadis Contract to reflect Arcadis replacing BNA, the prior electrical engineering and commissioning consultant with its own in-house staff. **Exhibit J0012**. The remainder of the Arcadis Contract was unchanged by this amendment.

- Section 2.2 of the Arcadis Contract states:

  The Architect shall perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.

- Section 2.10 of the Arcadis Contract states:

> Review or approval by Owner, Contractor, their respective agents or others, of Architect's Instruments of Service, design services or contract administration services. . . shall not relieve Architect of its sole liability for any damages resulting from or arising out of defects or deficiencies in the Architects services or the Instruments of Service[.]

At the outset of the Project, on September 10, 2019, Marty Breen, as the Owner's Representative, stated in an email to Arcadis's principals on the Project that, with respect to the Construction Documents for the Project, Arcadis's role was to:

> a. Mak[e] the design permittable, construct-able, and contractable.
> b. Fully develop construction details for all elements of the project.
> c. Fully develop project specifications for all elements of the project.

**Exhibit D4021**.

Mr. Breen was the principal representative on the Project for DDRM Jackson LLC ("DDRM"), which at all relevant times served as the Development Manager for Cody Lane on the Project. DDRM's duties as Development Manager were determined by a Development Agreement between Cody Lane and DDRM, which was executed on or about May 4, 2021 (the "Development Agreement"). A copy of the Development Agreement may be found at **Exhibit J0003**. Under the Development Agreement, DDRM is responsible for:

- Generally oversee[ing] and manag[ing] the overall development of the Project, including selection of all consultants (without limitation, all design consultants and the Contractor), and management of the design, permit, construction and operational pre-opening of the Project[.]

**Exhibit J0003** at ¶ H. The Development Agreement reiterates and further details DDRM's duties on the Project with more specificity:

- Owner hereby engages Development Manager… for the purpose of managing, arranging, supervising and coordinating, at Owner's expense and subject to the approval of Owner, in Owner's sole and absolute discretion… the planning, design, construction and completion of the Project.

***Id.*** at ¶ 3.3. Under the Development Agreement, Mr. Breen was defined as a "Key Person," and with respect to Key Persons, the Development Agreement states:

- The performance of Development Manager's obligations hereunder shall be managed and coordinated, in all material respects, by the Key Persons and such Key Persons shall devote as much of their professional time as is required to fulfilling such role.

***Id.*** Mr. Breen testified at his deposition that he was the senior representative of DDRM on the Project and agreed that he was responsible for DDRM's duties as required by the Development Agreement, aside from selecting Project contributors who had been engaged prior to his arrival on the Project.

Layton and Cody Lane entered into a contract for construction of the Project on or about May 28, 2021 (the "A133 Contract"). The A133 Contract was a modified AIA A133-2009, Standard Form of Agreement Between Owner and Construction Manager as Constructor (the "A133") (**Exhibit J0004**), and included a modified AIA A201-2017, General Conditions of the Contract for Construction (the "A201") (**Exhibit J0005**). There were four amendments to the A133 Contract, consisting of: Amendment 1, on or about May 28, 2021 (**Exhibit J0006**); Amendment 2, on or about September 7, 2021 (**Exhibit J0008**); Amendment 3, on or about September 25, 2022 (**Exhibit J0010**); and Amendment 4, on or about April 14, 2023 (**Exhibit J0011**).

On the Project, Layton did not perform any construction work with its own personnel. As the Construction Manager, pursuant to the A133 Contract, Layton was responsible for administering the Work via procurements and written contracts with various Subcontractors. A133, § 2.3.2.1. Layton's duties as Construction Manager included: scheduling and conducting meetings regarding procedures, progress, coordination, scheduling, and status of the Work (A133, § 2.3.2.5); preparing and submitting construction and submittal schedules (A133, § 2.3.2.6); submitting monthly written progress reports to the Owner and Architect, along with a daily log for the Project

(A133, § 2.3.2.7); and developing cost control procedures and cost reports for the Owner and Architect (A133, § 2.3.2.8). Under the A133 Contract, Layton's duties did not include design services.

- Section 3.12.10 of the A201 states:

> The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work. To the extent the Owner requires any incidental services, construction consulting, or value engineering, the Owner acknowledges that such services are advisory and not professional design services. The Owner will, with due diligence, refer such questions, matters, and inquiries to the design professional. The Contractor shall not be required to provide professional services in violation of applicable law.

- Section 2.3.4 of the A201 states:

> The Contractor shall be entitled to reasonably rely on the accuracy of information furnished by the Owner, Architect, and the Owner's Development Manager. . . .

- Section 2.1.9 of the A133 states:

> The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities[.]

- Section 3.2.2 of the A201 states:

> [T]he Contractor does not thereby assume responsibility for any errors, inconsistencies, or omissions in the Contract Documents except for its failure to disclose the same it discovers or are made known to it as required by this section.

- Section 3.2.2 of the A201 also states:

> It is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional, unless otherwise specifically provided in the Contract Documents.

- Section 3.2.3 of the A201 states:

> [T]he Contractor shall promptly report to the Architect any nonconformity discovered by or made known to the Contractor as a request for information in such form as the Architect may require.

- Section 3.2.4 of the A201 states that, if the Contractor performs its obligations set forth in Sections 3.2.2 and 3.2.3 of the A201:

  > [T]he Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents[.]

- Section 1.2.1 of the A201 states:

  > The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

- Section 2.2.8 of the A133 states:

  > The Owner shall authorize the Architect to provide the revisions to the Drawings and Specifications to incorporate the agreed upon assumptions and clarifications contained in the Guaranteed Maximum Price Amendment. The Owner shall promptly furnish those revised Drawings and Specifications to the Construction Manager as they are revised.

- Section 3.3 of the A133 states:

  > The Owner shall retain an Architect to provide services, duties and responsibilities as described in AIA Document B101 Standard Form of Agreement Between Owner and Architect. Section 2.3.2 of the A201 and Section 3.3 of the A133 require the Owner to retain an Architect lawfully licensed to practice architecture in Wyoming.

- Section 2.3.5 of the A201 states:

  > The Owner shall furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Contractor's performance of the Work with reasonable promptness after receiving the Contractor's written request for such information and services.

- Section 2.2.2 of the A133 states:

  > To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Construction Manager shall provide in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of

> materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

It is Mr. Vlahos's opinion that, throughout the Project, Cody Lane abused the "reasonably inferable" standard repeatedly. In the construction industry, "reasonably inferable" refers to design elements which may be deduced based on the logical requirements to complete based on the existing Contract Documents.

An example of designs and changes which were not reasonably inferable on the Project can be found in the designs for interior walls and partitions. Arcadis issued Addendum 12 to the Construction Documents on April 9, 2021, which included drawings and specifications for individual units throughout the Project. This Addendum was intended to address conflicts in interior walls and partitions throughout the structure for elements including plumbing, electrical, and mechanical, and modified the 95% Construction Documents in an attempt to resolve these issues. On May 12, 2022, Arcadis issued Addendum 25, which was intended to supersede Addendum 12. Addendum 25 included significant revisions to designs for partitions and walls, including materials, specifications, and dimensions, throughout the Project. The drawings in Addendum 25 caused further conflicts among the plumbing, electrical, and mechanical elements within the walls, despite Arcadis's knowledge of the existing issues prior to the issuance of Addendum 12. Many of these issues remained outstanding at the time of Layton's termination. Other examples of design issues which were not reasonably inferable are duct penetrations, which originated in RFI 815, which was first submitted on August 24, 2022 and was not resolved until RFI 815R4, submitted on February 16, 2023 (**Exhibits D5502-0854--0858**); and framing for elevators and the elevator shafts, which first saw the relevant drawings revised in Addendum 1, issued January 8, 2021, and was not resolved until RFI 907R5, submitted on October 4, 2022 (**Exhibits D5502-0960—0965**).

It is Mr. Vlahos's expert opinion, based on his experience with the construction industry, design professional services, construction documents and the respective duties of owners, architects, and contractors, that the Arcadis Contract required Arcadis to produce Construction Documents for Cody Lane "consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances." Arcadis Contract, § 2.2; *see also* Vlahos Report at p 10; Vlahos Rebuttal at pp. 10, 29. The A133 then required Cody Lane to provide Layton with Construction Documents that were reasonably complete, coordinated, and constructible. Under § 1.2.1 of the A201, this "include[d] all items necessary for the proper execution and completion of the Work by the Contractor." *see also* Vlahos Report at pp. 16, 27; Vlahos Rebuttal at p. 29. Therefore, for Cody Lane to meet its contractual obligations to Layton, it engaged and relied upon Arcadis to meet Arcadis' contractual obligations to Cody Lane with respect to the design. *See* Vlahos Report at p. 10, Vlahos Rebuttal at p. 29. When Arcadis failed to produce Construction Documents that were complete, coordinated, and constructible, then those Construction Documents were insufficient to satisfy Cody Lane's contractual obligation to provide adequate Contract Documents to Layton. *Id.* Any ordered change in the Work, which was inconsistent with the Contract Documents and resulted in an increase to the GMP or Contract Time, was required by the A133 to be documented as a Change Order or Construction Change Directive. Vlahos Report at p. 21.

### B. The Construction Documents Were Not Reasonably Complete, Coordinated, and Constructible.

On or about December 28, 2020, Arcadis issued a so-called "95% Set" of Construction Documents to Layton. **<u>Exhibits J0590—J0595</u>**. By this time, Arcadis had expended 454 calendar days preparing the 95% Construction Documents. Following issuance of the 95% Construction Documents, as Cody Lane's authorized representative, DDRM engaged JAWA Design, a third-

party architecture firm, to perform a design peer review on the purported 95% Construction Documents. Upon completion of its review, JAWA Design concluded that "the average completion of the entire package is approximately 75%" (**Exhibit D4072**)—not 95%—and noted that, "[O]verall the level of inter-disciplinary coordination and completeness of the documents were deemed to be very lacking" (**Exhibit D4073**).

Amendment 1 to the A133 Contract incorporated the "95% Construction Documents," along with Addenda 1—7 and 13, which were developed between January 1, 2021 and April 28, 2021. Exhibit E ("Conditions and Clarifications") to Amendment 1 identified various incomplete design elements. Significant examples of incomplete design elements at that time include but are not limited to: missing and discontinued equipment (such as doors, roofing gutters and downspouts, interior hardware, glass panels, flooring, fireplace, appliances, elevators, HVAC units, drains and ductwork, and electrical panels and controls), performance standards, warranty requirements, fire suppression system, plumbing fixtures, missing drawing details, acoustic standards, heat tracer drawings, mechanical ductwork drawings, plumbing system drawings, snowmelt zone drawings, electrical emergency power drawings, CCTV drawings, and fire alarm conduit drawings. **Exhibit J0006**. Exhibit H ("Allowances in GMP") to Amendment 1 established "allowances" for the missing, incomplete, and uncoordinated design information, including but not limited to structural steel, architectural metals, ornamental metals, architectural woodwork, roofing, doors, frames & hardware, glass & glazing, framing & drywall, saunas & steam rooms, elevators, mechanical, electrical, earthwork, shoring, landscaping, and other miscellaneous items. **Exhibit J0006**.

On September 29, 2021, Arcadis issued a set of Construction Documents to DDRM, which were represented to be a "complete Construction Set that includes all revisions issued through

Addenda #1 – Addenda #21, RFIs #001 - #200 and ASI #002 - #005 since the December 28, 2020 95% CD set." **Exhibit J0613**. In the course of developing these Construction Documents, Arcadis and its design consultants internally referred to them as "100% Construction Documents." DDRM's employee, Ting Yek, also represented these Construction Documents to be a "100% Set," and the Project's schedule, as developed during the design phase of the Project by DDRM, anticipated the document set released after the 95% Construction Set would be a 100% Set for Construction. Some of the sheets within this Construction Set represented the documents as "100% Construction Documents" as well. *See* **Exhibits J0607—J0612.**

DDRM issued this "Complete Construction Set" to Layton on October 19, 2021, through CCD 009/Addendum 22. **Exhibit J0613**. These Construction Documents were commonly referred to as "Conformance Set #1" by personnel on the Project.

On November 11, 2022, Arcadis issued ASI 218/CCD 263, purporting to be an updated "Conformance Set #2," to DDRM for review and issuance to Layton. Despite the fact that this full set of conformance documents were prepared by Arcadis and issued to DDRM, DDRM never issued Conformance Set #2 to Layton.

Amendment 2, dated September 7, 2021, set the Project's baseline schedule which correlates to the Amendment 1 drawings issued on May 28, 2020. **Exhibit J0008.** By creating the baseline schedule, Layton had the right to rely on the drawings as being complete without expecting major additional changes.

On May 16, 2022, IBI issued Addendum 25, which contained modifications to Conformance Set #1 and superseded Addendum 12. **Exhibit D5496-021.** Addendum 25 made further design modifications to wall types and details throughout the Project. Modifications to wall types included improved sound transmission resistance and thickness of wall assemblies. These

design changes rippled through construction on all floors. This had a significant impact on the progress of Work being performed by Layton and the Subcontractors.

Amendment 3 to the Contract adjusted the GMP to reflect changes to the Project to that point and was executed on October 25, 2022. **Exhibit J0010**. Amendment 3 was based on the original 95% Set of Construction Documents, along with Conformance Set #1.

Amendment 4 to the A133 Contract re-baselined the Project schedule based on the existing Construction Documents at that time. A full demonstrative timeline of the design process, the A133 Contract, and amendments to each throughout Layton's tenure on the Project is located at **Exhibit D5527**. Between April 14, 2023, the effective date of Amendment 4, and March 11, 2024, the date of Layton's termination from the Project, Layton submitted over 1,200 additional RFIs, which resulted in Arcadis issuing an additional 488 CCDs. **Exhibit D5546**. From June 2023 through September 2023, Arcadis issued over 50 CCDs each month. At times, Arcadis released design changes to Layton the day before the work described in those Construction Documents was scheduled to be performed.

On June 6, 2023, Arcadis issued so-called "Conformance Set #3" to DDRM for QA/QC review, prior to issuance to Layton. On August 16, 2023, DDRM issued Conformance Set #3 to Layton as CCD 601/Addendum 26. **Exhibit D4613**. On August 31, 2023, Layton sent a letter to Cody Lane, which noted the following deficiencies in Conformance Set #3 following Layton's initial review:

- Missing, previously-included Contract Documents:
    - 3 Architectural Sheets
    - 10 Architectural Sketches
    - 7 Civil Sheets
    - 4 Electrical Sheets
    - 23 Food Service Sheets
    - Up to 4 Landscape Sheets
    - 42 Lighting Sheets

- 2 Mechanical Sheets
- 22 Signage Sheets
- 41 Spa & Pool Sheets
- 4 Trash Management Sheets
- 8 Vertical Transportation Sheets
- 68 Other Signage Sheets

- Included Contract Documents not yet issued as changes to Layton:
  - 8 new Architectural Sheets
  - 2 new ASKs (sketches)
  - 1 new Electrical Sheet
  - 2 new Plumbing Sheets
  - 1 new Structural Sheet
  - 11 new Interior Design Sheets

- Issued CCDs not included:
  - 128 CCDs issued since July 6, 2023, the last-referenced CCD in Conformance Set #4, including 38 CCDs issued between August 16, 2023 and August 31, 2023.

**Exhibit J0018**. Given these issues, Layton advised DDRM that it must direct Layton in writing to use Conformance Set #3 if it wanted Layton to do so, because the documents were incomplete, uncoordinated, and had significant conflicts. *Id*. Following receipt of Layton's August 31, 2023 letter, DDRM failed to respond to Layton's request for direction. Additionally, DDRM requested that Arcadis respond to Layton's letter. However, despite numerous requests from DDRM for such a response, Arcadis did not respond to Layton's August 31, 2023 letter prior to Layton's termination. Ultimately, neither DDRM nor Arcadis responded to Layton's request for direction regarding Conformance Set #3. By November 1, 2024, DDRM had voided Conformance Set #3, and was still relying on the so-called "100% Construction Set," Conformance Set #1, from September 2021. **Exhibit D5386**.

Overall, during Layton's tenure on the Project, 922 CCDs, 845 ASIs, 1,450 PCOs, and 3,150 RFIs were issued and/or submitted, including over 460 individual CCDs between the issuance of the 95% set of Construction Documents on December 28, 2020 and Layton's

termination. **Exhibit D5546**. Between the execution of the A133 Contract, on May 28, 2021, and Layton's termination from the Project on March 11, 2024, Layton issued 2,400 RFIs. ***Id***. Cody Lane and Arcadis regularly used ASIs and responses to RFIs as a means to provide significant design revisions throughout construction which changed the Work and increased the GMP price and/or the Contract Time.

On various occasions from September 2022 through Layton's termination from the Project, Cody Lane and DDRM criticized Arcadis for the quality of and deficiencies in the Construction Documents. During this period, they plainly stated that Arcadis's errors and omissions were negatively impacting the Project and causing delays. They made multiple threats to Arcadis that Cody Lane would assert claims under Arcadis's errors and omissions insurance policy, and on at least two occasions, DDRM wrote letters to Arcadis demanding that Arcadis put its insurance carrier on notice. For example, on April 25, 2023, DDRM alleged that "various concerns about the design documents have arisen, which have the potential to result in cost and/or time impacts to the project, and consequently to the Owner." **[Exhibit D5495**].

After Layton's termination from the Project, its replacement as Construction Manager, SMC, took assignment of the majority of Layton's subcontracts relating to the Project. Arcadis continued as the Project Architect, and DDRM remained Cody Lane's Development Manager, with Mr. Breen continuing to serve as DDRM's primary representative on the Project until early 2025. On February 29, 2024, immediately prior to Layton's termination, SMC submitted documentation to a third-party site inspector, Capital Consultants Inc., who determined based on SMC's submission that the Project was 81% complete at that time. **Exhibit P0018**.

Following Layton's termination, SMC immediately recognized and complained to Cody Lane that the same Construction Documents which Cody Lane had previously provided to Layton

had numerous deficiencies, including CCDs which had not been included. The incomplete, uncoordinated, and non-constructible design documents did not allow SMC the ability to complete the Project within the anticipated schedule, as Pete Smith, a principal for SMC, testified in his deposition. SMC eventually hired its own architect, Geroux Architects, to produce a new set of conformed Construction Documents which actually included all design changes.

It is Mr. Vlahos's expert opinion, based on these facts and his professional experience as a practicing architect on a multitude of construction projects over the past nearly five decades, that the Contract Documents which Cody Lane provided to Layton to construct the Project were incomplete, uncoordinated, ambiguous, and contained unreasonable errors and omissions, despite being represented as complete and constructible. Vlahos Report at pp. 10, 11, 14, 16—19; Vlahos Rebuttal at pp. 10, 14, 29. Arcadis repeatedly failed to provide all missing and required information necessary, including coordination of all newly designed solutions to deficiencies previously identified by Layton. *Id.*

Given the amount of time Arcadis spent developing the 95% Construction Documents, it was reasonable for Layton to expect the 95% Construction Documents to be sufficiently complete for bidding the Project and submission to plan check. Vlahos Report at p. 5. Taking the 95% Construction Documents and the Conformance Set #1 together, Layton had the right to rely on representations by DDRM and Arcadis that the Conformance Set #1 was complete, fully coordinated, absent ambiguities, and constructible, with only a reasonable number of errors and omissions. Of the 200 RFIs incorporated into Conformance Set #1, 17 RFIs (16, 18, 25, 49, 60, 63, 64, 114, 137, 145, 151, 164, 165, 172, 177, 179, and 198) required the issuance of a total of 76 revised construction drawings to respond to existing design deficiencies prior to Conformance Set #1's issuance to Layton. It was reasonable for Layton to have expected Arcadis to have resolved

and included all Amendment 1 Exhibit E qualifications in this set of documents. Layton could not have reasonably anticipated or foreseen the major additional changes that occurred after the issuance of Conformance Set #1 through to the end of the Project. Vlahos Report at p. 6.

The number of CCDs, ASIs, PCOs, and RFIs submitted on the Project are evidence of the lack of complete, coordinated, and constructible drawings which Cody Lane was required to provide. Vlahos Report at p. 23. The above-referenced conflicts and issues with the interior walls and partitions, ductwork penetrations, and elevator framing, which took in excess of four months and multiple resubmissions of RFIs and submittals to resolve, are further examples of the ongoing lack of completion, coordination, and constructability of the Construction Documents. Another example of the extensive ongoing design modifications which impacted Layton's ability to complete the Project involved Units #205 and #206, which saw between 30-50 CCDs during Layton's tenure on the Project. These changes impacted the Project due to out-of-sequence work with partial completion already achieved due to the issuance of changes through CCDs, a lack of original design coordination, and buyer modifications, all of which impacted entries, ceiling heights, wall framing locations, lighting and electrical coordination revisions, millwork, equipment layouts, HVAC duct configurations, light fixtures, bathrooms, code requirements, appliances, doors and frames, wine storage, acoustical insulation, kitchen island, and soffits. Some of these design changes were issued after work had been completed, which required Layton to remove and replace completed work. The full list of revisions for each of these units is as follows:

- Unit #205: CCDs 663, 503, 508, 525, 422, 417, 443, 436, 438, 171, 261, 273, 565, 596, 617, 714, 745, 766, 136, 136R1, 212, and 205; along with IDs 623.2, 623.5, 623.6, 623.4, P623, E225, M523, A819, and A841.
- Unit #206: CCDs 513, 494, 403, 206, 207, 243, 607, 615, 618, 633, 711, 797, 830, 831, 874, 876, 233, 476, and 233; along with M524, E326, E226.SW, P524, IDs 624.1-624.7, 824.2-824.6, A844, and A820.

As a result of mismanagement of Arcadis, the design process, and unit buyer modifications by Cody Lane's designated Owner Representative DDRM, Cody Lane breached the Contract by adding additional deficiencies and inefficiencies to the Contract Documents and disrupted Layton and its subcontractors from completing the Project as contracted. Vlahos Report at p. 11.

Cody Lane was on notice and fully aware of the deficiencies in the Construction Documents it had provided to Layton as early as early 2021 and continued to be fully aware of the continuing deficiencies in the Construction Documents through the remainder of Layton's tenure on the Project. However, instead of addressing these issues in a timely and effective manner, it sought to shift blame for the inadequacy of the Construction Documents to Layton. *See*, *e.g.*, Vlahos Report at p. 15. Ample evidence exists that DDRM was aware of the significant deficiencies in Arcadis's work product, dating back to the JAWA review of the 95% Construction Documents in early 2021. On September 19, 2022, DDRM issued a letter to Arcadis providing notice of a Notice of Potential Claim submitted by Layton. **Exhibit D5496**. After September of 2022, DDRM sent numerous additional letters to Arcadis regarding Arcadis's errors and omissions relating to the Contract Documents. However, the deficiencies were never sufficiently addressed during Layton's tenure on the Project.

Amendment 4 was intended to re-baseline the construction schedule based on the Construction Documents as they existed at that time. For Amendment 4 to be effective and achieve its intended purpose, as of Amendment 4's date of execution, the existing Construction Documents had to be sufficiently complete in order for the re-baselining to be effective. After Amendment 4's execution, the Contract Documents continued to be deficient and not reasonably complete, coordinated, nor constructible. From April 14, 2023, Amendment 4's effective date, through Layton's termination on March 11, 2024, Layton was required to submit over 1,200 additional

RFIs. This is evidence of the ongoing deficiencies in the Construction Documents after Amendment 4. In response to the deficiencies identified in these RFIs, Arcadis provided 488 additional CCDs, which caused the Project design to continually change, up to and past Layton's termination from the Project, leading to delays and price overruns beyond those contemplated in Amendment 4. Conformance Set #3, and Layton's August 31, 2023 letter responding to Conformance Set #3, encapsulate these ongoing issues perfectly: even Arcadis and Cody Lane's attempts to fix the deficient Construction Documents were themselves demonstrably incomplete, inaccurate, and not fit for Layton's use to construct the Project. The level of missing and incomplete information in Conformance Set #3, like in the previous Construction Documents Cody Lane issued to Layton, is a material failure by Cody Lane to meet the terms of the Contract, as Cody Lane once again failed to provide complete, coordinated, and constructible Contract Documents.

Exacerbating these issues, Cody Lane further breached the A133 Contract by ordering changes in the Work which increased either the GMP or Contract Time via ASIs and other documents, rather than the Change Orders which the A133 Contract required in those cases. Vlahos Report at p. 21. Cody Lane also failed to adequately mark and conform design changes in revised drawings it issued consistent with industry standards, including failing to clearly identify revisions via cloud identification markings or narrative descriptions. Vlahos Report at p. 10. These acts and omissions by Cody Lane, like the deficient Contract Documents, not only created construction challenges, but also made it difficult for both Layton and its subcontractors to be able to track the numerous design revisions and made it impossible for Layton to complete the Project within the Contract's construction schedule or price. These issues were further magnified by Cody Lane's poor management of Arcadis and its design consultants. For example, BNA, the Project's original

electrical engineer of record, issued numerous revisions to its original design drawings prior to its departure from the Project in November 2023. After Arcadis replaced BNA, the entire set of Construction Documents relating to the Project's electrical systems were re-issued, which only added to the existing confusion and inefficiencies imposed by Cody Lane and DDRM's poor management of the Project's design team.

### C. Cody Lane Breached its Contractual Duty to Provide Accurate and Timely Payments.

The A133 Contract has clear, unambiguous provisions for submission and processing of Applications for Payment and tendering of payments to Layton.

Section 9.3.1.1 of the A201 states:

- As provided in Section 7.3.9, such applications [for payment] may include requests for payment on account of changes in the Work that have been properly authorized by Construction Change Directives, or by interim written determinations of the Owner, but not yet included in Change Orders.

Section 7.3.9 of the A201 states:

- Pending final determination of the total cost of a Construction Change Directive to the Owner, the Contractor may request payment for Work completed under the Construction Change Directive in Applications for Payment. The Architect will make an interim determination for purposes of monthly certification for payment for those costs and certify for payment the amount that the Architect determines, in the Architect's professional judgment, to be reasonably justified. The Architect's interim determination of cost shall adjust the Guaranteed Maximum Price on the same basis as a Change Order, subject to the right of either party to disagree and assert a Claim in accordance with Article 15 [of the General Conditions].

Section 7.1.3 of the A133 states:

- Provided that an Application for Payment is received by the Architect not later than the twenty-fifth day of a month, the Owner shall make payment of the certified amount to the Construction Manager not later than the twenty-fifth day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than (30) days after the Architect receives the Application for Payment.

DDRM repeatedly rejected Layton's Applications for Payment on the Project, requiring Layton to make significant modifications to the Application for Payment in question and receive payments later. DDRM's bases for rejection of Applications for Payment included rejection of the Application for Payment format, rejection of billing for material deposits or stored materials, rejections of payment for work not yet included in Change Orders, and labeling billed-for work as non-conforming, despite that work being in progress and not yet ready for an inspection. Cody Lane also failed to timely pay Layton the amounts due and owing, in part or in full, following Arcadis's certification of Applications for Payment, repeatedly from June 2023 through early 2024. **Exhibits D4976, D4997**.

When Layton submitted Proposed Change Orders for work it had partially or fully completed that had not yet been included in Change Orders, Cody Lane repeatedly failed to provide timely approvals or rejections, which directly impacted Layton's ability to progress the Work. Cody Lane also made further modifications to PCOs after it and Layton had reached agreements on them, and they had been signed and submitted to DDRM for processing. Cody Lane also relied upon observation reports of work-in-progress to deny work submitted via PCOs as non-conforming.

It is Mr. Vlahos's expert opinion that Cody Lane's rejections of Layton's Applications for Payment and repeated failures to timely tender payments to Layton breached Cody Lane's contractual duties under the A133 Contract. Vlahos Report at p. 25. While not all payment applications were submitted by the 25th of each month, this was no fault of Layton, as Cody Lane was imposing new requirements. *Id.* Despite the unambiguous provisions of the A133 Contract, including A201 § 7.3.9, Cody Lane refused to make payments to Layton for work-in-progress it directed Layton to perform via CCDs and had not yet included in a Change Order. *Id.* Moreover,

the reasons which Cody Lane gave for rejection of Applications for Payment did not meet industry standards—observation reports are used in the construction industry to identify Work which is in progress and identify Work which may require correction or adjustment as the Work is progressing. *Id.* Even though observation reports provided by Arcadis on the Project were labeled “Work in Progress,” Cody Lane used these reports as a pretext to deny payment to Layton for this Work, even while Layton was continuing to perform and complete it. *Id*. These failures by Cody Lane breached the Contract and caused repeated, ongoing delays to Layton’s ability to progress the Work.

## REBUTTAL OPINIONS AND FACTUAL BASIS

### 1. Layton Coordinated with the Architect During Preconstruction and with RFIs

The contentions of Cody Lane that Layton failed to effectively collaborate with Arcadis and that Layton’s RFIs were “reactive” are not accurate. During preconstruction, Layton performed Design Development and Construction Document Estimates, which resulted in the first round of GMP RFIs, Addendum 2-7, along with exhibits "E" (“Conditions and Clarifications”) and "H" (Allowances”) to the Contract. Exhibits "E" and "H" were intended to be Addendum 8-19, which would be carried into construction. At the same time, Layton's construction team generated additional RFIs due to remaining deficiencies with the 95% set of Construction Documents issued by Arcadis. This is evidence of active interface with Arcadis to provide notice of design deficiencies, as required by the A133 Contract.

In compliance with the Section 3.12.l0 of the A201, Layton worked with the Owner and Arcadis in connection with Value Engineering, Constructability or Document Review. Cody Lane alleges Layton had failed to recognize their on-going design responsibilities during preconstruction coordination on the Project. This allegation is not only unsupported by Cody Lane but is false as

clearly defined by the Contract. Layton had no design responsibility relative to constructability reviews and cost analysis during the preconstruction coordination. Section 3.2.10 provides that:

> **The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work**. To the extent the Owner requires any incidental services, construction consulting, or value engineering, the **Owner acknowledges that such services are advisory and not professional design services**. The Owner will, with due diligence, refer such questions, matters, and inquiries to the design professional. The Contractor shall not be required to provide professional services in violation of applicable law. (emphasis added)

Throughout the course of preconstruction, Layton and Arcadis conducted team meetings resulting in the generation of 818 design deficient RFIs which required Arcadis's attention to resolve. Despite Arcadis having a collective list of RFI deficiencies, Arcadis failed to integrate them into Addenda 2-7 Construction Documents. As a result, Layton created attachments Exhibit "E" and "H" to address outstanding preconstruction tasks not addressed that required integration into the GMP Agreement. Layton was active; Arcadis failed to effectively respond.

Arcadis continued to develop additional missing information, which was released as Addenda 8-19. Following Layton's review of Addenda 8-19, Layton generated an additional 129 RFIs. This is yet another example of Layton's on-going efforts at key stages with Arcadis.

Layton continued to perform its duty in the capacity of a Contractor, in that when Conformance sets were issued, Layton performed a review and advised the Owner and Arcadis of problems observed. Layton generated RFIs relating to design deficiencies throughout the remainder of construction of the Project.

Cody Lane is attempting to improperly shift Arcadis's obligations onto Layton to excuse Arcadis's failure to provide a complete, coordinated, and constructable set of Construction Documents. Cody Lane fails to recognize Arcadis's contractual obligation to take appropriate

actions in addressing all RFIs generated to provide a complete set of coordinated Construction Documents. The allegation by Cody Lane that Layton failed to maintain an environment resulting in the issuance of reactive RFIs rather than early identification of deficiencies is simply false and unfounded.

**2. The Shop Drawing Submittal Process**

Cody Lane's allegation that Layton's mismanagement of the shop drawing submittal process was responsible for Project delays is unfounded. Cody Lane has failed to cite any substantive information regarding the alleged Layton failures. Instead, Cody Lane relied upon to citations from the A20l pertaining to compliance with approved shop drawings based on complete, approved Construction Documents, which Arcadis failed to provide at any point during construction.

Cody Lane fails to acknowledge Arcadis's numerous on-going project design changes resulted in incomplete and uncoordinated Construction Documents, which Layton was relying on to develop complete shop drawings. The deficient Construction Documents are the root cause of shop drawing delays, resubmissions, and misalignment with construction activities to the extent they existed.

The facts show that Arcadis used the shop drawings to make numerous design revisions to complete the Project design during construction. This does not meet the contractual requirements or the expectations of the parties and had a compounding effect. Constant design changes during the submittal process significantly impacted Layton's ability to prepare complete and timely shop drawings in a planned sequence. As a result, Layton was forced to submit and re-submit shop drawings repeatedly due to action designation "Revise and Resubmit" with notations indicating information to be submitted separately.

One specific example is the case of American Stone Company's shop drawing submittal 096340.02, which was submitted, revised and re-submitted as 096340.02F.R2. The initial documents were submitted on March 10, 2022. Arcadis made design revisions and returned partial comments back on January 4, 2024, twenty-two (22) months from submission. The remaining shop drawings which included enlarged wall and counter-top details were submitted by Layton on February 2, 2022. Further design revisions were returned by Arcadis on December 14, 2023, eleven (11) months later. Therefore, Layton was unable to make revisions and return the shop drawings as they were awaiting receipt of the future design revisions which impacted their ability to progress the Work. Shop drawing design revisions were finally issued by Arcadis as ASI 803.1 which included nine (9) interior design drawings and Finish Schedule - Section 09 06 00 on February 20, 2024. CCD 866 was issued on May 6, 2024, which identified ASI 803.1, approximately two (2) months after Layton was terminated.

Another example relates to electrical shop drawing submittals. The electrical shop drawing for the electrical panels was submitted, approved, and constructed. Shortly after, CCDs 792 through 792.3 were issued, adding additional Electrical Sub-panels to 23 of the 25 living units of the Project. This out of sequence design revision had a negative ripple effect on Project completion due to removal and replacement of plaster finish material, re-framing of walls, installation of new electrical sub-panels, conduit & wiring, and re-finishing areas within each living unit. The extent of this revision rippled through the shop drawing submittal process and had a significant effect on the sequence of construction.

Layton's ability to manage and review shop drawing submittals was impacted by Arcadis's untimely and uncoordinated delivery of complete Construction Documents. Cody Lane's allegations that submittals were provided out of sequence, incomplete, which impacted Arcadis's

ability to review shop drawing submittals timely is false and unfounded. It was Arcadis's own design changes and deficient performance that resulted in Project impacts.

**3. Volume of CCDs was Unreasonable.**

Mr. Vlahos agrees with Cody Lane's opinion that the volume of CCDs used on the Project was ***"well beyond what is reasonable*** **for a Project of this nature."** Cody Lane, however, fails to acknowledge the fact the Layton received various sets of Addendums and Conformance Sets over the course of construction despite containing a multitude of incomplete, uncoordinated, ambiguous document deficiencies, all of which were the result of an incomplete Project design.

Cody Lane has failed to provide any supporting documentation that substantiates its opinions. Cody Lane fails to recognize that the deficiencies in the Construction Documents resulted in the need to use CCDs. Cody Lane falsely alleges Layton was pressing the Owner to use CCDs on the Project to address Design changes. The following allegations contained in Cody Lane's expert reports regarding Layton's performance are false and lack any substantive foundation.

Cody Lane's expert opined:

> The CCD process is intended to be an exception, not a standard operating procedure used selectively to address urgent matters while preserving project momentum in the face of disagreement or incomplete information. Effective use requires disciplined documentation, timely decision-making, and prompt resolution of cost and time impacts. On this project, rather than pricing changes through the normal PCO process, Layton repeatedly pressed for the issuance of CCDs, resulting in nearly 1,000 CCDs during their tenure. This volume is well beyond what is reasonable for a project of this nature and reflects poor management and inadequate coordination of the change process resulting from design errors, omissions, or coordination that contributed to inefficiency and avoidable administrative burden.

The AIA A201 General Conditions for Construction identifies the method by which modifications issued after the execution of the Contract can be made. There are four (4) mechanisms that can be used: (1) changes by a written amendment to the Contract, (2) Change

Order, (3) CCD48 or (4) Minor change request by Arcadis. Rather than electing to proceed with changes in the design process through written amendments to the contract or the change order process, the Owner elected to use CCDs and ASIs, not Layton.

The AIA Document G714-2017 includes five (5) categories from which the Owner selected the proposed basis for adjustment to the GMP contract sum. The Owner violated industry standards for the use of the CCD procedure by including several issues on the same change directive, each with a different disposition. Each CCD included the Owner's selected method of pending change disposition for payment as identified by the AIA Document G714-2017. As a result, Layton objected to the use of the CCDs to track changes to the Project design for the purpose of establishing time and cost modifications to the GMP Contract.

Cody Lane abused this process. Despite having an approved CCD, the Owner refused to pay Layton for work under a CCD until it was fully complete, which is a further violation of the Contract and industry standards. Cody Lane failed to acknowledge the fundamental fact that ***only the Owner had the ability to issue CCDs.*** Layton had no contractual right to demand that a CCD be issued. Indeed, it is actually in the interest of Layton to have a Change Order before proceeding with change work. To force Layton's hand, however, it was the Owner who insisted on the use of CCDs to implement the change work. Cody Lane has failed to recognize Layton was managing the Project in compliance with the Contract and because of the Owner's refusal to pay resulted in Layton having to re-sequence on-going Work.

The sheer volume of CCDs generated relates directly to the Owner's refusal to utilize the usual and customary Change Order procedures. Cody Lane fails to acknowledge that it was insistent on maintaining construction progress but failed to process Change Orders in a timely

manner and, as a result, insisted on the use of CCDs to progress the Work in advance of an approved Change Order.